1
2
3
4

JOHN A. GIRARDI, State Bar No. 54917
2550 Via Tejon, Suite 3A
Palos Verdes Estates, CA 90274
Tel: 213.280.1978
John@JohnGirardiLaw.com
*Attorneys for Plaintiffs*

5
6
7

8
9
10

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17
18
19
20
21

| | |
|---|---|
| MARIA ANDRADE, ROSE ANDRADE, TERESA ANDRADE, and GLORIA ANDRADE, individually and as personal representatives and/or successors in interest to THE ESTATE OF DONDIEGO HERMILO ANDRADE,<br><br>        Plaintiffs,<br><br>  v.<br><br>STATION CASINOS, LLC., a limited liability company; SC SONOMA MANAGEMENT, LLC; a limited liability company; RED ROCK CASINOS, INC., a corporation; and DOES 1 through 20, inclusive,<br><br>        Defendants. | Case No. 3:20-CV-06495-LB<br><br>**DATE:   MARCH 18, 2021**<br>**TIME:     1:30 P.M.**<br>**CTRM:    5**<br><br><br>DECLARATION OF JOHN A. GIRARDI WITH EXHIBITS A - G, FILED IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS |

22
23
24

**DECLARATION OF JOHN A. GIRARDI**

25
26
27
28

    1.    I, John A. Girardi, am an attorney licensed to practice law in the State of California, State Bar No. 54917. I represent Plaintiffs, Maria Andrade, Rose Andrade, Teresa Andrade and Gloria Andrade, in the above-entitled matter Case No. 3:20-CV-06495-LB, pending before this Court. I declare the following

1

matters are within my personal knowledge and I could testify to them if called to do so in a court of law.

2.     I personally directed my law office staff to obtain the attached electronic versions of documents or pdfs, which are all matters of public record, as part of my due diligence and search for supporting information about the Defendants in this case.  Attached here as Exhibits A through G are true, correct and unedited/unadulterated copies of the electronic documents or pdfs, which my staff obtained at my request and direction from online public sources of records.

3.     Attached here as EXHIBIT A is the Graton Management Agreement dated September 8, 2010.

4.     Attached here as EXHIBIT B is the Amended and Restated Certificate of Incorporation of Red Rock Resorts, Inc.

5.     Attached here as EXHIBIT C is a list of the Directors of Red Rock Resorts, Inc.

6.     Attached here as EXHIBIT D is a United States S.E.C. Form 10-K "Annual Report" for fiscal year ending in Dec. 31, 2018 of Red Rock Resorts, Inc.

7.     Attached here as EXHIBIT E is the Chapter 11 Reorganization Plan "Organization and Background" of Station Casinos, LLC, dated "9 months ended Sept. 30, 2011."

8.     Attached here as EXHIBIT F is the State of California, Secretary of State, Limited Liability Company, Articles of Organization, of SC Sonoma Management, LLC, filed April 14, 2003.

9.     Attached here as EXHIBIT G is a Press Release dated April 10, 2010, in Las Vegas, about the Station Casinos, LLC Chapter 11, Comprehensive Reorganization and the "Opco Plan Support Agreement" between Fertitta Gaming LLC and the Opco Lenders.

I declare under penalty of perjury under the laws of the United States of America the foregoing is true and correct and that this declaration was executed on

2

this 28th day of February, 2021, in Los Angeles, California.

/S/ JOHN A. GIRARDI

_____

this 28th day of February, 2021, in Los Angeles, California.

/S/ JOHN A. GIRARDI

_____

DECLARATION OF JOHN A. GIRARDI, WITH EXHIBITS A – G,
FILED IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

# EXHIBIT A

EXECUTION COPY

GAMING MANAGEMENT AGREEMENT

BETWEEN

FEDERATED INDIANS OF GRATON RANCHERIA

A FEDERALLY RECOGNIZED INDIAN TRIBE

AND

SC SONOMA MANAGEMENT, LLC

A CALIFORNIA LIMITED LIABILITY COMPANY

Dated as of September 8, 2010

5106702

TABLE OF CONTENTS

RECITALS ............................................................................................................................. 1

AGREEMENT ...................................................................................................................... 2

ARTICLE 1 DEFINITIONS .................................................................................................. 2

ARTICLE 2 AUTHORITY AND DUTY OF MANAGER ........................................................ 15
    2.1     Appointment as Manager ...................................................................................... 15
    2.2     Limitations ........................................................................................................... 16
    2.3     Manager's Authority and Responsibility .............................................................. 16
    2.4     Compliance with Laws; Best Efforts to Obtain Necessary Approvals ................. 18
    2.5     Security ................................................................................................................ 19
    2.6     Accounting, Financial Records, and Audits ......................................................... 19
    2.7     Cash Monitoring; Policies and Procedures; Surveillance ..................................... 20
    2.8     Bank Accounts, Reserve Funds and Permitted Investments.................................. 21
    2.9     Enforcement of Rights .......................................................................................... 23
    2.10    Fire, Safety and Law Enforcement Services.......................................................... 23
    2.11    Timely Payment of Costs of Gaming Operations ................................................. 23
    2.12    Acquisition of Equipment ..................................................................................... 24
    2.13    Hours of Operation ............................................................................................... 24
    2.14    Access to Facility ................................................................................................. 24
    2.15    Advertising ........................................................................................................... 24
    2.16    Maintenance .......................................................................................................... 24
    2.17    Effective Date;Term.............................................................................................. 24
    2.18    Access to Property ................................................................................................ 25
    2.19    Creation and Operation of Business Board............................................................ 25
    2.20    Business Board Meetings ...................................................................................... 26
    2.21    Tribal Laws ........................................................................................................... 27
    2.22    Best Efforts; Covenant of Good Faith and Fair Dealing....................................... 27
    2.23    Compliance with Financing Agreements ............................................................... 28
    2.24    Affiliates ............................................................................................................... 28
    2.25    Tribal Licenses...................................................................................................... 28
    2.26    Taxes ..................................................................................................................... 28
    2.27    Enactment of Ordinances ...................................................................................... 29
    2.28    Standard of Care ................................................................................................... 29
    2.29    Management Exclusivity ....................................................................................... 30
    2.30    Amendment to Agreement ..................................................................................... 30

ARTICLE 3 EMPLOYMENT MATTERS; OTHER COVENANTS ......................................... 30
    3.1     Manager's Responsibilities for Employees ........................................................... 30
    3.2     Enterprise Employee Policies ............................................................................... 31
    3.3     Manager Employees.............................................................................................. 31
    3.4     Off-Site Manager Employees ............................................................................... 31
    3.5     No Manager Wages or Salaries............................................................................. 32

3.6   Costs of Gaming Commission ............................................................................. 32
3.7   Employee Background Investigations ................................................................. 32
3.8   Indian Preference, Recruiting and Training......................................................... 33
3.9   Discipline of Enterprise Employees..................................................................... 33
3.10  Conflict of Interest .............................................................................................. 34
3.11  Participation in Tribe Functions.......................................................................... 34
3.12  Alcoholic Beverages and Tobacco Sales ............................................................ 34
3.13  No Liens or Encumbrances .................................................................................. 34
3.14  Additional Tribal Covenants............................................................................... 35

ARTICLE 4 INSURANCE............................................................................................................. 38
4.1   Duty to Maintain ................................................................................................. 38
4.2   Payment of Deductibles ...................................................................................... 38
4.3   Evidence of Insurance......................................................................................... 38
4.4   Insurance Proceeds.............................................................................................. 38

ARTICLE 5 BUDGETS, COMPENSATION; REIMBURSEMENT........................................... 39
5.1   Pre-Opening Budget; Staffing Plan .................................................................... 39
5.2   Operating Capital................................................................................................ 40
5.3   Annual Business Plan, Annual Operating Budget and Annual Capital
      Budget................................................................................................................. 40
5.4   Adjustments to Annual Business Plan, Annual Operating Budget and
      Annual Capital Budget........................................................................................ 42
5.5   Capital Expenditures........................................................................................... 42
5.6   Capital Expenditure Account............................................................................... 43
5.7   Periodic Contributions to Capital Expenditure Account ..................................... 43
5.8   Use and Allocation of Capital Expenditure Account........................................... 43
5.9   Deposits............................................................................................................... 44
5.10  Minimum Guaranteed Monthly Payments; Security Interest .............................. 44
5.11  Daily and Monthly Statements............................................................................ 45
5.12  Distribution of Contract Net Revenues............................................................... 45
5.13  Annual Audit....................................................................................................... 47
5.14  Development and Construction Cost Recoupment .............................................. 47
5.15  Manager's Compensation Limit .......................................................................... 47
5.16  Payments Not Management Fees......................................................................... 47

ARTICLE 6 TERMINATION......................................................................................................... 48
6.1   Termination for Material Breach......................................................................... 48
6.2   Mutual Consent................................................................................................... 49
6.3   Involuntary Termination Due to Changes in Law ............................................... 49
6.4   Other Rights Upon Material Breach; Ownership of Assets; Repayment of
      Obligations on Expiration or Termination........................................................... 50
6.5   Notice of Termination......................................................................................... 52
6.6   Cessation of Commercial Activities at the Facility ............................................. 52
6.7   Cumulative Remedies ......................................................................................... 53

ARTICLE 7 INDEMNIFICATION OF MANAGER ............................................................... 54

ARTICLE 8 PARTIES IN INTEREST ................................................................................. 54
8.1     Payment of Fees; Background Investigations ...................................................... 54
8.2     Removal; Divestiture .......................................................................................... 55

ARTICLE 9 MISCELLANEOUS ....................................................................................... 55
9.1     Assignment and Subcontractors.......................................................................... 55
9.2     Notices ................................................................................................................ 56
9.3     Amendments ........................................................................................................ 57
9.4     Counterparts ........................................................................................................ 57
9.5     Force Majeure ..................................................................................................... 57
9.6     Time is Material .................................................................................................. 57
9.7     Further Assurances.............................................................................................. 58
9.8     Severability ......................................................................................................... 58
9.9     Waiver of Sovereign Immunity .......................................................................... 58
9.10    Representations and Warranties of Manager ...................................................... 60
9.11    Representations and Warranties of Tribe............................................................ 60
9.12    Governing Law .................................................................................................... 61
9.13    Entire Agreement ................................................................................................ 62
9.14    Representatives of Tribe ..................................................................................... 62
9.15    Limitations of Liability ....................................................................................... 62
9.16    Approvals ............................................................................................................ 62
9.17    Inconsistent Positions......................................................................................... 62
9.18    Request for Federal Approval ............................................................................. 62
9.19    Non-Disclosure .................................................................................................. 63
9.20    Non-Competition and Right of First Offer ......................................................... 63
9.21    Cooperation......................................................................................................... 63
9.22    Estoppel Certificate ............................................................................................ 64
9.23    Periods of Time................................................................................................... 64
9.24    Stay, Extension and Usury Laws ........................................................................ 64
9.25    No Brokers .......................................................................................................... 64
9.26    Government Savings Clause ................................................................................ 64
9.27    Standard of Reasonableness................................................................................ 65
9.28    Preservation of Agreement ................................................................................. 65
9.29    Recordation......................................................................................................... 65
9.30    No Joint Venture ................................................................................................. 65
9.31    Recitals................................................................................................................ 65
9.32    Interpretation....................................................................................................... 65
9.33    Third Party Beneficiary....................................................................................... 65
9.34    Preparation of Agreement ................................................................................... 65
9.35    Reasonable Consideration................................................................................... 65
9.36    Free and Voluntary Act....................................................................................... 66
9.37    Encumbrances ..................................................................................................... 66
9.38    Stay, Extension and Usury Laws ........................................................................ 66

ARTICLE 10 DISPUTE RESOLUTION ................................................................................. 67
   10.1   Disputes with Patrons ........................................................................... 67
   10.2   Disputes with Enterprise Employees .................................................... 67
   10.3   Disputes Between the Tribe and Manager ............................................ 67

ARTICLE 11 INTELLECTUAL PROPERTY MATTERS ....................................................... 69
   11.1   Manager Marks ..................................................................................... 69
   11.2   Manager Proprietary Assets .................................................................. 70
   11.3   Manager Software .................................................................................. 70
   11.4   Manager Proprietary Information .......................................................... 70
   11.5   License Matters ..................................................................................... 70
   11.6   Ownership Matters ................................................................................ 71
   11.7   Patron Database .................................................................................... 72

Attachment 1 - Legal Description of Site

Exhibit A – Gaming Security Agreement

Exhibit B – Gaming Blocked Account Agreement

Exhibit C - Gaming Operating Note

Exhibit D - Gaming Non-Solicitation Agreement

Exhibit E - Gaming Officer's Certificate

## GAMING MANAGEMENT AGREEMENT

This GAMING MANAGEMENT AGREEMENT (this "Agreement") is made and entered into as of this 8th day of September, 2010, by and between the FEDERATED INDIANS OF GRATON RANCHERIA, a federally recognized Indian tribe (the "Tribe"), and SC SONOMA MANAGEMENT, LLC, a California limited liability company ("Manager").

## RECITALS

A.     The Tribe and Manager are parties to a Management Agreement dated as of April 22, 2003, as amended by that Amendment No. 1 to Management Agreement dated as of August 10, 2005 (collectively, the "Original Agreement"), and the Tribe and Manager desire to supersede and restate the portions of the Original Agreement which relate to Commercial Activities on the terms and conditions hereinafter set forth.

B.     The Tribe is a federally recognized Indian tribe eligible for the special programs and services provided by the United States to Indians because of their status as Indians and is recognized as possessing powers of self-government.

C.     The Tribe has requested that the United States acquire land in trust for the benefit of the Tribe and over which the Tribe will possess sovereign governmental powers.

D.     The Tribe is committed to using the Enterprise to create employment opportunities and improve the social, economic, education, and health conditions of its members, to increase the revenues of the Tribe, and to enhance the Tribe's economic self-sufficiency and self-determination.

E.     The Tribe presently lacks the resources to develop and operate a Gaming facility and enterprise on its own and desires to retain the services of a manager, with knowledge and experience in the industry, to manage a Gaming facility on Indian Lands.

F.     Manager has represented to the Tribe that Manager and its Affiliates have the managerial capacity to manage the Enterprise.

G.     The Tribe has selected Manager because of Manager's knowledge and experience in managing similar facilities, and Manager agrees to provide the management necessary to successfully manage the Facility and the Enterprise.

H.     This Agreement shall become effective upon the Effective Date and shall continue for a term as described in Section 2.17, unless otherwise provided in this Agreement.

I.     This Agreement is entered into pursuant to the IGRA.

J.     All Commercial Activities conducted at the Facility will at all times comply with any applicable Tribal law.

K.     During the term of this Agreement, the Tribe desires to grant to Manager the exclusive right and obligation to manage, operate and maintain the Enterprise and to train Tribal

5106702                                1

members and others in the management, operation and maintenance of the Enterprise, and Manager desires to perform all such services for the Tribe.

      L.      Any dispute between the Parties regarding this Agreement or any other Transaction Document is to be subject to the dispute resolution and governing law provisions contained herein, unless otherwise provided in such Transaction Document.

## AGREEMENT

      NOW, THEREFORE, in consideration of the above recitals and the mutual promises and covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are expressly acknowledged, the Tribe and Manager agree as follows:

## ARTICLE 1
## DEFINITIONS

      In addition to certain terms defined elsewhere in this Agreement, the terms listed below shall have the meaning assigned to them in this Article:

      "Affiliate" means, for Manager or the Tribe, any enterprise, corporation, partnership, limited liability company, joint venture, trust, department, district, regulatory body or agency, or other entity controlled by, under common control with, or which controls, directly or indirectly, Manager or the Tribe, as applicable, and their respective successors or permitted assigns. For purposes of this Agreement, "control" means the ability, directly or indirectly, by contract, ownership of securities or other interests or otherwise to affect the management and policies of an entity. The Gaming Commission, the Business Board, the Enterprise and any department, district, agency, instrumentality, authority, regulatory body, commission, enterprise, corporation, limited liability company, court or subdivision wholly or partially owned or controlled by the Tribe or such Tribal entities shall be considered to be an Affiliate of the Tribe for purposes of this definition, including, without limitation, (i) any enterprise, corporation, limited liability company or other business entity wholly or partially owned or controlled by the Tribe, and (ii) any such Tribally owned business entity which conducts Non-Gaming Activities.

      "Agreement" means this Gaming Management Agreement, as the same may be amended or modified from time to time.

      "Allocable Share" means the following: (i) with respect to those facilities, assets, services, costs and expenses which Manager determines are easily matched, measured, tracked or allocated to the activities of the Enterprise or any Other Entity, the "Allocable Share" of the Enterprise or such Other Entity means the dollar amount of those facilities, services, costs and expenses which Manager determines are easily matched, measured, tracked or allocated to the activities of the Enterprise or such Other Entity; and (ii) with respect to those shared facilities, services, costs and expenses which Manager determines are not easily matched, measured, tracked or allocated to the Enterprise or an Other Entity, the "Allocable Share" of the Enterprise

or such Other Entity shall be the dollar amount of those shared facilities, assets, services, costs and expenses which are allocated to the activities of the Enterprise or such Other Entity in accordance with accounting policies and procedures consistent with GAAP established by Manager and agreed upon by Manager and the Business Board; provided, however, that, unless Manager and the Business Board agree otherwise, which agreement Manager or the Business Board may withhold in their discretion, (A) the Enterprise's or an Other Entity's Allocable Share of the following project costs and expenses shall be determined by allocating such costs and expenses between or among the Enterprise and such Other Entities in accordance with the Square Footage Ratio: design fees; landscaping/parking/site; core/shell and interiors; central plant; waste water treatment plant; wells and water treatment; testing and inspection; signage; offsites; insurance; fees and permits; construction administration; land; and Pre-Opening Expenses, and (B) the Enterprise's or an Other Entity's Allocable Share of the following costs and expenses shall be determined by allocating such costs and expenses between or among the Enterprise and such Other Entities in accordance with the Project Costs Ratio: (1) such Governmental Agreement Payments and other payments which mitigate environmental and other impacts of the Enterprise and Other Entities; (2) real property, personal property and intellectual property assets which are used jointly by the Enterprise and Other Entities; (3) depreciation and amortization expenses with respect to or associated with real property, personal property and intellectual property assets which are used jointly by the Enterprise and Other Entities, including the Facility and the Other Entities Facility; (4) interest expenses; (5) Compensation and benefits for Enterprise Employees, Manager Employees, Off-Site Manager Employees or other employees who work jointly for the Enterprise and Other Entities; and (6) other operating expenses associated with shared expenses of the Enterprise and Other Entities. (The Enterprise's and Other Entities' depreciation expenses shall be determined by depreciating those real property, personal property and intellectual property assets, or its Allocable Share thereof, which have been allocated to the Enterprise or such Other Entity on a straight line basis assuming the maximum useful life and residual value consistent with GAAP.) Any dispute between the Business Board and Manager regarding the determination or calculation of the Allocable Share of the Enterprise or any Other Entity or the application of the foregoing provisions regarding Allocable Share to any category of shared facilities, assets, services, costs or expenses shall be resolved in accordance with the dispute resolution provisions of this Agreement.

"Annual Business Plan", "Annual Operating Budget" and "Annual Capital Budget" means the business plan, operating budget and capital budget described in Section 5.3.

"BIA" means the United States Department of the Interior Bureau of Indian Affairs.

"Blocked Account(s)" means the account or accounts of the Tribe or the Enterprise described in the Blocked Account Agreement, which may include, if applicable, any or all Enterprise Accounts.

"Blocked Account Agreement" means the Gaming Blocked Account Agreement among the Tribe, Manager and Bank of America, N.A in substantially the form attached as an Exhibit hereto and such other similar agreement or agreements which may be entered into from time to time among the Tribe, Manager and any bank which acts as a depository institution for the Tribe or the Enterprise, as the same may be amended or modified from time to time.

3

"Business Board" shall have the meaning ascribed to it in Section 2.19.

"Capital Expenditures" means any alteration, rebuilding, renovation or expansion of the Facility, and any acquisition or replacement of Furnishings and Equipment or other assets of the Enterprise, the cost of which is capitalized and depreciated or amortized, rather than expensed, applying GAAP.

"Capital Expenditure Account" shall have the meaning ascribed to it in Section 5.6.

"Class II Gaming" means gaming defined as class II gaming in the IGRA.

"Class III Gaming" means all gaming that is not class I or class II gaming as defined in the IGRA and that is authorized under any Tribal-State Compact.

"City MOU" means the Memorandum of Understanding dated October 14, 2003, between the Tribe and the City of Rohnert Park.

"Collateral Assets" means the "Collateral" as such term is defined in the Security Agreement or the Blocked Account Agreement.

"Commencement Date" means the first day after approval of this Agreement by the Chairman of the NIGC on which Commercial Activities operated at the Facility or by the Enterprise which are managed by Manager pursuant to this Agreement begins.

"Compensation" means the direct salaries and wages paid to, or accrued for the benefit of, any employee, including incentive compensation, together with all fringe benefits payable to or accrued for the benefit of such employee, including, but not limited to, employer's contribution under F.I.C.A., unemployment compensation or other employment taxes, pension fund contributions, workers' compensation, group life, accident and health insurance premiums and costs, and profit sharing, severance, retirement, disability, relocation, housing and other similar benefits; provided, however, that the term "Compensation" shall not, in any event, include stock options or other rights in equity in Manager or any of its Affiliates.

"Commercial Activities" means Gaming Activities. The term "Commercial Activities" does not include Non-Gaming Activities or Other Activities.

"Contract Net Revenues" means Gross Revenues less Costs of Operations (excluding the Management Fee). For the avoidance of doubt, the calculation of "Contract Net Revenues" does not include deductions from Gross Revenues for (i) Management Fees, or (ii) Excluded Costs other than Deductable Non-Enterprise Costs.

"Costs of Gaming Operations" means the total of all operating expenses incurred in the operation of the Enterprise, including, but not limited to, the following: (1) fees imposed upon the Enterprise by the NIGC; (2) NIGC, State or Tribal license or other fees for background investigations of and the issuance of gaming licenses to Enterprise Employees, including, without limitation, "key employees" and "primary management officials" as defined in 25 C.F.R. § 502.14 and § 502.19; (3) all Governmental Agreement Payments and all payments to other parties to mitigate environmental and other impacts of the Facility and the Enterprise on the

4

surrounding community which mitigate environmental and other impacts which are solely or
primarily related to the Enterprise, and the Enterprise's Allocable Share of such Governmental
Agreement Payments and other payments which mitigate environmental and other impacts which
relate to both the Enterprise and any Other Entities; (4) all of the depreciation expenses for real
property located on the Site which is solely or primarily used by the Enterprise and the
Enterprise's Allocable Share of depreciation expenses for real property located on the Site which
is used jointly by the Enterprise and any Other Entities, in each case calculated on a straight line
basis assuming the maximum useful life and residual value consistent with GAAP, (5) all of the
depreciation and amortization expenses for all personal property and intellectual property assets
solely or primarily used by the Enterprise and the Enterprise's Allocable Share of depreciation
and amortization expenses for all other personal property or intellectual property assets used
jointly by the Enterprise and any Other Entities, in each case calculated on a straight line basis
assuming the maximum useful life and residual value consistent with GAAP; (6) costs of
administration, recruiting, hiring, firing and training employees working in the Facility or for the
Enterprise; (7) all of the Compensation and benefits for Enterprise Employees, Manager
Employees and Off-Site Manager Employees working solely or principally for the Enterprise and
the Enterprise's Allocable Share of the Compensation and benefits for Enterprise Employees,
Manager Employees and Off-Site Manager Employees who work jointly for the Enterprise and
Other Entities; (8) the Enterprise's Allocable Share of interest expenses of the Transition Loan
and the Facility Loan; (9) costs of or payments for allowances and complimentary services
(including, without limitation, complimentary services provided by any Other Entities) provided
at the request of the Enterprise and in support of its Commercial Activities; (10) Late Payment
Charges due under this Agreement; and (11) other operating expenses related solely or primarily
to the Enterprise or the Commercial Activities conducted at the Facility or by the Enterprise and
the Enterprise's Allocable Share of operating expenses which relate jointly to the Enterprise and
Other Entities, including, without limitation: materials, supplies, inventory, utilities, repairs and
maintenance (excluding capital assets, the costs of which shall be depreciated or amortized as
hereinabove provided), insurance and bonding, marketing, advertising, annual audits,
accounting, bank fees, legal or other professional and consulting services, security or guard
services, and such other operating expenses necessarily, customarily and reasonably incurred,
and reasonable and necessary travel expenses incurred subsequent to the Commencement Date
for Enterprise Employees, Manager Employees or Off-Site Manager Employees. For the
avoidance of doubt, "Costs of Gaming Operations" shall include the amounts which the
Enterprise is charged by and pays to any Other Entity for services provided by the Other Entity
to patrons of the Enterprise on a complimentary basis at the request of the Enterprise. The
amount which such Other Entity shall charge and the Enterprise shall pay for such services
provided by the Other Entity on a complimentary basis at the request of the Enterprise shall be

b4

b4

. Notwithstanding the foregoing, "Costs of Gaming Operations"
shall not include any Excluded Costs unless otherwise approved by Manager, which approval
Manager may withhold or condition in its discretion. The fact that the Parties have included an
express reference to costs or expenses or categories of costs or expenses in this definition of
"Cost of Gaming Operations" shall not be construed as an acknowledgement or admission by the
Parties that they necessarily consider such cost or expense to constitute an operating expense of
the Enterprise. If the Parties agree to modify the definition of the term "Costs of Gaming
Operations" in a manner which is adverse to the economic interests of the Tribe, such

5106702                                      5

modification shall constitute an amendment to this Agreement which requires the approval of the Chairman in order to be effective.

"Costs of Operations" means the sum of Costs of Gaming Operations plus Deductable Non-Enterprise Costs.

"Deductable Non-Enterprise Costs" means the following costs and expenses to the extent that they do not constitute "Costs of Gaming Operations:" (1) a Non-Gaming Enterprise's Governmental Agreement Payments and other payments or Allocable Share of Governmental Agreement Payments and other payments which mitigate environmental and other impacts of a Non-Gaming Enterprise; (2) a Non-Gaming Enterprise's depreciation expenses or Allocable Share of depreciation expenses with respect to real property located on the Site calculated on a straight line basis assuming the maximum useful life and residual value consistent with GAAP; (3) a Non-Gaming Enterprise's depreciation and amortization expenses or Allocable Share of depreciation and amortization expenses with respect to personal property assets located on the Site (including, without limitation, all capital assets and Furnishings and Equipment) calculated on a straight line basis assuming the maximum useful life and residual value consistent with GAAP; (4) a Non-Gaming Enterprise's interest and other expenses or Allocable Share of interest and other expenses associated with the ███████████████████████████; and (5) costs and expenses of the Gaming Commission up to One Million Two Hundred Thousand Dollars ($1,200,000) per Fiscal Year. For the avoidance of doubt, the Parties acknowledge and agree that (i) they intend for "Deductable Non-Enterprise Costs" to be █████████████████████  b4
b4  █████████████" and (ii) they intend for "Costs of Operations" to be deducted from Gross Revenues in calculating "Contract Net Revenues." For the avoidance of doubt, if the Tribe conducts both Class II Gaming and Class III Gaming, "Deductable Non-Enterprise Costs" shall mean the Enterprise's ██████████   █████████████████████████

b 4

"Dispute" shall mean any claim, controversy, question, disagreement or dispute of any nature between or among the Tribe or any of its Affiliates, on the one hand, and Manager, any of its Affiliates, their respective employees or any Indemnitee, on the other hand, whether arising under law or in equity, whether arising as a matter of contract, tort or otherwise, and whether now existing or hereafter arising during the term of, or after the expiration or termination of, this Agreement or the other Transaction Documents, including, without limitation, any dispute arising out of, related to or in any way connected or incidental to any of the following: this Agreement; the other Transaction Documents; the validity, enforceability, interpretation, breach or enforcement hereof or thereof, including the determination of the scope or applicability of any agreement to arbitrate set forth herein or therein; the transactions contemplated hereby or thereby; any Party's performance hereunder or thereunder; the Enterprise; the Facility; any Tribal Governmental Action or Tribal governmental non-action; or any tort or alleged tort.

"Economically Feasible" means that the gross revenues anticipated to be derived from any applicable operation is at least █████████████████████ of the anticipated amount  b4 of the operating expenses applicable to the operation in question.

"Effective Date" means the effective date of this Agreement as determined pursuant to Section 2.17(a).

"Emergency Condition" shall have the meaning ascribed to it in Section 5.5.

"Enterprise" means the business enterprise or enterprises of the Tribe created or to be created which will engage in Gaming Activities at the Facility or on the Site in whatever form created, whether or not separately incorporated and whenever created. For the avoidance of doubt, the term "Enterprise" does not include any Non-Gaming Enterprise or Other Entity.

"Enterprise Accounts" shall have the meaning ascribed to it in Section 2.8(a).

"Enterprise Employee Policies" shall have the meaning ascribed to it in Section 3.2.

"Enterprise Employees" means employees of the Tribe or the Enterprise who are assigned to work substantially full-time at the Facility or for the Enterprise and all employees of the Enterprise, but not including Manager Employees or Off-Site Manager Employees.

"Excluded Costs" means (i) any costs or expenses which are not operating expenses of the Enterprise incurred during the period between the Commencement Date and the expiration or termination date of this Agreement, and (ii) any Management Fees whether or not they are operating expenses of the Enterprise incurred during the period between the Commencement Date and the expiration or the termination date of this Agreement. For the avoidance of doubt, "Excluded Costs" includes costs and expenses incurred by the Tribe or any Affiliate of the Tribe other than the Enterprise, including, without limitation, the following costs and expenses which the Parties agree shall be considered to be costs and expenses of the Tribe or an Affiliate of the Tribe other than the Enterprise for the purposes of this Agreement: (1) costs and expenses of the General Council, the Tribal Council, the Business Board, the Gaming Commission, any Tribal Department, any Tribal Committee or any Tribal economic development authority, corporation or other entity; (2) costs and expenses incurred by the Tribe or any Affiliate of the Tribe in performing or providing any Tribal governmental function, program or service to or for the benefit of members of the Tribe, including health care, tuition assistance, housing, schools, welfare, or needy family assistance; (3) costs and expenses of, or any payments due under, any Tribal revenue allocation plan or per capita distribution plan; (4) contributions and payments to any non-profit, religious, educational, charitable, scientific, literary, civic, social welfare, labor, agricultural, social, or fraternal organizations or institutions (not including contributions or other payments to be made by the Tribe pursuant to the City MOU, which contributions and other payments have been previously approved by Manager); (5) contributions and payments to or for the benefit of any political party or organization or candidate for public office; (6) costs and expenses associated with any effort to affect any election, recall, initiative, referendum or public vote; and (7) costs and expenses associated with any effort to affect any proposed law, rule, regulation, initiative, referendum or public policy (other than any effort to cause the California state legislature to ratify a Tribal-State Gaming Compact between the Tribe and the·State of California). For the avoidance of doubt, "Excluded Costs" includes costs and expenses incurred by any Non-Gaming Enterprise or Other Entity, including, without limitation, the following costs and expenses which the Parties agree shall be considered to be costs and expenses of a Non-Gaming Enterprise or an Other Entity: (8) costs and expenses which are not for the purposes of generating Gross Revenue for the Enterprise, including costs and expenses of any Non-Gaming Enterprise or Other Entity; (9) management fees which the Tribe or any of its Affiliates owes to any entity other than Manager or its Affiliates; (10) a Non-Gaming Enterprise's or Other Entity's

Governmental Agreement Payments and other payments or Allocable Share of Governmental Agreement Payments and other payments which mitigate environmental and other impacts of a Non-Gaming Enterprise or Other Entity; (11) a Non-Gaming Enterprise's or Other Entity's depreciation expenses or Allocable Share of depreciation expenses with respect to ███████ ▌; (12) a Non-Gaming Enterprise's or Other Entity's depreciation and amortization expenses or Allocable Share of depreciation and amortization expenses with respect to █████; and (13) a Non-Gaming Enterprise's or Other Entity's interest and other expenses or Allocable Share of interest and other expenses associated with the ██████████. For the avoidance of doubt, "Excluded Costs" include costs or expenses of or for the benefit of the Enterprise which do not constitute operating expenses, including, without limitation, the following costs and expenses which the Parties do not consider to be operating expenses for the purposes of this Agreement: (14) principal payments on loans; (15) Capital Expenditures or costs and expenses associated with the acquisition of capital assets; (16) reserves of the Enterprise, including the Capital Expenditure Account; and (17) any taxes, levies, assessments or license fees collected or paid by the Tribe or the Enterprise. For the avoidance of doubt, "Excluded Costs" include any fees, costs and expenses which constitute operating expenses of the Enterprise, but which are considered to be incurred (pursuant to generally accepted accounting principles) during accounting periods prior to the Commencement Date or subsequent to the expiration or termination date of this Agreement, regardless of when such fees, costs or expenses are actually paid, including, without limitation, the following fees, costs and expenses which the Parties consider to have been or will be incurred prior to the Commencement Date for the purposes of this Agreement: (18) Pre-Opening Expenses; (19) interest, depreciation or amortization expenses for accounting periods prior to the Commencement Date; (20) payments due under any development, design or construction agreements for services performed or substantially performed prior to the Commencement Date; and (21) payments due under any other agreement entered into by the Tribe or the Enterprise for services performed or substantially performed prior to the Commencement Date. The Parties have agreed that certain "Excluded Costs" are also classified as Deductable Non-Enterprise Costs for the purposes of this Agreement and that such Deductable Non-Enterprise Costs are deducted from Gross Revenues in calculating Contract Net Revenues. Notwithstanding the fact that a cost or expense constitutes an "Excluded Cost," the Parties may, upon mutual agreement, elect for the Tribe or the Enterprise to treat such cost or expense as a Cost of Gaming Operations or a Deductable Non-Enterprise Cost for the purposes of this Agreement, in which event such cost or expense would be deducted from Gross Revenues in calculating Contract Net Revenues. In the event that Manager makes such an election with respect to a recurring cost or expense, Manager's election shall be deemed to apply to each instance in which such costs or expense recurs, unless otherwise specified in Manager's election.

"Execution Date" means the date this Agreement is executed by the Parties.

"Facility" means any temporary or permanent buildings, structures, improvements or fixtures, or portions thereof, which Manager and the Business Board determine are used solely or primarily by the Enterprise for its Commercial Activities located on the Site, and all renovations or expansions thereof. For the avoidance of doubt, the term "Facility" does not include any Other Entities Facilities. Any dispute between the Business Board and Manager regarding

whether any temporary or permanent buildings, structures, improvements or fixtures, or portions thereof, constitute the Facility versus an Other Entities Facilities shall be resolved in accordance with the dispute resolution provisions of this Agreement.

"Facility Loan" means the loan or loans made by any Lender other than Manager or its Affiliates to the Tribe, the Enterprise and/or any Non-Gaming Enterprise to fund costs and expenses of the Tribe, the Enterprise, any Non-Gaming Enterprise and/or the Gaming Commission, including, without limitation, the following costs and expenses: the fees, costs and expenses of the Tribe's developer; the repayment of the Transition Loan; the acquisition of the Site and alternative sites; the development, construction, furnishing and equipping the Facility and the Other Entities Facilities; and the initial operating capital of the Enterprise, Non-Gaming Enterprises and the Gaming Commission.

"Fiscal Year" means the accounting year used for the operation of the Enterprise as agreed upon by Manager and the Business Board and which, unless otherwise agreed by the Business Board, shall be the same as the accounting year for the Tribe.

"Furnishings and Equipment" means all furniture, furnishings and equipment acquired for or used in the operation of the Enterprise wherever located, including, without limitation:

      (a)     Cashier, redemption, kiosk, money sorting and money counting equipment, surveillance and communications equipment, and security equipment;

      (b)     Office furnishings and equipment;

      (c)     Specialized equipment necessary for the operation of any portion of the Enterprise;

      (d)     Video games of chance, table games, keno equipment, bingo equipment and other gaming equipment;

      (e)     All other furnishings and equipment hereafter located and installed in or about the Facility or on the Site which are used in the operation of the Enterprise.

"Gaming" means Class II Gaming and does not include Class III Gaming.

"Gaming Activities" means those Gaming activities and operations conducted or owned by the Tribe, its Affiliates or its licensees which generate Gaming revenue (as distinguished from non-Gaming revenue), including, without limitation, the operation of games, the receipt of Gaming revenues, the issuance of Gaming prizes, and the payment of Gaming expenses. For the avoidance of doubt, the term "Gaming Activities" does not include Non-Gaming Activities or Other Activities which do not generate Gaming revenue.

"Gaming Commission" means the Gaming Commission of the Tribe established or to be established by the Tribe.

"Gaming Ordinance" shall mean a gaming ordinance adopted by the Tribe and approved by the Chairman of the NIGC in accordance with IGRA.

"Generally Accepted Accounting Principles" or "GAAP" means those accounting principles defined by the Financial Accounting Standards Board consistently applied and applicable to the Commercial Activities.

"Governmental Authorities" means any federal, state, county, municipal or tribal government or any political subdivision, court, agency, department, district, commission, board, bureau or instrumentality thereof, including, without limitation, the United States, the BIA, the National Indian Gaming Commission, the State, the California Gambling Control Commission, the County of Sonoma, California, the City of Rohnert Park, the Tribe and the Tribe's Affiliates.

"Governmental Agreement Payments" means fees, charges, contributions and payments paid to local governments, the State, or any department, agency, district, instrumentalities or other body thereof, pursuant to any agreement or amendment thereto entered into between the Tribe and such entity (not including any Tribal-State Compact); provided, however, that, prior to the execution of such agreement or amendment, Manager shall have approved each contribution or payment to be made thereunder as an operating expense of the Enterprise and therefore a Cost of Gaming Operations, which approval shall not be unreasonably withheld, conditioned or delayed; provided, further, that contributions or other payments to non-profit, charitable or educational organizations or institutions shall not be considered to be an operating expense of the Enterprise and a Cost of Gaming Operations unless approved by Manager, which approval Manager may withhold or condition in its discretion; and provided, further, that one-time or other non-recurring contributions or payments made by the Tribe pursuant to such agreement or amendment shall be depreciated or amortized on a straight-line basis over the term of such agreement or amendment. Manager acknowledges that, for the purposes of this definition, Manager has approved all contributions or other payments to be made by the Tribe pursuant to the City MOU.

"Gross Revenues" means (i) the Enterprise's total revenue from all Commercial Activities, plus (ii) the Enterprise's total revenue, receipts or credits relating to Enterprise assets, including, without limitation, (A) receipts or credits for lost or damaged merchandise, (B) the sale or disposition of Enterprise assets, (C) insurance proceeds related to Enterprise assets, or (D) interest on Enterprise accounts, plus (iii) any taxes or assessments collected by the Tribe from Enterprise patrons which are not passed through to Governmental Authorities, less (iv) amounts paid out as, or paid for, Gaming prizes and awards.

"IGRA" means the Indian Gaming Regulatory Act of 1988, P.L. 100-497, 25 U.S.C. §§ 2701 et. seq., and the regulations promulgated thereunder, as the same may be amended from time to time.

"Indemnitees" shall have the meaning ascribed to it in Article 7.

"Indian Lands" means all lands held in trust by the United States for the benefit of the Tribe.

"Late Payment Charge" means a charge on any past due payment which, as of any given date, shall accrue at a rate per annum equal to the weighted cost of capital of Manager's parent as of the end of the preceding month multiplied by a factor of 1.25.

"Legal Requirements" means any and all present and future judicial, administrative, and federal, state, local or Tribal rulings or decisions, and any and all present and future federal, state, local and Tribal laws, ordinances, rules, regulations, permits, licenses, certificates and determinations of suitability, in any way applicable to the Tribe, Manager, their respective employees, the Site, the Facility, or the Enterprise, including, without limitation, the IGRA, the Internal Revenue Code, any Tribal-State Compact, the Gaming Ordinance and any Gaming Commission regulations.

"Lender" means any lender or successor to any lender which lends funds for any portion of the Transition Loan or the Facility Loan to the Tribe, including, if applicable, Manager or any Affiliate of Manager and the bondholders in any public bond offering.

"Management Fee" shall have the meaning ascribed to it in Section 5.12(b).

"Manager" means SC Sonoma Management, LLC, a California limited liability company, and its successors and permitted assigns.

"Manager Employees" means those employees of Manager or its Affiliates who are working at the Facility on a full-time or substantially full-time basis and who are not Enterprise Employees, which employees shall hold or perform the following positions or job functions: (1) General Manager and/or Chief Executive Officer; (2) Director of Operations; (3) Director of Slot Operations; (4) Director of Table Games; (5) Director of Finance and/or Chief Financial Officer; (6) Director of Marketing; (7) Director of Information Technology; (8) Director of Player Development; and (9) up to four additional positions or job functions to be designated by Manager in its discretion from time to time.

"Manager Intellectual Property" shall have the meaning ascribed to it in Section 11.5.

"Manager Marks" shall have the meaning ascribed to it in Section 11.1.

"Manager Proprietary Information" shall have the meaning ascribed to it in Section 11.3.

"Manager Representatives" shall have the meaning ascribed to it in Section 2.19.

"Manager Software" shall have the meaning ascribed to it in Section 11.2.

"Marks" shall have the meaning ascribed to it in Section 11.1.

"Material Breach" shall have the meaning ascribed to it in Section 6.1.

"Minimum Guaranteed Monthly Payments" shall have the meaning ascribed to it in Section 5.10.

"Minimum Guaranteed Payment Advances" shall have the meaning ascribed to it in Section 5.10(b).

"National Indian Gaming Commission" or "NIGC" means the commission established pursuant to the IGRA.

"Non-Gaming Activities" means commercial activities or operations conducted or owned by the Tribe or its Affiliates located on or in connection with the Site which are not Class II Gaming or Class III Gaming or which generate revenue which is not Class II Gaming revenue or Class III Gaming revenue, including, without limitation, commercial operations related to any hotel, convention and meeting facilities, parking facilities, entertainment facilities, sports facilities, restaurants, food and beverage services, office space, swimming pool, spa, fitness center, child care facility, bars, lounges, arcade, retail stores, concessions, gift shop and automatic teller machines (ATMs). For the avoidance of doubt, the term "Non-Gaming Activities" does not include Gaming Activities or Other Activities and does not include "gaming activities" or "gaming operations" within the meaning of IGRA.

"Non-Gaming Enterprise" means any commercial corporation or enterprise of the Tribe which engages in Non-Gaming Activities and which has its principal place of business on the Site. For the avoidance of doubt, the term "Non-Gaming Enterprise" does not include the Enterprise and is included within the definition of the term "Other Entity."

"Non-Solicitation Agreement" means the Gaming Non-Solicitation Agreement between the Tribe and Manager dated as of the Execution Date in the form attached as an Exhibit hereto, as the same may be amended or modified from time to time.

"Note" means the Gaming Promissory Note executed by the Tribe in favor of Manager dated as of the Execution Date in the form attached as an Exhibit hereto, together with all amendments, substitutions and renewals thereof.

"Off-Site Manager Employees" means employees of Manager or its Affiliates who are not located at the Facility, but who are used by Manager to provide services to the Enterprise.

"Officers' Certificate" means the Officers' Certificate issued by officers of the Tribe to Manager dated as of the Execution Date, as the same may be amended, modified or supplemented from time to time.

"Original Agreement" shall have the meaning ascribed to it in Recital A above.

"Opening Date" means the date on which the Facility or any portion thereof is open to the public for Commercial Activities.

"Other Activities" means (i) non-commercial operations owed or operated by the Tribe, including, without limitation, governmental activities of the Tribe and its Affiliates, and (ii) commercial or non-commercial operations or activities which are not owned or operated by the Tribe and which are principally conducted on or from the Site (other than operations or activities of Manager or any Affiliate of Manager). For the avoidance of doubt, the term "Other Activities" does not include Gaming Activities or Non-Gaming Activities.

"Other Entity(ies)" means (i) the Tribe, (ii) any Affiliate of the Tribe other than the Enterprise, and (iii) any non-Tribal commercial or non-commercial business or entity which conducts operations at the Facility or on the Site other than Manager or any Affiliate of Manager. For the avoidance of doubt, the term "Other Entity" does not include the Enterprise and does include any Non-Gaming Enterprise or any enterprise which conducts Class III Gaming.

"Other Entities Facilities" means any temporary or permanent buildings, structures, improvements or fixtures, or portions thereof, which Manager and the Business Board determine are used solely or primarily by Other Entities, and all renovations or expansions thereof. For the avoidance of doubt, the term "Other Entities Facilities" does not include the Facility. Any dispute between the Business Board and Manager regarding whether any temporary or permanent buildings, structures, improvements or fixtures, or portions thereof, constitute the Other Entities Facilities versus the Facility shall be resolved in accordance with the dispute resolution provisions of this Agreement.

"Parties" shall mean the Tribe and Manager.

"Patron Database" shall have the meaning ascribed to it in Section 11.6.

"Policies and Procedures" shall have the meaning ascribed to it in Section 2.7.

"Pre-Opening Budget" shall have the meaning ascribed to it in Section 5.1(a).

"Pre-Opening Expenses" shall have the meaning ascribed to it in Section 5.1(a).

"Prior Agreements" means any agreements or business relationships entered into by the Tribe, its Affiliates, its officer or its members prior to or as of April 22, 2003 (which is the date of the Original Agreement between the Tribe and Manager) or any amendments, agreements, arrangements or understandings which amend or supersede such agreements or business relationships, but not including any agreements or business relationships with Manager or its Affiliates.

"Project Costs" means Pre-Opening Expenses and the costs of developing, financing, constructing, furnishing and equipping the property, plant and equipment located on the Site, including, without limitation, (i) the following hard costs: design fees; landscaping/parking/site; core/shell and interiors; kitchen equipment; central plant; waste water treatment plant; wells and water treatment; testing and inspection; hard furniture, fixtures and equipment; signage; offsites; insurance; fees and permits; and construction administration, and (ii) the following soft costs: furniture, fixtures and equipment; land; base stock (less operating cash); bankroll; Pre-Opening Expenses; contingencies; capitalized interest, financing fees and other pre-development costs.

"Project Cost Ratio" means the fraction (i) the numerator of which is the Project Costs which Manager determines are solely or primarily attributable to the Enterprise or the conduct of Commercial Activities, and (ii) the denominator of which is the sum of (A) the numerator, plus (B) the Project Costs which Manager determines are solely or primarily attributable to Other Entities. The fraction shall be calculated on the basis of financial statements prepared by the Enterprise and Other Entities for the preceding Fiscal Year or, in the case of the first Fiscal Year, based on projections established by Manager and such Other Entities and approved by the Business Board. The fraction for any given Fiscal Year or portion thereof shall be initially calculated by Manager and approved by the Business Board.

"Resolution of Waiver" means, collectively, Resolution No. 03-01-GC approved by the General Council of the Tribe on April 22, 2003, Resolution No. 08-19-GC approved by the General Council of the Tribe on December 13, 2008, Resolution No. 09-04-GC approved by the General Council of the Tribe on June 13, 2009, Resolution No. 09-09-TC approved by the Tribal Council of the Tribe on September 30, 2009, and Resolution No. 10-07-TC approved by the Tribal Council of the Tribe on September 7, 2010, which resolutions evidence all waivers and approvals required pursuant to the Tribe's governing documents and applicable law relating to this Agreement and the other Transaction Documents.

"Restricted Area" shall have the meaning ascribed to it in Section 9.20.

"Security Agreement" means the Gaming Security Agreement between the Tribe and Manager dated as of the Execution Date in the form attached as an Exhibit hereto securing the obligations of the Tribe under the Note and/or this Agreement, as the same may be amended or modified from time to time.

"Site" means, unless otherwise agreed by Manager, those lands, or any portion thereof, which the United States accepts in trust for the benefit of the Tribe, including, without limitation and if and to the extent accepted into trust, those lands described in Attachment 1 hereto.

"Square Footage Ratio" means the fraction (i) the numerator of which is the square footage of the improvements located on the Site which Manager determines are solely or primarily used by the Enterprise in conducting Commercial Activities, and (ii) the denominator of which is the sum of (A) the numerator, plus (B) the square footage of the improvements located on the Site which Manager determines are solely or primarily used by Other Entities. The fraction shall be calculated on the basis of financial statements prepared by the Enterprise and Other Entities for the preceding Fiscal Year or, in the case of the first Fiscal Year, based on projections established by Manager and such Other Entities and approved by the Business Board. The fraction for any given Fiscal Year or portion thereof shall be initially calculated by Manager and approved by the Business Board.

"State" means the State of California.

"Transaction Document" and "Transaction Documents" shall mean this Agreement, the Note, the Blocked Account Agreement, the Security Agreement, the Non-Solicitation Agreement and any Officers' Certificate or Uniform Commercial Code financing statements relating thereto.

"Transition Loan" means the loan or loans made by Manager or its Affiliates to the Tribe and/or the Enterprise to fund the costs and expenses of the Tribe, the Enterprise and/or any Other Entities, including, without limitation, the following costs and expenses: the fees, costs and expenses of the Tribe's developer; the acquisition of the Site and alternative sites; and the initial stage development of the Facility and Other Entities Facilities.

"Tribal Council" means the governing body of the Tribe composed of the duly elected officers of the Tribe.

"Tribal Court" means any court or similar judicial branch or body of the Tribe, but not including any court which only has jurisdiction over matters arising under the Indian Child Welfare Act, 25 U.S.C. 1901 et seq., and other family law matters.

"Tribal Governmental Action" means any resolution, ordinance, statute, law, rule, regulation, order, decision, determination, action or inaction, regardless of how constituted, adopted, made or taken by the Tribe or its Affiliates acting in a legislative, regulatory or other governmental capacity which has the force of law, including, without limitation, (i) the adoption, amendment or revocation of any law, rule, regulation, ordinance or tax by the Tribe or its Affiliates, or (ii) the issuance, denial, suspension, revocation or non-renewal of any license by the Tribe or its Affiliates; provided, however, that the term "Tribal Governmental Action" shall not, in any event, include any actions or inactions taken by the Tribe or its Affiliates in their respective capacities as (i) the legal, beneficial or proprietary interest holder of the Facility or the Enterprise, or (ii) a party to this Agreement or any Transaction Document.

"Tribal Representatives" shall have the meaning ascribed to it in Section 2.19.

"Tribal-State Compact" means any compact entered into between the Tribe and the State concerning Class III Gaming and any amendments or other modifications thereto, after such compact has been approved by the Secretary of the Interior or became effective by operation of law and notice of such approval or effectiveness has been published in the Federal Register, or any Secretarial procedures issued by the Secretary of the Interior pursuant to the IGRA in lieu of a compact.

"Tribe" means Federated Indians of Graton Rancheria (a/k/a Graton Rancheria, California or the Indians of the Graton Rancheria of California), a federally recognized Indian tribe, and its successors and permitted assigns.


## ARTICLE 2
## AUTHORITY AND DUTY OF MANAGER

2.1    Appointment as Manager. Subject to the limitations and terms and conditions of this Agreement, the Tribe, on behalf of itself and the Enterprise, hereby appoints Manager to act as the sole and exclusive manager of the Facility and the Enterprise and as the exclusive agent for the Tribe and the Enterprise for all non-governmental matters related to the management of the operations of the Facility and the Enterprise during the term of this Agreement. Until the expiration or termination of this Agreement, the Tribe, the Business Board and/or the Enterprise shall not manage the Facility or the Enterprise themselves without the services of Manager pursuant to this Agreement. Manager's rights and responsibilities as manager of the Facility and the Enterprise shall include, among other things, maintenance and improvement of the Facility and management and operation of the Enterprise's Commercial Activities at the Facility, on the Site and off the Site. Subject to the terms and conditions of this Agreement, Manager accepts such appointment as the Tribe's exclusive manager of, and managerial agent for, the Facility and the Enterprise for the term of this Agreement. Subject to the provisions of this Agreement and specifically the restrictions in this Article 2 and the budget provisions in Article 5, Manager shall

have, and the Tribe does hereby grant to Manager, the power and authority to act as agent for the Tribe or the Enterprise, to exercise the rights of the Tribe or the Enterprise under, and to execute, modify, or amend any contracts associated with, the operations of the Facility or the Enterprise (excluding this Agreement) in the name of the Tribe, the Enterprise or Manager, including, without limitation, purchase orders, equipment and retail leases, contracts for services, including utilities, and maintenance and repair services, relating to the operation of the Facility or the Enterprise; provided, however, that Manager shall not have the authority to execute, modify or amend real estate agreements or contracts (excluding retail leases), or compacts or other agreements with the State or any other Governmental Authorities, which agreements shall remain within the sole and exclusive authority of the Tribe; and provided, further, that in no event shall Manager execute any contracts or agreements which require payments exceeding $500,000 in the aggregate or which have a term exceeding one (1) year, or such greater dollar amount or longer term as the Business Board may establish from time to time, without the prior approval of the Business Board.

      2.2    <u>Limitations</u>. Except as stated herein, Manager shall have no authority as the Tribe's or Enterprise's agent under this Agreement without the prior written approval of the Business Board (which approval shall not be unreasonably withheld, conditioned or delayed): (a) to incur costs which exceed the expenditures to be agreed upon in the Annual Operating Budget or the Annual Capital Budget by a factor of 10% or such greater percentage as the Business Board may establish from time to time; (b) to sell, encumber or otherwise dispose of any personal property or Furnishing and Equipment located in the Facility, except for inventory sold in the regular course of business and Furnishings and Equipment and other items which must be replaced due to age, obsolescence, or wear and tear and except for enforcement of any security interest granted to Manager in any Collateral Assets; (c) to purchase any goods or services from Manager or any of Manager's Affiliates as a Cost of Gaming Operations unless (i) such arrangement is approved in writing by the Business Board, and (ii) the price of such goods and services shall not, in any event, exceed the amount which the Business Board determines is substantially equivalent to the price which would be charged by an entity which is not affiliated with Manager. Notwithstanding any other provision of this Agreement, Manager shall not be in breach or Material Breach of this Agreement for failure to perform services which do not constitute the management or operation of the Facility or the Enterprise, including, without limitation, (i) the design, development, construction, licensing, initial equipping or initial furnishing of the Facility, (ii) the negotiation of agreements or compacts between the Tribe or its Affiliates and any Governmental Authority, or (iii) the arrangement, negotiation or provision of the Transaction Loan, the Facility Loan or any other loan relating to the Facility, the Enterprise or the Furnishings and Equipment. However, the Tribe shall not issue any certification that the Facility is substantially complete or execute or deliver any agreements or compacts between the Tribe or the Enterprise and any Governmental Authority or Lender relating to the completion or substantial completion of the Facility without the prior approval of Manager. As between the Tribe and Manager, the Tribe shall be solely responsible for the design, development, financing, construction, licensing, initial equipping and initial furnishing of the Facility or the Enterprise and, notwithstanding the provisions of Section 2.4, for assuring that the Facility or the Enterprise complies in all respects with all Legal Requirements.

      2.3    <u>Manager's Authority and Responsibility</u>.

(a)     Manager shall conduct and direct all business and affairs in connection with the day-to-day operation, management, maintenance, repair, refurbishment or expansion of the Enterprise and the Facility, including, without limitation, the establishment of operating days and hours. The Manager Employee who shall have the primary responsibility for the day-to-day management of the Enterprise shall be the Enterprise General Manager.

(b)     Nothing herein grants or is intended to grant Manager a titled or proprietary interest in or to the Facility or to the Enterprise. The Tribe shall have the sole proprietary interest in and ultimate responsibility for the Enterprise and the conduct of all Commercial Activities conducted by the Enterprise to the extent required by federal law, subject to the rights and responsibilities of Manager under this Agreement and the other Transaction Documents.

(c)     In managing, operating, maintaining, repairing, refurbishing, or expanding the Enterprise and the Facility under this Agreement, Manager's duties shall include, without limitation, the full right and authority, without requiring the consent of the Tribe or the Business Board except as specifically set forth in Section 2.2, to conduct the orderly administration, management and operation of the Facility and the Enterprise, including, without limitation, the following:

(i)     the administration of the decorating, cleaning, grounds care and maintenance of the Facility and the Facility's mechanical, electrical and operating systems;

(ii)     the selection, composition, administration and operation of a security force and related security measures, all as more fully described in Section 2.5;

(iii)     except as may otherwise be required by the Gaming Commission, the operation and maintenance of the surveillance system (including, without limitation, closed-circuit television) for monitoring the activities of the customers, employees, supervisors and management personnel, as well as the tracking of the movement of all funds into, within and out of the Facility;

(iv)     subject to the Annual Budget, the terms, conditions and amount of any insurance to be taken out with respect to the Facility and the Enterprise, all as more fully described in Article 4;

(v)     the establishment and administration of an accounting system and financial records relating to all of the operations of the Enterprise and the maintenance of such accounting system and financial records, all as more fully described in Section 2.6;

(vi)     subject to the approval of the Business Board for expenditures in excess of $100,000 per contract or per event or such greater amount as the Business Board may establish from time to time, the selection of all major entertainment, sports and promotional events to be staged at the Facility;

(vii)     subject to the provisions of Section 5.12, the distribution of revenues generated from the operation of the Enterprise;

(viii)  subject to the approval of the Business Board, the selection and location of the financial institution in which the revenues generated from the operation of the Enterprise shall be deposited pursuant to Section 2.8 and administration of the banking arrangements in connection therewith (it being agreed that the financial institution selected should have assets on a consolidated basis of not less than One Hundred Billion Dollars ($100,000,000,000));

(ix)  the engagement of professionals (not including independent auditors, who shall be selected and engaged by the Tribal Council) with respect to all matters regarding taxation or other operations of the Enterprise;

(x)  the advertisement, marketing and promotion of the Enterprise;

(xi)  subject to the approval of the Business Board, the preparation of an Annual Business Plan, Annual Operating Budget and Annual Capital Budget, all as more fully described in Section 5.3; and

(xii)  all matters necessarily ancillary to the responsibilities set forth in subparagraphs (i) to (xiii) above, it being acknowledged and agreed that the foregoing is not intended to be an exhaustive list of the rights and duties of Manager concerning the management, operation, maintenance, repair, refurbishment or expansion of the Facility and the Enterprise.

2.4  Compliance with Laws; Best Efforts to Obtain Necessary Approvals.

(a)  In performing its duties hereunder, Manager shall direct the Enterprise to comply with all duly enacted Legal Requirements. The Tribe and the Enterprise shall comply with, and shall be responsible for compliance with, all Legal Requirements, including, without limitation, the Internal Revenue Code and its requirements with respect to the prompt filing of any cash transaction reports and W-2G reports that may be required by the Internal Revenue Service of the United States or pursuant to other Legal Requirements; provided, however, that the cost of such compliance shall be a Cost of Gaming Operations; and, provided, further, that Manager shall provide the Tribe with such assistance in such compliance as the Tribe and the Enterprise may reasonably request. The Tribe covenants and agrees that the Tribe and its Affiliates will take no action and adopt no statute, ordinance or regulation that may prejudice, impair or adversely affect Manager's rights under this Agreement or any Transaction Document or that would violate the doctrines and principles of due process as set forth in the United States Constitution or the Indian Civil Rights Act (25 U.S.C. § 1301, et seq.) and the interpretations thereof.

(b)  The Tribe shall comply with, and shall cause the Enterprise to comply with, and Manager shall assist the Tribe and the Enterprise in compliance by the Tribe with, all applicable Legal Requirements, including, without limitation, legal requirements the violation of which would materially impair the conduct of the Commercial Activities of the Enterprise. Without limiting the generality of the foregoing, the Tribe shall supply, and Manager shall assist the Tribe in supplying, to the applicable Governmental Authorities all information necessary to comply with the National Environmental Policy Act, as it may be amended from time to time, and in complying with such Governmental Authorities' regulations relating thereto; provided, however,

that the Tribe shall be responsible for supplying such information. The Tribe and the Enterprise shall make, and Manager shall assist the Tribe and the Enterprise in making, all reasonable arrangements on behalf of the Tribe or the Enterprise as to comply with applicable tax laws, including, without limitation, tax law requirements concerning the reporting and withholding of taxes or other payments due by the Tribe or the Enterprise to any entity pursuant to any agreements the Tribe enters with a Governmental Authority; provided, however, that Manager shall have no other legal or financial responsibility for the Tribe's or the Enterprise's due performance and payment in full of such obligations of the Tribe or the Enterprise. The Tribe agrees that, through its Tribal Council and any subsequent or delegated governing or administrative authority, it shall take all reasonable actions necessary or advisable to ensure that the Tribe and the Enterprise comply with the foregoing Legal Requirements, it being understood and agreed that Manager shall not be liable for any violation due to action or inaction of the Tribe or the Enterprise. Manager and the Tribe shall comply with all Legal Requirements and all other agreements affecting the Facility and the Enterprise.

(c)     The Parties shall use their best efforts to promptly obtain all necessary approvals of all Governmental Authorities relating to this Agreement, the Transaction Documents and the transactions and activities contemplated hereby and thereby.

2.5     Security.  Manager shall direct the Enterprise to provide for appropriate security for the operation of the Enterprise. Manager shall direct the Enterprise to ensure that any security officer is bonded and insured in an amount commensurate with his or her enforcement duties and obligations. The cost of any charge for security and public safety services will be a Cost of Gaming Operations.

2.6     Accounting, Financial Records, and Audits.

(a)     Manager shall, or shall direct the Enterprise to, maintain full and accurate books and records of account for operations of the Commercial Activities of the Enterprise, including, without limitation, books and records which set forth the daily Gross Revenue from Commercial Activities of the Enterprise. Such books and records shall be maintained at Manager's office located within the Facility. Manager shall make available for immediate inspection and verification at all times and shall make copies of such books, records and other information relating to Commercial Activities as the Business Board or the Gaming Commission requests be made available to and/or copied and delivered to those members of the Business Board or the Gaming Commission who are authorized by the Business Board or the Gaming Commission, as applicable, to inspect, verify and/or receive copies of such books, records and other information relating to Commercial Activities. Authorized members of the Business Board or the Gaming Commission may remove from the Facility copies or originals of books, records and information relating to Commercial Activities; provided, however, that if such members remove originals, they shall leave or immediately provide Manager with copies of such books, records and information for Manager.

(b)     At least three (3) months prior to the scheduled Opening Date, and subject to the approval of the Business Board, which approval shall not be unreasonably withheld, conditioned or delayed and which shall occur at least four (4) months prior to the Opening Date, Manager shall establish and maintain satisfactory accounting systems and procedures that shall, at a

5106702                                         19

minimum: (i) include an adequate system of internal accounting controls; (ii) permit the preparation of financial statements in accordance with GAAP; (iii) be susceptible to audit; (iv) allow the Enterprise, the Tribe and the NIGC to calculate any annual fees due under 25 CFR § 514.1; (v) permit the calculation and payment of the Management Fee; and (vi) provide for the allocation of operating expenses or overhead expenses among the Tribe, the Enterprise, Manager and any other user of shared facilities and services. Supporting books and records and the agreed upon accounting systems and procedures shall be sufficiently detailed to permit the calculation and payment of the Management Fee hereunder and to permit the calculation and payment of any fee or contribution computations required under any Legal Requirements or agreements between the Tribe and Governmental Authorities.

(c)     Net Revenue will be calculated by Manager for purposes of distribution monthly in accordance with Section 5.12 and copies of such calculations shall be promptly supplied to the Business Board as required by Section 5.11.

(d)     All records shall be maintained so as to permit the preparation of financial statements and reports in accordance with GAAP consistently applied and in accordance with procedures to be mutually agreed upon by Manager and the Business Board. Manager shall, as a Cost of Gaming Operations, direct the Enterprise to prepare and furnish to the Business Board and the Gaming Commission monthly financial statements and reports in accordance with Section 5.11; provided, however, that, in the event such financial statements and reports are not prepared by the Enterprise, they shall be prepared by Manager. Such financial statements and reports shall provide reasonable detail as requested by the Business Board and the Gaming Commission with respect to revenues and expenses of each department of the Enterprise. In addition, all Commercial Activities conducted within the Facility shall be subject to independent annual audits, and such audit shall include an audit of all contracts that result in purchases within any given Fiscal Year of supplies, services or concessions relating to the Tribe's Commercial Activities of Twenty-Five Thousand Dollars ($25,000) or such greater amount as may be specified in the Tribe's Gaming Ordinance in effect from time to time (but not including contracts for professional legal or accounting services). The Tribal Council shall cause such audits to be conducted by an independent certified public accounting firm with more than five (5) years experience in audits of Commercial Activities selected by the Tribal Council. The cost of such audits and audit reports (including the annual audit under Section 5.13) shall constitute a Cost of Gaming Operations. Manager shall make any reports or presentations to the Business Board as are reasonably requested by the Business Board. Nothing contained in the foregoing shall prohibit Manager from employing an internal auditor to perform ongoing audit functions necessary or useful to the operation of the Enterprise. Such internal auditor shall be a Cost of Gaming Operations.

2.7     Cash Monitoring; Policies and Procedures; Surveillance.

(a)     The Gaming Commission shall adopt ordinances, regulations or standards which establish internal control standards which provide for a level of control which equals or exceeds the minimum internal control standards established by the NIGC from time to time.

(b)     Manager shall develop systems, standards, policies and procedures for the Enterprise which are consistent with requirements of any internal control standards established

by the Business Board or the Gaming Commission (the "Policies and Procedures"). The Business Board and the Gaming Commission shall have the right to approve the initial Policies and Procedures developed by Manager and any material amendments or changes to such Policies and Procedures thereafter developed by Manager from time to time. Manager shall direct the Enterprise to implement and comply with the Policies and Procedures and shall direct Enterprise Employees and Manager Employees to comply with the Policies and Procedures; provided, however, that, except as set forth in Section 4.2, Manager shall not be liable to the Enterprise or the Tribe in the event any Enterprise Employee or Manager Employee fails to comply with the Policies and Procedures. The costs of implementing and complying with Policies and Procedures shall be a Cost of Gaming Operations. The Business Board or the Gaming Commission shall have the right to select and retain an auditor to review the adequacy of the Policies and Procedures prior to the Opening Date, and to review the Policies and Procedures from time to time after the Opening Date. The cost of any such review prior to the Opening Date shall be a Pre-Opening Expense and the costs of any such review after the Opening Date shall be a Cost of Gaming Operations.

(c)     In consultation with the Business Board and the Gaming Commission, Manager shall direct the Enterprise to procure, install and operate a closed circuit television surveillance system to be used for monitoring the appropriate Commercial Activities of the Enterprise and such other activities as the Business Board or the Gaming Commission and Manager may agree upon from time to time.

2.8     Bank Accounts, Reserve Funds and Permitted Investments.

(a)     On or prior to the Opening Date, the Tribe, on behalf of itself and the Enterprise, and Manager shall execute the Blocked Account Agreement and establish and activate the Blocked Account(s) described therein. The Tribe, the Enterprise and Manager shall deposit all Gross Revenues daily into the Blocked Account(s) and shall take such actions and execute and deliver such agreements and instructions as shall be necessary or appropriate from time to time to ensure that all Gross Revenues continue to be deposited into the Blocked Account(s). Manager shall also establish other segregated bank accounts with the approval of the Business Board for the operation of the Enterprise (the "Enterprise Accounts"), which accounts must indicate the custodial nature of the accounts. The Blocked Account(s) and the Enterprise Accounts shall be established at such bank as the Business Board and Manager shall agree upon from time to time; provided, however, that such bank shall be organized under the laws of the United States of America or any state thereof; and provided, further, that such bank is a member of the Federal Deposit Insurance Corporation and has combined capital, profits and surplus of at least One Hundred Billion Dollars ($100,000,000,000). The funds in the Blocked Account(s) and the Enterprise Accounts shall be considered to be funds of the Enterprise and shall not be considered to have been distributed to the Tribe or to be available to the Tribe to be used for purposes unrelated to the Enterprise.

(b)     The signatures of authorized representatives of Manager shall be the only signatures required to make withdrawals from the Blocked Account(s) or Enterprise Accounts (i) for single withdrawals of less than Two Hundred Fifty Thousand Dollars ($250,000) or such greater amount as the Business Board may establish from time to time, (ii) for the purposes of making payments on behalf of the Tribe or the Enterprise for payouts, prizes, payroll, taxes,

purchases of currency, and payment of amounts owing to Manager under this Agreement, including, without limitation, the Management Fee under Section 5.12(a), (iii) payments to such additional payees or for such additional purposes as the Business Board may approve from time to time, or (iv) if the Tribe or the Enterprise are in default of their obligations under this Agreement; provided, however, that the monies withdrawn by Manager are to be used only for the expenses of the Enterprise or payments or distributions pursuant to Section 5.12 or the other provisions of this Agreement. Except as set forth in the preceding sentence, the signature of the Business Board's designated representative will also be required for withdrawals from the Blocked Accounts or the Enterprise Accounts. Cash withdrawals shall not be permitted except pursuant to policies drafted by Manager and approved by the Business Board. The authorized representatives of Manager for the purposes of this Section may include Manager Employees or Off-Site Manager Employees.

(c)    Notwithstanding the foregoing, the Tribe and the Enterprise agree that, without requiring the signature of any member of the Business Board or its representative, Manager may, or may direct the Enterprise to, make or permit timely transfers between or among any of the Blocked Account(s) and any of the Enterprise Accounts, including, without limitation, transfers necessary or appropriate to facilitate the payment on behalf of the Enterprise of (i) Costs of Gaming Operations; (ii) required debt service on the Transition Loan and the Facility Loan, as well as any other third party loans to which Manager has consented in writing pursuant to the terms of this Agreement or any other agreement; (iii) the Minimum Guaranteed Monthly Payment; (iv) reimbursement of Minimum Guaranteed Payment Advances; (v) the Management Fee; (vi) any reasonable reserves created and approved by the Business Board and Manager; and (vii) payments to the Tribe pursuant to Section 5.12(a).

(d)    Manager may direct the Enterprise to invest funds deposited in the Blocked Account(s) and the Enterprise Accounts in the following permitted investments: (i) a money market mutual fund registered under the Investment Company Act of 1940 that invests exclusively in (1) marketable direct obligations issued or unconditionally guaranteed by the United States Government or issued by an agency thereof and backed by the full faith and credit of the United States; (2) commercial paper having, at the time of acquisition, a rating of A-1 or P-1 or better from either Standard & Poor's Corporation or Moody's Investors Service, Inc., respectively; or (ii) other investments as may be directed by Manager with the prior written consent of the Business Board.

(e)    In order to secure the obligations of the Tribe and the Enterprise to Manager and its Affiliates under this Agreement and the other Transaction Documents, the Tribe and the Enterprise hereby grant to Manager a security interest in the Collateral Assets.  By execution of this Agreement, the Tribe and the Enterprise shall be deemed to have agreed to the Security Agreement, the terms of which shall be deemed to be a part of this Agreement and to be incorporated by reference into this Agreement as if set forth in full herein. The Tribe and the Enterprise agree to execute and deliver to Manager the Blocked Account Agreement, the Security Agreement, financing statements applicable to the Collateral Assets, and such other amendments, agreements and financing statements which amend, supplement or supersede the Blocked Account Agreement, the Security Agreement and such financing statements, as Manager may reasonably request in order to confirm the creation, attachment and perfection of the security interest of Manager and its Affiliates in the Collateral Assets.

2.9   Enforcement of Rights.

(a)   Except as otherwise provided in Section 2.9(b), the Business Board and Manager shall mutually agree with respect to the handling of the defense, prosecution or settlement of civil disputes with third parties relating to activities conducted by the Enterprise, Enterprise Employees or Manager Employees or contracts or causes of action relating the Facility or the Enterprise. The Parties will assist and cooperate with each other with respect to such third-party disputes. All uninsured liabilities incurred or expenses incurred by the Tribe or Manager or any of the Affiliates, employees, officers, directors, members, shareholders, agents, representatives, successors or permitted assigns of either Party or its Affiliates in defending such claims by third parties or prosecuting claims against third parties shall be considered Costs of Gaming Operations.

(b)   Manager may, in accordance with Manager's good faith business judgment and without requiring the consent of the Business Board, settle and pay in the name of and on behalf of the Enterprise, the Tribe, Manager, Manager's Affiliates or any of their respective employees, officers, directors, members, shareholders, agents, representatives, successors or permitted assigns any claims brought against such persons or entities arising out of or relating to Commercial Activities conducted by the Enterprise or other activities or transactions contemplated by this Agreement or the other Transaction Documents; provided, however, that, in the case of settlements which do not involve claims against Manager, its Affiliates or related persons, the total amount to be paid pursuant to the settlement is less than Two Hundred Fifty Thousand Dollars ($250,000) and the total amount to be paid pursuant to all settlements entered into in the applicable Fiscal Year is less than Three Million Dollars ($3,000,000); and provided, further, that, in the case of settlements which involve claims against Manager, its Affiliates or related persons, the total amount to be paid pursuant to the settlement is less than One Hundred Thousand Dollars ($100,000) and the total to be paid pursuant to all such settlements in the applicable Fiscal Year is less than Seven Hundred Fifty Thousand Dollars ($750,000). The Business Board may increase the foregoing amounts in its discretion. The Manager shall not enter into settlements which exceed the applicable threshold amounts without the consent of the Business Board unless, in the case of claims brought against Manager, its Affiliates or related persons, Manager or its Affiliates agree to pay the excess over the threshold amount from funds of Manager or its Affiliates and not from funds of the Enterprise.

2.10   Fire, Safety and Law Enforcement Services. The Tribe and the Business Board shall be responsible for obtaining, and Manager shall assist the Tribe and the Business Board in obtaining, adequate coverage for fire, safety and law enforcement services for the Facility and the Enterprise and may, in their discretion, have such services provided on a contractual basis by local fire and police departments. The Parties agree that the costs of any fire, safety or law enforcement protection services shall be Costs of Gaming Operations and, if provided by a department of the Tribe, shall not exceed the actual cost to the Tribe of providing such services.

2.11   Timely Payment of Costs of Gaming Operations. Manager shall be responsible for directing the Enterprise to pay Costs of Gaming Operations on behalf of the Enterprise from the bank account(s) established pursuant to Section 2.8 so as to avoid any late-payment penalties (except those incurred as a result of good faith payment disputes or the failure of the Business Board or its designated representative to timely approve such payments, if required) to the extent

funds of the Enterprise are available; provided, however, that payment of all such costs (and taxes or similar payments arising from Enterprise operations) shall be solely the legal responsibility of the Enterprise.

2.12    Acquisition of Equipment.

(a)    All equipment shall be acquired by the Tribe or the Enterprise or by Manager, acting as agent for the Tribe or the Enterprise, from distributors and manufacturers approved by the Business Board or, if required, licensed by the Gaming Commission.

(b)    All acquisitions of new Furnishings and Equipment after the Opening Date shall be purchased or leased by the Tribe or the Enterprise at the direction of Manager, as agent for the Tribe or the Enterprise, under market terms and conditions, unless otherwise agreed to by the Business Board.

(c)    The Business Board and Manager shall mutually agree upon the number and type of gaming devices and related hardware and software to be acquired by the Enterprise and operated at the Facility. The Business Board and Manager shall mutually agree upon the type and performance characteristics or any gaming systems acquired by the Enterprise and operated at the Facility which may be or are intended to be operated as Class II Gaming.

2.13    Hours of Operation. Manager shall establish the operating days and hours of the Facility and the Enterprise, which, unless otherwise agreed by Manager and the Business Board, shall be seven (7) days per week and twenty-four (24) hours per day.

2.14    Access to Facility. Manager shall, and shall direct the Enterprise to, provide immediate access at all times to those locations within the Facility which operate the Enterprise's Commercial Activities for those members of the Business Board or the Gaming Commission who are authorized by the Business Board or the Gaming Commission, as applicable, to access such locations.

2.15    Advertising. Manager shall, on behalf of the Tribe or the Enterprise, contract for and place advertising, subject to prior approval of the general concepts of the advertising by the Business Board. Advertising costs will be included in the Annual Operating Budgets prepared in accordance with Section 5.3.

2.16    Maintenance. Manager will direct the Enterprise to cause the Facility to be repaired and maintained and operated in a clean, good and orderly condition. Repairs and maintenance will be paid as Costs of Gaming Operations.

2.17    Effective Date; Term.

(a)    Notwithstanding the date of signature of the Parties, this Agreement shall become effective automatically (without need of amendment, ratification or other action of the Parties) upon the approval of this Agreement by the Chairman of the NIGC (the "Effective Date"). Unless sooner terminated as provided in Article 6, this Agreement shall expire on the [ ] b4 anniversary of the Commencement Date; provided, however, that the term and expiration date of this Agreement may be extended as provided in Section 6.6.

5106702                                24

(b)     The Tribe shall use its best efforts to promptly cause any of the following events to occur which have not occurred as of the Effective Date: (i) the acceptance of the Site into trust by the United States government, as trustee for the Tribe; (ii) the approval by the Chairman of the NIGC of this Agreement and any Transaction Document or other agreement which is a collateral agreement to this Agreement which requires the approval of the Chairman of the NIGC in order to not be void under the IGRA, or a determination by the NIGC that such approval is not required in order for this Agreement, such Transaction Document or such other collateral agreement to not be void under IGRA; (iii) the approval of this Agreement or any Transaction Document by the Secretary of the Interior which requires such approval or a determination by the Secretary that such approval is not required; (iv) the issuance by the Solicitor's Office of the Department of the Interior or the Office of the General Counsel of the NIGC of an opinion or determination that the Site constitutes "Indian lands" within the meaning of the IGRA and is eligible for the conduct of Gaming pursuant to Section 20 of the IGRA; (v) the approval by the Chairman of the NIGC of the Gaming Ordinance; or (vi) issuance by the Gaming Commission to Manager, any of its Affiliates or any Manager Employees of all applicable license(s) required by the Gaming Ordinance or any Gaming Commission regulations.

2.18    Access to Property. The Tribe agrees that Manager, its Affiliates and any Manager Employees shall peaceably have complete access to and presence on the Site and in the Facility in accordance with the terms of this Agreement, free from molestation, eviction and disturbance by the Tribe or by any other person or entity; provided, however, that such right of access to and presence on the Site and in the Facility shall cease upon the expiration or termination of this Agreement pursuant to its terms; and provided, further, that such right to access and presence on the Site and in the Facility shall not be considered to be a transfer, conveyance, mortgage, charge, lien, encumbrance, right of entry, liability to real property, right, title or interest in or to the Site or any other land or real property; and provided, further, that, if Manager's license is revoked by the Gaming Commission, Manager's access and presence on the Site and in the Facility shall be limited to recovery of Manager's books, records and personal property and shall be terminated thereafter.

2.19    Creation and Operation of Business Board. In order to provide a mechanism to ensure the efficient exercise of control over the Enterprise by the Tribe, the Tribe agrees to create a business board (the "Business Board") comprised of the following members: (i) between three (3) and seven (7) voting members appointed by the Tribe from time to time (the "Tribal Representatives"), and (ii) non-voting members appointed by Manager from time to time who shall, in any event, always be fewer in number than the number of voting members appointed by the Tribe from time to time (the "Manager Representatives"). Upon the request of the Tribal Council, members of the Tribal Council who are not members of the Business Board may attend, but may not vote at, meetings of the Business Board. By execution of this Agreement, the Tribe acknowledges and agrees that, without requiring any further action or resolution by it or any of its Affiliates, (i) the Business Board, upon its creation, shall have the power of the Tribe with respect to all matters relating to this Agreement, the Transaction Documents, the Facility and the Enterprise, and (ii) actions and directions of the Business Board shall be, and shall be deemed to be, actions and directions of the Tribe and shall bind the Tribe; provided, however, that the Business Board shall not have authority to waive the sovereign immunity of the Tribe or the Enterprise except pursuant to authority delegated by the Tribe to the Business Board in accordance with the Constitution of the Tribe and other applicable Tribal law. The Business

Board shall meet as necessary to ensure timely decision-making. Any travel or similar expenses incurred by the Tribal Representative members of the Business Board acting in their capacities as members of the Business Board shall be deemed to constitute a Cost of Gaming Operations. Any compensation to be paid to the Tribal Representatives of the Business Board, acting in their capacities as members of the Business Board, shall be borne by the Tribe and shall not constitute Costs of Gaming Operations or other expenses of the Enterprise. Any expenses or compensation to be paid to the Manager Representatives, acting in their capacities as members of the Business Board, shall be borne by Manager and shall not constitute Costs of Gaming Operations or other expenses of the Enterprise.

     2.20   Business Board Meetings.

     (a)    A regular monthly meeting of the Business Board is to be held at such places and at such times as the Business Board shall determine. Every six (6) months, the Business Board shall distribute a set of meeting times and dates for the next six (6) months. Special meetings of the Business Board may be held whenever and wherever called for by at least two (2) members. Two (2) Tribal Representatives and two (2) Manager Representatives shall constitute a quorum for the transaction of business at any meeting of the Business Board. The Business Board shall appoint a Chairperson and Vice-Chairperson who shall serve two year terms, which terms may be renewed. The appointed Chairperson shall cause a written agenda to be sent to each member of the Business Board for each regularly scheduled meeting and special meeting, at least twenty-four (24) hours in advance of the meeting. The Vice-Chairperson shall conduct the Business Board meetings when the Chairperson is absent or unable to do so.

     (b)    Once the regular meeting is set by the Business Board, no notice need be given of regular meetings of the Business Board. Notice of the time and place of any special meeting shall be given at least twenty-four (24) hours prior to the meeting. Any member may waive notice of any meeting and any adjournment thereof at any time before, during, or after it is held. Except as provided in the next sentence below, the waiver must be in writing, signed by the member entitled to the notice, and filed with the minutes of the Business Board. The attendance of a member at, or participation of a member in, a meeting shall constitute a waiver of notice of such meeting, unless the member at the beginning of the meeting (or promptly upon his/her arrival) objects to holding the meeting or transacting business at the meeting, and does not thereafter vote for or assent to action taken at the meeting.

     (c)    If a quorum is present when a vote is taken, the affirmative vote of the majority of the voting members of the Business Board present shall be the act of the Business Board. The non-voting members of the Business Board may participate in the deliberations of the Business Board, but shall not vote with respect to actions of the Business Board.

     (d)    Any or all members of the Business Board may participate in a regular or special meeting by, or conduct the meeting through the use of, any means of communication by which all members participating may simultaneously hear and communicate with each other during the meeting, in which case any required notice of the meeting may generally describe the arrangements (rather than or in addition to the place) for the holding thereof. A member participating in a meeting by this means is deemed to be present in person at the meeting.

(e)     Any action required or permitted to be taken by the Business Board at a meeting may be taken without a meeting if the action is taken by unanimous written consent of the voting members as evidenced by one (1) or more written consents describing the action taken, signed by each voting member, and a copy of such consent is provided to each non-voting member. Action taken by consent is effective when the last voting member signs the consent and the last non-voting member is provided a copy of the consent, unless the consent specifies a different effective date. Any such consent has the effect of a meeting vote and may be described as such in any document.

2.21    Tribal Laws.

(a)     The Tribe covenants that the provisions of any Tribal or Tribal Affiliate laws, rules or regulations and any amendments to the foregoing will be enacted in a legitimate and good faith effort to protect the environment, public health and safety, the integrity of Commercial Activities, and to otherwise fulfill the purposes of this Agreement. In the event that the Tribe or its Affiliates are required to adopt or enforce a law, ordinance or regulation to protect the environment, public health and safety or the integrity of the Commercial Activities which materially and adversely affect Manager's rights, benefits or obligations under this Agreement in a manner that is disproportionate to the adverse economic consequences suffered by the Tribe, the Tribe shall indemnify and reimburse Manager in such amount as will restore to Manager the proportionate Management Fee and other economic benefits under this Agreement to which Manager would have been entitled had such action not been taken by the Tribe.

(b)     In the event the Tribe or any of its Affiliates adopts any Tribal or Tribal Affiliate law, rule, regulation, ordinance or resolution, or any amendments to the foregoing not required to be adopted pursuant to federal or State law which would adversely affect the Enterprise's ability to succeed in the marketplace or which would adversely affect Manager's rights under this Agreement, the Transaction Documents or any related agreement, the Tribe agrees to make a payment to Manager as of the date of adoption in an amount which would compensate Manager for its economic damages and losses and would place or restore Manager to the economic position it would have enjoyed if such law, rule, regulation, ordinance, resolution or amendment had not been adopted, plus a Late Payment Charge on the outstanding balance of such amount, compounded monthly, for the period from the date of adoption until the date of payment.

(c)     The Tribe shall give Manager at least ten (10) business days' notice of the proposed provisions and adoption of any Tribal or Tribal Affiliate law, rule or regulation, any amendments to the foregoing, or any other Tribal governmental action affecting the Facility, the Enterprise, this Agreement, any Transaction Document, the Transition Loan, the Facility Loan or any rights hereunder or thereunder.

2.22    Best Efforts; Covenant of Good Faith and Fair Dealing.  The Tribe and Manager agree to use their best efforts and to act in good faith in dealing with one another. Manager and the Tribe hereby specifically warrant, represent and covenant to each other that neither shall act in any manner which would cause this Agreement to be altered, amended, modified, canceled, or voided without the consent of the other. The Tribe and Manager further agree that they shall take all actions necessary to ensure that this Agreement shall remain in full force and effect at all times and will fully cooperate with each other in achieving the goals of this Agreement.

2.23   Compliance with Financing Agreements. The Tribe, Manager and their respective Affiliates, if applicable, shall comply with the affirmative and negative covenants which they made in the Transition Loan, the Facility Loan and any documents relating thereto.

2.24   Affiliates. The Tribe shall, and shall cause its Affiliates to, comply with and act in a manner consistent with this Agreement. The provisions of this Agreement shall bind the Tribe's Affiliates, including, without limitation, the Business Board, the Gaming Commission, the Enterprise or any other agency, instrumentality or subdivision of the Tribe, as if such entity had executed this Agreement. Upon the request of Manager, the Tribe shall cause such entities to execute and deliver such joinder or similar agreement as Manager may reasonably request. In the event the Enterprise is organized as or deemed to be a juridical entity separate from the Tribe, the Enterprise shall be deemed to be a party to this Agreement without requiring any further action by the Tribe or the Enterprise.

2.25   Tribal Licenses. The Tribe and the Gaming Commission shall grant any application for a Tribal gaming license if the applicant complies with the licensing standards stated in the Gaming Ordinance. The Tribe or the Gaming Commission shall act in good faith and shall not unreasonably or without good cause delay, deny, qualify, condition, suspend, revoke, withdraw, terminate or fail to renew such licenses as it is authorized to grant. The Tribe or its Affiliates shall not take or fail to take any Tribal Governmental Action which is adverse to the interests of Manager, any Manager Affiliate or their respective officers, directors, managers, shareholders, members or employees (including, without limitation, any Manager Employee or Off-Site Manager Employee) or which conflicts or is inconsistent with the Gaming Ordinance in effect as of the Effective Date or any Legal Requirements. The Tribe and its Affiliates, including the Gaming Commission, shall be deemed to have waived sovereign immunity in connection with any proceeding, hearing or appeal contemplated by the Gaming Ordinance in effect as of the Effective Date or any Legal Requirement or any action to compel, or enforce any determination of, the foregoing; provided, however, that such waiver does not modify the provisions of Section 10.3(k). Except for Tribal gaming licenses to be issued by the Gaming Commission to any Manager Employees to the extent required under the Gaming Ordinance, the Tribe acknowledges and agrees that Manager, Manager's Affiliates or their respective officers, directors, managers, shareholders, members and employees shall not be required to obtain any license, permit or approval from the Tribe, the Gaming Commission or any other Affiliate of the Tribe in order for Manager to retain its rights or perform its obligations under this Agreement or such other persons or entities to support Manager in performing its obligations under this Agreement. Any action or failure to act by the Tribe's Affiliates (including, without limitation, the Gaming Commission) shall be deemed for all purposes to be an action or failure to act by the Tribe for which the Tribe shall be responsible pursuant to the terms of this Agreement.

2.26   Taxes.

(a)   If the State of California or any local government attempts to impose any tax, including, without limitation, any possessory interest tax, upon any Party to this Agreement or its Affiliates with respect to the Enterprise, the Facility or the Site, the Enterprise, in the name of the appropriate party or parties in interest, shall resist such attempt through legal action. This Section 2.26(a) shall in no manner be construed to imply that any Party to this Agreement or the Enterprise is liable for any such tax.

(b)     The Tribe agrees that neither it nor any agent, agency, Affiliate or representative of the Tribe will impose any taxes, fees, assessments or other charges of any nature whatsoever on payments of any debt service to any Lender, Manager or any of their Affiliates, or on the Enterprise, the Facility, the revenues therefrom or the Management Fee or other payments due Manager under this Agreement or any Transaction Document.  Unless otherwise agreed by Manager, the Tribe and any agent, agency, Affiliate or representative of the Tribe will not impose any taxes, fees, assessments or other charges of any nature whatsoever on the salaries or benefits of, or dividends paid to, any of Manager's or its Affiliates' stockholders, officers, directors, or employees, or any of the employees of the Enterprise; or any provider of goods, materials or services to the Enterprise or upon any patron of the Enterprise; provided, however, that the Tribe may impose a nondiscriminatory sales, use, excise or other tax on patrons of the Facility or the Enterprise to the extent that it is a substitute for a similar tax then charged by the State or the local government whose boundaries include the Site but which is not applicable to the Site, or transactions taking place on the Site, and the tax is no greater than the avoided taxes that would have been charged by the State or local government.  In addition to its rights under Article 6, Manager retains the right to terminate this Agreement and all related agreements if it reasonably determines that any statute, law, code or regulation of the Tribe renders operation of the Enterprise, or any component thereof, uncompetitive.  The Tribe agrees that, although it has the power to do so, it recognizes the importance of remaining competitive, and therefore it will not levy or assess any tax upon the sale of goods or services by the Enterprise except as permitted by this Section.  If any taxes, fees or assessments are levied by the Tribe or its Affiliates which are inconsistent with the terms of this Section, the Tribe shall indemnify and hold harmless the payers of any such taxes, fees or assessments which are paid.  The provisions of this Section shall survive the expiration or earlier termination of this Agreement, regardless of the reason for such termination.

2.27     Enactment of Ordinances.  The Parties acknowledge and agree that, in order for the Enterprise to succeed, it will be necessary or advisable that the Tribe or its Affiliates adopt such laws, rules, regulations, ordinances or resolutions, or amendments to the foregoing, as may be required, appropriate or contemplated in accordance with Legal Requirements and to maintain such laws, rules, regulations, ordinances or resolutions in full force and effect during the term of this Agreement, including, without limitation and to the extent applicable, a building and safety code ordinance, a public health, safety and welfare standards ordinance, a labor ordinance, and an environmental ordinance.  In the event that, after receiving a request from Manager, the Tribe or any of its Affiliates fails to adopt any such laws, rules, regulations, ordinances or resolutions on a timely basis, the Tribe agrees to make a payment to Manager in an amount which would compensate Manager for its economic damages and losses and would place or restore Manager to the economic position it would have enjoyed if such law, rule, regulation, ordinance, resolution or amendment had been adopted on a timely basis, plus a Late Payment Charge on the outstanding balance of such amounts, compounded monthly, for the period from the date of Manager's request until the date of payment.

2.28     Standard of Care.  The standard of care which shall apply to Manager in the performance of its obligations under this Agreement shall be reasonable efforts of a manager managing a similar project or facility.

2.29    Management Exclusivity.  Prior to the expiration or termination of this Agreement, the Tribe agrees that, without the prior and express consent of Manager, the Tribe, any Tribal Affiliate, any member of the Tribal Council or the Tribe or any of their respective agents or representatives shall not, directly or indirectly, (i) enter into any discussions, negotiations, arrangements, understandings or agreements with any person or entity other than Manager or any Manager Affiliate regarding such person or entity assisting the Tribe or the Enterprise in the operation or management of the Enterprise (other than communications between the Tribe or the Gaming Commission and the NIGC or law enforcement authorities and communications between the Tribe or the Gaming Commission and background investigators, independent auditors or attorneys solely in connection with the provision of investigative, auditing or legal services, as applicable, to the Tribe or the Gaming Commission), or (ii) operate or manage the Enterprise itself or themselves without the services of Manager.  The Tribe represents and warrants that, prior to the date of this Agreement, the Tribe and any Tribal Affiliates have not entered into any communications, discussions, negotiations, arrangements, understandings or agreements referenced in this Section.  After the date of this Agreement, the Tribe agrees to disclose any communications, discussions, negotiations, arrangements, understandings or agreements which occur in violation of the provisions of this Section immediately upon discovery of their occurrence.  Notwithstanding the foregoing provisions of this Section, upon the termination of this Agreement or during the period commencing nine (9) months prior to the expiration of this Agreement, the Tribe may, without the consent of Manager, enter into communications, discussions, negotiations, arrangements, understandings or agreements with third parties regarding such person or entity assisting the Tribe or the Enterprise in the operation or management of the Enterprise; provided, however, that, during the period prior to the expiration of this Agreement, the Tribe provides Manager with prior written notice of such communications, discussions, negotiations, arrangements, understandings or agreements.

2.30    Amendment to Agreement.  In the event Manager desires to amend or restate this Agreement after the Effective Date of this Agreement, the Tribe agrees to (i) consider and negotiate in good faith with Manager regarding its proposed amendment or restated version of this Agreement, and (ii) if the Tribe agrees, in its discretion, to such proposed amendment or restated version of this Agreement, promptly approve, execute and deliver two or more counterparts of such amendment or restated version of this Agreement.  The Tribe further agrees to act in good faith and use its best efforts to promptly (i) submit such amendment or restated version of this Agreement to any governmental authorities Manager may request, (ii) address and resolve any issues raised by such governmental authorities, and (iii) cause such governmental authorities to approve such amendment or restated version of this Agreement or issue a determination that such approval is not required.

## ARTICLE 3
## EMPLOYMENT MATTERS; OTHER COVENANTS

3.1    Manager's Responsibilities for Employees.

(a)      Manager shall have, subject to any applicable provisions of Enterprise Employee Policies, the exclusive responsibility and authority to direct the selection, hiring, training, promotion, control and discharge of all Enterprise Employees.  All Enterprise Employees shall be employees of the Tribe or the Enterprise.

(b)      Manager shall have the exclusive responsibility and authority to direct the selection, hiring, training, promotion, control and discharge of all Manager Employees and Off-Site Manager Employees without such actions being subject to Enterprise Employee Policies or any involvement of the Business Board or any other Affiliate of the Tribe, except for any requirements of the Gaming Commission for Manager Employees to undergo background investigations and/or obtain gaming licenses.  All Manager Employees or Off-Site Manager Employees shall be employees of Manager or its Affiliates.

(c)      The terms of employment of all Enterprise Employees, Manager Employees and Off-Site Manager Employees shall comply with all Legal Requirements.

3.2      Enterprise Employee Policies.  Manager shall prepare a draft of personnel policies and procedures (the "Enterprise Employee Policies") which shall include a job classification system with salary levels and scales and grievance procedure.  Disputes regarding any terms of employment with respect to any Enterprise Employee and Manager shall first be resolved through the Enterprise Employee Policies.  Any dispute that cannot be resolved through the Enterprise Employee Policies shall be submitted to an employee review board for resolution in accordance with applicable Tribal Law.  Such Enterprise Employee Policies shall be subject to approval by the Business Board.  The Enterprise Employee Policies shall include a grievance and dispute resolution procedure in order to establish fair and uniform standards for the Enterprise Employees which include procedures for the initiation and resolution of disputes between Enterprise, the Tribe, Manager, any Affiliate of Manager or any Manager Employee, on one hand, and any Enterprise Employee, on the other hand.  The Enterprise Employee Policies and any amendments thereto shall not be effective unless they are approved by the Business Board.  The Enterprise Employee Policies shall not be applicable to Manager Employees or Off-Site Manager Employees unless expressly agreed in writing by Manager.

3.3      Manager Employees.  The Enterprise shall reimburse Manager or its Affiliates an amount equal to the actual Compensation (including, but not limited to, salaries, benefits, pension, retirement, severance or similar benefits) which is related to Manager Employees and the services they provide, plus the full amount of any travel and other business expenses incurred by such Manager Employees for the benefit of the Tribe or the Enterprise.  Manager or its Affiliates shall only be reimbursed for the actual Compensation and expenses incurred relating to such Manager Employees and the services they provide without any additional fee, mark-up or premium.  The amount of such reimbursements shall be Costs of Gaming Operations and shall be included in the Annual Operating Budget approved by the Business Board.

3.4      Off-Site Manager Employees.  Subject to the Business Board's approval of such costs in the Annual Operating Budget or as otherwise agreed in writing by the Business Board, Manager shall have the right to use employees of Manager or its Affiliates not located at the Facility to provide services to the Enterprise ("Off-Site Manager Employees").  Upon the request of the Business Board, Manager shall cause the Enterprise to hire full-time employees or third

parties to perform functions which have been or could be performed by Off-Site Manager Employees if the Business Board and Manager agree that hiring a full-time Enterprise Employee would result in less cost to the Enterprise than using Off-Site Manager Employees to perform the same or similar functions. The Enterprise shall reimburse and pay Manager or its Affiliate an amount equal to a pro-rated portion of the expenses and costs (including, but not limited to, Compensation, salaries, benefits, pension, retirement or similar benefits) which are related to such Off-Site Manager Employees and the services they provide, plus business expenses associated with providing services to the Tribe or the Enterprise, including, without limitation, travel, meals and lodging for business trips to the Facility or other locations necessary to perform services for the Enterprise. The amounts of such reimbursements shall be Costs of Gaming Operations and the budget for such amounts shall be included in the Annual Operating Budget approved by the Business Board. The amounts which the Enterprise shall pay Manager or its Affiliates for the services of such Off-Site Manager Employees shall be based on the same allocation formula and other reimbursement amounts, policies and procedures which Manager or its Affiliates use in allocating and obtaining reimbursement for the services provided by such Off-Site Manager Employees to other facilities or enterprises owned or managed by Manager and its Affiliates. Manager or its Affiliates shall not receive reimbursement for salary or benefits related to Off-Site Manager Employees of Manager's parent who have the level of seniority of Senior Vice President or above. Off-Site Manager Employees who are not "key employees" or "primary management officials" within the meaning of IGRA shall not be required to obtain gaming or other licenses from the Gaming Commission, provided that they hold a gaming license issued by a state gaming commission or, if not required to obtain a gaming license from any state gaming commission in order to perform their responsibilities for Manager or its Affiliates, have passed such internal background investigation as Manager or its Affiliates may conduct from time to time.

3.5     No Manager Wages or Salaries. Except as otherwise provided in Sections 3.3 and 3.4, neither Manager nor its Affiliates nor any of their respective officers, directors, shareholders, or employees shall be compensated by wages or other payments paid by the Enterprise for any work which they perform for the Enterprise, except for the Management Fee to be paid to Manager hereunder.

3.6     Costs of Gaming Commission. The Parties acknowledge and agree that (i) the costs and expenses of the operation of the Gaming Commission are costs and expenses of the Tribe performing a governmental function which shall be paid for pursuant to appropriations by the Tribe to the Gaming Commission, and (ii) such costs and expenses are not operating expenses of the Enterprise. The Parties have nevertheless agreed that the costs and expenses of the Gaming Commission up to a maximum amount of One Million Two Hundred Thousand Dollars ($1,200,000) per Fiscal Year shall be deemed to be included within the definition of the term "Deductable Non-Enterprise Costs" for the purposes of calculating the Management Fee under this Agreement. The figure of One Million Two Hundred Thousand Dollars ($1,200,000) shall be pro-rated for any partial Fiscal Year during the term of this Agreement.

3.7     Employee Background Investigations. An appropriate background investigation shall be conducted by the Gaming Commission in compliance with all Legal Requirements, to the extent applicable, on each applicant for employment as soon as reasonably practicable. No individual whose prior activities, criminal record, if any, or reputation, habits and associations

are known to pose a threat to the public interest, the effective regulation of Gaming, or to the gaming licenses of Manager or any of its Affiliates, or to create or enhance the dangers of unsuitable, unfair or illegal practices and methods and activities in the conduct of Gaming, shall knowingly be employed by Manager, the Tribe or the Enterprise. The background investigation procedures employed shall satisfy all regulatory requirements. Any cost associated with performing such background investigations shall constitute a cost of the Gaming Commission and not a Cost of Gaming Operations. Manager shall pay the fees associated with the background investigation by the NIGC of Manager and its Affiliates and such fees shall not constitute Costs of Gaming Operations or other expenses of the Enterprise.

3.8     Indian Preference, Recruiting and Training. In order to maximize the benefits of the Enterprise to the Tribe, Manager shall, to the extent permitted by applicable law (including, but not limited to, the Indian Civil Rights Act, 25 U.S.C. §§ 1301 et seq.), direct the Enterprise to give preference in recruiting, training and employment in all job categories of the Enterprise to members of the Tribe qualified for the position if and as required in any duly enacted Tribal member preference ordinance adopted by the Tribe. Manager shall direct the Enterprise to:

(a)     conduct job fairs and skills assessment meetings for Tribal members;

(b)     abide by any duly enacted Tribal member preference ordinance;

(c)     in consultation with and subject to the approval of the Business Board, develop a management training program for Tribal members or individuals selected by the Business Board, which program shall commence no later than ninety (90) days before the scheduled Opening Date and shall be structured to provide appropriate training for those participating to assume full managerial control of the Enterprise and the Facility at the conclusion of the term of this Agreement; and

(d)     whenever reasonably possible, fill Enterprise Employee positions with a member of the Tribe who has demonstrated skills and abilities to perform the tasks to be undertaken in an acceptable manner and can satisfy the reasonable bonding requirements of Manager. Final determination of the qualifications of Tribal members and all other persons for employment shall be made by Manager, subject to any licensing requirements of the Gaming Commission.

3.9     Discipline of Enterprise Employees. With the exception of Manager Employees and Off-Site Manager Employees, Manager will direct the Enterprise to act in accordance with the Enterprise Employee Policies with respect to the hiring, training, discharge, demotion or discipline of any Enterprise Employee. Manager shall retain sole discretion with respect to the hiring, training, discharge, demotion or discipline of any Manager Employee or Off-Site Manager Employee; provided, however, that the revocation, suspension or denial of a Manager Employee's license shall remain under the authority of the Gaming Commission, subject to the applicable provisions of the Gaming Ordinance, any Legal Requirements and this Agreement.

3.10    Conflict of Interest.

(a)    Manager covenants that it will not unduly interfere with, or attempt to influence the internal affairs or government decisions of, the Tribe for its gain or advantage.

(b)    Manager hereby certifies that no payments have been made or will be made in the future by Manager to any Tribal official, member of the Tribal Council, relative of any Tribal official or Tribal government employee for the purpose of obtaining any special privilege, gain, advantage or consideration for Manager, except for the fees payable to the Tribe pursuant to this Agreement or the Tribe's Affiliates in the normal course of business; provided, however, that nothing in this provision shall prohibit Manager from making contributions to community organizations associated with the Tribe or to the Tribe for the purpose of funding community activities.

(c)    No member or official of the Tribal Council, the Business Board or any other Affiliate of the Tribe may be employed by Manager or have a direct or indirect financial interest in this Agreement. Members or officials of the Tribal Council, the Business Board, or the Gaming Commission shall not be eligible for employment at the Facility or the Enterprise, but will be eligible to enter into contracts for the provision of goods or services for the Facility and the Enterprise.

3.11    Participation in Tribe Functions. Manager acknowledges that personnel who are members of the Tribe have cultural and religious responsibilities to perform in regard to Tribal rituals and similar activities. Manager will schedule working hours and take other actions, with the assistance and advice of the Business Board, to accommodate Tribal members in performing these responsibilities without affecting their employment status or position.

3.12    Alcoholic Beverages and Tobacco Sales. During the term of this Agreement, alcoholic beverages shall be sold and served at the Facility in accordance with Legal Requirements. The Parties acknowledge that enabling Tribal legislation for the sale of alcoholic beverages is required, and that such legislation will be necessary in order to serve alcoholic beverages at the Facility. The Tribe agrees to enact and perfect such legislation, and use best efforts to obtain any and all other requisite approvals as soon as possible, including, without limitation, publication of such legislation governing the sale of alcoholic beverages in the Federal Register, pursuant to 18 U.S.C. §1154 and §1161, but in no event later than thirty (30) days prior to the Opening Date. The Tribe and Manager hereby mutually agree to include service of such beverages within the Facility. Tobacco shall also be sold at the Facility, subject to and in accordance with the Tribe's licensing requirements, if any.

3.13    No Liens or Encumbrances. During the term of this Agreement, the Tribe shall not act in any way whatsoever, either directly or indirectly, to cause or suffer any person or entity to hold a security interest, lien or encumbrance on the Enterprise, the assets of the Enterprise, the Site or the Facility, other than security interests in the Collateral Assets in favor of Manager, Manager's Affiliates or Lender, or to allow any person or entity to obtain any interest in this Agreement without the prior written consent of Manager. The Tribe and Manager (to the extent within Manager's control) shall keep the Enterprise, the personal property assets of the Enterprise, the Site and the Facility free and clear of all enforceable mechanics' and other

liens resulting from the construction of the Facility and all other enforceable liens which may attach to the Enterprise, the personal property assets of the Enterprise, the Site or the Facility. If any such lien is claimed or filed, it shall be the duty of the Tribe to discharge, or cause the Enterprise to discharge, the lien within thirty (30) days after having been given written notice of such claim, either by payment to the claimant, by the posting of a bond and the payment into court of the amount necessary to relieve and discharge the Enterprise, the assets of the Enterprise, the Site or the Facility from such claim, or in any other manner which will result in the discharge or stay of such claim, and Manager is authorized to act on behalf of the Tribe or the Enterprise to discharge any liens. Notwithstanding the foregoing, the Tribe and the Enterprise shall have the right to grant a security interest in the Collateral Assets to Lender to secure the Tribe and the Enterprise's obligations to Lender under the Transition Loan or Facility Loan documents. Notwithstanding the foregoing, the Tribe and the Enterprise hereby grant a security interest in all Collateral Assets to Manager to secure the Tribe and the Enterprise's obligations to Manager and its Affiliates under this Agreement and the other Transaction Documents, and the Tribe and the Enterprise agree to execute and deliver to Manager the Blocked Account Agreement, the Security Agreement and such other agreements and instruments in favor of Manager or its Affiliates as Manager may reasonably request to confirm, create, attach or perfect such security interest.

    3.14    <u>Additional Tribal Covenants</u>. The Tribe further covenants and agrees as follows:

    (a)    The Tribe shall not permit the Business Board or the Enterprise to sell, lease, transfer or otherwise dispose of any of the Enterprise properties or assets of the Enterprise, or purchase any property or assets from, or enter into or make any contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Tribe, any members of the Tribe or any entity wholly or partially owned by any member of the Tribe (each of the foregoing, an "Affiliate Transaction"), unless (i) such Affiliate Transaction is on terms that are no less favorable to the Tribe or the Enterprise than those that would have been obtained in a comparable transaction by the Tribe or the Enterprise with an unrelated person or entity, and (ii) the Business Board delivers to Manager with respect to any Affiliate Transaction involving aggregate payments in excess of $100,000 a resolution adopted by a majority of the disinterested members of the Business Board approving such Affiliate Transaction and certifying that such Affiliate Transaction complies with clause (i) above, and, with respect to any Affiliate Transaction involving aggregate payments in excess of $1 million, a written opinion as to the fairness to the Tribe or the Enterprise from a financial point of view issued by an independent financial advisor with assets in excess of $1 billion.

    (b)    The Tribe shall do or cause to be done all things necessary to preserve and keep in full force and effect (i) the existence in accordance with the respective organizational, statutory, constitutional or legal documents (as the same may be amended from time to time) of the Tribe, the Gaming Commission and the Enterprise and (ii) all rights, licenses and franchises of the Tribe and the Enterprise.

    (c)    The Tribe covenants to use its best efforts to obtain and retain in full force and effect at all times all federal, state, local and Tribal licenses, certificates and authorizations (including, but not limited to, gaming licenses, licenses for the sale of alcoholic beverages and licenses of the Facility) which may be necessary or desirable for the occupancy of the Facility or

the operation of the Enterprise; provided, that, if, in the course of the exercise of its governmental or regulatory functions, the Tribe is required to condition, suspend or revoke any consent, permit or license or close or suspend any operation of any part of the Facility or the Enterprise as a result of any noncompliance with Legal Requirements, the Tribe and the Enterprise will use their best efforts to promptly and diligently correct such noncompliance so that the Facility and the Enterprise will be opened and fully operating.

(d)     Within thirty (30) days following the Tribe's establishment of any Tribal Court in accordance with all applicable Legal Requirements, the Tribe, upon the request of Manager, shall file an action with such Tribal Court seeking the entry of a stipulated declaratory judgment upholding the validity and enforceability of this Agreement and the Transaction Documents, the form of which will be mutually agreed to by the Tribe and Manager.  The Tribe represents and warrants that, once established, the Tribal Court will have full authority under the Tribe's Constitution and laws to enter an order upholding the validity and enforceability of this Agreement and the Transaction Documents, and to enter orders prohibiting the impairment of contracts and requiring due notice of any proposed changes of any such contracts, including, without limitation, this Agreement and all of the other Transaction Documents.

(e)     The Tribe agrees that the Enterprise shall not develop, construct or otherwise engage in an expansion or major renovation of the Facility after the Facility is initially completed unless the Tribe agrees to amend this Agreement and the other Transaction Documents in such manner as Manager may reasonably request in order to ensure that Manager continues to enjoy substantially the same economic and other rights and benefits under this Agreement and the other Transaction Documents as Manager would have enjoyed if the expansion or major renovation did not occur.

(f)     The Tribe and the Enterprise shall not enter into or refinance the Facility Loan, any loan to the Enterprise or any agreement which grants a security interest in any Collateral Assets without the prior approval of Manager, which approval Manager may withhold or condition in its discretion.

(g)     The Tribe and the Enterprise shall not lease or encumber all or any portion of the Collateral Assets which are used by the Enterprise without the prior approval of Manager, which approval Manager may condition or withhold in its discretion.

(h)     The Tribe agrees to adopt such secured transactions law or ordinance as Manager or Lender may reasonably request in order to clarify issues related to secured transactions involving the Tribe, its Affiliates or assets located on Indian Lands of the Tribe.

(i)     The Tribe shall make all payments and perform all obligations in accordance with the terms of the documents evidencing and relating to the Transition Loan and the Facility Loan.

(j)     The Tribe shall segregate the assets and liabilities of the Enterprise from the assets and liabilities of the Tribe, any Other Entities or any other Affiliates of the Tribe. Without limiting the generality of the foregoing, the Tribe shall (i) not commingle assets of the Enterprise with the assets of the Tribe, any Other Entities or any other Affiliates of the Tribe, (ii)

not voluntarily comingle liabilities of the Enterprise with the liabilities of the Tribe, any Other Entities or any other Affiliates of the Tribe, (iii) identify and record in appropriate books and records assets and liabilities as assets or liabilities of the Enterprise, the Tribe, any Other Entities or any other Affiliates of the Tribe, as the case may be, and (iv) maintain separate accounting books and records and financial statements for the Enterprise, the Tribe, any Other Entities or other Affiliates of the Tribe, as the case may be.

(k)     The Tribe and its Affiliates will not take any position in any court, proceeding or other forum which is inconsistent with the representations and warranties set forth in this Agreement.

(l)     The Tribe and the Enterprise agree that they shall act in good faith and use their best efforts to negotiate and enter into a Facilities Loan which (i) permits the repayment of the Transition Loan from the first proceeds of the Facility Loan, and (ii) permits prepayment of the Facilities Loan at any time and without penalty. Without Manager's consent, which consent Manager may condition or withhold in its discretion, the Tribe and the Enterprise shall (i) pay the Transition Loan in full from the first proceeds received from the Facility Loan, (ii) in the event that, for any reason, the Tribe or the Enterprise do not pay the Transition Loan in full from the first proceeds received from the Facility Loan, the Tribe or the Enterprise shall pay the Transition Loan in full from Tribal or Enterprise revenues or loan proceeds as soon thereafter as possible and, in any event, upon demand, and (iii) repay and prepay the Facility Loan from Tribal or Enterprise revenues or loan proceeds in full as soon as possible consistent with the Tribe's responsibilities to fund tribal government operations or programs and provide for the general welfare of the Tribe and its members. Without the consent of Manager, which consent Manager may condition or withhold in its discretion, the Tribe and the Enterprise shall not, prior to the date the Transition Loan and the Facility Loan are repaid in full, (i) borrow funds other than pursuant to the Transition Loan or the Facility Loan, or (ii) make donations to charitable organizations or help fund operations of local government agencies except for payments which constitute Governmental Agreement Payments.

(m)     The Tribe shall only use Contract Net Revenues distributed by the Enterprise to the Tribe pursuant to Section 5.12(a) for (i) the purposes set forth in IGRA (25 U.S.C. 2710(b)(2)(B)), applicable NIGC regulations and the Gaming Ordinance, or (ii) per capita payments to Tribal members pursuant to a Tribal revenue allocation plan which complies with the requirements of 25 U.S.C. 2710(b)(3), applicable NIGC or Department of the Interior regulations and applicable Tribal law and which has been duly approved or adopted by the NIGC or the Department of the Interior and the Tribe.

(n)     The Tribe shall take the steps necessary to ensure that the Gaming Ordinance and any Gaming regulations will always meet the requirements of the IGRA and any other Legal Requirements and will be consistent with the provisions of this Agreement and the Transaction Documents and will not adversely affect the rights of Manager hereunder and thereunder.

(o)     Within twenty-four (24) hours after receipt of any Notice of Violation, Order of Temporary Closure or Assessment of Civil Fines from the NIGC pursuant to 25 C.F.R. Part 573 or 575 or any other similar notice or action from any Governmental Authority pursuant

to any Legal Requirements or any agreement with such Governmental Authority, the Tribe or the Enterprise, as applicable, shall provide Manager with a copy of such notice and of all documents which may be served upon the Tribe, its Affiliates or the Enterprise pursuant to any such notice.

(p)     The Tribe and the Enterprise shall not purchase or lease any electronic video equipment or similar or associated gaming equipment, systems or software without the prior approval of Manager.

(q)     The Tribe shall cause the Gaming Commission to conduct background investigations for, and issue licenses to, Enterprise Employees and Manager Employees on a timely basis so that substantially all prospective or actual Enterprise Employees or Manager Employees who meet the standards set forth in the Gaming Ordinance or applicable Gaming Commission regulations are licensed as of Opening Date or, for Enterprise Employees or Manager Employees who are or may be hired after Opening Date, as soon as reasonably possible.

## ARTICLE 4
## INSURANCE

4.1     Duty to Maintain.  Manager, on behalf of the Tribe and the Enterprise, shall arrange for, obtain and maintain during the course of this Agreement as Costs of Gaming Operations insurance coverages (including, without limitation, public liability and property loss or damage coverages) in forms and amounts that will adequately protect the Facility and the Enterprise, naming the Tribe, the Enterprise, Manager and Manager's Affiliates as insured parties thereunder; provided, however, that in no event shall the coverage amounts thereunder be less than the amounts which may be required by any Legal Requirement.  The insurance policies shall cover actions or omissions by Manager Employees and Off-Site Manager Employees, as well as actions or omissions by Enterprise Employees.

4.2     Payment of Deductibles.  In the event that an occurrence which is covered by insurance is primarily the result of an action or omission by a Manager Employee or an Off-Site Manager Employee, Manager shall be responsible for paying the detectable associated with such occurrence and such payment shall not be a Cost of Gaming Operations.  In the event that an occurrence which is covered by insurance is not primarily the result of an action or omission by a Manager Employee or an Off-Site Manager Employee, the Enterprise shall be responsible for paying the deductible associated with such occurrence and such payment shall be a Cost of Gaming Operations.

4.3     Evidence of Insurance.  Prior to the Opening Date, and from time to time as reasonably requested by the Business Board, Manager shall supply to the Business Board and, if required, any Governmental Authorities copies of the insurance policies, certificates or binders applicable to the Facility or Enterprise operations.

4.4     Insurance Proceeds.  Subject to the terms of Sections 6.4 and 6.6, any insurance proceeds received with respect to the Enterprise shall be deposited into the Blocked Account(s) and disbursed in accordance with the same terms and provisions applicable to Gross Revenues of

the Enterprise; provided, however, that, if there is any insurance recovery for a claim related to the operation of the Enterprise for which either the Tribe or Manager has previously paid from its own separate funds, then, to the extent of amounts paid by either of such Parties, the insurance proceeds will be paid over to them and the balance shall be deposited into the Blocked Account(s).

ARTICLE 5

BUDGETS, COMPENSATION; REIMBURSEMENT

### 5.1   Pre-Opening Budget; Staffing Plan.

(a)      Not later than one hundred eighty (180) days prior to the scheduled Opening Date, Manager shall implement a pre-opening program which shall include all activities necessary to financially and operationally prepare the Facility and the Enterprise for the Opening Date. To implement the pre-opening program, Manager shall prepare a comprehensive pre-opening budget which shall be submitted to the Business Board for its approval not later than one hundred twenty (120) days prior to the scheduled Opening Date (the "Pre-Opening Budget"). The Pre-Opening Budget shall set forth operating expenses which Manager anticipates to be necessary or desirable in order to prepare the Facility for the Opening Date. It shall also include a statement of pre-opening expenses incurred to date, including, without limitation, the following: pre-opening salaries, wages and benefits; advertising; food and beverage; employment center; employment background checks; outside services; utilities/supplies/phone/etc; grand opening party; Tribal fees, legal fees, consulting fees, and interest on the Transition Loan incurred prior to the Opening Date which the Manager determines after consultation with the Business Board should be expensed in accordance with GAAP in accounting periods prior to the Opening Date, rather than capitalized; and other pre-opening expenses ("Pre-Opening Expenses"). Pre-Opening Expenses may include costs and expenses incurred by Manager or its Affiliates (including expenses, costs and benefits of Manager Employees and Off-Site Manager Employees); provided, however, that the costs and expenses for Manager Employees shall only include the actual costs and expenses incurred without any additional fee, mark-up or premium; and provided, further, that the costs and expenses for Off-Site Manager Employees shall be included in accordance with the provisions set forth in Section 3.4. The Pre-Opening Expenses of the Enterprise, and the expenses of the Gaming Commission incurred prior to the Opening Date, shall be funded through the Facility Loan.

(b)      Manager shall have the responsibility and authority to prepare a staffing plan for the Enterprise and to direct the selection, retention and training of all employees performing services in connection with the management, operation and maintenance of the Enterprise on and after the Opening Date, including, without limitation, employees performing security and surveillance services. No later than sixty (60) days prior to the scheduled Opening Date, Manager will have the responsibility to submit to the Business Board, for its approval, the staffing plan. The staffing plan shall cover all personnel necessary to operate the Enterprise (or any portion thereof) in the manner contemplated by this Agreement, which staffing plan shall include, without limitation, organizational charts, a job classification system with job descriptions, salary levels and wage scales.

(c)     The Tribe recognizes that the Pre-Opening Budget will be prepared well in advance of the Opening Date and is intended only to be a reasonable estimate, subject to variation due to a number of factors, some of which will be outside of Manager's control (e.g., the time of completion, inflationary factors and varying conditions for the goods and services required). The Tribe agrees that the Pre-Opening Budget may be modified from time to time, subject to approval of the Business Board in accordance with the procedure established by Section 5.4 for adjustments to the Annual Business Plan, Annual Operating Budget and Annual Capital Budget.

5.2     Operating Capital. The Tribe and the Enterprise shall be responsible for providing the operating capital for the Enterprise and the cash necessary to cover any cash shortfalls of the Enterprise.

5.3     Annual Business Plan, Annual Operating Budget and Annual Capital Budget.

(a)     Manager shall, not less than ninety (90) days prior to the scheduled Opening Date, submit to the Business Board, for its approval, a proposed Annual Business Plan, Annual Operating Budget and Annual Capital Budget for the remainder of the then current Fiscal Year. Thereafter, Manager shall, not less than sixty (60) days prior to the commencement of each full or partial Fiscal Year, submit to the Business Board, for its approval, a proposed Annual Business Plan, Annual Operating Budget and Annual Capital Budget for the ensuing full or partial Fiscal Year, as the case may be. The Annual Business Plan, Annual Operating Budget and Annual Capital Budget shall include a projected income statement, balance sheet and projection of cash flow for the Enterprise, with detailed justifications explaining the assumptions used therein and included with the Annual Business Plan, Annual Operating Budget and Annual Capital Budget shall be a schedule of repairs and maintenance (other than Capital Expenditures), a business plan for the Fiscal Year and the minimum balance which must remain in the Enterprise Accounts as of the end of each month during the Fiscal Year to assure sufficient monies for the purposes of working capital and other expenditures authorized under the Annual Business Plan, Annual Operating Budget and Annual Capital Budget.

(b)     The Annual Business Plan, Annual Operating Budget and Annual Capital Budget for the Enterprise will be comprised of the following:

(i)     a statement of the estimated income and expenses for the coming Fiscal Year, including estimates as to Gross Revenues and Costs of Gaming Operations for such Fiscal Year, such operating budget to reflect the estimated results of the operation of the Enterprise during each month of the subject Fiscal Year;

(ii)     either as part of the statement of the estimated income and expenses referred to in the preceding clause (i), or separately, budgets for:

> (A)     repairs and maintenance;
> (B)     Capital Expenditures;
> (C)     Furnishings and Equipment;
> (D)     the estimated cost of promotional allowances;
> (E)     Manager Employees; and

(F)   Off-Site Manager Employees.

(iii)   a business plan for the subject Fiscal Year.

(c)   The Business Board's review and approval of the Annual Business Plan, Annual Operating Budget and Annual Capital Budget shall proceed with all deliberate speed and shall not be unreasonably withheld or delayed.  To be effective, any notice which disapproves or proposes an adjustment to an Annual Business Plan, Annual Operating Budget or Annual Capital Budget submitted by Manager must contain specific objections or proposed adjustments to individual line items in reasonable detail.

(d)   The Business Board may propose adjustments to the Annual Business Plan, Annual Operating Budget and Annual Capital Budget submitted by Manager, in which event the Business Board and Manger shall cooperate in good faith to review and resolve the proposed adjustments.  If Manager agrees with the adjustment proposed by the Business Board, the Annual Business Plan, Annual Operating Budget or Annual Capital Budget, as the case may be, shall be adjusted accordingly.  If Manager does not agree with any adjustment proposed by the Business Board because Manager does not believe that such adjustment will maximize the Contract Net Revenues of the Enterprise during the term of this Agreement, the Business Board and Manager may agree in writing to a corresponding and appropriate one-time or permanent adjustment in the calculation of Gross Revenues, Cost of Operations or Contract Net Revenues for the purposes of calculating the Management Fee due under this Agreement; provided, however, that any such adjustment to the calculation of the Management Fee shall not, in any event, be inconsistent with Section 5.15; and provided, further, that any such adjustment to the calculation of the Management Fee shall not be considered to be the type of amendment to this Agreement which requires the approval of the Chairman of the NIGC in order to be legally effective.  Upon the request of Manager, the Tribe shall nevertheless submit such agreement regarding an adjustment to the calculation of the Management Fee to the Chairman of the NIGC for an accommodation approval.  If the Business Board and Manager reach an agreement regarding an adjustment to the calculation of the Management Fee and Manager determines such agreement to be legally effective, the applicable Annual Business Plan, Annual Operating Budget and/or Annual Capital Budget, as the case may be, shall include the adjustments proposed by the Business Board, and the calculation of the Management Fee shall thereafter include the adjustments agreed upon by the Business Board and Manager.  (This procedure may be used if, by way of example, the Business Board proposes to hire an employee or make a Capital Expenditure which Manager does not believe to be a cost-effective expenditure which will maximize the Gross Revenues or Contract Net Revenues of the Enterprise during the term of this Agreement.)

(e)   In the event the Business Board and Manager are not able to reach mutual agreement concerning any adjustments to the Annual Business Plan, the Annual Operating, the Annual Capital Budget or the calculation of the Management Fee, as the case may be, within a period of fifteen (15) days after written notice submitted by the Business Board or Manager to the other party, the matter shall be subject to resolution pursuant to Article 10.  If the Business Board and Manager are unable to resolve the disputed or objectionable item(s) prior to the commencement of the applicable Fiscal Year, the undisputed portions of the Annual Business Plan, Annual Operating Budget and Annual Capital Budget submitted by Manager shall be deemed to be adopted and approved, and the corresponding line item(s) contained in the Annual

Business Plan, Annual Operating Budget or Annual Capital Budget for the preceding Fiscal Year shall be adjusted as set forth below shall be substituted in lieu of the disputed item(s) in the proposed Annual Business Plan, Annual Operating Budget or Annual Capital Budget. Those line items which are in dispute shall be determined by increasing the preceding Fiscal Year's actual expense for the corresponding line items by an amount determined by Manager which does not exceed the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics of the United States Department of Labor, U.S. City Average, all items (1982-1984 = 100) (or any successor or replacement index thereto). The resulting Annual Business Plan, Annual Operating Budget and Annual Capital Budget obtained in accordance with the preceding sentences shall be deemed to be the Annual Business Plan, Annual Operating Budget and Annual Capital Budget in effect until such time as Manager and the Business Board have resolved the disputed items.

5.4    Adjustments to Annual Business Plan, Annual Operating Budget and Annual Capital Budget. Manager may from time to time, after notice to and approval by the Business Board, revise the Annual Business Plan, Annual Operating Budget and Annual Capital Budget approved by the Business Board as necessary to reflect any unpredicted significant changes, variables or events or to include significant, additional, unanticipated items of expense. Manager may, after notice to the Business Board, reallocate part or all of the amount budgeted with respect to any line item to another line item and to make such other modifications to the Annual Business Plan, Annual Operating Budget and Annual Capital Budget approved by the Business Board as Manager deems necessary; provided, however, that the total adjustments to each of the Annual Business Plan, Annual Operating Budget and Annual Capital Budget shall not exceed one hundred ten percent (110%) or such greater percentage as the Business Board may establish from time to time of each of the approved Annual Business Plan, Annual Operating Budget and Annual Capital Budget without approval of the Business Board. Manager shall submit a revision of the Annual Business Plan, Annual Operating Budget and Annual Capital Budget to the Business Board for review on a quarterly basis. In addition, in the event actual Gross Revenues for any period are greater than those provided for in the Annual Business Plan, Annual Operating Budget and Annual Capital Budget, the amounts approved in the Annual Business Plan, Annual Operating Budget and Annual Capital Budget for all variable costs for any month shall be automatically deemed to be increased to an amount that bears the same relationship (ratio) to the amounts budgeted for such items as actual Gross Revenues for such month bears to the projected Gross Revenues for such month. The Tribe, on behalf of itself and the Business Board, acknowledges that the Annual Business Plan, Annual Operating Budget and Annual Capital Budget are intended only to be a reasonable estimate of the Enterprise's revenues and expenses for the ensuing Fiscal Year. Manager shall not be deemed to have made any guarantee concerning projected results contained in the Annual Business Plan, Annual Operating Budget and Annual Capital Budget.

5.5    Capital Expenditures. Manager shall direct the Enterprise to expend such amounts for any Capital Expenditures as Manager or the Business Board shall deem to be required, in the course of the operation of the Facility or the Enterprise, to maintain, at a minimum, the Facility and the Enterprise in compliance with any Legal Requirements and to comply with Manager's recommended programs for renovation, modernization and improvement intended to (i) keep the Facility and the Enterprise competitive in its market, (ii) maintain industry standards, or (iii) correct any condition of an emergency nature, including, without

limitation, maintenance, replacements or repairs which are required to be effected, in Manager's sole discretion, or which otherwise requires immediate action to preserve and protect the Facility and the Enterprise, assure its continued operation, and/or protect the comfort, health, safety and/or welfare of the Facility's and the Enterprise's guests or employees (an "Emergency Condition"). Manager is authorized to take all steps and direct the Enterprise to make all expenditures from the Enterprise Accounts (in the case of non-capitalized repairs and maintenance), or the Capital Expenditure Account (in the case of expenditures for Capital Expenditures) as Manager deems necessary to repair and correct any Emergency Condition, regardless of whether such provisions have been made in the Annual Capital Budget, Annual Operating Budget, and/or Annual Business Plan for any such expenditures; provided that the cost thereof shall not, in any event, be required to be advanced by Manager. Design and installation of Capital Expenditures shall be effectuated in a time period and subject to such conditions as the Business Board and Manager may mutually establish to minimize interference with or disruption of ongoing operations.

5.6     Capital Expenditure Account. Manager shall direct the Enterprise to establish a Capital Expenditure reserve on the books of account of the Enterprise and/or establish a Capital Expenditure account at such bank as the Business Board and Manager shall agree (such reserve and/or account is hereinafter referred to as the "Capital Expenditure Account"). The funds in the Capital Expenditure Account shall be considered to be assets and funds of the Enterprise. All amounts in the Capital Expenditure Account shall be invested in Permitted Investments in accordance with Section 2.8(c) to the extent that availability of funds, when required, is not thereby impaired. Interest earned on amounts deposited in the Capital Expenditure Account shall be credited to the Capital Expenditure Account and shall be available for payment of expenditures for Capital Expenditures to the Facility. Manager shall draw on the Capital Expenditure Account to purchase those items included in the Annual Capital Budget approved by the Business Board or such emergency additions, repairs or replacements as shall be required to correct an Emergency Condition or to comply with operating standards.

5.7     Periodic Contributions to Capital Expenditure Account. Pursuant to Section 5.12(a), Manager shall direct the Enterprise to make monthly deposits on behalf of the Enterprise into the Capital Expenditure Account in amounts equivalent to an annual rate of one percent (1%) of Gross Revenues or such greater amount as the Business Board and Manager may mutually agree upon from time to time. The cash amounts required to be so deposited shall be deposited into the Capital Expenditure Account no later than the twentieth (20th) day of the month immediately following the month upon which the amount to be deposited is calculated. If any adjustment of Gross Revenues is made as a result of an audit or for other accounting reasons, a corresponding adjustment in the Capital Expenditure Account deposit shall be made.

5.8     Use and Allocation of Capital Expenditure Account. Any expenditures for Capital Expenditures which have been budgeted and previously approved may be paid from the Capital Expenditure Account without further approval from the Business Board. Any amounts remaining in the Capital Expenditure Account at the close of any Fiscal Year shall be carried forward and retained in the Capital Expenditure Account until fully used unless distribution thereof is approved by the Business Board and Manager. If amounts in the Capital Expenditure Account at the end of any Fiscal Year plus the anticipated contributions to the Capital Expenditure Account for the next ensuing year are not sufficient to pay for Capital Expenditures

authorized by the Annual Capital Budget for such ensuing Fiscal Year, then Manager may direct the Enterprise to deposit into the Capital Expenditure Account additional funds in the amount of the projected deficiency.

5.9     Deposits. The Tribe, the Enterprise and Manager shall direct and cause the Gross Revenues of the Enterprise to be deposited in the Blocked Account(s) on a daily basis and such Blocked Account(s) shall be subject to the security interest granted by the Tribe and the Enterprise to Manager in the Collateral Assets pursuant to this Agreement, the Blocked Account Agreement and the Security Agreement. The funds in the Blocked Account(s) shall be considered to be assets and funds of the Enterprise. In the event the Tribe or Manager receives any payment which is intended to be a payment to the Enterprise, or the Tribe or Manager receives a payment from the Enterprise or obtains legal or constructive possession of funds of the Enterprise which is not a distribution or other payment contemplated by Section 5.12 or the other terms of this Agreement, such payment or funds shall be deemed to be held by the Tribe or Manager, as the case may be, in trust for the benefit of, and shall be promptly paid over and delivered to, the Enterprise.

5.10    Minimum Guaranteed Monthly Payments; Security Interest.

(a)     During the term of this Agreement, provided that the Commencement Date has occurred, the Enterprise shall, subject to the provisions of Section 5.10(b), pay the Tribe One Hundred Thousand Dollars ($100,000) per month (the "Minimum Guaranteed Monthly Payment"), beginning on the Commencement Date and continuing for the remainder of the term of this Agreement. The Minimum Guaranteed Monthly Payment shall be payable by the Enterprise to the Tribe in arrears on the twentieth (20th) day of each calendar month following the month in which the Commencement Date occurs, which payment shall have priority over the Note, Facility Loan or Transition Loan repayment and payment of the Management Fee. If the Commencement Date is a date other than the first day of a calendar month, the first payment will be prorated from the Commencement Date to the end of the month. The Minimum Guaranteed Monthly Payment shall be prorated if Gaming is conducted at the Facility for any other partial months.

(b)     If the Contract Net Revenues in a given month are less than $100,000, Manager shall advance to the Enterprise the funds necessary to compensate for the deficiency from Manager's funds (the "Minimum Guaranteed Payment Advances"), which Minimum Guaranteed Payment Advances shall not accrue interest and may be evidenced by the Note. Manager shall be entitled to repayment from the Enterprise of any Minimum Guaranteed Payment Advances made under this Subsection from the Contract Net Revenues of the Enterprise in the next succeeding months following any such Minimum Guaranteed Payment Advance; provided, however, that any amounts outstanding on account of Minimum Guaranteed Payment Advances at the end of the term of this Agreement shall be immediately due and payable by the Tribe. In no event shall repayment by the Enterprise of any Minimum Guaranteed Payment Advances result in the Tribe receiving less than its Minimum Guaranteed Monthly Payment. Notwithstanding the foregoing, no Minimum Guaranteed Monthly Payments or Minimum Guaranteed Payment Advances shall be required or accrue with respect to any months (or portions thereof) in which Gaming Activities are not being conducted and managed by Manager at the Facility; provided, however, that Minimum Guaranteed Monthly Payments and, if

applicable, Minimum Guaranteed Payment Advances shall be pro-rated and due for any portion of the months in which Manager is managing Gaming Activities at the Facility. Further, no Minimum Guaranteed Monthly Payments or Minimum Guaranteed Payment Advances shall be required or accrue subsequent to the expiration or termination of this Agreement, for any reason.

(c)     The Tribe and the Enterprise hereby grant to Manager a security interest in the Collateral Assets, including, without limitation, any future Gross Revenues or Contract Net Revenues of the Enterprise, in order to secure payment of the obligations of the Tribe and the Enterprise under this Agreement and the Transaction Documents. The Tribe and the Enterprise agree to cooperate with Manager in confirming and perfecting such security interest in the Collateral Assets, including filing such financing statements or other documents with the State or the Tribe as may be necessary or appropriate, and entering into the Blocked Account Agreement or similar agreements with depositary institutions. The Tribe agrees not to encumber any of the Collateral Assets without the written consent of Manager, which consent Manager may condition or withhold in its discretion. The Tribe and/or the Enterprise further agree to enter into a waiver of sovereign immunity and consent to jurisdiction and arbitration in favor of Manager in connection with the Transaction Documents and such other documents as Manager may reasonably request in order to confirm or perfect its security interest.

5.11     Daily and Monthly Statements.  Manager shall direct the Enterprise to furnish to the Business Board financial statements identifying for each day the Gross Revenues attributable to the Enterprise's Commercial Activities on each day that such reports are normally available. Within fifteen (15) days after the end of each calendar month, Manager shall direct the Enterprise to provide verifiable financial statements in accordance with GAAP to the Business Board covering the preceding month's operations of the Enterprise, including operating statements, balance sheets, income statements and statements reflecting the amounts computed to be distributed in accordance with Section 5.12.

5.12     Distribution of Contract Net Revenues.

(a)     All Contract Net Revenues shall be disbursed by Manager on a monthly basis as set forth below, paid on the twentieth (20th) day of each calendar month for the preceding month. Such Contract Net Revenues shall be disbursed from the Enterprise Accounts to the extent funds are available to the following entities in the following amounts in the following order of priority:

(i)     To the Tribe, the Minimum Guaranteed Monthly Payment described in Section 5.10;

(ii)     To Manager, repayment of any outstanding Minimum Guaranteed Payment Advances;

(iii)     To Lender, current principal and any other payments due on the Transition Loan;

(iv)     To Lender, current principal and any other payments due on the Facility Loan;

45

(v)     To Manager, the Management Fees referenced in Subsection 5.12(b) for the preceding calendar month or any prior period;

(vi)    To Manager, its Affiliates or any Indemnitee, any indemnification or other obligations then owing by the Tribe or the Enterprise to Manager, its Affiliates or any Indemnitee under this Agreement, any Transaction Document or any other agreement or otherwise and not paid as Costs of Gaming Operations;

(vii)   To Manager, its Affiliates or any Indemnitee, Late Payment Charges on the outstanding balance of any amounts owing under clauses (v) and (vi) which are not paid when due, compounded monthly, for the period commencing on the date such payments are due and continuing until the date paid; provided, however, that Manager shall not be paid a Late Payment Charge if the Enterprise has sufficient funds available to make the applicable payment and Manager voluntarily elects not to make such payment or not to direct such payment to be made;

(viii)  To the Capital Expenditure Account, contributions as contemplated by Section 5.7; and

(ix)    To the Tribe at a bank account of the Tribe which is not one of the Blocked Account(s) or Enterprise Accounts, all remaining Contract Net Revenues to the extent not prohibited by any other agreement to which the Tribe is a party and subject to the rights of Manager under this Agreement, the Blocked Account Agreement and the Security Agreement.

(b)     As compensation for Manager's management and other services with respect to the Commercial Activities of the Enterprise, Manager shall receive a management fee (the "Management Fee") payable on a monthly basis equal to the sum of the following: (i) twenty-four percent (24%) of Contract Net Revenues for the prior calendar month for the first 48 months following the Commencement Date during which Gaming Activities are conducted at the Facility, and (ii) twenty-seven percent (27%) of Contract Net Revenues for the prior calendar month for the remaining months of the term of this Agreement during which Gaming Activities are conducted at the Facility. All Management Fees paid to Manager are non-refundable. Any amounts owing to Manager hereunder shall be secured by the security interests granted by the Tribe and the Enterprise to Manager pursuant to the terms of this Agreement, the Blocked Account Agreement, the Security Agreement and the other Transaction Documents.

(c)     Manager, on behalf of the Enterprise, is responsible for making, or directing the Enterprise to make, the Contract Net Revenues disbursements to the appropriate party, including to Manager.

(d)     The Parties agree that the gross revenues, Contract Net Revenues, cash and other assets of the Enterprise and the cash and cash equivalents derived therefrom shall be considered for accounting, financial reporting and other purposes to be assets of the Enterprise, rather than assets available for unrestricted use by the Tribe, until properly distributed or transferred by the Enterprise from an Enterprise Account to the Tribe at a separate Tribal account (as the equivalent of a dividend or other distribution of available cash flow to the Tribe in its capacity as owner of

the Enterprise) with the prior consent of Secured Party and in accordance with any applicable provisions of this Agreement.

5.13    Annual Audit.  With respect to each Fiscal Year, the Tribal Council shall select and engage an independent certified public accounting firm with more than five (5) years experience in audits of gaming enterprise operations, and shall cause such accounting firm to conduct an audit of the Enterprise on or before one hundred twenty (120) days after the end of such Fiscal Year. The accounting firm shall issue a report with financial statements in accordance with GAAP with respect to the preceding Fiscal Year (or portion of the Fiscal Year in the case of the first year) operations of the Enterprise, including operating statements, balance sheets, income statements and statements reflecting the amounts computed to be distributed in accordance with Section 5.12, such report to be approved at an annual meeting of the Business Board to be held at a location mutually agreed upon by the Business Board and Manager.  In addition, upon expiration or termination of this Agreement in accordance with its terms, the Tribal Council, on behalf of the Enterprise, shall cause such accounting firm to conduct an audit, and, on or before ninety (90) days after the termination date, shall issue a report setting forth the same information as is required in the annual report, in each case with respect to the portion of the Fiscal Year ending on the expiration or termination date.  If the amounts paid to the Tribe or Manager in accordance with Section 5.12(a) and (b) for the relevant period are different from the amounts which should have been paid to such Party based on the report prepared by the accounting firm and based upon the provisions of this Agreement, then, to the extent either Party received an overpayment, it shall repay and deposit the amount of such overpayment into the Blocked Account within twenty-five (25) days of the receipt by such Party of the accounting firm's report, and, to the extent either Party received an underpayment, it shall receive a distribution from the Enterprise Accounts of the amount of such underpayment within ten (10) days of the receipt by such Party of the accounting firm's report.  Manager may make adjustments to future payments to correct a discrepancy if required distributions are not made.

5.14    Development and Construction Cost Recoupment.  Unless otherwise agreed in a written document signed by the Tribe and Manager and approved by the Chairman of the NIGC, the maximum dollar amount to be paid by the Tribe or the Enterprise for the repayment or recoupment of development, land acquisition and construction costs (but not including Pre-Opening Expenses or Costs of Operation), plus interest thereon, applicable to the portion of the Facility and the Enterprise relating to Gaming Activities shall be Eight Hundred Fifty Million Dollars ($850,000,000).  In the event that such costs exceed such amount, the Tribe shall be responsible for paying such excess.  Upon the request of Manager, the Tribe shall submit to the Chairman a request to approve an amendment to this Agreement increasing the amount set forth in this Section.

5.15    Manager's Compensation Limit.  Notwithstanding any other provision in this Agreement to the contrary, pursuant to 25 U.S.C. § 2711(c), the Gaming Management Fee and all other fees which Manager shall receive from the Tribe or the Enterprise for the operation and management of the Enterprise shall not, in any event, exceed thirty percent (30%) of the "net revenues" of the Enterprise within the meaning of, and calculated in accordance with, IGRA.

5.16    Payments Not Management Fees.  The Parties acknowledge and agree that the Management Fee to be paid by the Tribe and the Enterprise to Manager pursuant to Subsections

5.12(a)(v) and 5.12(b) of this Agreement is the only payment which the Parties consider to constitute fees to be paid by the Tribe, the Enterprise or any Other Entity to Manager or its Affiliates for the operation or management of the Enterprise. The Parties further acknowledge and agree that the reimbursement, indemnification, default, termination, arbitration award or court judgment payments to be paid to Manager pursuant to this Agreement are intended to be compensatory payments without any premium, mark-up or fee and, in any event, are not intended to constitute fees for the operation or management of the Enterprise, including, without limitation, the reimbursement, indemnification, default, termination, arbitration award and court judgment payments contemplated by the following Sections or Subsections of this Agreement: 2.12(a), 2.26(b), 2.27, 3.3, 3.4, 5.12(a)(vii), 6.4(d), 7, 9.25, and 10.3. The Parties further acknowledge and agree that the fees, reimbursements and other payments to be paid by the Tribe, the Enterprise or any Non-Gaming Enterprise to any Affiliate of Manager pursuant to any other agreement or instrument between the Tribe, the Enterprise or any Non-Gaming Enterprise, on the one hand, and any such Affiliate of Manager, on the other hand, are not intended to constitute, and do not constitute, fees to Manager or any Affiliate of Manager for the operation or management of the Enterprise. Without limiting the generality of the foregoing, the Parties acknowledge and agree that the following payments, among others, which the Tribe, the Enterprise or any Non-Gaming Enterprise has made or may make to any Affiliate of Manager are separate and independent of, and do not constitute, fees to be paid by the Tribe or the Enterprise to Manager for the operation and management of the Enterprise: (i) fees, supplemental development fees and reimbursement, indemnification, default, termination or other payments for the development, construction, furnishing, equipping or financing of the Facility or any Other Entity Facility; (ii) fees and reimbursement, indemnification, termination or other payments for services provided to any Non-Gaming Enterprise or for the operation or management of any Non-Gaming Enterprise; (iii) interest, fees, charges, reimbursements, costs or other payments for or in connection with loans made to or for the benefit of the Tribe, the Enterprise or any Non-Gaming Enterprise; (iv) payments for the transfer of rights to any lands to the Secretary or the Tribe or for the benefit of the Tribe, the Enterprise or any Non-Gaming Enterprise, and (v) payments if the Tribe makes certain decisions to not pursue the project originally contemplated by the Parties. The Parties further acknowledge and agree that the fees, interest, charges, reimbursements, and other payments made or to be made by the Tribe, the Enterprise, or any Non-Gaming Enterprise to any Affiliate of Manager pursuant to any agreement or instrument other than this Agreement entered into prior to or as of the date of this Agreement are payments which the Parties consider to be at market rates or below market rates and which, in any event, do not contain any premium, mark-up or fee which is in excess of market rates for services or loans which are provided to the Tribe, the Enterprise or any Non-Gaming Enterprise. The Tribe and the Enterprise agree not to take a position in any dispute or forum which contradicts or is inconsistent with the acknowledgements and agreements set forth in this Section.

## ARTICLE 6
### TERMINATION

6.1     Termination for Material Breach. Either Party may terminate this Agreement for Material Breach (as hereinafter defined) pursuant to the terms of this Section if (i) the other Party or, in the case of a termination by Manager, the Tribe's Affiliate, commits or allows to be

committed a Material Breach of this Agreement, (ii) the breaching Party fails to cure such Material Breach within sixty (60) calendar days after receipt of a preliminary notice of termination from the non-breaching Party identifying the nature of the alleged Material Breach in specific detail and its intention to terminate this Agreement, and (iii) the non-breaching Party issues a final notice of termination in accordance with the terms of this Section. Notwithstanding the foregoing, if the Material Breach (but specifically excluding breaches curable by the payment of money) has not been fully cured within such sixty.(60) day period, but the breaching Party is using diligent efforts to cure the Material Breach, the sixty (60) day period shall be extended for so long as the breaching Party shall be using diligent efforts to effect a cure thereof; and provided, further, that Manager shall not be entitled to an extension of such sixty (60) day cure period in the event the Material Breach is a result of a Manager Employee being found guilty of theft or embezzlement with respect to the handling of money or other property and Manager has not removed such Manager Employee from connection with the Enterprise. Termination is not an exclusive remedy for claims of a Material Breach, and the Parties shall be entitled to other rights and remedies as may be available pursuant to the terms hereof or under applicable law. For purposes of this Agreement, a "Material Breach" means one of the following circumstances and does not include any other circumstances: (i) the material failure of either Party or their Affiliates to perform a material obligation hereunder for reasons not excused under Section 9.5 (Force Majeure); (ii) if any Manager Employee is found guilty of theft, embezzlement or a crime of moral turpitude by a final judgment of a court of competent jurisdiction and if, after knowledge of such final judgment, Manager does not remove such Manager Employee from connection with the Enterprise; (iii) default by the Tribe or the Enterprise under the Transition Loan, the Facility Loan, any Transaction Document or any document or agreement related hereto or thereto; (iv) any representation or warranty made pursuant to Sections 9.10 or 9.11 proves to be knowingly false in any material respect when made; (v) the Tribe or any Affiliate of the Tribe, in bad faith or without due process denies, delays, withdraws, qualifies, conditions, terminates, revokes or non-renews any license applied for by, or issued to, any Manager, any of its Affiliates or any Manager Employee; (vi) the occurrence of any material theft, embezzlement or misappropriation of Enterprise funds by the Tribe or by officers of the Tribe; (vii) a breach under Section 2.21; or (viii) failure of Manager to provide the Tribe with the Minimum Guaranteed Monthly Payment Advances pursuant to Section 5.10(b), unless Manager's obligation is suspended pursuant to the terms of Section 5.10(c). Any dispute as to whether an event constitutes a Material Breach shall be resolved pursuant to the dispute resolution provisions set forth in Article 10. A final notice of termination must be authorized or ratified by a resolution duly adopted by, in the case of the Tribe, its General Council and, in the case of Manager, its members(s) or owner(s). Any final notice of termination hereunder shall be in writing detailing the reason the Party considers the Material Breach not to be cured within the applicable time period and must be delivered to the other Party at least thirty (30) days before the termination date referenced in the final notice. Any Material Beach which has been cured prior to the date of termination of this Agreement shall no longer serve as a basis for termination of this Agreement.

     6.2    Mutual Consent. This Agreement may be terminated at any time upon the mutual written consent and approval of the Parties.

     6.3    Involuntary Termination Due to Changes in Law. The Parties hereby agree to use their best efforts to conduct Commercial Activities in accordance with this Agreement and to ensure that such Commercial Activities and this Agreement conform to and comply with all

Legal Requirements. In the event of any prospective or actual change in law or regulations, advisory opinion or final determination by the Department of the Interior, the NIGC, or a court of competent jurisdiction that this Agreement or any Transaction Document is or may be void or unlawful or any provision of this Agreement or any Transaction Document is or may be inconsistent with any Legal Requirement, the Tribe and Manager shall use their respective good faith best efforts to amend this Agreement or any Transaction Document in a mutually satisfactory manner which will conform to the Legal Requirement and not materially change the rights, duties and obligations of the Parties hereunder. In the event such amendment cannot be legally effected following exhaustion of all such good faith best efforts (including the lapse of all legal proceedings and appeal periods without favorable results), Manager shall thereafter have the right to terminate this Agreement upon written notice to the Tribe.

      6.4    Other Rights Upon Material Breach; Ownership of Assets; Repayment of Obligations on Expiration or Termination.

      (a)    Upon the occurrence of any Material Breach by the Tribe or its Affiliate or upon the occurrence of any event or circumstance due solely to the action or inaction of the Tribe or its Affiliate which, with the giving of notice or the passage of time or both, would constitute a Material Breach by the Tribe or its Affiliate, which Material Breach was not cured by the Tribe or its Affiliate within thirty (30) days after receiving written notice thereof from Manager, Manager may suspend performance of any or all of its obligations under this Agreement until such time as the Material Breach has been cured; and, provided, further, that Manager may not, in any event, suspend its obligation to make Minimum Guaranteed Payment Advances to the extent required pursuant to Section 5.10. Either Party shall be entitled to injunctive or other equitable relief to prevent a termination or attempted termination of this Agreement; provided, however, that Manager shall not be entitled to injunctive or other equitable relief which compels, overturns, negates or modifies a Tribal Governmental Action.

      (b)    Upon termination or expiration of this Agreement, the Tribe will continue to have sole and exclusive ownership of the Facility, the Enterprise and its assets, subject to Manager's security interest in the Collateral Assets, including, without limitation, the Gross Revenues and Contract Net Revenues of the Enterprise. In the event of expiration or any termination (whether voluntary or involuntary of this Agreement), the Tribe shall continue to have the obligation to pay unpaid principal and interest and other amounts due under indemnity obligations set forth in this Agreement or the Transaction Documents. In the event of termination of this Agreement for any reason prior to the full repayment to Manager and its Affiliates of any amounts owed to it by the Tribe under this Agreement or the Transaction Documents, the Tribe shall have the right, but not the obligation, to appoint, as promptly as reasonably possible, a person or entity qualified to manage the Facility and operate the Enterprise and use its best efforts to obtain approvals of all required Governmental Authorities for such replacement manager. The Tribe agrees to keep full and accurate financial records of operations of the Enterprise by such replacement manager and to allow Manager to audit such records at reasonable times prior to full repayment to Manager of any amounts owed to it by the Tribe under this Agreement or the Transaction Documents and the Tribe's compliance with this Subsection shall not preclude Manager from exercising any of its other rights and remedies hereunder or under any document or agreement related hereto, including, without limitation, rights under the Transaction Documents. Manager shall be entitled to retain all Management Fees previously paid to it pursuant to this Agreement. The termination

of this Agreement shall not preclude either Party from pursuing its legal remedies relating to such termination or otherwise.

(c)     Any and all payment, indemnity or security obligations and provisions contained in this Agreement or the Transaction Documents shall survive expiration or termination of this Agreement for any reason. In addition to any other survival provisions set forth in this Agreement, upon the expiration or termination of this Agreement, the terms and provisions of Articles 6, 7, 9 and 10 shall survive such expiration or termination. If, at the time of expiration or termination of this Agreement for any reason, the Tribe's or the Enterprise's payment obligations to Manager or any Affiliate of Manager under this Agreement, the Transaction Documents, the Transition Loan, the Facility Loan or otherwise remain unsatisfied in part or in full, the Tribe and the Enterprise shall be obligated to pay such obligations in full as of the date of such expiration or termination. The Tribe and the Enterprise shall have the right, but not the obligation, to continue to operate and maintain the Facility and the Enterprise in accordance with reasonable industry standards and, as to any portions of the Facility and the Enterprise that the Tribe determines are no longer Economically Feasible to operate, the Tribe shall conduct an orderly liquidation of such assets (excluding fixtures or real property) and any liquidation proceeds (net of reasonable sale costs) shall be deposited into the Blocked Account. The Tribe shall also keep the Facility and the Enterprise and all related assets insured for the coverage and amounts required by this Agreement and name Manager as an additional insured, loss payee and mortgagee, as applicable, and provide evidence thereof upon request until all amounts owing to Manager under this Agreement and the Transaction Documents have been paid in full. If any portion of the Enterprise assets are damaged by any casualty and it is Economically Feasible for the Tribe or the Enterprise to continue to operate such damaged assets, then the Tribe or the Enterprise shall repair and reconstruct such assets and operations that were damaged and are to be continued, and any excess insurance proceeds that are not used to repair and reconstruct the applicable damaged Enterprise assets shall be deposited into the Blocked Account.

(d)     In the event the Tribe terminates this Agreement for any reason, the Tribe and the Enterprise shall owe and pay Manager as of the day prior to the termination date an amount equal to (i) all outstanding Management Fees and other payment obligations which the Tribe or the Enterprise owes Manager as of the day prior to the termination date, plus (ii) the net present value of the total amount of all the Management Fees and other payment obligations which the Tribe or the Enterprise would have paid Manager for the remaining term of this Agreement assuming (a) the Commencement Date is the day prior to the termination date if the termination date occurs prior to the actual Commencement Date, (b) the performance of the Enterprise after the termination date conforms to the latest pro forma financial statements which Manager has delivered to the Business Board prior to the Tribe's issuance of a notice of termination of this Agreement and which were not objected to by the Business Board in writing within fifteen (15) days of receipt, and (c) such payments are discounted to the day prior to the termination date at a discount rate of three percent (3%). (For the purposes of the calculation in clause (ii) of the preceding sentence, it is assumed that (i) all parties have performed all of their respective obligations under this Agreement, (ii) this Agreement received all necessary government approvals and such approvals remain in effect, (iii) this Agreement is not terminated and is effective for its full term, and (iv) this Agreement is otherwise enforceable and in full force and effect.) If the Tribe or the Enterprise does not pay Manager the amounts required pursuant to this Subsection in full as of the day prior to the termination date, the Tribe and the Enterprise

shall also owe and pay Manager, in addition to the outstanding balance of such amounts, Late Payment Charges on the outstanding balance of any amounts owing under this Subsection which are not paid when due, compounded monthly, for the period commencing on the date such payments are due and continuing until the date paid. The Tribe's and the Enterprise's obligations to pay the amounts set forth in this Subsection shall survive the expiration or termination of this Agreement for any reason. Notwithstanding the foregoing, the Tribe shall receive a credit towards any payments due under this Subsection for any payments made by the Tribe or its affiliates pursuant to Subsections 2.1(b), (c) or (d) and, to the extent applicable to payments due under Subsection 2.1(b), (c) or (d), Subsection (e) of the Land Transfer Agreement among the Tribe, SC Sonoma Development, LLC and Sonoma Land Holdings, LLC dated of even date herewith, or any successor provision thereto.

6.5     Notice of Termination.  In the event of a preliminary notice of termination pursuant to this Article, the Tribe shall provide notice of the preliminary notice of termination to the Chairman of the NIGC and other appropriate Governmental Authorities within ten (10) days after issuance of the preliminary notice of termination.

6.6     Cessation of Commercial Activities at the Facility.

(a)     If, during the term of this Agreement, Commercial Activities cannot be lawfully conducted at the Facility for any reason (including, without limitation, because of the application of any legislation or court or administrative agency order or decree adopted or issued by a Governmental Authority having the authority to do so), Manager shall, within sixty (60) days after the applicable event, elect in its discretion to:

(i)     retain Manager's interest in this Agreement and direct the Enterprise to suspend Commercial Activities until such date, if any, on which Commercial Activities at the Facility becomes lawful, in which event performance under this Agreement shall be suspended until the date, if any, on which Commercial Activities at the Facility becomes lawful; or

(ii)    terminate this Agreement.

(b)     If Manager elects to retain its interest in this Agreement under Sections 6.6 (a)(i), Manager shall have the right (but not the obligation) to direct the Enterprise to commence Commercial Activities promptly after the date on which Commercial Activities becomes lawful. Manager may exercise such right by giving the Tribe written notice of such exercise within thirty (30) days after the date on which Commercial Activities becomes lawful.

(c)     If, during the term of this Agreement, the Facility is damaged by casualty or other occurrence to the extent, as reasonably determined by Manager, that Commercial Activities cannot be conducted at the Facility, Manager shall elect in its discretion to:

(i)     retain Manager's interest in this Agreement pending repair or reconstruction of the Facility, suspend Commercial Activities pending the repair or reconstruction of the Facility, and arrange for such repair or reconstruction in the manner described in this Section 6.6; or

(ii)    terminate this Agreement.

Manager shall give the Business Board written notice of Manager's election under this
Subsection promptly after such casualty or occurrence.

(d)    If Manager elects to retain its interest in this Agreement under Section 6.6(c)(i)
above, the Tribe shall be obligated to make such repairs or reconstruction as the Manager shall
reasonably determine should be made to the Facility (to the extent that insurance proceeds are
available or as otherwise mutually agreed by the Business Board and Manager), and Manager
shall promptly verify the amount of insurance proceeds available to pay the cost of repair or
reconstruction. If Manager elects to retain its interests under Section 6.6(c)(i), Manager is
hereby granted the authority to submit, adjust and settle, on behalf of the Tribe or the Enterprise,
all insurance claims associated with the casualty or occurrence; provided, however, that Manager
shall obtain the Business Board's prior written consent (which consent shall not be unreasonably
withheld, conditioned or delayed) to any settlement. Manager shall provide copies of all
settlement documents to the Business Board. If Manager does not elect to retain its interest
under Section 6.6(c)(i) and if the Tribe's obligations under this Agreement and the Transaction
Documents or any other note owing to Manager or its Affiliates are not yet satisfied, then: (i) the
Business Board shall have the authority to submit, adjust and settle all insurance claims,
provided that any final settlement shall be with the prior written consent of Manager, which
consent will not be unreasonably withheld, and the Business Board shall provide copies of all
settlement documents to Manager; (ii) to the extent Economically Feasible, the Tribe and the
Enterprise shall have the right (but not the obligation) to continue to operate and maintain the
Facility and the Enterprise in accordance with reasonable industry standards and, as to any
portions of the Facility and the Enterprise that are no longer Economically Feasible to operate,
the Business Board and Manager shall conduct an orderly liquidation of such assets (but not
including real estate assets) and any liquidation proceeds (net of reasonable sale costs) shall be
deposited into the Blocked Account and disbursed in accordance with the same terms and
provisions applicable to Contract Net Revenues; (iii) the Tribe and the Enterprise shall have the
right (but not the obligation) to repair and reconstruct such operations that were damaged and are
to be continued; and (iv) any excess insurance proceeds that are not used to repair and
reconstruct the applicable damaged Enterprise assets and any business interruption insurance
proceeds shall be deposited into the Blocked Account and disbursed in accordance with the same
terms and provisions applicable to Contract Net Revenues.

(e) If Manager elects to retain its interest in this Agreement under Sections 6.6(a)(i) or
6.6(c)(i) and the Commencement Date has occurred, this Agreement shall remain in full force
and effect during any period in which Manager is not managing Commercial Activities at the
Facility or for the Enterprise, and the term and expiration date of this Agreement shall be
extended for a period equal to the number of days from the last date on which Manager managed
Commercial Activities at the Facility or for the Enterprise until the date on which Manager
resumes managing Commercial Activities at the Facility or for the Enterprise.

(f)    If Manager elects to terminate this Agreement under Sections 6.6(a)(ii) or
6.6(c)(ii), the provisions of Section 6.4 shall apply.

6.7    Cumulative Remedies. All rights or remedies of either the Tribe or Manager
under this Agreement or any other Transaction Document shall be cumulative and may be
exercised singularly in any order or concurrently, at such Party's respective option, and the

exercise or enforcement of any such right or remedy shall neither be a condition to, nor a bar to, the exercise or enforcement of any other right or remedy.

## ARTICLE 7
## INDEMNIFICATION OF MANAGER

To the fullest extent permitted by law, the Tribe and the Enterprise shall fully protect, indemnify, defend and hold harmless Manager and its Affiliates and, if requested by and at the discretion of Manager, their respective members, partners, officers, directors, agents, sureties, servants, and employees and the successors, assigns, heirs and personal representatives of the foregoing (hereinafter collectively, "Indemnitees") for, from and against any and all liabilities, claims, damages, demands, losses, costs or expenses (including, without limitation, attorneys' fees for counsel selected by Manager, but not including legal fees associated with defending claims that Manager has breached its obligations under the terms of this Agreement) arising out of or resulting from, either directly or indirectly, the Facility, the Enterprise, this Agreement, any Transaction Document, the Transition Loan, the Facility Loan or any contractual or business relationships between the Tribe and any third parties, including, without limitation, (i) the performance or lack of performance of this Agreement by the Tribe or its Affiliates and whether or not arising from the sole or contributory negligence of Manager, provided that the foregoing indemnity will not, as to any Indemnitee, apply to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the willful misconduct or gross negligence of such Indemnitee, (ii) the enactment or issuance of any Tribal Legal Requirement which is inconsistent with this Agreement or otherwise adverse to the interests of Manager or any Manager Employee, (iii) the employment, discharge or workplace environment of any Enterprise Employee, (iv) any claim by any patron of the Facility or other person who was physically present at the Facility, (v) any claim based in whole or in part on any actual or alleged contractual or business relationship between the Tribe or any of its Affiliates and any third party. The cost of defending a lawsuit pursuant to this Section, as well as any liability, damages, demands, losses, costs or expenses incurred by Manager or its Affiliates, shall be a Pre-Opening Expense if incurred prior to the Opening Date, which Tribe or the Enterprise agrees to reimburse Manager promptly upon request, and a Cost of Gaming Operations if incurred after the Opening Date, and shall be payable by the Enterprise as incurred by Manager, its Affiliate or Indemnitee.

## ARTICLE 8
## PARTIES IN INTEREST

8.1   Payment of Fees; Background Investigations.

(a)   Manager shall pay the NIGC the fees required by NIGC regulations to conduct background investigations for the persons and entities required to undergo background investigations pursuant to such NIGC regulations. Manager or the applicable Manager Employee shall pay the Gaming Commission the fees required by the Gaming Commission to

conduct background investigations for the persons or entities required to undergo background investigations pursuant to the Gaming Ordinance or any Gaming Commission regulations. In no event shall the fees for background investigations to be conducted by the Gaming Commission with respect to Manager, any Affiliate of Manager or any Manager Employee exceed      per investigation without the written approval of both Manager and the Tribe.

    (b)    Except for Manager, there is no person or entity who or which is designated by this Agreement as having management responsibility for the Enterprise or any Gaming Activities of the Enterprise within the meaning of 25 C.F.R. 502.18, as the same may be amended from time to time.

    8.2    Removal; Divestiture. Should the Gaming Commission or the NIGC, in a final non-appealable decision, find that any "person having a direct or indirect financial interest" in this Agreement (within the meaning of 25 C.F.R. § 502.17, as amended from time to time) is a person whose prior activities, criminal record, if any, or reputation, habits, and associations pose a threat to the public interest, or the Tribal interest, or the effective regulation of gaming, or create or enhance the dangers of unsuitable, unfair, or illegal practices and methods and activities in the conduct of gaming or the carrying on of related business and financial arrangements, and should either agency notify Manager of such finding, Manager shall immediately remove such person from all association with Gaming Activities of the Enterprise under this Agreement and shall require such person to divest any direct or indirect interest in this Agreement as soon as · practicable. In addition, if any "person having a direct or indirect financial interest" in this Agreement (within the meaning of 25 C.F.R. § 502.17, as amended from time to time): (a) has been or is subsequently convicted of a felony relating to gaming, (b) knowingly or willfully provided materially false statements to the Tribe, the Gaming Commission or the NIGC, or refused to respond to questions from either of such agencies, or (c) attempts to unduly interfere or unduly influence for his or her gain or advantage any decision or process of Tribal government relating to Gaming Activities and if Manager becomes aware of such conflicts or prohibited actions, Manager shall promptly notify the Gaming Commission of such event, promptly remove such person or entity from all association with Gaming Activities of the Enterprise under this Agreement and require such person or entity to divest any direct or indirect interest in this Agreement as soon as practicable. The occurrence of the decisions, events or circumstances described in this Section shall not constitute a basis for terminating, voiding, amending or modifying this Agreement.

## ARTICLE 9
## MISCELLANEOUS

    9.1    Assignment and Subcontractors. This Agreement and the rights under this Agreement shall not be assigned and the obligations under this Agreement shall not be subcontracted or delegated without the prior written consent of the other Party and without first obtaining prior approval by the Chairman of the NIGC, if required; provided, however, Manager shall have the right to assign this Agreement or any rights under this Agreement or subcontract or delegate any duties or obligations under this Agreement without the consent of the Tribe to an Affiliate of Manager, provided that any such assignment has been approved by the Chairman of

the NIGC, if required, and any such assignee has received any required license from the Gaming Commission. Any assigning Party engaging in a permitted assignment described above shall, and shall cause its assignee to, execute and deliver to the other Party such assignment documents, together with evidence of the due authorization, execution, delivery and enforceability of such assignment documents, as the other Party may reasonably request. Notwithstanding the foregoing and for the avoidance of doubt, Manager may utilize Off-Site Manager Employees or other employees of any Affiliate of Manager in order to provide services to the Tribe under this Agreement and such use of employees of Affiliates of Manager shall not be considered to be an assignment of rights, or a subcontracting or delegation of duties, under this Agreement for the purposes of this Agreement or IGRA and shall not require the consent of the Tribe or its Affiliates. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and, subject to the preceding requirements, their permitted assigns. Any change in persons having a direct or indirect financial interest in this Agreement within the meaning of IGRA and any change in persons having management responsibility for this Agreement within the meaning of IGRA which requires the approval of the Chairman of the NIGC pursuant to IGRA as in effect from time to time shall be void within the meaning of IGRA unless such change is approved by the Chairman of the NIGC. Notwithstanding the foregoing or any provision of the Gaming Ordinance or regulations issued by the Gaming Commission, the acquisition by any third party (whether or not an Affiliate of Manager) of, or any other change in, any or all of the equity, financial or voting interest of any direct or indirect parent of Manager or any Affiliate of Manager shall not (i) constitute an actual or constructive assignment by Manager of this Agreement or any rights under this Agreement, or a subcontracting or delegation of any duties or obligations under this Agreement, for the purposes of this Agreement, (ii) require the consent or approval of the Tribe or any Affiliate of the Tribe, (iii) require any application, license, background investigation or suitability determination to or by the Tribe, the Gaming Commission, any other Tribal Affiliate, (iv) modify or otherwise affect in any way the rights or obligations of the Parties under this Agreement, or (v) require an amendment to this Agreement. Any change in the officers of Manager shall require the approval of the Tribe, which approval shall not be unreasonably withheld. The Parties acknowledge and agree that nothing in this Section prevents the Tribe or its Affiliates from conducting background investigations.

9.2     Notices. Any notice, consent or any other communication permitted or required by this Agreement shall be in writing and shall be effective on the date sent and shall be delivered by personal service, via telecopier with reasonable evidence of transmission, express delivery or by certified or registered mail, postage prepaid, return receipt requested, and, until written notice of a new address or addresses is given, shall be addressed as follows:

If to the Tribe:     Greg Sarris, Tribal Chair
Federated Indians of Graton Rancheria
6400 Redwood Drive
Suite 300
Rohnert Park, CA 94928
Telephone: (707) 566-2288
Facsimile: (707) 566-2291
Email: lfye@gratonrancheria.com

With a copy to:       John A. Maier, Esq.
                         Maier Pffefer Kim & Geary, LLP
                         510 16th Street, Suite 302
                         Oakland, California 94612
                         Telephone:    (510) 835-3020
                         Facsimile:    (510) 835-3040
                         Email: jmaier@jmandmplaw.com

If to the Manager:    SC Sonoma Management, LLC
                         1505 S. Pavilion Center Drive
                         Las Vegas, Nevada 89135
                         Attention: Scott M Nielson, Esq.
                         Telephone:    (702) 495-3800
                         Facsimile:    (702) 495-3310
                         Email: scott.nielson@stationcasinos.com

     9.3    Amendments. This Agreement and the Transaction Documents may be amended or modified only by written instrument duly executed by the Parties and, if required, approved by the Chairman of the NIGC. Notwithstanding the foregoing, the following shall not be construed to be an amendment or modification of this Agreement or any Transaction Document, as applicable, and shall not require the signature of the other Party to this Agreement or the approval of the Chairman of the NIGC in order to be legally binding and effective: (i) any consent or approval provided under or in connection with this Agreement or any Transaction Document by the Tribe, the Business Board or Manager; or (ii) any single circumstance waiver of any rights provided under or in connection with this Agreement or any Transaction Document which does not permanently amend the terms of this Agreement or such Transaction Document for other circumstances. The Tribe agrees, on behalf of itself and each Tribal Affiliate, that it will not rely on any course of dealing, course of performance, or any oral or written statements by Manager or any representative of Manager to effect an amendment, modification, waiver or supplement to this Agreement or any Transaction Document.

     9.4    Counterparts. This Agreement may be executed in two or more counterparts and by facsimile, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

     9.5    Force Majeure. No Party shall be in default in performance due hereunder or under any Transaction Document if such failure of performance is due to causes beyond its reasonable control, including acts of God, war, fires, floods, or accidents causing damage to or destruction of the Facility or property necessary to operate the Facility, or any other causes, contingencies, or circumstances not subject to its reasonable control which prevent or hinder performance of this Agreement or the Transaction Documents; provided, however, that the foregoing shall not excuse any obligations of the Tribe to make monetary payments to Manager as and when required hereunder or in any Transaction Document.

     9.6    Time is Material. The Parties agree that time is of the essence and the time and schedule requirements in this Agreement are material terms of this Agreement.

9.7    Further Assurances. The Parties hereto agree to do all acts and deliver all documents as shall from time to time be reasonably required to carry out the terms and provisions of this Agreement.

9.8    Severability. If any provision or provisions of this Agreement, or portion thereof, is found by an arbitration panel, court of law or governmental authority (i) to be illegal, invalid, unlawful, void or unenforceable as written, or (ii) to cause this Agreement to be void or invalid or require an approval from the Chairman of the NIGC, the Secretary of the Interior or other government official which has not been obtained, the Parties agree that such provision, provisions or portions thereof shall be deemed to be severed and/or deleted from this Agreement without requiring any further action by the Parties and that the remaining provisions of this Agreement shall continue in full force and effect. Without limiting the generality of the foregoing, the Parties intend and desire that this Agreement shall be interpreted in such a manner that any such provision, provisions or portions thereof (i) does not void or invalidate the entire Agreement, (ii) does not invalidate the Tribe's waiver of sovereign immunity as set forth in this Agreement or any arbitration panel, court or government authority's jurisdiction over the Tribe and the Enterprises, (iii) is construed to be collateral to the main purpose of this Agreement, and (iv) is construed to able to be severed and/or deleted from this Agreement without defeating the main purpose of this Agreement. In the event any such provision, provisions or portions thereof are severed and/or deleted from this Agreement and the remainder of this Agreement continues in full force and effect, the Parties shall use their best efforts to negotiate and enter into an amendment to this Agreement which will maintain the originally contemplated rights, duties and obligations of the Parties under this Agreement in a manner consistent with the applicable determination, which amendment, if agreed by the Parties, would require approval of the Chairman of the NIGC in order to be effective.

9.9    Waiver of Sovereign Immunity.

(a)    The Tribe hereby expressly, irrevocably and unconditionally waives, and agrees not to assert, its sovereign immunity (and any and all defenses based thereon) from any suit, action or proceeding or from any legal process related thereto with respect to any matters related in any way to any Dispute or for the purposes of enforcing this Agreement or any Transaction Document, including, without limitation, in connection with compelling arbitration, enforcing any arbitration or court award or seeking equitable or injunctive relief authorized hereunder or thereunder. The waivers, consents and agreements set forth in this Section, this Agreement and the other Transaction Documents are made by the Tribe on behalf of itself and any Affiliate of the Tribe. Such waivers, consents and agreements are made in favor and for the benefit of Manager and, if requested and at the discretion of Manager, any Manager Affiliate, Manager Employee, Off-Site Manager Employee or other Indemnitee, and Manager and such other persons or entities are hereby authorized to bring suit and arbitration proceedings and take other actions against the Tribe or Affiliates of the Tribe. In connection with any such suit, action or proceeding, the Tribe hereby consents to the jurisdiction of the United States District Court for the Northern District of California, the United States Court of Appeals for the Ninth Circuit, and the United States Supreme Court. If the United States District Court for the Northern District of California lacks jurisdiction or declines to exercise jurisdiction, the Tribe consents to the jurisdiction of the California State Court system. The Tribe agrees to California State Court

venue in any such case in San Francisco County. The Tribe waives any argument that venue in the above-named forums is not convenient and consents to be sued in such forums.

(b)     The Tribe hereby expressly, irrevocably and unconditionally waives any application of the doctrine of exhaustion of tribal remedies, abstention or any similar rule of comity with respect to the Tribe or any Tribal Courts and agrees that it will not present any affirmative defense based on any such doctrines. The Tribe expressly authorizes any Governmental Authorities which have the right or duty under applicable law to take any action authorized or ordered by any arbitration panel or court to take such action, including, without limitation, temporarily entering any site or facility, repossessing any assets subject to a security interest or otherwise enforcing or giving effect to any award, judgment, order or decree entered. The Tribe also authorizes Manager to pursue such self-help and other remedies as it deems appropriate to exercise and enforce its rights under this Agreement and the other Transaction Documents to the extent not prohibited by applicable law.

(c)     The Tribe understands that its agreement to an enforceable waiver of sovereign immunity in this Agreement and the Transaction Documents and the adoption of the Resolution of Waiver are a material inducement to Manager's execution of this Agreement and are a condition precedent to any of the respective obligations of the Parties under this Agreement. The Tribe shall take such further actions to ratify, adopt and enforce the Resolution of Waiver as shall be required by law or regulation due to future changes in its own legal or governing status to fully preserve its stated intent. The Tribe further agrees that it will not amend or alter or in any way lessen the rights of Manager as set forth in this Agreement, the Transaction Documents or the Resolution of Waiver. The Tribe hereby agrees to preserve the terms of this Agreement and the Transaction Documents in the event of future changes in its legal status or governance. This Section 9.9 shall survive the expiration or earlier termination of this Agreement or any Transaction Document, regardless of the reason for the termination.

(d)     The purpose of the waivers, consents and agreements set forth in this Section, this Agreement and the other Transaction Documents are to induce Manager and its Affiliates to enter into this Agreement and the other Transaction Documents. The Tribe agrees that this Agreement and the Transaction Documents are fully enforceable, non-usurious (under the laws applicable to the Tribe) and binding obligations of the Tribe and that the Tribe will not assert that its obligations hereunder or thereunder violate any Tribal law. The Tribe expressly waives any right it may have to veto this Agreement or the other Transaction Documents or the transactions contemplated hereby or thereby pursuant to the Tribe's Constitution or other applicable Tribal law. The Tribe irrevocably agrees to be bound by any final judgment (after any and all appeals) of any court or arbitration authorized by the waiver of sovereign immunity provisions(s) of this Agreement or the other Transaction Documents. At such time as the Tribe establishes a Tribal Court, (i) no party to this Agreement or the other Transaction Documents shall be required to commence or pursue any proceeding with respect to any Dispute in such Tribal Court, (ii) such Tribal Court shall lack the discretion to refuse to compel arbitration among the parties to any such dispute, (iii) such Tribal Court shall be obligated to honor and enforce any award by any arbitrator, without review of any nature by such Tribal Court, and (iv) such Tribal Court shall issue a stipulated declaratory judgment upholding the validity and enforceability of this Agreement and the other Transaction Documents. The Tribe will not and may not amend or alter the Resolution of Waiver in any way that lessens the rights of the beneficiaries of such

Resolution of Waiver, and the Resolution of Waiver shall survive termination of this Agreement or any of the other Transaction Documents, regardless of the reason for termination. The Tribe shall not, whether by initiative, referendum or otherwise, void, cancel, abrogate, modify or amend this Agreement or the other Transaction Documents without the prior written consent of Manager, which consent Manager may withhold or condition in its discretion. The Resolution of Waiver is hereby incorporated in this Agreement by reference and is a part of this Agreement as if set forth in full herein.

9.10     Representations and Warranties of Manager.  Manager hereby represents and warrants to the Tribe as follows:

(a)     This Agreement has been duly executed and delivered by Manager and, when approved by the Chairman of the NIGC, will constitute a valid and binding obligation, enforceable against Manager in accordance with its terms.

(b)     The execution and delivery of this Agreement, the performance by Manager of its obligations hereunder and the consummation by Manager of the transactions contemplated hereby will not violate any contract or agreement to which Manager is a party or any law, regulation, rule or ordinance or any order, judgment or decree of any federal, state, tribal or local court or require any regulatory approval beyond those contemplated herein.

(c)     Manager has the full legal right, power and authority and has taken all action necessary to enter into this Agreement, to perform its obligations hereunder, and to consummate all other transactions contemplated by this Agreement.

(d)     Manager specifically warrants to the Tribe that, during the term of this Agreement, Manager shall not act in any way, directly or indirectly, to cause any person or entity to become an encumbrancer or lienholder of the Enterprise, the assets of the Enterprise, the Site or the Facility, other than Manager, Manager's Affiliates or Lender.

9.11     Representations and Warranties of Tribe.  The Tribe hereby represents and warrants to Manager as follows:

(a)     The Tribe is an Indian tribe under the Constitution of the Tribe and laws of the United States.

(b)     The Tribe has full legal right, power and authority under the laws of the Tribe and has taken all official Tribal Council and General Council action necessary (i) to enter into this Agreement and authorize the Tribe to execute and deliver this Agreement and the Transaction Documents, (ii) to perform its obligations hereunder and thereunder, and (iii) to consummate all other transactions contemplated by this Agreement and the other Transaction Documents.

(c)     This Agreement has been duly executed and delivered by the Tribe and, when approved by the Chairman of the NIGC, will constitute a valid and binding obligation of the Tribe, enforceable in accordance with its terms. The Transaction Documents have been duly executed and delivered by the Tribe and constitute valid and binding obligations of the Tribe, enforceable in accordance with their terms, without requiring the approval of the Chairman of the NIGC.

(d)     The execution and delivery of this Agreement and the other Transaction Documents, the performance by the Tribe of its obligations hereunder and thereunder and the consummation by the Tribe of the transactions contemplated hereby and thereby will not violate any contract or agreement to which the Tribe is a party, or any law, regulation, rule or ordinance, or any order judgment or decree of any federal, state, tribal or local court, or require any approval by Governmental Authorities except for approval of this Agreement by the Chairman of the NIGC.

(e)     The Tribe does not have any indebtedness for borrowed money, except for money owing to Manager and its Affiliates or any Lender under the Transition Loan or the Facility Loan.

(f)     The Tribe is not subject to regulation under any law limiting or regulating its ability to incur indebtedness for money borrowed under the Transition Loan, Facility Loan or as otherwise provided under this Agreement or any Transaction Document, to grant liens in personal property to secure its obligations with respect to any such indebtedness or to otherwise perform its obligations under this Agreement or any Transaction Document.

(g)     There are no actions, suits, proceedings or investigations pending or as to which the Tribe has been served or has received notice or, to the best knowledge of the Tribe, threatened against or affecting the Tribe or any of its property, including, without limitation, actions before any Governmental Authority.

(h)     The Tribe does not own or license any intellectual property.

(i)     The Tribe is in compliance with all laws, rules, regulations or orders of any federal, state or Tribal court which are applicable to the Tribe or its properties.

(j)     The Tribe has not established a Tribal court or judicial system.

(k)     No written statement made by or on behalf of the Tribe to Manager in connection with this Agreement or any Transaction Document contains any untrue statement of a material fact or omits a material fact necessary in order to make the statement made not misleading in light of all the circumstances existing on the date the statement was made.

(l)     The representations, warranties and certifications set forth in any Officers' Certificate delivered by officers of the Tribe to Manager in connection with this Agreement or the Transaction Documents are true, correct and complete.

9.12    Governing Law.  This Agreement has been negotiated, made and executed in the State and shall be governed by and construed in accordance with the laws of the State, without regard to its conflict of laws provisions, and, to the extent applicable by operation of law, the IGRA and other federal laws. The Tribe agrees not to invoke or assert in any arbitration or court proceeding, any claim that any law, ordinance or regulation of the Tribe or any Affiliate of the Tribe governs this Agreement or any Transaction Document; provided, however, that, if the law of the State does not recognize the creation, attachment, perfection or enforcement of a lien or security interest securing any obligation with respect to any item of collateral, and the law of the Tribe does recognize such creation, attachment, perfection or enforcement of a lien or security

interest, then the law of the Tribe shall apply with respect to the creation, perfection and enforcement of such lien or security interest.

9.13    Entire Agreement. Each of the Exhibits to this Agreement is a part and component of this Agreement and is incorporated herein by reference as if set forth in full herein. This Agreement and the Exhibits hereto collectively constitute the "management contract" within the meaning of IGRA which is approved by the Chairman if and when the Chairman approves this Agreement. This Agreement, together with the Exhibits hereto, represents the entire agreement between the Parties regarding the subject matter hereof and supersedes all prior agreements relating to management of Commercial Activities to be conducted by the Tribe at the Facility and the operations of the Enterprise, including any unwritten oral agreements between the Parties regarding the subject matter hereof. The Original Agreement is hereby amended, restated and superseded by this Agreement and is of no further force and effect.

9.14    Representatives of Tribe. The Tribal Council shall furnish to Manager a list of Tribal Representatives on the Business Board and the Tribe shall keep such list current.

9.15    Limitations of Liability. The Tribe expressly agrees that Manager, its Affiliates and their respective employees shall not be liable for any specific, indirect, punitive or consequential damages in connection with its obligations, acts or omissions under this Agreement.

9.16    Approvals. Unless otherwise provided herein, all approvals or consents required by either Party hereunder shall not be unreasonably withheld, conditioned or delayed. Unless otherwise provided herein, approval by the Business Board or its duly authorized representatives shall be deemed to constitute approval by the Tribe and approval by the President or Secretary of Manager shall be deemed to constitute approval by Manager.

9.17    Inconsistent Positions. The Tribe agrees not to take a position in any dispute, proceeding or forum which is inconsistent or in conflict with the representations, warranties, certifications and agreements set forth in this Agreement or any Officers' Certificate of officers of the Tribe which references this Agreement.

9.18    Request for Federal Approval. The Parties specifically request that the Chairman of the NIGC, or the Secretary of the Interior where appropriate, approve this Agreement and the other Transaction Documents, if required, or declare that such approval is not required. In the event the Chairman of the NIGC approves this Agreement, but the NIGC determines that any of the other Transaction Document are not required to be approved by the Chairman of the NIGC in order for such other Transaction Document to not be void under IGRA for lack of approval, the Tribe agrees not to assert in any court or arbitration proceeding or other forum that such Transaction Document requires the approval of the Chairman of the NIGC in order to not be void under IGRA for lack of approval. In the event any approval issued by the Chairman of the NIGC of this Agreement or any Transaction Document may be or is revoked or voided for any reason, the Parties agree to immediately take any and all actions which either Party deems necessary or advisable to cause the Chairman of the NIGC to maintain or reissue such approval as soon as possible, including, without limitation, amending provisions of this Agreement or providing the NIGC with such documents or information as may be appropriate under the circumstances.

9.19    Non-Disclosure.  The Parties agree not to divulge to third parties the terms of this Agreement or any Transaction Document or any other proprietary or confidential information exchanged between the Parties pursuant to this Agreement or the Transaction Documents, unless (i) the information is required to be disclosed pursuant to judicial order or Legal Requirements, (ii) the information is at the time of disclosure already in the public domain, or (iii) to the extent required in order to obtain financing.  This prohibition shall not apply to disclosures by either Party to their attorneys, accountants, or other professional advisers.  In situations where disclosure of the terms of this Agreement, business plans, financial information or any Transaction Document to regulatory, governmental or judicial entities is required by law or regulations, the Parties will make reasonable efforts to secure confidential treatment of the economic terms of such documents by such entities; provided, however, this disclosure restriction shall not prohibit Manager or its Affiliates from making any SEC filings they deem legally necessary.  The Parties agree to consult with each other and cooperate regarding any press releases regarding this Agreement, the Transaction Documents and the relationships described herein and therein.

9.20    Non-Competition and Right of First Offer.  Manager agrees that, during the term of this Agreement, neither Manager, nor any of its Affiliates, shall manage or have any direct or indirect ownership or other interest in, or consult with or otherwise provide any financing or services to, any facility or enterprise (other than the Facility and the Enterprise) where Commercial Activities are conducted or which otherwise competes with the Facility or the Enterprise within Marin County and Sonoma County, California (the "Restricted Area") without the prior written consent of the Tribe.  The Tribe agrees that, during the term of this Agreement, Manager shall have the exclusive right to operate and manage all Commercial Activities on the Site and at any other location owned or held in trust for the benefit of the Tribe, or in which the Tribe or its Affiliate has an interest, within the Restricted Area.  In the event that the Tribe desires to develop, construct, operate, own, conduct, support or permit Commercial Activities which compete with the Enterprise within the Restricted Area (other than at the Facility) during the term of this Agreement, the Tribe shall first offer to Manager the right to manage such facility or enterprise upon the terms and conditions proposed by the Tribe to any third party manager (or, if the Tribe does not intend to engage a third party manager, upon the terms and conditions set forth in this Agreement), with a prompt response by Manager required, but in no event later than thirty (30) days after written notice from the Tribe.  In the event that Manager declines to accept such offer upon such terms and conditions, the Tribe shall have the right to pursue such Commercial Activities within the Restricted Area, provided that (i) the Tribe may not offer to an unrelated third party terms and conditions which are more favorable than those offered to Manager, and (ii) such Commercial Activities shall not commence operations prior to the Opening Date of the Facility unless this Agreement shall have been terminated.

9.21    Cooperation.  The Parties hereby agree to cooperate reasonably and fully and shall try to reach agreement or compromise on all matters arising under or relating to this Agreement or the subject matter hereof.  In the event that the Parties hereto are unable to reach agreement or compromise on any matter that reasonably may be expected to have an adverse material effect on the Enterprise, that matter shall be submitted to the dispute resolution provisions of Article 10.

9.22    Estoppel Certificate.  Manager and the Tribe agree to furnish to the other Party, from time to time upon request, an estoppel certificate in such reasonable form as the requesting Party may request stating whether there have been any defaults under this Agreement known to the Party furnishing the estoppel certificate and such other information relating to the Enterprise as may be reasonably requested.

9.23    Periods of Time.  Whenever any determination is to be made or action is to be taken on a date specified in this Agreement, if such date shall fall on a Saturday, Sunday or legal holiday under the laws of the Tribe or the State, then in such event said date shall be extended to the next day which is not a Saturday, Sunday or legal holiday.

9.24    Stay, Extension and Usury Laws.  To the extent permitted by applicable law, the Tribe covenants and agrees that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Agreement or the Transaction Documents, and the Tribe hereby expressly waives all benefit or advantage of any such law, and covenants that it shall not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to Manager, but shall suffer and permit the execution of every such power as though no such law has been enacted.  The Tribe represents and warrants that (i) it has a preexisting personal or business relationship with Manager which pre-dates the Effective Date of this Agreement and the Transaction Documents, (ii) the Tribe and the members of its Tribal Council have the business or financial experience and capacity to protect the interests of the Tribe in connection with the transactions contemplated by this Agreement and the Transaction Documents, (iii) in preparing, negotiating, approving, executing and delivering this Agreement and the Transaction Documents, the Tribe has been represented by outside legal counsel which has a bona fide attorney-client relationship with the Tribe, and (iv) such outside counsel, acting as the Tribe's professional advisors, has the business or financial experience and capacity to protect the interests of the Tribe in connection with the transactions contemplated by this Agreement and the Transaction Documents.

9.25    No Brokers.  The Tribe hereby agrees to indemnify and hold the other harmless from and against any and all claims, loss, liability, damage or expenses (including reasonable attorneys' fees) suffered or incurred by Manager or its Affiliates as a result of a claim brought by a person or entity engaged or claiming to be engaged by the Tribe or any person or entity which is affiliated with, or under common control with, such person or entity.

9.26    Government Savings Clause.  Each of Manager and the Tribe agrees to execute, deliver and, if necessary, record any and all additional instruments, certifications, amendments, modifications and other documents as may be required by the United States Department of the Interior, BIA, the NIGC, the office of the Field Solicitor, or any applicable statute, rule or regulation in order to effectuate, complete, perfect, continue or preserve the respective rights, obligations, liens and interests of the Parties hereto to the fullest extent permitted by law; provided, however, that any such additional instrument, certification, amendment, modification or other document shall not materially change the respective rights, remedies or obligations of the Tribe or Manager under this Agreement or other Transaction Documents.

9.27    Standard of Reasonableness. Except as otherwise provided herein, all provisions of this Agreement and all Transaction Documents and actions necessary to implement or enforce any such agreement or provision shall be governed by a standard of commercial reasonableness and good faith. Obligations of any Party to use best efforts will also be qualified by a standard of commercial reasonableness and good faith.

9.28    Preservation of Agreement. Except as otherwise provided in Section 9.3, each of Manager and the Tribe represent and warrant that they shall not act in any way whatsoever, directly or indirectly, to cause this Agreement to be amended, modified, canceled, or terminated. Each of Manager and the Tribe further warrant and represent that they shall take all actions necessary to ensure that this Agreement shall remain in effect at all times.

9.29    Recordation. At the option of Manager or the Tribe, any security agreement related to this Agreement or any Transaction Documents may be recorded in any public records. Where such recordation is desired in any relevant recording office maintained by the Tribe, and/or in the public records of the BIA, the Tribe will accomplish such recordation upon the request of Manager. Manager shall promptly reimburse the Tribe for all expenses, including reasonable attorneys fees, incurred as a result of such request.

9.30    No Joint Venture. The Parties further agree and acknowledge that it is not their intent, and that this Agreement shall not be construed, to create a joint venture between the Tribe and Manager. Rather, Manager shall be deemed to be an independent contractor of the Tribe and the Enterprise for all purposes hereunder.

9.31    Recitals. The recitals at the beginning of this Agreement are true and are incorporated by reference herein.

9.32    Interpretation. When a reference is made in this Agreement to Articles or Sections, such reference shall be to an Article or Section of this Agreement unless otherwise indicated.

9.33    Third Party Beneficiary. This Agreement is exclusively for the benefit of the Parties hereto and their respective Affiliates and, at the discretion of Manager, any Indemnitee and it may not be enforced by any party other than the Parties to this Agreement, their Affiliates or, at the discretion of Manager, an Indemnitee. This Agreement shall not give rise to liability to any third party other than the authorized successors and assigns of the Parties hereto, their Affiliates or, at the description of Manager, an Indemnitee.

9.34    Preparation of Agreement. This Agreement has been carefully prepared and reviewed by counsel for each Party hereto and shall not be construed more strongly for or against either Party hereto regardless of who is responsible for its preparation.

9.35    Reasonable Consideration. The Tribe, after consultation with its legal, financial and other professional advisors, acknowledges, represents, warrants and agrees that, taking into account the terms and conditions of and circumstances surrounding the transactions contemplated this Agreement, the payments to be made by the Tribe or its Affiliates to Manager pursuant to the terms of this Agreement are reasonable and appropriate, constitute reasonable

consideration and fair value, and are proportionate to the value provided to the Tribe by Manager under this Agreement.

9.36    Free and Voluntary Act. The Tribe acknowledges, represents, warrants and agrees that, prior to the execution and delivery of this Agreement, (i) the Tribe has had ample opportunity to review the legal and financial terms of this Agreement, (ii) the members of the Tribal Council of the Tribe have had ample opportunity to discuss, and have discussed, this Agreement and any related documents with the Tribe's legal, financial and other professional advisors, (iii) the Tribe and the members of the Tribal Council understand the provisions of this Agreement, the significance of them and the risks inherent in them, and (iv) the Tribe enters into this Agreement, and all documents required to be entered into pursuant to this Agreement, freely, voluntarily and without duress or compulsion.

9.37    Encumbrances. Notwithstanding any other provision of this Agreement, the Transaction Documents or any other agreement between or among the Tribe, Manager and their respective Affiliates, nothing in this Agreement is intended to (i) transfer, or in any other manner, convey any interest in land or other real property to Manager or its Affiliates, or (ii) attach an encumbrance, claim, lien, charge, liability, mortgage, leasehold mortgage or easement to any real property of the Tribe or its Affiliates.

9.38    Stay, Extension and Usury Laws. To the extent permitted by applicable law, the Tribe, on behalf of itself and the Enterprises, covenants and agrees that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Agreement, and the Tribe hereby expressly waives all benefit or advantage of any such law, and covenants that it shall not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to Manager, but shall suffer and permit the execution of every such power as though no such law has been enacted. The Tribe represents and warrants that (i) the Tribe and its officers, on the one hand, have personal and business relationships with Manager and its officers, on the other hand, which have existed for over five years prior to the Effective Date of this Agreement, (ii) the Tribe and the members of its Tribal Council have the business or financial experience, capacity and acumen to protect the interests of the Tribe and its affiliates in connection with the transactions contemplated by this Agreement and the Transaction Documents, (iii) in preparing, negotiating, approving, executing and delivering this Agreement and the Transaction Documents, the Tribe has been represented by the law firm of Maier Peffer Kim & Geary, LLP, which has a bona fide attorney-client relationship with the Tribe, (iv) Maier Peffer Kim & Geary, LLP, acting as the Tribe's professional advisors, has the business or financial experience, capacity and acumen to protect the interests of the Tribe in connection with the transactions contemplated by this Agreement and the Transaction Documents, (v) Maier Peffer Kim & Geary, LLP are not controlled, employed or compensated by, and do not intend to be controlled, employed or compensated by Manager or its affiliates, and (vi) this Agreement and the Transaction Documents have been provided to, and reviewed and commented upon by, the National Indian Gaming Commission prior to the Effective Date of this Agreement. The Tribe, on behalf of itself and the Enterprises, agrees not to take any position in any dispute or forum which is inconsistent with the representations and warranties set forth in this Section.

ARTICLE 10
DISPUTE RESOLUTION

10.1    Disputes with Patrons. Disputes that arise between the Enterprise, the Tribe,
Manager, any Affiliate of Manager, any Manager Employee or any Off-Site Manager Employee,
on the one hand, and any patron of the Facility, on the other hand, shall be resolved in
accordance with the applicable Tribal ordinances.

10.2    Disputes with Enterprise Employees. Disputes that arise between the Enterprise,
the Tribe, Manager, any Affiliate of Manager, any Manager Employee or any Off-Site Manager
Employee, on the one hand, and any Enterprise Employee, on the other hand, shall be resolved
pursuant to the Enterprise Employee Policies developed and implemented pursuant to Section
3.2.

10.3    Disputes Between the Tribe and Manager. Disputes (as defined in Article 1) shall
be resolved by the following Dispute resolution process.

(a)    The Parties shall first meet and confer in a good faith attempt to resolve the
Dispute through negotiations not later than ten (10) calendar days after receipt of written notice
of the Dispute, unless both Parties agree in writing to an extension of time.

(b)    If the Dispute is not resolved to the satisfaction of the Parties within thirty (30)
calendar days after the first meeting in Subsection (a), then the Dispute shall be submitted to
binding arbitration administered by JAMS pursuant to its Comprehensive Arbitration Rules and
Procedures (see http://www.jamsadr.com/index.asp) in effect at the time of submission, except as
modified by the provisions of this Agreement.

(c)    The question of whether or not all or any portion of a Dispute is within the scope
of, and is otherwise able to be arbitrated pursuant to, the arbitration provisions of this Agreement
shall be a matter for binding arbitration by the arbitrators, such question shall not be determined
by any court and, in determining any such question, all doubts shall be resolved in favor of the
Dispute and all portions thereof being within the scope of, and otherwise able to be arbitrated
pursuant to, the arbitration provisions of this Agreement. The Parties intend that the issue of
whether a Tribal Governmental Action constitutes a breach of contract, a tort or any other
impairment of rights to constitute an issue which is within the scope of, and otherwise able to be
arbitrated pursuant to, the arbitration provisions of this Agreement. In the event the arbitration
panel determines that any issue in a Dispute is not within the scope of, and otherwise able to be
arbitrated pursuant to, the arbitration provisions of this Agreement or otherwise declines
jurisdiction over all or any portion of a Dispute, the remaining portion of the Dispute may be
resolved in any court of competent jurisdiction.

(d)    If the Tribe is a named party to any arbitration or court proceedings, no other
Affiliate of the Tribe shall be considered to be, and the Tribe agrees not to assert that any
Affiliate of the Tribe is, an indispensable party to the Dispute or any arbitration or court
proceedings, and it shall not be necessary for any Affiliate of the Tribe to be a named party to the
Dispute or the arbitration or court proceedings in order for the arbitrators or the court to accept

5106702                                    67

jurisdiction and arbitrate or litigate any Dispute involving or affecting such Affiliate of the Tribe. The Parties agree that, while any arbitration or court proceedings are pending, the Parties shall continue to possess the rights and perform their duties and obligations as set forth in this Agreement and the other Transaction Documents.

(e)     Discovery shall be permitted in accordance with the Federal Rules of Civil Procedure, subject to supervision as to scope and appropriateness by the arbitrators.

(f)     Judgment on any arbitration award may be entered in any court having jurisdiction over the Parties. Awards, judgments, decrees and orders shall be binding upon the Parties and their respective Affiliates.

(g)     Unless the Parties hereto otherwise agree in writing prior to the submission of such Dispute to arbitration, arbitration proceedings under this Section shall be held in San Francisco, California.

(h)     Either Party may, at any time prior to the selection of an arbitrator or arbitrators, require that the arbitrator or arbitrators selected be an attorney or attorneys licensed to practice law in the United States and that the attorneys have experience in Indian law and/or commercial issues.

(i)     Unless the Parties hereto otherwise agree in writing, any Dispute to be arbitrated shall be submitted to a panel of three arbitrators. One arbitrator shall be selected by the Tribe, one arbitrator shall be selected by Manager and the third arbitrator shall be selected by mutual agreement of the two arbitrators selected by the Parties hereto.

(j)     The arbitration award shall be in writing signed by each of the arbitrators, and shall state the basis for the award. The arbitration award shall be set forth in reasonable detail as to its findings of fact and law, and basis of determination of award form and amount. The arbitration findings and award shall be considered to be confidential information which shall not be disclosed except as permitted by this Agreement or agreement of the Parties.

(k)     In connection with any arbitration award, the arbitrators shall be empowered to award such damages and other remedies as they deem appropriate, including, without limitation, interim injunctive relief, permanent injunctive relief, declaratory relief, specific performance or monetary damages. The arbitrators may, in the award, allocate all or part of the costs of the arbitration, including the fees of the arbitrators and the reasonable attorneys' fees of the prevailing party. Notwithstanding the foregoing, the arbitrators shall not have the power or authority to award exemplary or punitive damages or to award disgorgement, forfeiture or restitution of any prior payment received under this Agreement or any Transaction Documents. Also, the arbitrators shall not have the power to compel, overturn, negate or modify any Tribal Governmental Action or award injunctive relief or specific performance with respect to any Tribal Governmental Action; provided, however, such restriction shall not prevent an arbitrator from determining that the taking of any Tribal Governmental Action, or the failure to take any Tribal Governmental Action, constitutes a breach of this Agreement or any Transaction Document by the Tribe or its Affiliate or the impairment of rights of the Manager under this Agreement or any Transaction Document, which therefore results in liability on the part of the Tribe for damages or other remedies in favor

of Manager or its Affiliates; and provided, further, that such restriction shall not prevent Manager from enforcing its rights with respect to this Agreement and the other Transaction Documents, or the liens and security interests granted thereunder, including, without limitation, realizing on collateral encumbered thereby.

(l)     Arbitration awards made pursuant to this Section 10.3 shall be enforceable under Title 9 of the United States Code and any applicable tribal, federal or state law governing the enforcement of arbitration awards.

(m)     In addition to any basis for appeal of an arbitration award stated in Title 9 of the United States Code or any applicable tribal, federal or state law governing the enforcement of arbitration awards, either Party hereto may appeal an arbitration award on the basis that the arbitrator or arbitrators incorrectly decided a question of law in making the award, or the award was made in an arbitrary or capricious manner or in manifest disregard of the factual evidence.

(n)     Either Party hereto, without having to comply with the provisions of Subsections 10.3 (a) or (b) or exhaust any tribal remedies first, shall have the right to seek and obtain a temporary restraining order, permanent injunction or other order from the arbitration panel or a court having jurisdiction over the Parties requiring that the circumstances specified in the order be maintained pending completion of the arbitration or court proceeding, to the extent permitted by applicable law.

(o)     The Tribe agrees not to institute any action in any Tribal Court relating to any Dispute without the consent of Manager. The Tribe agrees that any Tribal Court shall enforce and give full faith and credit to any award, judgment, order or decree of any arbitration panel or court in connection with any Dispute.

(p)     Each of the Parties hereby waive the right to any jury trial in any action proceeding or claim relating to any Dispute.

## ARTICLE 11

### INTELLECTUAL PROPERTY MATTERS

11.1     Manager Marks. Notwithstanding any other provision of this Agreement or any Transaction Document, the Parties acknowledge and agree that neither this Agreement, the other Transaction Documents, nor any communications preceding the date of this Agreement between the Manager or its Affiliates or representatives, on the other hand, and the Tribe or its representatives, on the other hand, expressly or implicitly offered to grant, granted or grants the Tribe, the Enterprise or any other Affiliate of the Tribe any rights whatsoever in any trademarks, service marks, logotypes, advertising, commercial symbols, trade names, trade dress or domain names (collectively, "Marks") now or hereafter owned or licensed by, or designating, Manager or any of its Affiliates ("Manager Marks"), including, without limitation, any license or right to use any of the Manager Marks. Notwithstanding any other provision of this Agreement or any Transaction Document, and unless otherwise expressly agreed in a separate written agreement hereafter duly approved, executed and delivered by Manager or its Affiliate and the Tribe, the

Tribe, the Enterprise and any other Affiliate of the Tribe are expressly prohibited from (i) using any of the Manager Marks, (ii) participating in progressive or similar games or jackpots which utilize any Manager Marks, (iii) adopting any Marks which are confusingly similar to the Manager Marks or which could otherwise be considered to designate Manager or its Affiliates, or (iv) creating the appearance or otherwise suggesting to patrons of the Facility or the Enterprise or any other persons or entities that the operation of the Tribe, the Facility, the Enterprise or the Commercial Activities are being conducted under, or in association with, any of the Manager Marks.

11.2    Manager Proprietary Assets. This Agreement does not grant the Tribe or the Enterprise any rights to license or use (i) any foreign or U.S. patents or patent applications now or hereafter filed, owned or licensed by Manager or its Affiliates, or (ii) any proprietary games, game themes or other assets now or hereafter developed, owned or licensed by Manager or its Affiliates.

11.3    Manager Software. The Tribe and the Enterprise acknowledge and agree that Manager and its Affiliates currently own or license certain computer software and related documentation, and may in the future develop, own or license additional computer software and related documentation, which could be useful in the operation of the Facility or the Enterprise as the same may be further developed, upgraded and supplemented from time to time (collectively, "Manager Software").

11.4    Manager Proprietary Information. The Tribe and the Enterprise acknowledge and agree that Manager and its Affiliates currently own or license certain proprietary information, and may in the future develop, own or license additional proprietary information, which could be useful in the operation of the Enterprise (collectively, "Manager Proprietary Information"), including without limitation, the following: (i) certain proprietary information, techniques and methods of operating certain businesses and training employees in those businesses; and (ii) certain proprietary business plans, projections, strategies, and systems. The Tribe and the Enterprise further acknowledge and agree that such Manager Proprietary Information has been developed by Manager or its Affiliates and/or acquired over many years through the expenditure of time, money and effort and that Manager or its Affiliates maintain such Manager Proprietary Information as confidential information and as a trade secret(s). The Tribe and the Enterprise further acknowledge and agree that proprietary information owned or licensed by Manager or its Affiliates shall be considered "Manager Proprietary Information" for the purposes of this Agreement whether or not Manager or its Affiliates label or otherwise designate such information as confidential or proprietary information at the time it is provided to the Tribe or the Enterprise.

11.5    License Matters. The Tribe, the Enterprise or the Business Board may, in their discretion, request that Manager or its Affiliates license or sublicense certain Manager Software or Manager Intellectual Property to the Tribe or the Enterprise. Manager or its Affiliates may in their discretion, but shall not be obligated to, license or sublicense any requested Manager Software or Manager Proprietary Information to the Tribe or the Enterprise. In the event that Manager or any of its Affiliates elect to license or sublicense any Manager Software or Manager Proprietary Information to the Tribe or the Enterprise, the terms of any such license or sublicense

shall be mutually agreed upon by Manager or its Affiliate, on the one hand, and the Business Board acting on behalf of the Tribe or the Enterprise, on the other hand; provided, however, that the members of the Business Board who are Manager Representatives shall recuse themselves from participating in the deliberations of the Business Board relating to such license or sublicense; and provided, further, that, if Manager or its Affiliates request payment of any royalty fee or other payment for such license or sublicense, the amount of such fee or payment shall not, in any event, exceed the amount which the Business Board determines is substantially equivalent to the fees or payments which would be charged by an entity which is not affiliated with Manager for similar software or proprietary information. Unless Manager or its Affiliate, on the one hand, and the Business Board, on the other hand, expressly agree otherwise in writing, the license or sublicense by Manager or its Affiliates to the Tribe or the Enterprise of Manager Software or Manager Proprietary Information shall be: (i) royalty-free; (ii) non-exclusive; (iii) for use only at the Facility; (iv) for use only by the Tribe or the Enterprise without any right to sublicense, disclose or distribute to any third party; (v) be for a term which does not extend beyond the date of the expiration or termination of this Agreement for any reason; and (vi) shall terminate upon the expiration or termination of this Agreement for any reason, after which date the Tribe and the Enterprise shall promptly discontinue use of such Manager Software and/or Manager Proprietary Information and shall return to Manager all copies thereof or documents, summaries or notes relating thereto.

11.6  Ownership Matters.  The Tribe and the Enterprise acknowledge and agree that Manager or its Affiliates shall have the ownership and proprietary interest in any software or proprietary information which Manager, its Affiliates or any Manager Employees or Off-Site Manager Employees develop or cause to be developed during the term of this Agreement, including, without limitation, software and proprietary information which is intended to be used at the Facility or by the Enterprise, and that such software and proprietary information shall be considered to be "Manager Software" or "Manager Proprietary Information" for the purposes of this Agreement. Notwithstanding the foregoing, in the event any software or proprietary information is developed for use solely at the Facility or by the Enterprise, the Tribe shall be a co-owner of such software or proprietary information and either Party may use such software or proprietary information in any manner without requiring any notice, payment or accounting to the other Party. The Tribe and the Enterprise further agree as follows: (i) Manager, Manager's Affiliates or their respective licensors, as the case may be, are the sole owners of Manager Software or Manager Proprietary (collectively, "Manager Intellectual Property"); (ii) the Tribe and the Enterprise shall not challenge or attack the validity of Manager's or its Affiliates' rights in Manager Intellectual Property; (iii) the Tribe and the Enterprise shall not assert that they have any ownership or other interest in any Manager Intellectual Property, except as a licensee or sublicencee thereof; (iv) the Tribe and the Enterprise shall take such actions and execute, deliver and file such agreements, acknowledgements and other documents as Manager may request in order to confirm and reaffirm Manager's, Manager's Affiliate's or their respective licensors' sole ownership or other rights in any Manager Intellectual Property, as the case may be; and (v) the Tribe and the Enterprise shall take reasonable actions to avoid causing or permitting anything within their control which may damage, endanger or reduce the value of any Manager Intellectual Property.

11.7    Patron Database.  During the term of this Agreement, Manager shall develop and maintain a patron database which contains information regarding patrons who originated any patron card or rewards program at the Facility or the Enterprise or who were inserted into the database as a result of the patron's activities at the Facility or the Enterprise (the "Patron Database").  During the term of this Agreement, Manager may merge the Patron Database with other databases owned or managed by Manager or its Affiliates and may otherwise use the Patron Database in any manner without requiring any notice, payment or accounting to the Tribe or the Enterprise; provided, however, that, in the event Manager merges the Patron Database with other databases, Manager shall always maintain a separate copy of the Patron Database or shall otherwise be able to segregate the data in the Patron Database from the data in the other databases.  Upon expiration or termination of this Agreement for any reason, Manager shall provide the Tribe and the Enterprise with a copy of the data in the Patron Database which is current through such date of expiration or termination in machine readable form and/or written form, at the election of the Tribe.  After the date of expiration or termination of this Agreement for any reason, Manager may use the data in the Patron Database in any manner, and the Tribe and the Enterprise may use the data in the copy of such Patron Database provided by Manager to the Tribe and the Enterprise in any manner, without requiring any notice, payment or accounting to the other Party.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first written above.

"Tribe"                                    "Manager"

FEDERATED INDIANS OF                       SC SONOMA MANAGEMENT, LLC,
GRATON RANCHERIA,                          a California limited liability company
a federally recognized
Indian tribe

By: _____              By: _____
        Greg Sarris, Tribal Chair                Scott M Nielson, Secretary

ATTEST:

        _____
        Jeannette Anglin, Tribal Secretary

[SIGNATURE PAGE FOR GAMING MANAGEMENT AGREEMENT]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first written above.

"Tribe"

FEDERATED INDIANS OF
GRATON RANCHERIA,
a federally recognized
Indian tribe

By: _Greg Sarris_

Greg Sarris, Tribal Chair

ATTEST:

_Jeannette Anglin_

Jeannette Anglin, Tribal Secretary

"Manager"

SC SONOMA MANAGEMENT, LLC,
a California limited liability company

By: _____

Scott M Nielson, Secretary

[SIGNATURE PAGE FOR GAMING MANAGEMENT AGREEMENT]

The Amended and Restated Management Agreement dated September 8, 2010, between the Federated Indians of Graton Rancheria and SC Sonoma Management, LLC is approved by the National Indian Gaming Commission.


By: _____        Date: _10 – 01 – 10_

    Tracie Stevens, Chairwoman

ATTACHMENT 1 TO GAMING MANAGEMENT AGREEMENT

25766          Federal Register / Vol. 73, No. 89 / Wednesday, May 7, 2008 / Notices

office. Please reference Batch IV ITPs for 41 applications in requests for the documents discussed herein.

**FOR FURTHER INFORMATION CONTACT:** Mr. Aaron Valenta, Regional HCP Coordinator (see ADDRESSES), telephone: 404–679–4144; or Mr. Darren LeBlanc, Fish and Wildlife Service Biologist, Daphne Field Office (see ADDRESSES), telephone: 251–441–5859.

**SUPPLEMENTARY INFORMATION:** We announce applications for 41 ITPs, including the HCPs, and the availability of an EA. The EA is a combined assessment addressing the environmental impacts associated with these projects both individually and cumulatively. Copies of these documents may be obtained by making a request in writing to the Service's Regional Office (see ADDRESSES). This notice advises the public that we have opened the comment period on the ITP applications, the HCPs, and the EA. This notice is provided pursuant to section 10 of the Act and National Environmental Policy Act regulations at 40 CFR 1506.6.

We specifically request information, views, and opinions from the public on the Federal action, including the identification of any other aspects of the human environment not already identified in our EA. Further, we specifically solicit information regarding the adequacy of the HCPs as measured against our ITP issuance criteria found in 50 CFR parts 13.21 and 17.22.

If you wish to comment, you may submit comments by any one of several methods. Please reference Batch IV ITPs for 41 applications for residential development in such comments. You may mail comments to our Regional Office (see ADDRESSES). You may also comment via the Internet to *aaron_valenta@fws.gov*. Please include your name and return mailing address in your Internet message. If you do not receive a confirmation from us that we have received your Internet message, contact us directly at either telephone number listed (see FOR FURTHER INFORMATION CONTACT).

Finally, you may hand-deliver comments to either Service office listed (see ADDRESSES). Our practice is to make comments, including names and home addresses of respondents, available for public review during regular business hours. Individual respondents may request that we withhold their home address from the administrative record. We will honor such requests to the extent allowable by law. There may also be other circumstances in which we would withhold from the administrative

record a respondent's identity, as allowable by law. If you wish to withhold your name and address, you must state this prominently at the beginning of your comments. We will not, however, consider anonymous comments. We will make all submissions from organizations or businesses, and from individuals identifying themselves as representatives or officials of organizations or businesses, available for public inspection in their entirety.

The ITPs would cover 14 discrete lots totaling 16.2 acres on the Fort Morgan Peninsula. Under the preferred alternative, project development would result in the overall loss of 4.25 acres of ABM habitat. Minimization and mitigation of impacts includes: reduced project impacts, maintenance of ABM habitat on-site, prohibition of cats, preservation of dune habitat, and elimination of debris.

We will evaluate the HCPs, applications, and any received comments to determine whether the applications meet the requirements of section 10(a) of the Act. If it is determined that those requirements are met, the ITPs will be issued for the incidental take of the ABM. We will also evaluate whether issuance of the section 10(a)(1)(B) ITPs comply with section 7 of the Endangered Species Act by conducting an intra-Service section 7 consultation. The results of this consultation, in combination with the above findings, will be used in the final analysis to determine whether or not to issue the ITPs.

Dated: April 30, 2008.
Noreen K. Walsh,
*Acting Regional Director.*
[FR Doc. E8–10052 Filed 5–6–08; 8:45 am]
BILLING CODE 4310–55–P

---

**DEPARTMENT OF THE INTERIOR**

**Bureau of Indian Affairs**

**Land Acquisitions; Federated Indians of Graton Rancheria, California**

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Notice of Final Agency Determination To Take Land Into Trust under 25 CFR Part 151.

**SUMMARY:** The Assistant Secretary—Indian Affairs made a final agency determination to acquire approximately 254 acres of land into trust for the Federated Indians of Graton Rancheria of California on April 18, 2008. This notice is published in the exercise of authority delegated by the Secretary of

the Interior to the Assistant Secretary—Indian Affairs by 209 Departmental Manual 8.1.

**FOR FURTHER INFORMATION CONTACT:** George Skibine, Director, Office of Indian Gaming, MS–3657 MIB, 1849 C Street, NW, Washington, DC 20240; Telephone (202) 219–4066.

**SUPPLEMENTARY INFORMATION:** This notice is published to comply with the requirement of 25 CFR Part 151.12(b) that notice be given to the public of the Secretary's decision to acquire land in trust at least 30 days prior to signatory acceptance of the land into trust. The purpose of the 30-day waiting period in 25 CFR 151.12(b) is to afford interested parties the opportunity to seek judicial review of final administrative decisions to take land in trust for Indian tribes and individual Indians before transfer of title to the property occurs. On April 18, 2008, the Assistant Secretary—Indian Affairs decided to accept approximately 254 acres of land into trust for the Federated Indians of Graton Rancheria of California. The Graton Rancheria was restored to federal recognition pursuant to Title XV of Public Law 106–568 (the Graton Rancheria Restoration Act, 25 U.S.C. 1300n-3, which mandates that, "the Secretary shall accept into trust for the benefit of the Tribe any real property located in Marin or Sonoma County. The 254 acre parcel is located in Sonoma County, California.

The legal description of the property is as follows:

Tract One

Farms 102, 103, 104, 105, 106, 124, 125, 126 and 127, as shown upon the Map of Plan of Subdivision of Santa Rosa Farms No. 2, filed March 7, 1910 in the Office of the County Recorder of Sonoma County in Book 21 of Maps, Page 14, Sonoma County Records. Certificate of Compliance recorded January 28, 1998 as Document No.'s 1998 0008588 through 1998 0008596, Sonoma County Records. Being Assessors Parcel No. 045–073–001

Tract Two

*Parcel One*

Farms 130 and 131 as shown upon the Map of Plan of Subdivision of Santa Rosa Farms No. 2 filed March 7, 1910 in the Office of the County Recorder of Sonoma County in Book 21 of Maps, Page 14, Sonoma County Records. Certificate of Compliance recorded January 28, 1998 as Document No.'s 1998 0008597 and 1998 0008598, Sonoma County Records. Being a portion of Assessor's Parcel No. 045–074–009.

*Parcel Two*

Farm 129 of Santa Rosa Farms No. 2, according to Map thereof filed in the Office of the County Recorder of said County on March 7, 1910 in Book 21 Maps, Page 14, Sonoma County Records.

Being Assessor's Parcel No. 045–074–010.

*Parcel Three*

Farm No. 128 as same is shown upon that certain Map Entitled "Plan of Subdivision of Santa Rosa Farms No. 2, Sonoma Co., Cal., Etc.", filed March 7, 1910 in Book 21 of Maps at Page 14.

*Saving and Excepting Therefrom, the following:*

Commencing at the Southeasterly corner of said Farm No. 128; thence Northerly along the Eastern line thereon, 155 feet and 7 inches to a point, for the actual point of commencement of the tract to be herein described; thence from said point of commencement, South 89° West, 289 feet and 6 inches to a point; thence Northerly, parallel with the Eastern line of said Farm No. 128, a distance of 155 feet and 10 inches to a point; thence North 89° East, 289 feet and 6 inches to the Eastern line of said Farm No. 128; thence Southerly along said Eastern line, 155 feet and 10 inches to the point of commencement.

*Also Saving and Excepting Therefrom, the following:*

Beginning at a point on the center line of Labath Avenue, which point is the Southeast corner of Lot 128 as shown upon the Map entitled "Plan Of Subdivision of Santa Rosa Farms No. 2, Sonoma Co., Cal., Etc.", filed March 7, 1910 in Book 21 of Maps, Page 14, Sonoma County Records; thence North 1° West along the Easterly line of Lot 128, a distance of 155 feet, 7 inches to a point; thence South 89° West, 289.5 feet; thence North 1° West, 77 feet, 10 inches; thence South 89° West, 283.66 feet to the Westerly line of said Lot 128; thence along said line, South 1° East, 233.5 feet to the Southwest corner of said Lot 128; thence along the Southerly line of said Lot, North 89° East, 573.16 feet to the point of beginning.

Being Assessor's Parcel No. 045–073–002.

Tract Three

A Portion of Farm No. 128 as shown upon the Map entitled "Plan of Subdivision of Santa Rosa Farms No. 2, Sonoma County, California", filed in the Office of the County Recorder of Sonoma County, California, on March 7, 1910 in Book 21 of Maps, page 14, more particularly described as follows:

Commencing at the Southeasterly corner of said Farm No. 128; thence

Northerly along the Easterly line thereof, 155 feet, 7 inches to a point for the true point of beginning of the tract to be herein described; thence South 89° West 289 feet, 6 inches to a point; thence Northerly parallel with the Easterly line of said Farm No. 128, a distance of 155 feet, 10 inches to a point; thence North 89° East, 289 feet, 6 inches to the Easterly line of said Farm No. 128; thence Southerly along said Easterly line, 155 feet, 10 inches to the point of beginning.

Being Assessor's Parcel No. 045–073–003.

*Tract Four*

Beginning at a point on the center line of Labath Avenue which point is the Southeast corner Lot 128 as shown upon the Map entitled Plan of Subdivision of Santa Rosa Farms No. 2, Sonoma County, California, etc., filed March 7, 1910 in Book 21 of Maps, page 14, Sonoma County Records; thence North 1° West along the Easterly line of Lot 128, a distance of 155 feet 7 inches to a point; thence South 89° West, 289.5 feet; thence North 1° West, 77 feet 10 inches; thence South 89° West, 283.66 feet to the Westerly line of said Lot 128; thence along said line South 1° East, 233.5 feet to the Southwest corner of said Lot 128; thence along the Southerly line of said Lot, North 89° East, 573.16 feet to the point of beginning.

Being Assessor's Parcel No. 045–073–004.

*Tract Five*

A tract of land, being a portion of the Rancho Llano de Santa Rosa, and commencing on the boundary line of said Rancho on the line between Section 21 and 22, in Township 6 North, Range 8 West, Mount Diablo Base & Meridian, at a point in the center of the County Road known as the Santa Rosa and *Stony Point Road, from which point* the post for the railing of the bridge, across the Laguna and standing on the Southeast corner of the same, is North 31° West, 13 links distant; thence from said point of beginning, North 89° 30' East, 11.92 chains, South 39° 05' East, 2.61 chains, South 53° East, 1.36 chains, South 64° East, 1.23 chains, South 77° 15' East, 2.82 chains, South 88° 05' East, 3.94 chains, North 4° 15' East, 1.43 chains, South 88° East, 2.03 chains, South 56° East, 2.44 chains, North 87° 15' East, 22.62 chains to the Northwest *boundary line of the* Cotati Rancho; thence along said line, North 29° 15' East, 39.44 chains; thence leaving said line, West 67.92 chains to the center of the aforesaid Road and Section line; thence South, 32.18 chains to the point

of beginning. Magnetic Variation 17° East.

Excepting therefrom those portions of land described in the Deeds from Manuel T. Pimentel, *et al*, to the Sonoma County Flood Control and Water Conservation District, recorded August 16, 1961 in Book 1840 of Official Records, page 280, Serial No. G–60050, Sonoma County Records, and recorded September 24, 1963 in Book 1989 of Official Records, page 575, Serial No. H–56600, Sonoma County Records.

Also excepting therefrom that portion of land described in the Deed from Mary C. Pimentel, *et al*, to the Sonoma County Flood Control and Water Conservation District, recorded February 11, 1966 in Book 2187 of Official Records, page 957, Serial No. J–83549, Sonoma County Records.

Also excepting therefrom that portion of land described in the Deed to the City of Rohnert Park, recorded January 11, 1989, as Document No. 89002750 of Official Records of Sonoma County.

Also excepting therefrom that portion of land described in the Deed to the County of Sonoma, recorded May 17, 1996 as Document No. 1996 0044116 of Official Records of Sonoma County.

An easement for cattle and agricultural equipment crossing, as described in the Deed from the Sonoma County Flood Control and Water Conservation District to Manuel L. Pimentel and Mary C. Pimentel, recorded August 15, 1961 in Book 1840 of Official Records, page 284, Serial No. G–60051, Sonoma County Records.

An easement for cattle and agricultural equipment crossing, as described in the Deed from the Sonoma County Flood Control and Water Conservation District to Manuel L. Pimentel and Mary C. Pimentel, recorded August 15, 1961 in Book 1840 of Official Records, page 288, Serial No. G–60052, Sonoma County Records.

Being Assessor's Parcel Nos. 046–021–020 & 021,046–021–039 & 040.

Tract Six

All that certain real property situated in the City of Rohnert Park, County of Sonoma, State of California, described as follows: Lot 6, as shown on the map of "Rohnert Business Park Subdivision", filed August 12, 1985 in the office of the County Recorder in Book 375 of Maps, at pages 10 and 11, Sonoma County Records.

Being Assessor's Parcel No. 143–040–068.

# EXHIBIT B

EX-3.3 2 a2226927zex-3_3.htm EX-3.3

**Exhibit 3.3**

**FORM OF**
**AMENDED AND RESTATED**
**CERTIFICATE OF INCORPORATION**
**OF**
**RED ROCK RESORTS, INC.**

It is hereby certified that:

1.     The name of the corporation is Red Rock Resorts, Inc.

2.     The date of filing of its original Certificate of Incorporation with the Secretary of State of the State of Delaware was September 9, 2015.

3.     The Corporation has not received any payment for any of its stock.

4.     This Amended and Restated Certificate of Incorporation of the Corporation has been duly adopted by the board of directors of the Corporation in accordance with Section 241 of the Delaware General Corporation Law.

5.     The effective date (the "Effective Date") of this Amended and Restated Certificate of Incorporation of the Corporation shall be the date it is filed with the Secretary of State of the State of Delaware.

6.     The Certificate of Incorporation of the Corporation is hereby amended and restated in its entirety to read as follows:

**ARTICLE I**
**NAME**

The name of the corporation is Red Rock Resorts, Inc. (hereinafter referred to as the "Corporation").

**ARTICLE II**
**REGISTERED OFFICE**

The address of the registered office of the Corporation in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, postal code 19801, County of New Castle.  The name of the registered agent of the Corporation at that address is The Corporation Trust Company.

**ARTICLE III**
**CORPORATE PURPOSE**

The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the Delaware General Corporation Law (the "DGCL").

**ARTICLE IV**
**AUTHORIZED CAPITAL STOCK**

(1)     Authorized Capital Stock.  The total number of shares of all classes of stock which the Corporation shall have authority to issue is [       ] shares, consisting of [       ] shares of Class A Common Stock, par value $0.01 per share (the "Class A Common Stock"), [       ] shares of Class B Common Stock, par value $0.00001 per share (the "Class B Common Stock," together with the Class A Common Stock, the "Common Stock") and [       ] shares of Preferred Stock, par value $0.01 per share (the "Preferred Stock").

(2)  Common Stock.  The powers, preferences, and rights and the qualifications, limitations, and restrictions of the Class A Common Stock and the Class B Common Stock are as follows:

(a)  Voting Rights.  Except as otherwise required by the DGCL or as provided by or pursuant to the provisions of this Amended and Restated Certificate of Incorporation:

(i)  Each holder of Class A Common Stock shall be entitled to one (1) vote for each share of Class A Common Stock held of record by such holder. The holders of shares of Class A Common Stock shall not have cumulative voting rights.

(ii)  Each holder of Class B Common Stock shall be entitled to one (1) vote for each share of Class B Common Stock held of record by such holder; *provided* that each holder that, together with its Affiliates (which, in the case of the Fertitta Family Entities, shall be deemed to include each other Fertitta Family Entity), (A) beneficially owns thirty percent (30%) or more of the units of membership interest (hereafter, a "Holdco Unit") of Station Holdco LLC, a Delaware limited liability company ("Holdco LLC"), immediately following the consummation of the initial public offering of the Corporation's Class A Common Stock and (B) as of the applicable record date or other date of determination maintains direct or indirect beneficial ownership of an aggregate of at least ten percent (10%) of the outstanding shares of Class A Common Stock (determined assuming that each unit of membership interest of Holdco LLC held by holders other than the Corporation were exchanged for Class A Common Stock in accordance with the terms and conditions of either (i) the Exchange Agreement (as defined below) or (ii) the LLC Agreement (as defined below)), shall be entitled to ten (10) votes for each share of Class B Stock held of record by such holder.

2

(iii)  Except as otherwise required in this Amended and Restated Certificate of Incorporation or by applicable law, the holders of Class A Common Stock and Class B Common Stock shall vote together as a single class on all matters on which stockholders are generally entitled to vote (or, if any holders of Preferred Stock are entitled to vote together with the holders of Common Stock, as a single class with such holders of Preferred Stock).

(iv)  In addition to any other vote required in this Amended and Restated Certificate of Incorporation or by applicable law, the holders of Class A Common Stock and Class B Common Stock shall each be entitled to vote separately as a class only with respect to amendments to this Amended and Restated Certificate of Incorporation that increase or decrease the par value of the shares of such class, or alter or change the powers, preferences, or special rights of the shares of such class so as to affect them adversely.

(b)  Dividends.  Subject to applicable law and the rights, if any, of the holders of any outstanding series of Preferred Stock or any class or series of stock having a preference over or the right to participate with the Class A Common Stock with respect to the payment of dividends and other distributions in cash, stock of any corporation or property of the Corporation, such dividends and other distributions may be declared and paid on the Class A Common Stock out of the assets of the Corporation that are by law available therefor at such times and in such amounts as the Board in its discretion shall determine.  Except as provided in Section 2(d) of this Article IV, dividends and other distributions shall not be declared or paid on the Class B Common Stock.

(c)  Liquidation, Dissolution, etc.  In the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation, after payment or provision for payment of the debts and other liabilities of the Corporation and of the preferential and other amounts, if any, to which the holders of Preferred Stock shall be entitled, the holders of all outstanding shares of Class A Common Stock shall be entitled to receive the remaining assets of the Corporation available for distribution ratably in proportion to the number of shares held by each such stockholder.  The holders of shares of Class B Common Stock, as such, shall not be entitled to receive any assets of the Corporation in the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation.

(d)  Reclassification. Neither the Class A Common Stock nor the Class B Common Stock may be subdivided, consolidated, reclassified, or otherwise changed unless contemporaneously therewith the other class of Common Stock and the Holdco Units are subdivided, consolidated, reclassified, or otherwise changed in the same proportion and in the same

manner.

(e) <u>Exchange</u>. The holders of Holdco Units other than the Corporation shall, to the extent provided in the Exchange Agreement or the LLC Agreement and in accordance with the terms and conditions of the Exchange Agreement or the LLC Agreement, as applicable, have the right to exchange each such Holdco Unit, together with one share of Class B Common Stock, for one fully paid and nonassessable share of

3

Class A Common Stock.  The Corporation shall at all times when any Holdco Units shall be outstanding, reserve and keep available out of its authorized but unissued Class A Common Stock such number of shares of Class A Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding Holdco Units in accordance with the terms of the Exchange Agreement or the LLC Agreement.  If at any time the number of authorized but unissued shares of Class A Common Stock shall not be sufficient to effect the conversion of all outstanding Holdco Units, the Corporation will take such corporate action as may, in the opinion of its counsel, be necessary to increase the number of authorized shares of Class A Common Stock to such number as shall be sufficient for such purpose.  If at any time the number of authorized but unissued shares of Class B Common Stock shall not be sufficient to issue a share of Class B Common Stock for each Holdco Unit outstanding (other than Holdco Units held by the Corporation), the Corporation will take such corporate action as may, in the opinion of its counsel, be necessary to increase the number of authorized shares of Class B Common Stock to such number as shall be sufficient for such purpose.

(f) <u>Automatic Transfer</u>.  In the event that any outstanding share of Class B Common Stock shall cease to be held by a holder of a Holdco Unit (including a transferee of a Holdco Unit), such share shall automatically and without further action on the part of the Corporation or any holder of Class B Common Stock be transferred to the Corporation and thereupon shall be retired.

(g) <u>No Preemptive or Subscription Rights</u>. No holder of shares of Common Stock shall be entitled to preemptive or subscription rights.

(3) <u>Preferred Stock</u>.

(a) The board of directors is authorized, subject to any limitations prescribed by law, to provide for the issuance of shares of Preferred Stock in series, and by filing a certificate pursuant to the applicable law of the State of Delaware (such certificate being hereinafter referred to as a "<u>Preferred Stock Designation</u>"), to establish from time to time the number of shares to be included in each such series, and to fix the designation, powers, preferences, and rights of the shares of each such series and any qualifications, limitations or restrictions thereof.  The number of authorized shares of Preferred Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority of the voting power of all of the then-outstanding shares of capital stock of the Corporation entitled to vote thereon, without a vote of the holders of the Preferred Stock, or of any series thereof, unless a vote of any such holders is required pursuant to the terms of any Preferred Stock Designation.

(b) There shall be no limitation or restriction on any variation between any of the different series of Preferred Stock as to the designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions thereof; and the several series of Preferred Stock may, except as otherwise expressly provided in this <u>Article IV</u>, vary in any and all respects as fixed and determined by the resolution or resolutions of the board of directors, providing for the issuance of the various series; *provided*, *however*, that all shares of any one series of Preferred Stock

4

shall have the same designation, preferences and relative, participating, optional or other special rights and qualifications, limitations and restrictions.

## ARTICLE V
### STOCKHOLDER ACTION BY WRITTEN CONSENT

Until such time as the Fertitta Ownership Condition (as defined below) ceases to be satisfied, any action required or permitted to be taken at any annual or special meeting of stockholders of the Corporation may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of shares having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation in accordance with Section 228 of the DGCL. If at any time the Fertitta Ownership Condition shall not be satisfied, then any action required or permitted to be taken by the stockholders of the Corporation must be effected at a duly called annual or special meeting of stockholders of the Corporation, and the ability of the stockholders to consent in writing to the taking of any action is hereby specifically denied.  For purposes of this Certificate of Incorporation, "Fertitta Ownership Condition" shall mean for so long as the Fertitta Family Entities (A) maintains direct or indirect beneficial ownership of an aggregate of at least ten percent (10%) of the outstanding shares of Class A Common Stock of the Corporation (determined assuming each Holdco Unit held by holders other than the Corporation were exchanged for Class A Common Stock in accordance with either the terms and conditions of (i) the Exchange Agreement or (ii) the LLC Agreement.

## ARTICLE VI
### CORPORATE GOVERNANCE

The following provisions are inserted for the management of the business and the conduct of the affairs of the Corporation, and for further definition, limitation and regulation of the powers of the Corporation and of its directors and stockholders:

(a)      The business and affairs of the Corporation shall be managed by or under the direction of the board of directors.  In addition to the powers and authority expressly conferred upon them by statute or by this Certificate of Incorporation or the bylaws of the Corporation, the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation, subject, nevertheless, to the DGCL, this Certificate of Incorporation, and the bylaws of the Corporation.

(b)      The directors of the Corporation need not be elected by written ballot unless the bylaws of the Corporation so provide.

(c)      Special meetings of the stockholders, other than those required by statute, may be called at any time by (i) the Chairman of the Board, (ii) the Chief Executive Officer at the request in writing of (a) directors constituting a majority of the Whole Board (as defined below), (b) a committee of the Board of Directors that has been duly designated by the Board of Directors and whose powers and authority include the power

5

to call such meetings or (c) until such time as the Fertitta Ownership Condition ceases to be satisfied, stockholders collectively holding a majority of the voting power of the shares entitled to vote in the election of directors of the Corporation.  For purposes of this Certificate of Incorporation, the term "Whole Board" shall mean the total number of authorized directors whether or not there exist any vacancies in previously authorized directorships.

(d)      An annual meeting of stockholders, for the election of directors and for the transaction of such other business as may properly come before the meeting, shall be held at such place, on such date, and at such time as the board of directors shall fix.

## ARTICLE VII
### THE BOARD OF DIRECTORS

(1)      Subject to the rights of the holders of any series of Preferred Stock to elect additional directors under specified circumstances, the number of directors shall be fixed from time to time exclusively by the board of directors pursuant to a resolution adopted by a majority of the Whole Board.  The directors, other than those who may be elected by the holders of any series of Preferred Stock under specified circumstances, shall be of one class and each director shall serve until his or her successor shall have been duly elected and qualified or, if earlier, until his or her death, resignation or removal. At each annual meeting of stockholders,

(i) directors shall be elected for a term of office to expire at the succeeding annual meeting of stockholders, with each director to hold office until his or her successor shall have been duly elected and qualified or, if earlier, until his or her death, resignation or removal; and (ii) if authorized by a resolution of the board of directors, directors may be elected to fill any vacancy on the board of directors, regardless of how such vacancy shall have been created.

(2)       A majority of the Whole Board shall constitute a quorum for all purposes at any meeting of the board of directors, and, except as otherwise expressly required by law or by this Certificate of Incorporation, all matters shall be determined by the affirmative vote of a majority of the directors present at any meeting at which a quorum is present.

(3)       Subject to the rights of the holders of any series of Preferred Stock then outstanding, newly created directorships resulting from any increase in the authorized number of directors or any vacancies in the board of directors resulting from death, resignation, disqualification, removal from office or other cause shall, unless otherwise required by law or by resolution of the board of directors, be filled only by a majority vote of the directors then in office, though less than a quorum (and not by stockholders), or by a sole remaining director.  Any director elected in accordance with this paragraph shall hold office for the remainder of the term of the director for whom the vacancy was created or occurred and until such director's successor shall have been duly elected or qualified or, if earlier, such director's death, resignation or removal.  No decrease in the authorized number of directors shall shorten the term of any incumbent director.

(4)       Advance notice of stockholder nominations for the election of directors and of business to be brought by stockholders before any meeting of the stockholders of the Corporation shall be given in the manner provided in the bylaws of the Corporation.

6

(5)       Except as otherwise required by applicable law and subject to the rights of the holders of any series of Preferred Stock then outstanding directors may be removed from office with or without cause by the affirmative vote of holders of a majority of the voting power of the shares entitled to vote in connection with the election of the directors of the Corporation, voting together as a single class.

**ARTICLE VIII**
**BYLAW AMENDMENTS**

The board of directors is expressly authorized to adopt, amend and repeal the bylaws of the Corporation.  Any adoption, amendment or repeal of the bylaws of the Corporation by the board of directors shall require the approval of a majority of the Whole Board.  The stockholders shall also have power to adopt, amend or repeal the bylaws of the Corporation; *provided*, that notwithstanding any provision of law which might otherwise permit a lesser vote or no vote, but in addition to any affirmative vote of the holders of any particular class or series of the capital stock of the Corporation required by law, the bylaws or any Preferred Stock:

A.       So long as the Fertitta Ownership Condition is satisfied, the affirmative vote of the holders of at least a majority of the voting power of all of the then-outstanding shares of capital stock entitled to vote generally in the election of directors, voting together as a single class, shall be required to adopt, amend or repeal any provision of the bylaws; and

B.       Upon such time that the Fertitta Ownership Condition is not satisfied, the affirmative vote of the holders of at least sixty-six and two-thirds percent (66 2/3%) of the voting power of all of the then-outstanding shares of capital stock entitled to vote generally in the election of directors, voting together as a single class, shall be required to adopt, amend or repeal any provision of the bylaws.

**ARTICLE IX**
**BUSINESS COMBINATIONS**

The Corporation shall not be governed by Section 203 of the DGCL. Notwithstanding the foregoing, the Corporation shall not engage in any Business Combination (as defined below), at any point in time at which the Corporation's Class A Common Stock is registered under Section 12(b) or 12(g) of the Exchange Act, with any Interested Stockholder (as defined below) for a period of three (3) years following the time that such stockholder became an Interested Stockholder, unless:

(i)         prior to such time, the board of directors approved either the Business Combination or the transaction which resulted in the stockholder becoming an Interested Stockholder, or

(ii)        upon consummation of the transaction which resulted in the stockholder becoming an Interested Stockholder, the Interested Stockholder owned at least 85% of the voting stock (as defined below) of the Corporation outstanding at the time the transaction commenced, excluding for purposes of

7

determining the voting stock outstanding (but not the outstanding voting stock owned by the Interested Stockholder) those shares owned by (i) persons who are directors and also officers or (ii) employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer, or

(iii)       at or subsequent to such time the Business Combination is approved by the board of directors and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least sixty-six and two-thirds percent (66 2/3%) of the outstanding voting stock of the Corporation which is not owned by the Interested Stockholder.

ARTICLE X
LIMITATION ON DIRECTOR LIABILITY

A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for any act or omission not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL, or (iv) for any transaction from which the director derived an improper personal benefit.  If the DGCL is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended.  In the event that it is determined that Delaware law does not apply, the liability of a director of the Corporation to the company or its stockholders for monetary damages shall be eliminated to the fullest extent permissible under applicable law.  Any repeal or modification of the foregoing paragraph shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

ARTICLE XI
EXCLUSIVE FORUM

Unless the Corporation consents in writing to the selection of an alternative forum, to the fullest extent permitted by law, all Internal Corporate Claims (as defined below) shall be brought solely and exclusively in the Court of Chancery of the State of Delaware (or, if such court does not have jurisdiction, the Superior Court of the State of Delaware, or, if such other court does not have jurisdiction, the United States District Court for the District of Delaware).  "Internal Corporate Claims" means claims, including claims in the right of the Corporation, brought by a stockholder (including a beneficial owner) (i) that are based upon a violation of a duty by a current or former director or officer or stockholder in such capacity or (ii) as to which the DGCL confers jurisdiction upon the Court of Chancery of the State of Delaware.

ARTICLE XII
AMENDMENTS

The Corporation reserves the right to amend or repeal any provision contained in this Certificate of Incorporation in the manner prescribed by the laws of the State of Delaware and all

8

rights conferred upon stockholders are granted subject to this reservation.  Notwithstanding any other provisions of this Certificate or any provision of law which might otherwise permit a lesser vote or no vote, but in addition to any affirmative vote of the holders of any particular class or series of the capital stock of the Corporation required by law or this Certificate, amendments to this Certificate of Incorporation shall require the approval of the holders of a majority of the then outstanding shares of shares of capital stock entitled to vote generally in the election of directors, voting together as a single class; *provided that*:

        A.        So long as the Fertitta Ownership Condition is satisfied, the affirmative vote of the holders of at least a majority of the voting power of all of the then-outstanding shares of capital stock entitled to vote generally in the election of directors, voting together as a single class, shall be required, to amend or repeal this Article XII, Article V, Article VI, Article VII, Article VIII, Article IX and Sections 2 and 4 of Article IV; and

        B.        Following such time that the Fertitta Ownership Condition is not satisfied, the affirmative vote of the holders of at least sixty-six and two-thirds percent (66 2/3%) of the voting power of all of the then-outstanding shares of capital stock entitled to vote generally in the election of directors, voting together as a single class, shall be required to amend or repeal this Article XII, Article V, Article VI, Article VII, Article VIII, Article IX and Sections 2 and 4 of Article IV.

## ARTICLE XIII
## GAMING AND REGULATORY MATTERS

        (1)        The Affected Interests owned or controlled directly or indirectly by an Affected Equityholder shall be subject to redemption by the Corporation, out of funds legally available therefor, to the extent required by the Gaming Authority making the determination of unsuitability or reasonably deemed necessary or advisable by the Board of Directors.  If the Gaming Authority or the Board of Directors making the determination of unsuitability requires or deems it reasonably necessary or advisable to redeem the Affected Interests, the Corporation shall give a Redemption Notice to the Affected Equityholder and shall thereafter proceed to purchase the Affected Interests on the Redemption Date for the Redemption Price, subject to any approvals, conditions or limitations under applicable Gaming Laws.  The Affected Equityholder shall surrender any certificates representing the Affected Interests to be redeemed in accordance with the requirements of the Redemption Notice.

        (2)        Notwithstanding any other provision in this Agreement, commencing on the date that a stockholder becomes an Affected Equityholder, and until the Affected Interests of such Affected Equityholder are redeemed or are transferred to a Person who is not an Unsuitable Person in a transfer permitted by the terms of this Agreement, such Affected Equityholder:  (i) shall not be entitled to receive any distributions with regard to such Affected Interests; (ii) shall not be entitled to exercise, directly or indirectly or through any proxy, trustee or nominee, any voting or other right conferred by such Affected Interests, and Affected Interests shall not for any purposes be included in the Equity Securities of the Corporation entitled to vote; and (iii) shall not be entitled to receive any remuneration in any form from the Corporation or its Affiliates for services rendered or otherwise.

        (3)        In the event that shares of Class B Common Stock owned or controlled directly or indirectly by an Affected Equityholder are redeemed in accordance with this Article XIII, the Corporation shall purchase or, in its capacity as the managing member of Holdco LLC, cause Holdco LLC to concurrently redeem, any and all Holdco Units owned or controlled directly or indirectly by such Affected Equityholder; provided that, whether such Holdco Units are purchased or redeemed, the consideration per Holdco Unit payable to the Affected Equityholder shall be equal to the hypothetical Redemption Price (solely for purposes of this clause (3), as defined in the LLC Agreement, as in effect immediately following the IPO (also as defined in the LLC Agreement)) in respect of one Holdco Unit redeemed in accordance with the terms of the LLC Agreement at the same time as the applicable shares of Class B Common Stock are redeemed.

        (4)        Each Affected Equityholder shall indemnify and hold harmless the Corporation for any and all losses, costs and expenses, including attorneys' fees, incurred by it as a result of, or arising out of, such Affected Equityholder's refusal or failure to comply with the provisions of this Article or failure to promptly divest itself of any Affected Interests when required to do so by this Article XIII.

        (5)        The right of redemption provided in this Article shall not be exclusive of any other rights the Corporation may hereunder or under applicable law or rights that the Corporation may hereafter acquire under any agreement or otherwise.

(6)        Nothing contained in this Article shall limit the authority of the Corporation to take such other action to the extent permitted by law as it deems necessary or advisable to protect the Corporation or its Affiliates from the denial or threatened denial or loss or threatened loss of any Gaming Licenses or as required by any Gaming Authority.  Without limiting the generality of the foregoing, the Board of Directors may, to the extent permitted by law, from time to time establish, modify, amend or rescind regulations, and procedures of the Corporation not inconsistent with the express provisions of this Article for the purpose of determining whether any Person is an Unsuitable Person and, as applicable, for the orderly application, administration and implementation of the provisions of this Article.

(7)        Except as may be required by any applicable Gaming Laws or a Gaming Authority, the Corporation may waive any of the rights of the Corporation or any restrictions contained in this Article in any instance in which the Board of Directors determines that a waiver would be in the best interests of the Corporation.  Except as may be required by a Gaming Authority, nothing in this Article shall be deemed or construed to the Corporation to repurchase any Affected Interest of an Affected Equityholder.

## ARTICLE XIV
## DEFINITIONS

As used herein, the following terms shall have the meanings specified below:

(1)        "<u>beneficial ownerhsip</u>" shall have the same meaning given to it in Section 13(d) under the Securities Exchange Act of 1934, as amended, and the rules thereunder,

10

except that a person will be deemed to have "beneficial ownership" of all securities that person has the right to acquire, whether the right is exercisable immediately, only after the passage of time or only after the satisfaction of conditions and notwithstanding any right to pay cash in lieu of such securities.

(2)        "<u>Affected Interests</u>" means Equity Securities that are owned or controlled directly or indirectly by an Unsuitable Person or an Affiliate of an Unsuitable Person.

(3)        "<u>Affected Equityholder</u>" means a holder of Equity Securities who is an Unsuitable Person or is an Affiliate of an Unsuitable Person.

(4)        "<u>Affiliate</u>" means a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, another person.

(5)        "<u>Associate</u>," when used to indicate a relationship with any person, means:  (i) any corporation, partnership, unincorporated association or other entity of which such person is a director, officer or partner or is, directly or indirectly, the owner of 20% or more of any class of voting stock; (ii) any trust or other estate in which such person has at least a 20% beneficial interest or as to which such person serves as trustee or in a similar fiduciary capacity; and (iii) any relative or spouse of such person, or any relative of such spouse, who has the same residence as such person.

(6)        "<u>Business Combination</u>," when used in reference to the Corporation and any Interested Stockholder of the Corporation, means:

(1)        any merger or consolidation of the Corporation or any direct or indirect majority-owned subsidiary of the Corporation (a) with the Interested Stockholder, or (b) with any other corporation, partnership, unincorporated association or other entity if the merger or consolidation is caused by the Interested Stockholder and as a result of such merger or consolidation the first sentence of this <u>Article IX</u> is not applicable to the surviving entity;

(2)        any sale, lease, exchange, mortgage, pledge, transfer or other disposition (in one transaction or a series of transactions), except proportionately as a stockholder of the Corporation, to or with the Interested Stockholder, whether as part of a dissolution or otherwise, of assets of the Corporation or of any direct or indirect majority-owned subsidiary of the Corporation which assets have an aggregate market value equal to 10% or more of either the aggregate market value of all the assets of the Corporation

determined on a consolidated basis or the aggregate market value of all the outstanding stock of the Corporation;

(3)     any transaction which results in the issuance or transfer by the Corporation or by any direct or indirect majority-owned subsidiary of the Corporation of any stock of the Corporation or of such subsidiary to the Interested Stockholder, except: (a) pursuant to the exercise, exchange or conversion of securities exercisable for, exchangeable for or convertible

11

into stock of the Corporation or any such subsidiary which securities were outstanding prior to the time that the Interested Stockholder became such; (b) pursuant to a merger under Section 251(g) of the DGCL; (c) pursuant to a dividend or distribution paid or made, or the exercise, exchange or conversion of securities exercisable for, exchangeable for or convertible into stock of the Corporation or any such subsidiary which security is distributed, pro rata to all holders of a class or series of stock of the Corporation subsequent to the time the Interested Stockholder became such; (d) pursuant to an exchange offer by the Corporation to purchase stock made on the same terms to all holders of said stock; or (e) any issuance or transfer of stock by the Corporation; *provided, however,* that in no case under items (c)-(e) of this subsection (3) shall there be an increase in the Interested Stockholder's proportionate share of the stock of any class or series of the Corporation or of the voting stock of the Corporation (except as a result of immaterial changes due to fractional share adjustments);

(4)     any transaction involving the Corporation or any direct or indirect majority-owned subsidiary of the Corporation which has the effect, directly or indirectly, of increasing the proportionate share of the stock of any class or series, or securities convertible into the stock of any class or series, of the Corporation or of any such subsidiary which is owned by the Interested Stockholder, except as a result of immaterial changes due to fractional share adjustments or as a result of any purchase or redemption of any shares of stock not caused, directly or indirectly, by the Interested Stockholder; or

(5)     any receipt by the Interested Stockholder of the benefit, directly or indirectly (except proportionately as a stockholder of the Corporation), of any loans, advances, guarantees, pledges, or other financial benefits (other than those expressly permitted in subsections (1)-(4) above and pursuant to Article X of the LLC Agreement) provided by or through the Corporation or any direct or indirect majority-owned subsidiary.

(7)     "control," including the terms "controlling," "controlled by" and "under common control with," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting stock, by contract, or otherwise.  A person who is the owner of 20% or more of the outstanding voting stock of the Corporation, partnership, unincorporated association or other entity shall be presumed to have control of such entity, in the absence of proof by a preponderance of the evidence to the contrary.  Notwithstanding the foregoing, a presumption of control shall not apply where such person holds voting stock, in good faith and not for the purpose of circumventing this Article IX, as an agent, bank, broker, nominee, custodian or trustee for one or more owners who do not individually or as a group have control of such entity.

12

(8)     "Equity Securities" means all Common Stock of the Corporation and any and all securities of the Corporation or any of its direct or indirect subsidiaries, convertible into, or exchangeable or exercisable for, options, warrants or other rights to acquire, shares of Common Stock.

(9)     "Exchange Agreement" means that certain Exchange Agreement, dated as of or about the date hereof, by and among the Corporation, Holdco LLC and the Company Unitholders party thereto (as the same may be amended, supplemented or modified from time to time in accordance with the terms thereof).

(10)    "<u>Family Group</u>" means, for any individual, such individual's current or former spouse, their respective parents, descendants of such parents (whether natural or adopted) and the spouses of such descendants, and any trust, limited partnership, corporation or limited liability company established solely for the benefit of such individual or such individual's current or former spouse, their respective parents, descendants of such parents (whether natural or adopted) or the spouses of such descendants.

(11)    "<u>Fertitta Family Entities</u>" means, collectively, (a) FI Station Investor LLC, a Delaware limited liability company, (b) Frank J. Fertitta III, (c) Lorenzo J. Fertitta, (d) any member of the Family Group of Frank J. Fertitta III or Lorenzo J. Fertitta, other than, in each case, the Corporation or its subsidiaries.

(12)    "<u>Gaming Authority</u>" means all governmental authorities or agencies with regulatory control or jurisdiction over all or any portion of the gaming activities of the Corporation or any of its subsidiaries, or over ownership of an interest in an entity engaged in gaming activities, or any successor to any such authority, including, as applicable, (i) in the State of Nevada, the Nevada Gaming Commission, the Nevada State Gaming Control Board, the Clark County Liquor and Gaming Licensing Board, the Henderson City Council, the City of Las Vegas City Council and all other state and local regulatory and licensing agencies or bodies with authority over gaming, gaming activities and gaming devices, mobile gaming systems and associated equipment in the State of Nevada, the City of Henderson, the City of Las Vegas, the City of Reno, Clark County, Nevada or Washoe County, Nevada, and (ii) the National Indian Gaming Commission and the applicable gaming regulatory authority established by the Federated Indians of Graton Rancheria, the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians of Michigan and the North Fork Rancheria of Mono Indians.

(13)    "<u>Gaming Laws</u>" means any federal, state, tribal, local or foreign statute, ordinance, rule, regulation, requirement, directive, judgment, order, decree, injunction or other authorization, and any Gaming License, governing or relating to casino and gaming activities and operations of the Corporation or any of its subsidiaries or the ownership of an interest therein.

(14)    "<u>Gaming License</u>" shall mean all licenses, consents, permits, approvals, authorizations, registrations, findings of suitability, franchises, entitlements, exemptions, waivers and orders of registration approved or issued by any Gaming Authority under Gaming Laws necessary for or relating to the conduct of activities or the ownership of an interest in an entity

13

engaged in activities under the Gaming Laws, including any condition or limitation placed thereon.

(15)    "<u>Governmental Authority</u>" means any governmental, regulatory or administrative authority, whether foreign, federal, state or local, or any agency or commission or any court, tribunal, or judicial or arbitral body (or any subdivision of any of the foregoing) having jurisdiction or authority with respect to the particular matter at issue in its context, including any Gaming Authority.

(16)    "<u>Interested Stockholder</u>" means any person (other than the Corporation or any direct or indirect majority-owned subsidiary of the Corporation) that (i) is the owner of 15% or more of the outstanding voting stock of the Corporation, or (ii) is an Affiliate or Associate of the Corporation and was the owner of 15% or more of the outstanding voting stock of the Corporation at any time within the three (3) year period immediately prior to the date on which it is sought to be determined whether such person is an Interested Stockholder, and the Affiliates and Associates of such person; *provided*, *however*, that the term "Interested Stockholder" shall not include (a) the Fertitta Family Entities, or (b) any person whose ownership of shares in excess of the 15% limitation set forth herein is the result of any action taken solely by the Corporation; *provided*, that such person specified in this clause (b) shall be an Interested Stockholder if thereafter such person acquires additional shares of voting stock of the Corporation, except as a result of further corporate action not caused, directly or indirectly, by such person.  For the purpose of determining whether a person is an Interested Stockholder, the voting stock of the Corporation deemed to be outstanding shall include stock deemed to be owned by the person through application of the definition of "owner" below but shall not include any other unissued stock of the Corporation which may be issuable pursuant to any agreement, arrangement or understanding, or upon exercise of conversion rights, warrants or options, or otherwise.

(17)    "<u>LLC Agreement</u>" means that certain Third Amended and Restated Limited Liability Company Agreement of Holdco LLC, dated as of or about the date hereof, by and among the Corporation and the other members of Holdco LLC (as the same may be amended, supplemented or modified from time to time in accordance with the terms thereof).

(18)    "owner," including the terms "own" and "owned," when used with respect to any stock, means a person that individually or with or through any of its Affiliates or Associates:

(1)    beneficially owns such stock, directly or indirectly; or

(2)    has (a) the right to acquire such stock (whether such right is exercisable immediately or only after the passage of time) pursuant to any agreement, arrangement or understanding, or upon the exercise of conversion rights, exchange rights, warrants or options, or otherwise; *provided*, *however*, that a person shall not be deemed the owner of stock tendered pursuant to a tender or exchange offer made by such person or any of such person's Affiliates or Associates until such tendered stock is accepted for purchase or exchange; or (b) the right to vote such stock

14

pursuant to any agreement, arrangement or understanding; *provided*, *however*, that a person shall not be deemed the owner of any stock because of such person's right to vote such stock if the agreement, arrangement or understanding to vote such stock arises solely from a revocable proxy or consent given in response to a proxy or consent solicitation made to ten (10) or more persons; or

(3)    has any agreement, arrangement or understanding for the purpose of acquiring, holding, voting (except voting pursuant to a revocable proxy or consent as described in item (b) of subsection (2) above), or disposing of such stock with any other person that beneficially owns, or whose Affiliates or Associates beneficially own, directly or indirectly, such stock.

(19)    "Person" means any individual, corporation, partnership, unincorporated association or other entity.

(20)    "Redemption Date" shall mean the date specified in a Redemption Notice as the date on which Affected Interests of an Affected Equityholder are to be redeemed by the Corporation, which Redemption Date shall be determined by the Board of Directors of such the Corporation and may be extended to the extent required in connection with any actions required to be taken under any Gaming Law; provided, that, unless otherwise directed by a Gaming Authority, in no event shall the Redemption Date be more than 180 days after the date such Affected Equityholder receives the Redemption Notice.

(21)    "Redemption Notice" shall mean that notice of redemption given by the Corporation to an Affected Equityholder pursuant to Article XIII. Each Redemption Notice shall set forth (i) the Redemption Date; (ii) the Affected Interests to be redeemed; (iii) the Redemption Price and the manner of payment therefor; (iv) the place where certificates, if any, shall be surrendered for payment; and (v) any other requirements of surrender of the certificates, including how they are to be endorsed, if at all.

(22)    "Redemption Price" shall mean the price specified in the Redemption Notice to be paid by the Corporation for the redemption of Affected Interests to be redeemed pursuant to Article XIII, which shall be that price (if any and to the extent applicable) required to be paid by the Gaming Authorities making the finding of unsuitability, or if the Gaming Authorities do not require a certain price to be paid, (x) $0.00001 per share of Class B Common Stock constituting Affected Interests and (y) in the case of shares of Class A Common Stock that constitute Affected Interests, the amount reasonably determined by the Board of Directors to be the fair value of the Affected Interests to be redeemed; provided, that unless a Gaming Authority requires otherwise, the Redemption Price per share of Class A Common Stock shall in no event be less than (i) the average VWAP per share of Class A Common Stock over the ten (10) consecutive Trading Day period ending on the Trading Day immediately preceding the date of the Redemption Notice, or (ii) if the VWAP is not available, then the market value per share of Class A Common Stock as determined in good faith and in the reasonable discretion of the Board of Directors. The Redemption Price may be paid in cash, by promissory note, or both, as required by the Gaming Authorities and, if not so required, as the Board of Directors reasonably determines. Any promissory note shall contain such terms and conditions as the Board of

15

Directors reasonably determines to be necessary or advisable to comply with any law or regulation then applicable to the Corporation or any Affiliate thereof, or to prevent a default under, or acceleration of, any loan, note, mortgage, indenture, line of credit or other debt or financing agreement to which the Corporation or any of its subsidiaries is a party.  Subject to the foregoing, (i) the principal amount of the promissory note together with any unpaid interest shall be due and payable no later than the ten-year anniversary of the delivery of the note, (ii) interest on the unpaid principal thereof shall be payable at maturity at a rate per annum equal to the applicable federal rate within the meaning of Code section 1274(d) for debt with a maturity of over nine years, as in effect at the date of such issuance, compounded annually, until the Redemption Price has been paid in full and (iii) the promissory note shall provide that at any time prior to the 15-month anniversary of the date of issuance, if the promissory note is transferred to a Person that immediately after such transfer would not be an Unsuitable Person, such promissory note may, at the election of the holder thereof prior to such 15-month anniversary (but with such 15-month period being subject to reasonable extensions up to six months in the aggregate for all such extensions in order to procure any required Gaming Licenses or other regulatory approvals being diligently pursued in good faith), converted into the Equity Securities for which such promissory note was issued as the Redemption Price upon the cash payment by such holder to the Corporation in an amount equal to the sum of (x) all cash amounts paid to the original holder thereof as part of the Redemption Price and (y) all interest paid on such promissory note prior to such conversion.  If the Redemption Price is being determined under clause (ii) with respect a redemption of at least 10% of the outstanding shares of Class A Common Stock (determined assuming that each unit of membership interest of Holdco LLC held by holders other than the Corporation were exchanged for Class A Common Stock in accordance with the terms and conditions of either (i) the Exchange Agreement or (ii) the LLC Agreement), the Redemption Price shall be at least equal to the value as determined by a valuation procured by the Corporation from a nationally recognized investment banking firm.

(23)    "stock" means, with respect to any corporation, capital stock and, with respect to any other entity, any equity interest.

(24)    "Trading Day" means a day on which the Class A Common Stock: (a) is not suspended from trading on any national or regional securities exchange or association or over-the-counter market at the close of business; and (b) has traded at least once on the national or regional securities exchange or association or over-the-counter market that is the primary market for the trading of the Common Stock.

(25)    "Unsuitable Person" means a Person, including any member, shareholder, partner, manager, director, officer or employee of a Person (a) who is denied or disqualified from eligibility for a Gaming License by any applicable Gaming Authority or who is determined by any applicable Gaming Authority to be unsuitable to own or control an Equity Security in the Corporation or to be affiliated or connected with or in the gaming business of the Corporation, (b) whose ownership of an Equity Security in the Corporation or affiliation or involvement with or in the business of the Corporation in any capacity causes the Corporation to lose or to be threatened by any applicable Gaming Authority with the loss or denial of a Gaming License, (c) who is deemed likely, as determined in good faith by the Board of Directors based on verifiable information received from any applicable Gaming Authority or other Governmental Authority having jurisdiction over the Corporation, to preclude or materially delay, impede or

16

impair, or jeopardize or threaten the loss of, or result in the imposition of materially burdensome terms and conditions on, any Gaming License of the Corporation or on such Person's application for, or right to the use of, entitlement to or ability to obtain or retain any Gaming License in any jurisdiction or (d) who is deemed likely, as determined in good faith by the Board of Directors without taking into account the votes of directors affiliated or associated with the Unsuitable Person, to result in the disapproval, cancellation, rescission, termination, material adverse modification or non-renewal of any material contract between the Corporation, on one hand, and a third party that is not an Affiliate of the Corporation or any stockholder, on the other hand.

(26)    "voting stock" means stock of any class or series entitled to vote generally in the election of directors and, with respect to any entity that is not a corporation, any equity interest entitled to vote generally in the election of the governing body of that entity.

(27)    "VWAP" per share of Class A Common Stock on any Trading Day means the per share volume-weighted average price as displayed on Bloomberg page "RRR <Equity> AQR" (or its equivalent successor if such page is not available) in respect of the period from 9:30 a.m. to 4:00 p.m., New York City time, on such Trading Day.  The "average VWAP" means the average

of the VWAP for each Trading Day in the relevant period.

17

IN WITNESS WHEREOF, the Corporation has caused this Amended and Restated Certificate of Incorporation to be signed as of            , 2016.

RED ROCK RESORTS, INC.

_____

Name:
Title:

18

# EXHIBIT C

CONTACT US

CORPORATE
GOVERNANCE
FINANCIAL
INFORMATION

NEWS & EVENTS
INVESTOR RESOURCE

# BOARD OF DIRECTORS

**Frank J. Fertitta III**                                    ⌄

**Lorenzo J. Fertitta**                                      ⌄

**Robert A. Cashell, Jr.**                                   ⌄

**Robert E. Lewis**                                          ⌄

**James E. Nave, D.V.M.**                                    ⌄

✉   🖨

# INFORMATION REQUEST

**REQUEST**

## INVESTOR HOTLINE

Red Rock Resorts
1505 S Pavilion Center Dr.
Las Vegas, NV 89135

E-mail Us or Call
702.495.3550

## SIGN UP FOR RRR NEWS

Sign up to receive the latest information from Red Rock Resorts.

**JOIN NOW**

## FOLLOW AND SHARE

Get Red Rock Resorts Mail    Contact Us    Site Map    Privacy Policy    Investors

© 2016 Red Rock Resorts

# EXHIBIT D

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K

**(Mark One)**

☑    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2018**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from              to              .**

**Commission file number 001-37754**

---

# RED ROCK RESORTS, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | |
| (State or other jurisdiction of incorporation or organization) | **47-5081182** (I.R.S. Employer Identification No.) |

**1505 South Pavilion Center Drive, Las Vegas, Nevada 89135**
(Address of principal executive offices, Zip Code)

**(702) 495-3000**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act**

| <u>Title of each class</u> | <u>Name of each exchange on which registered</u> |
|---|---|
| Class A Common Stock ($0.01 par value) | NASDAQ Stock Market LLC |

**Securities registered pursuant to Section 12(g) of the Act**
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐    No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☑    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☑ | Accelerated filer ☐ |
| Non-accelerated filer ☐ | Smaller reporting company ☐ |
| | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐    No ☑

As of June 29, 2018, the last business day of the registrant's most recently completed second fiscal quarter, the aggregate market value of the registrant's Class A common stock held by non-affiliates (all persons other than executive officers or directors) was $2.3 billion, based on the closing price on that date as reported by the NASDAQ Stock Market LLC.

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date.

| Class | Outstanding at February 22, 2019 |
|---|---|
| Class A Common Stock, $0.01 par value | 69,740,561 |
| Class B Common Stock, $0.00001 par value | 46,884,413 |

**Documents Incorporated by Reference**

Portions of the registrant's definitive Proxy Statement for the 2019 Annual Meeting of Stockholders are incorporated by reference into Part III of this Annual Report on Form 10-K. Such proxy statement will be filed with the Securities and Exchange Commission within 120 days of the registrant's fiscal year end of December 31, 2018.

**TABLE OF CONTENTS**

**PART I**

| | | |
|---|---|---|
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 21 |
| Item 1B. | Unresolved Staff Comments | 38 |
| Item 2. | Properties | 38 |
| Item 3. | Legal Proceedings | 39 |
| Item 4. | Mine Safety Disclosures | 39 |

**PART II**

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 40 |
| Item 6. | Selected Financial Data | 42 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 43 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 59 |
| Item 8. | Financial Statements and Supplementary Data | 61 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 112 |
| Item 9A. | Controls and Procedures | 112 |
| Item 9B. | Other Information | 115 |

**PART III**

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance | 115 |
| Item 11. | Executive Compensation | 115 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Shareholder Matters | 115 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 115 |
| Item 14. | Principal Accountant Fees and Services | 115 |

**PART IV**

| | | |
|---|---|---|
| Item 15. | Exhibits, Financial Statement Schedules | 116 |
| Item 16. | Form 10-K Summary | 119 |
| | Signatures | 120 |

# PART I

## ITEM 1.   BUSINESS

### *Introduction*

Red Rock Resorts, Inc. ("we," "our," "us," "Red Rock" or the "Company") is a holding company that owns an indirect equity interest in and manages Station Casinos LLC ("Station LLC"), through which we conduct all of our operations. Station LLC is a gaming, development and management company established in 1976 that develops and operates strategically-located casino and entertainment properties. Station LLC currently owns and operates ten major gaming and entertainment facilities and ten smaller casinos (three of which are 50% owned), offering approximately 20,000 slot machines, 360 table games and 5,000 hotel rooms in the Las Vegas regional market. Station LLC also manages Graton Resort & Casino in Sonoma County, California on behalf of a Native American tribe.

We hold an indirect equity interest in Station LLC through our ownership interest in Station Holdco LLC ("Station Holdco"), which holds all of the economic interests in Station LLC. At December 31, 2018, we held approximately 60% of the equity interests in Station Holdco. We operate and control all of the business and affairs of Station LLC and Station Holdco through our ownership of 100% of the voting interests in Station LLC and our designation as the sole managing member of both Station LLC and Station Holdco. Our only assets are our ownership interests in Station LLC and Station Holdco, other than cash and tax-related assets and liabilities. We have no operations outside of our management of Station LLC.

Red Rock was incorporated in Delaware in September 2015 and in May 2016 we completed an initial public offering ("IPO") of approximately 29.5 million shares of Class A common stock, $0.01 par value per share, at an offering price to the public of $19.50 per share. We received net proceeds from the IPO of approximately $541 million, which was used to purchase newly issued limited liability company interests in Station Holdco ("LLC Units") and outstanding LLC Units from existing members of Station Holdco.

Station Holdco used the proceeds from the newly issued LLC Units to pay the majority of the purchase price of Fertitta Entertainment LLC ("Fertitta Entertainment," and such purchase, the "Fertitta Entertainment Acquisition"). Prior to the Fertitta Entertainment Acquisition, subsidiaries of Fertitta Entertainment managed Station LLC through long-term management agreements and such management agreements were terminated in connection with the Fertitta Entertainment Acquisition.

Our Consolidated Financial Statements in Part II, Item 8 of this Annual Report on Form 10-K (the "Consolidated Financial Statements") reflect the consolidation of Station LLC and its consolidated subsidiaries, including the retrospective consolidation of Fertitta Entertainment, and Station Holdco for all periods presented. The financial position and results of operations attributable to LLC Units we do not own are reported separately as noncontrolling interest. Station Holdco, as combined with Fertitta Entertainment, is our predecessor for accounting purposes and accordingly, for all periods prior to May 2, 2016, the financial information presented herein represents the information of the predecessor.

Our casino properties are conveniently located throughout the Las Vegas valley and provide our customers a wide variety of entertainment and dining options. Over 90% of the Las Vegas population is located within five miles of one of our gaming facilities. We provide friendly service and exceptional value in a comfortable environment. We believe we surpass our competitors in offering casino patrons the newest and most popular slot and video games featuring the latest technology. We also believe the high-quality entertainment experience we provide our customers differentiates us from our competitors.

Most of our major properties are master-planned for expansion, enabling us to incrementally expand our facilities as demand dictates. We also control eight highly desirable gaming-entitled development sites in Las Vegas and Reno, Nevada.

Our principal source of revenue and operating income is gaming, and our non-gaming offerings include restaurants, hotels and other entertainment amenities. Approximately 80% to 85% of our casino revenue is generated from slot play. The majority of our revenue is cash-based and as a result, fluctuations in our revenues have a direct impact on our cash flows from operations. Because our business is capital intensive, we rely heavily on the ability of our properties to generate operating cash flow to fund capital expenditures and repay debt financing.

A significant portion of our business is dependent upon customers who live and/or work in the Las Vegas metropolitan area. Based on population and employment growth, the Las Vegas economy was one of the fastest growing economies in the United States from 2015 to 2018. Based on a recent U.S. Census Bureau release, Nevada was first among all states in percentage growth of population from July 2017 to July 2018. In addition, based on preliminary data for December 2018 from the U.S. Bureau of Labor Statistics, Las Vegas experienced a 3.6% year-over-year increase in employment to 1,023,100, which is an all-time high. This resulted in an unemployment rate of 4.5% which has declined from 14.1% in July 2011. Businesses and

consumers in Las Vegas continue to increase their spending as evidenced by 70 consecutive months of year-over-year increases in taxable retail sales from February 2013 to November 2018. Home values have also improved significantly over the past several years with the median price of an existing single family home in Las Vegas up approximately 165% at December 2018 compared to January 2012, as reported by the Greater Las Vegas Association of Realtors.

The Las Vegas economy continues to show growth in employment, taxable sales and home prices, and we believe these positive trends, along with new capital investment planned or underway in Las Vegas, provide a foundation for future growth in our business. Although we experienced improved operating results over the past few years due, in part, to more favorable local economic conditions, we cannot be sure if, or how long, these favorable market conditions will persist or that they will continue to positively impact our results of operations.

Our principal executive offices are located at 1505 South Pavilion Center Drive, Las Vegas, Nevada 89135. The telephone number for our executive offices is (702) 495-3000. We maintain a website at www.redrockresorts.com, the contents of which are expressly not incorporated by reference into this filing.

### Business Strategy

Our primary operating strategy emphasizes attracting and retaining customers, primarily Las Vegas residents and, to a lesser extent, out-of-town visitors. Our properties attract customers through:

•   convenient locations with best-in-class assets;

•   offering our customers the latest in slot and video poker technology;

•   a variety of non-gaming amenities such as hotel resorts, restaurants, bars and entertainment options;

•   focused marketing efforts targeting our extensive customer database;

•   innovative, frequent and high-profile promotional programs; and

•   convention business.

The Las Vegas regional market is very competitive, and our competitors include both large hotel casinos in Las Vegas and smaller gaming-only establishments throughout the Las Vegas valley.

*Provide a high quality, value-oriented gaming and entertainment experience.*  We are committed to providing a high-value entertainment experience for our guests, as our significant level of repeat visitors demand exceptional service, variety and quality in their overall experience. We offer a broad array of gaming options, including the most popular slot and video poker products, and the latest technological innovations in slots, table games and sports wagering. We believe that providing a wide variety of entertainment options is also a significant factor in attracting guests. In particular, we feature multiple dining options at all of our major properties, which is a primary motivation for casino visits. We are dedicated to ensuring a high level of guest satisfaction and loyalty by providing attentive guest service in a convenient, friendly and casual atmosphere. As part of our commitment to providing a high value entertainment experience and to stimulate visitation, we regularly refresh and enhance our gaming and non-gaming amenities.

*Generate revenue growth through targeted marketing and promotional programs.*  Our significant advertising programs generate consistent brand awareness and promotional visibility. Our ability to advertise under a single brand across our portfolio also allows us to achieve material economies of scale. While we advertise through traditional media such as television, radio and newspaper to reach our core guests, we continue to expand our focus and spend on social, digital and mobile platforms to respond to the evolving methods that guests receive information.

We employ an innovative marketing strategy that utilizes our frequent high-profile promotional programs to attract and retain guests, while also establishing and maintaining a high level of brand recognition. Through our analytical approach to promotional development, we are also able to drive profits by optimizing reinvestment in those guests who deliver stronger results. Our proprietary customer relationship management systems are highly attuned to how guests interact with our properties and products. This information allows us to focus on targeting guests based on their preferences.

We have installed new technology on all of our slot machines which permits us to provide "on device" marketing, bonusing and guest communication, including real-time customized promotions and incentives. We believe that this investment in technology, which allows us to communicate with our guests directly on device, has resulted in an increase in guest loyalty and enhanced the value of our loyalty program. As we continue to introduce new features and brand titles for customized promotional incentives, the technology should continue to help drive participation in our *my|Rewards Boarding Pass* loyalty program.

*Maximize business profitability.*  During our over 40-year history, we have developed a culture that focuses on operational excellence and cost management. We believe that this focus has contributed to adjusted earnings before interest, taxes, depreciation and amortization ("Adjusted EBITDA") margins that compare favorably to our public peers over the past several years. Our internally developed proprietary systems and analytical tools provide us with the ability to closely monitor revenues and operational expenses and provide real-time information to management. Benchmarking across our properties also allows us to create and take advantage of best practices in all functional areas of our business. We believe our existing cost structure, which has low variable costs, can support significant incremental revenue growth while maximizing the flow through of revenue to Adjusted EBITDA.

*Utilize flexible capital structure to drive growth and equity holder returns.*  We maintain a flexible capital structure that we believe will allow us to pursue a balance of new growth opportunities and a disciplined return of capital to our equity holders. We believe our scalable platform and extensive development and management expertise provide us the ability to build master-planned expansions, pursue acquisitions and/or seek new development opportunities in an effort to maximize equity holder returns.

*Employee relations.*  Station LLC began as a family-run business in 1976 and has maintained close-knit relationships among our management, and we endeavor to instill this same sense of loyalty among our employees. Toward this end, we take a hands-on approach through active and direct involvement with employees at all levels. We believe we have very good employee relations. See "*Risk Factors—Risks Related to Our Business*—Union organization activities could disrupt our business by discouraging patrons from visiting our properties, causing labor disputes or work stoppages, and, if successful, could significantly increase our labor costs."

*Native American projects.*  We currently provide management and development services to two Native American tribes using our expertise in developing and operating regional entertainment destinations. We also managed a gaming and entertainment facility for another Native American tribe under a seven-year management agreement that expired in February 2018.

**Organizational Structure**

The following chart summarizes our organizational structure as of December 31, 2018. This chart is provided for illustrative purposes only and does not purport to represent all legal entities owned or controlled by us:



_____

(1)     Shares of Class A common stock and Class B common stock vote as a single class. Each outstanding share of Class A common stock is entitled to one vote, each outstanding share of Class B common stock that is held by a holder that, together with its affiliates, owns at least 30% of the outstanding LLC Units and, at the applicable record date, maintains direct or indirect beneficial ownership of at least 10% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the LLC Units were exchanged for Class A common stock) is entitled to ten votes and each other outstanding share of Class B common stock is entitled to one vote. The only holders of Class B common stock that satisfy the foregoing criteria are entities controlled by Frank J. Fertitta III, our Chairman of the Board and Chief Executive Officer, and Lorenzo J. Fertitta, our Vice Chairman of the Board. These entities are referred to herein as the "Fertitta Family Entities" or "Principal Equity Holders."

(2)     "Continuing Owners" refers to the owners of LLC Units at December 31, 2018 who held such units prior to the IPO.

**Properties**

Set forth below is certain information at January 31, 2019 concerning our properties.

| | Hotel Rooms | Slots [1] | Gaming Tables [2] | Acreage |
|---|---|---|---|---|
| ***Las Vegas Properties*** | | | | |
| Red Rock | 796 | 2,789 | 67 | 64 |
| Green Valley Ranch | 495 | 2,365 | 48 | 40 |
| Palms Casino Resort [3] | 1,364 | 1,159 | 39 | 42 |
| Palace Station | 575 | 1,557 | 43 | 30 |
| Boulder Station | 299 | 2,461 | 27 | 46 |
| Texas Station | 199 | 1,684 | 24 | 47 |
| Sunset Station | 457 | 2,083 | 36 | 80 |
| Santa Fe Station | 200 | 2,375 | 38 | 39 |
| Fiesta Rancho | 100 | 1,031 | 15 | 25 |
| Fiesta Henderson | 224 | 1,390 | 18 | 35 |
| Wild Wild West | 260 | 173 | — | 20 |
| Wildfire Rancho | — | 99 | — | 5 |
| Wildfire Boulder | — | 153 | — | 2 |
| Wildfire Sunset | — | 125 | — | 1 |
| Wildfire Lake Mead | — | 60 | — | 3 |
| Wildfire Valley View | — | 35 | — | — |
| Wildfire Anthem | — | 15 | — | — |
| ***50% Owned Properties*** | | | | |
| Barley's | — | 193 | — | — |
| The Greens | — | 38 | — | — |
| Wildfire Lanes | — | 184 | — | — |
| | 4,969 | 19,969 | 355 | 479 |
| ***Managed Property*** | | | | |
| Graton Resort & Casino | 200 | 3,330 | 131 | 254 |
| | 5,169 | 23,299 | 486 | 733 |

(1) Includes slot and video poker machines.
(2) Generally includes blackjack ("21"), craps, roulette, pai gow, baccarat, let it ride and three-card poker.
(3) Hotel rooms include 599 condominium units. Slots and table games are temporarily lower due to the renovations underway.

*Red Rock*

Red Rock opened in 2006 and is strategically located at the intersection of Interstate 215 and Charleston Boulevard in the Summerlin master-planned community in Las Vegas, Nevada. Red Rock is adjacent to Downtown Summerlin, a 1.6 million square foot outdoor shopping, dining and entertainment center; City National Arena, which features two National Hockey League-sized ice sheets for use by both the Vegas Golden Knights team and the public; and Las Vegas Ballpark, which is scheduled to open in April 2019 as the new home for the Las Vegas Aviators professional Triple-A baseball team. The AAA Four Diamond resort features an elegant desert oasis theme with a contemporary design featuring luxury amenities. This resort offers six styles of suites, including one-of-a-kind custom villas and penthouse suites, in addition to standard guest rooms. Additional non-gaming amenities include nine full-service restaurants, a 16-screen movie theater complex, approximately 94,000 square feet of meeting and convention space, a full-service spa, a 72-lane bowling center, a Kid's Quest child care facility and a gift shop. Red Rock's Restaurant Row links, via a pedestrian walkway, five of our premier restaurants including Masso Osteria, Hearthstone Kitchen & Cellar, Yard House, Blue Ribbon Sushi Bar & Grill and Lucille's Smokehouse Bar-B-Que. Other full-service restaurants at Red Rock include T-bones Chophouse, 8 Noodle Bar, Grand Café, Feast Buffet (which features live-action themed buffets offering options that include Mexican, Italian, barbecue, American and Chinese

cuisines) and the Sandbar pool café. Red Rock features numerous bars and lounges including Rocks Lounge, Onyx Bar, Sandbar and Lucky Bar. Red Rock also offers a variety of quick-serve restaurants.

*Green Valley Ranch*

Green Valley Ranch opened in 2001 and is strategically located at the intersection of Interstate 215 and Green Valley Parkway in Henderson, Nevada. Green Valley Ranch is approximately five minutes from McCarran International Airport and seven minutes from the Las Vegas Strip. Green Valley Ranch was designed to complement the Green Valley master-planned community. This Mediterranean style AAA Four Diamond resort features standard guest rooms and suites, eight full-service restaurants, a 4,200-square-foot non-gaming arcade, a European Spa with outdoor pools, a 10-screen movie theater complex, a Kid's Quest child care facility, gift shop and approximately 65,000 square feet of meeting and convention space which includes the Grand Events Center and El Cielo Ballroom. Green Valley Ranch also offers an eight-acre outdoor complex featuring private poolside cabanas and a contemporary poolside bar and grill. Green Valley Ranch's full-service restaurants include Hank's Fine Steaks & Martinis, Borracha Mexican Cantina, Bottiglia Cucina & Enoteca Italian restaurant, Tides Seafood & Sushi Bar, Pizza Rock by Tony Gemignani, Grand Café, Feast Buffet and the Turf Grill. Guests can also enjoy the Drop Bar, a centerpiece of the casino, the Lobby Bar, which is open to the lobby entrance and overlooks the pool area, and the Sip Bar. Green Valley Ranch also offers a variety of quick-serve restaurants.

*Palms Casino Resort*

We purchased Palms Casino Resort ("Palms") in 2016. Palms is strategically located just west of the center of the Las Vegas Strip off Interstate 15 on Flamingo Road. Palms is undergoing a $690 million redevelopment that is expected to completely reposition and reimagine the property. Phase one of the redevelopment project opened in May 2018, with the remaining components of phase two expected to be complete in the second quarter of 2019 and phase three expected to be completed in the third quarter of 2019.

Highlights of phase one of the redevelopment include: a completely renovated casino floor with expanded number of slot machines and table games; new slot and table games high limit rooms; Lucky Penny, a new 24-hour café; A.Y.C.E. ("All You Can Eat") Buffet; Scotch 80 Prime, a new high-end steakhouse; Send Noodles, a new noodle bar restaurant; Apex, a new rooftop social club; Camden, a new high-end casino lounge; The Unknown, a new and iconic center bar featuring signature art pieces from world-renowned artist Damien Hirst; 18,000 net square feet of completely renovated meeting and convention space; a new hotel front desk registration and VIP registration and reception areas; a fully upgraded 14-screen Brendan Theatres luxury movieplex; a complete renovation of the 2,500 seat Pearl Concert Theater; and an all-new exterior look, including a new marquee, modernized porte cochere, new exterior facades and lush landscaping.

Highlights of phase two of the redevelopment include: 282 fully redesigned and renovated premium hotel rooms and one-of-a-kind luxury suites, as well as construction of 60 new hotel rooms in the Fantasy Tower; Vetri Cucina, a new Italian restaurant with award-winning chef Marc Vetri; Mabel's, a new American barbeque restaurant with celebrity chef Michael Symon; Shark, a new seafood restaurant with celebrity chef Bobby Flay; Greene St. Kitchen, a New York-inspired eatery in partnership with Clique Hospitality Group; KAOS, a new entertainment experience consisting of a fully integrated 73,000 square foot dayclub and new 29,000 square foot nightclub; a new wellness spa and salon; and an additional 15,000 net square feet of completely renovated meeting and convention space.

Highlights of phase three of the redevelopment include: a casino floor expansion featuring the addition of approximately 300 slot machines and 16 table games; Tim Ho Wan, a new Michelin-Star dim sum restaurant from Hong Kong; a casino connector integrating the adjacent 599 room Palms Place tower directly into the newly expanded casino floor; an indoor connector to the pre-existing self-park garage with ingress directly into the newly expanded casino floor; collaborations with world-class artists throughout the property; and state-of-the-art digital signage on the hotel tower exterior. The redevelopment project remains on schedule and the $690 million budget remains unchanged. In addition to its many full-service restaurants, Palms also offers a variety of quick-serve restaurants.

*Palace Station*

Palace Station opened in 1976 and is strategically located at the intersection of Sahara Avenue and Interstate 15, one of Las Vegas' most heavily traveled areas. Palace Station is a short distance from McCarran International Airport and very close to major attractions on the Las Vegas Strip and in downtown Las Vegas. In December 2018, Palace Station completed a $191 million redevelopment project, which added 178,000 square feet of new gaming and entertainment space to the property, along with a refreshed exterior look. The redevelopment project was completed on schedule and on budget. Highlights of the completed project include: a fully renovated and upgraded gaming floor; 575 updated hotel rooms and suites; two new signature restaurants, San Francisco-based Boathouse Asian Eatery and Chef Ralph Perrazzo's New York-based BBD's Restaurant; a new 14,000 square foot, state-of-the-art Feast Buffet; a new resort-style pool area; a new state-of-the-art bingo

room; a fully renovated poker room; a fully renovated race and sports book; a new nine-screen Regal Cinnebarre luxury movieplex; and two new LED marquee signs.

In addition to those new venues and upgrades, Palace Station offers other non-gaming amenities including four other full-service restaurants (Charcoal Room steakhouse, Brass Fork Café, The Oyster Bar and Little Tony's Italian restaurant), three additional bars, an approximately 20,000-square-foot meeting and convention center and a gift shop. In addition to its many full-service restaurants, Palace Station also offers a variety of quick-serve restaurants.

*Boulder Station*

Boulder Station opened in 1994 and is strategically located at the intersection of Boulder Highway and Interstate 515. Boulder Station is located approximately four miles east of the Las Vegas Strip and approximately four miles southeast of downtown Las Vegas. Boulder Station features a turn-of-the-20th-century railroad station theme with non-gaming amenities including five full-service restaurants, a 750-seat entertainment lounge, four additional bars, an 11-screen movie theater complex, a Kid's Quest child care facility, a swimming pool, a non-gaming video arcade and a gift shop. Boulder Station's restaurants, which offer a variety of enjoyable meals at reasonable prices, include Grand Café, Feast Buffet, The Broiler Steakhouse, Pasta Cucina and Guadalajara Mexican restaurant. Boulder Station also offers a variety of quick-serve restaurants.

*Texas Station*

Texas Station opened in 1995 and is strategically located at the intersection of Lake Mead Boulevard and Rancho Drive in North Las Vegas. Texas Station features a friendly Texas atmosphere, highlighted by distinctive early Texas architecture with non-gaming amenities including four full-service restaurants, a Kid's Quest child care facility, a 300-seat entertainment lounge, a 2,000-seat event center, six additional bars, an 18-screen movie theater complex, a swimming pool, two non-gaming video arcades, a gift shop, a 60-lane bowling center and approximately 40,000 square feet of meeting and banquet space. Texas Station's full-service restaurants offer a variety of enjoyable meals at reasonable prices, and include Grand Café, Beaumont's Southern Kitchen, Feast Buffet and The Oyster Bar. Guests also enjoy the unique features of several bars and lounges including the Sports Bar, Martini Bar, Whiskey Bar, Garage Bar, Splitz Bar and South Padre Lounge. Texas Station also offers a variety of quick-serve restaurants.

*Sunset Station*

Sunset Station opened in 1997 and is strategically located at the intersection of Interstate 515 and Sunset Road. Situated in a highly concentrated commercial corridor along Interstate 515, Sunset Station has prominent visibility from the freeway and the Sunset commercial corridor. Sunset Station is located approximately 4.5 miles east of McCarran International Airport and approximately 5.5 miles southeast of Boulder Station. Sunset Station features a Spanish/Mediterranean style theme. Additional non-gaming amenities include five full-service restaurants, approximately 13,000 square feet of meeting space, a 500-seat entertainment lounge, a 5,000-seat outdoor amphitheater, six additional bars, a gift shop, a non-gaming video arcade, a 13-screen luxury seating movie theater complex, a 72-lane bowling center, a Kid's Quest child care facility and a swimming pool. Sunset Station's full-service restaurants, which include Grand Café, Sonoma Cellar Steakhouse, Pasta Cucina, Feast Buffet and the Oyster Bar, offer a variety of enjoyable meals at reasonable prices. Guests also enjoy the Gaudi Bar, a centerpiece of the casino featuring over 8,000 square feet of stained glass. Sunset Station also offers a variety of quick-serve restaurants.

*Santa Fe Station*

We purchased Santa Fe Station in 2000 and subsequently refurbished and expanded the facility. Santa Fe Station is strategically located at the intersection of Highway 95 and Rancho Drive, approximately five miles northwest of Texas Station. Santa Fe Station features non-gaming amenities including five full-service restaurants, a gift shop, a non-gaming video arcade, a swimming pool, a 500-seat entertainment lounge, four additional bars and grills, a 60-lane bowling center, a 16-screen luxury seating movie theater complex, a Kid's Quest child care facility and over 14,000 square feet of meeting and banquet facilities. Santa Fe Station's full-service restaurants include The Charcoal Room, Cabo Mexican Restaurant, Grand Café, Feast Buffet and the Oyster Bar. Guests also enjoy 4949 Lounge, a centerpiece of the casino. Santa Fe Station also offers a variety of quick-serve restaurants.

*Fiesta Rancho*

We purchased Fiesta Rancho in 2001. Fiesta Rancho is strategically located at the intersection of Lake Mead Boulevard and Rancho Drive in North Las Vegas across from Texas Station. Fiesta Rancho features non-gaming amenities including full-service restaurants, a gift shop, a non-gaming video arcade, a swimming pool, a 700-seat entertainment lounge, a regulation-size ice skating rink and several additional bars, including the Cabo Lounge, Venom Bar and the Sports Bar. Fiesta

10

Rancho's full-service restaurants include Denny's and the Festival Buffet. Fiesta Rancho also offers a variety of quick-serve restaurants.

### Fiesta Henderson

We purchased Fiesta Henderson in 2001 and subsequently refurbished and expanded the facility. Fiesta Henderson is strategically located at the intersection of Interstate 215 and Interstate 515 in Henderson, Nevada, approximately three miles southeast of Sunset Station. Fiesta Henderson features non-gaming amenities including four full-service restaurants, a 12-screen movie theater complex, a gift shop, a swimming pool, four bars and lounges and meeting space. Fiesta Henderson's full-service restaurants include Fuego Steakhouse, Café Fiesta, Leticia's Cocina and the Festival Buffet. Fiesta Henderson also offers a variety of quick-serve restaurants.

### Wild Wild West

We opened Wild Wild West in 1998. Wild Wild West is strategically located on Tropicana Avenue immediately adjacent to Interstate 15. Wild Wild West's non-gaming amenities include a hotel, a full-service restaurant, a bar, a gift shop and a truck plaza.

### Wildfire Rancho

We purchased Wildfire Rancho in 2003. Wildfire Rancho is located on Rancho Drive across from Texas Station. Wildfire Rancho's non-gaming amenities include a lounge, outdoor patio and quick-serve food offerings.

### Wildfire Boulder and Wildfire Sunset

We purchased Wildfire Boulder and Wildfire Sunset in 2004. Both properties are located in Henderson, Nevada, and offer non-gaming amenities which include a full-service restaurant and a bar. Wildfire Boulder is located approximately seven miles southeast of Fiesta Henderson. Wildfire Sunset is located next to Sunset Station.

### Wildfire Lake Mead

We purchased Wildfire Lake Mead in 2006. Wildfire Lake Mead is located in Henderson, Nevada, and features a sports lounge, a bar and quick-serve food offerings.

### Wildfire Valley View and Wildfire Anthem

We purchased Wildfire Valley View and Wildfire Anthem in 2013. Wildfire Valley View is located in Las Vegas and Wildfire Anthem is a tavern located in Henderson, Nevada. Non-gaming amenities offered by Wildfire Valley View and Wildfire Anthem include a bar and quick-serve food offerings.

### Barley's, The Greens and Wildfire Lanes

We own a 50% interest in three smaller properties in Henderson, Nevada including Barley's, a casino and brew pub, The Greens, a restaurant and lounge, and Wildfire Lanes, which features a full-service restaurant, a bar and an 18-lane bowling center.

### Graton Resort & Casino

We manage Graton Resort & Casino ("Graton Resort") in Sonoma County, California, which opened in November 2013, on behalf of the Federated Indians of Graton Rancheria (the "Graton Tribe"), a federally recognized Native American tribe. Graton Resort is located just west of U.S. Highway 101 near Rohnert Park, California, approximately 43 miles north of San Francisco. It is the largest gaming and entertainment facility in the Bay Area. Graton Resort offers various dining options including four full-service restaurants and eight fast-casual restaurants. In 2016, the Graton Tribe completed a $185 million expansion of Graton Resort that included 200 hotel rooms, meeting and convention space, a spa, a resort-style pool, a lobby bar and additional casino space. In October 2018, the Graton Tribe opened a nonsmoking addition to the casino. The management agreement has a term of seven years from the opening date and expires November 2020. We currently receive a management fee of 27% of Graton Resort's net income as defined in the management agreement.

### **Developable Land**

We control approximately 420 acres of developable land comprised of eight strategically-located parcels in Las Vegas and Reno, Nevada, each of which is zoned for casino gaming and other commercial uses. Following is a description of such parcels:

- *Durango/I-215:*  We own approximately 71 acres located at the intersection of Durango Road and I-215 in the southwestern area of the Las Vegas valley. The site has excellent visibility and access from I-215. As a result of gaming and land use restrictions, there are no major casino sites, other than those owned by us, within approximately five miles of this site.

- *Wild Wild West:*  We control approximately 105 acres of land located at the intersection of Tropicana Boulevard and I-15, less than one-half mile from the Las Vegas strip. This parcel has excellent visibility and access from I-15, on which approximately 225,000 cars per day pass by the site.

- *Flamingo/I-215:*  We own approximately 58 acres located at the intersection of Flamingo Road and I-215 in the master-planned community of Summerlin in Las Vegas. The site has excellent visibility and access from I-215.

- *Via Inspirada/Bicentennial Parkway:*  We own approximately 45 acres located on Via Inspirada near Bicentennial Parkway in the Las Vegas valley, approximately six miles southwest of Green Valley Ranch. This property is the only casino gaming-entitled property in the master-planned community of Inspirada.

- *Skye Canyon:*  We own approximately 40 acres in northwestern Las Vegas off of U.S. Highway 95 approximately seven miles north of Santa Fe Station.

- *Boulder Highway:*  We own approximately five acres at the intersection of Boulder Highway and Oakey Boulevard approximately 1.5 miles southeast of downtown Las Vegas. This property has grandfathered gaming entitlements that predate room and other amenity requirements, which creates greater flexibility with respect to the potential development of this site.

- *Mt. Rose Property (Reno):*  We own approximately 88 acres at the intersection of Mt. Rose Highway and South Virginia Street in Reno, Nevada.

- *South Virginia Street/I-580 (Reno):*  We own approximately eight acres on South Virginia Street near I-580, directly across from the Reno-Sparks Convention Center.

We also own one additional 57-acre development site in Las Vegas that is currently for sale. From time to time we may acquire additional parcels or sell portions of our existing sites that are not necessary to the development of additional gaming facilities.

### Native American Development

We have entered into development and management agreements with the North Fork Rancheria of Mono Indians (the "Mono"), a federally recognized Native American tribe located near Fresno, California, under which we will assist the Mono in developing and operating a gaming and entertainment facility (the "North Fork Project") to be located on a 305-acre site (the "North Fork Site") located adjacent to Highway 99 north of the city of Madera in Madera County, California. The North Fork Site was taken into trust for the benefit of the Mono by the United States Department of the Interior ("DOI") in February 2013.

We will receive a development fee of 4% of the costs of construction (as defined in the development agreement) for our development services, which will be paid upon the commencement of gaming operations at the facility. The management agreement provides for a management fee of 30% of the facility's net income. As currently contemplated, the North Fork Project is expected to include approximately 2,000 slot machines, approximately 40 table games and several restaurants. The management agreement and the development agreement have a term of seven years from the opening of the facility.

Development of the North Fork Project is subject to certain governmental and regulatory approvals, including, but not limited to, approval of the management agreement by the National Indian Gaming Commission ("NIGC").

The development of the North Fork Project is subject to several ongoing legal challenges, the receipt of required regulatory approvals and financing. There can be no assurance that the North Fork Project will be successfully completed nor that future events and circumstances will not change our estimates of the timing, scope, and potential for successful completion or that any such changes will not be material. There can be no assurance that we will recover all of our investment in the North Fork Project even if it is successfully completed and opened for business. See Note 8 to the Consolidated Financial Statements for additional information about the North Fork Project.

## Intellectual Property

We use a variety of trade names, service marks, trademarks, patents and copyrights in our operations and believe that we have all the licenses necessary to conduct our continuing operations. We have registered several service marks, trademarks, patents and copyrights with the United States Patent and Trademark Office or otherwise acquired the licenses to use those

which are material to conduct our business. We file copyright applications to protect our creative artworks, which are often featured in property branding, as well as our distinctive website content.

**Seasonality**

Our cash flows from operating activities are somewhat seasonal in nature. Our operating results are traditionally strongest in the fourth quarter and weakest during the third quarter.

**Competition**

Our casino properties face competition from all other casinos and hotels in the Las Vegas area, including to some degree, from each other. We compete with other nonrestricted casino/hotels, as well as restricted gaming locations, by focusing on repeat customers and attracting these customers through innovative marketing programs. Our value-oriented, high-quality approach is designed to generate repeat business. Additionally, our casino properties are strategically located and designed to permit convenient access and ample free parking, which are critical factors in attracting local visitors and repeat patrons.

At December 31, 2018, there were approximately 39 major gaming properties located on or near the Las Vegas Strip, 14 located in the downtown area and several located in other areas of Las Vegas. We also face competition from 144 nonrestricted gaming locations in the Clark County area primarily targeted to the local and repeat visitor markets. In addition, our casino properties face competition from restricted gaming locations (sites with 15 or fewer slot machines) in the greater Las Vegas area. At December 31, 2018, there were approximately 1,400 restricted gaming locations in Clark County with approximately 14,100 slot machines. Major additions, expansions or enhancements of existing properties or the construction of new properties by competitors could have a material adverse effect on our business.

The Nevada legislature enacted SB 208 in 1997. This legislation identified certain gaming enterprise districts wherein casino gaming development would be permitted throughout the Las Vegas valley and established more restrictive criteria for the establishment of new gaming enterprise districts. We believe the growth in gaming supply in the Las Vegas regional market has been, and will continue to be, limited by the provisions of SB 208.

To a lesser extent, we compete with gaming operations in other parts of the state of Nevada, such as Reno, Laughlin and Lake Tahoe, and other gaming markets throughout the United States and in other parts of the world, and with state sponsored lotteries, on- and off-track wagering on horse and other races, card rooms, online gaming and other forms of legalized gambling. The gaming industry also includes land-based casinos, dockside casinos, riverboat casinos, racetracks with slots and casinos located on Native American land. There is intense competition among companies in the gaming industry, some of which have significantly greater resources than we do. In May 2018, the United States Supreme Court overturned a law prohibiting states from legalizing sports wagering, which has resulted in a substantial expansion of sports gaming outside the state of Nevada. Several states are also considering legalizing casino gaming in designated areas. Legalized casino and sports gaming in various states and on Native American land could result in additional competition and could adversely affect our operations, particularly to the extent that such gaming is conducted in areas close to our operations. We also face competition from internet poker operators in Nevada. In addition, internet gaming has commenced in Nevada, New Jersey, Delaware and Pennsylvania, and legislation approving internet gaming has been proposed by the federal government and other states. Expansion of internet gaming in new or existing jurisdictions and on Native American land could result in additional competition for our Las Vegas operations and for the gaming facilities that we manage for Native American tribes.

Native American gaming in California, as it currently exists, has had little, if any, impact on our Las Vegas operations to date, although there are no assurances as to the future impact it may have. In total, the State of California has signed and ratified Tribal-State Compacts with 74 Native American tribes. At December 31, 2018, there were 63 Native American gaming facilities in operation in the State of California. These Native American tribes are allowed to operate slot machines, lottery games, and banked and percentage games (including "21") on Native American lands. A banked game is one in which players compete against the licensed gaming establishment rather than against one another. A percentage game is one in which the house does not directly participate in the game, but collects a percentage of the amount of bets made, winnings collected, or the amount of money changing hands. It is not certain whether any additional expansion of Native American gaming in California will affect our Las Vegas operations given that visitors from California make up Nevada's largest visitor market. Increased competition from Native American gaming in California may result in a decline in our revenues and may have a material adverse effect on our business.

**Regulation and Licensing**

In addition to gaming regulations, our business is subject to various federal, state and local laws and regulations of the United States and Nevada. These laws and regulations include, but are not limited to, restrictions concerning employment and immigration status, currency transactions, zoning and building codes, protection of human health and safety and the environment, marketing and advertising, privacy and telemarketing. Since we deal with significant amounts of cash in our

operations we are subject to various reporting and anti-money laundering regulations. Any violations of anti-money laundering laws or any of the other laws or regulations to which we are subject could result in regulatory actions, fines, or other penalties. Any material changes, new laws or regulations or material differences in interpretations by courts or governmental authorities or material regulatory actions, fines, penalties or other actions could adversely affect our business and operating results.

*Nevada Gaming Laws and Regulations*

The ownership and operation of casino gaming facilities and the manufacture and distribution of gaming devices in Nevada are subject to the Nevada Gaming Control Act and the rules and regulations promulgated thereunder (collectively, the "Nevada Act") and various local ordinances and regulations. Our gaming operations in Nevada are subject to the licensing and regulatory control of the Nevada Gaming Commission (the "Nevada Commission"), the Nevada State Gaming Control Board (the "Nevada Board"), the Las Vegas City Council, the Clark County Liquor and Gaming Licensing Board (the "CCLGLB"), the North Las Vegas City Council, the Henderson City Council and certain other local regulatory agencies. The Nevada Commission, Nevada Board, Las Vegas City Council, CCLGLB, North Las Vegas City Council, Henderson City Council, and certain other local regulatory agencies are collectively referred to as the "Nevada Gaming Authorities".

The laws, regulations and supervisory procedures of the Nevada Gaming Authorities are based upon declarations of public policy which are concerned with, among other things: (i) the prevention of unsavory or unsuitable persons from having a direct or indirect involvement with gaming at any time or in any capacity; (ii) the establishment and maintenance of responsible accounting practices and procedures; (iii) the maintenance of effective controls over the financial practices of gaming licensees, including the establishment of minimum procedures for internal controls and the safeguarding of assets and revenues, providing reliable record keeping and requiring the filing of periodic reports with the Nevada Gaming Authorities; (iv) the prevention of cheating and fraudulent practices; and (v) providing a source of state and local revenues through taxation and licensing fees. Changes in such laws, regulations and procedures could have an adverse effect on our gaming operations.

Our indirect subsidiaries that conduct gaming operations in Nevada are required to be licensed by the Nevada Gaming Authorities. The gaming licenses require the periodic payment of fees and taxes and are not transferable. NP Red Rock LLC, NP Boulder LLC, NP Palace LLC, NP Sunset LLC, NP Tropicana LLC, NP Fiesta LLC, NP Gold Rush LLC, NP Lake Mead, LLC, NP Magic Star LLC, NP Rancho LLC, NP Santa Fe LLC, NP Texas LLC, Station GVR Acquisition, LLC, SC SP 2 LLC, NP LML LLC, FP Holdings, L.P. and NP River Central LLC hold licenses to conduct nonrestricted gaming operations. NP Opco Holdings is registered as an intermediary company and is licensed as the sole member and manager of NP Opco LLC. NP Opco LLC is registered as an intermediary company, is licensed as the sole member and manager of NP Fiesta LLC, NP Lake Mead LLC, NP Santa Fe LLC, NP Gold Rush LLC, NP Magic Star LLC, NP Rancho LLC, NP Texas LLC, NP River Central LLC, and Station GVR Acquisition LLC. NP Opco LLC is found suitable as the sole member and manager of NP Green Valley LLC, SC SP Holdco LLC and NP LML LLC. Our ownership in NP Tropicana LLC is held through NP Landco Holdco LLC, which has a registration as an intermediary company and a license as the sole member of NP Tropicana LLC. Our ownership in SC SP 2 LLC is held through SC SP Holdco LLC which has a registration as an intermediary company and a license as a member and manager of SC SP 2 LLC. Town Center Amusements, Inc., a Limited Liability Company is licensed to conduct nonrestricted gaming operations at Barley's. Greens Café, LLC is licensed to conduct nonrestricted gaming operations at The Greens, and Sunset GV, LLC is licensed to conduct nonrestricted gaming operations at Wildfire Lanes. A license to conduct "nonrestricted" operations is a license to conduct an operation of (i) at least 16 slot machines, (ii) any number of slot machines together with any other game, gaming device, race book or sports pool at one establishment, (iii) a slot machine route, (iv) an inter-casino linked system, or (v) a mobile gaming system. SC SP 4 LLC holds a restricted gaming license, which is a state gaming license to operate not more than 15 slot machines and no other gaming device, race book or sports pool. We are required to periodically submit detailed financial and operating reports to the Nevada Commission and provide any other information that the Nevada Commission may require. Substantially all material loans, leases, sales of securities and similar financing transactions by us and our licensed or registered subsidiaries must be reported to or approved by the Nevada Commission and/or the Nevada Board.

We have been found suitable to indirectly own the equity interests in our licensed and registered subsidiaries (the "Gaming Subsidiaries") and we are registered by the Nevada Commission as a publicly traded corporation for purposes of the Nevada Act (a "Registered Corporation"). On September 20, 2018, the Nevada Commission issued its Fourth Revised Order of Registration for the Company that, among other things, reaffirmed our registration as a publicly traded corporation for the purposes of the Nevada Act ("Fourth Revised Order"). As a Registered Corporation, we are required to periodically submit detailed financial and operating reports to the Nevada Board and provide any other information the Nevada Board may require. No person may become a more than 5% stockholder or holder of more than a 5% interest in, or receive any percentage of gaming revenue from the Gaming Subsidiaries without first obtaining licenses, approvals and/or applicable waivers from the Nevada Gaming Authorities.

The Nevada Gaming Authorities may investigate any individual who has a material relationship to, or material involvement with, a Registered Corporation or its licensed subsidiaries, in order to determine whether such individual is suitable or should be licensed as a business associate of a Registered Corporation or a gaming licensee. Officers, directors and certain key employees of our licensed subsidiaries must file applications and may be required to be licensed or found suitable by the Nevada Gaming Authorities. Our officers, directors and key employees who are actively and directly involved in gaming activities of our licensed subsidiaries may be required to be licensed or found suitable by the Nevada Gaming Authorities. The Nevada Gaming Authorities may deny an application for licensing for any cause that they deem reasonable. A finding of suitability is comparable to licensing, and both require submission of detailed personal and financial information followed by a thorough investigation. The applicant for licensing or a finding of suitability must pay all the costs of the investigation. Changes in licensed positions must be reported to the Nevada Gaming Authorities and, in addition to their authority to deny an application for a finding of suitability or licensure, the Nevada Gaming Authorities have jurisdiction to disapprove a change in corporate position.

If the Nevada Gaming Authorities were to find an officer, director or key employee unsuitable for licensing or unsuitable to continue to have a relationship with us or our licensed subsidiaries, the companies involved would have to sever all relationships with such person. In addition, the Nevada Commission may require our licensed subsidiaries to terminate the employment of any person who refuses to file the appropriate applications. Determinations of suitability or questions pertaining to licensing are not subject to judicial review in Nevada.

If it were determined that the Nevada Act was violated by a licensed subsidiary, the gaming licenses it holds could be limited, conditioned, suspended or revoked, subject to compliance with certain statutory and regulatory procedures. In addition, the Company, our licensed subsidiaries and the persons involved could be subject to substantial fines for each separate violation of the Nevada Act at the discretion of the Nevada Commission. Further, a supervisor could be appointed by the Nevada Commission to operate our properties, and under certain circumstances, earnings generated during the supervisor's appointment (except for the reasonable rental value of the premises) could be forfeited to the State of Nevada. Limitation, conditioning or suspension of the gaming licenses of the licensed subsidiaries or the appointment of a supervisor could (and revocation of any such gaming license would) have a material adverse effect on our gaming operations.

Any beneficial owner of our equity securities, regardless of the number of shares owned, may be required to file an application, may be investigated, and may be required to obtain a finding of suitability if the Nevada Commission has reason to believe that such ownership would otherwise be inconsistent with the declared policies of the State of Nevada. If the beneficial owner of our equity securities who must be found suitable is a corporation, partnership, limited partnership, limited liability company or trust, it must submit detailed business and financial information, including a list of its beneficial owners, to the Nevada Board. The applicant must pay all costs of investigation incurred by the Nevada Gaming Authorities in conducting any such investigation.

The Nevada Act provides that persons who acquire beneficial ownership of more than 5% of the voting or non-voting securities of a Registered Corporation must report the acquisition to the Nevada Commission. The Nevada Act also requires that beneficial owners of more than 10% of the voting securities of a Registered Corporation must apply to the Nevada Commission for a finding of suitability within thirty days after the Chair of the Nevada Board mails the written notice requiring such filing. An "institutional investor," as defined in the Nevada Commission's regulations, which acquires beneficial ownership of more than 10%, but not more than 25%, of our voting securities may apply to the Nevada Commission for a waiver of such finding of suitability if such institutional investor holds the voting securities for investment purposes only. An institutional investor that has obtained a waiver may, in certain circumstances, hold up to 29% of our voting securities and maintain its waiver for a limited period of time. An institutional investor shall not be deemed to hold voting securities for investment purposes unless the voting securities were acquired and are held in the ordinary course of business as an institutional investor and not for the purpose of causing, directly or indirectly, the election of a majority of the members of our board of directors, any change in our corporate charter, bylaws, management policies or our operations, or any of our gaming affiliates, or any other action which the Nevada Commission finds to be inconsistent with holding our voting securities for investment purposes only. Activities which are not deemed to be inconsistent with holding voting securities for investment purposes only include: (i) voting on all matters voted on by stockholders; (ii) making financial and other inquiries of management of the type normally made by securities analysts for informational purposes and not to cause a change in our management, policies or operations; and (iii) such other activities as the Nevada Commission may determine to be consistent with such investment intent.

Any person who fails or refuses to apply for a finding of suitability or a license within thirty days after being ordered to do so by the Nevada Commission, or the Chair of the Nevada Board, may be found unsuitable. The same restrictions apply to a record owner if the record owner, after request, fails to identify the beneficial owner. Any equity holder who is found unsuitable and who holds, directly or indirectly, any beneficial ownership of the common equity of a Registered Corporation beyond such period of time as may be prescribed by the Nevada Commission may be guilty of a criminal offense. We will be subject to disciplinary action if, after we receive notice that a person is unsuitable to be an equity holder or to have any other

relationship with us or our licensed or registered subsidiaries, we (i) pay that person any dividend or interest upon our securities, (ii) allow that person to exercise, directly or indirectly, any voting right conferred through securities held by that person, (iii) pay remuneration in any form to that person for services rendered or otherwise, or (iv) fail to pursue all lawful efforts to require such unsuitable person to relinquish his securities including, if necessary, the immediate purchase of said securities for the price specified by the relevant gaming authority or, if no such price is specified, the fair market value as determined by our board of directors. The purchase may be made in cash, notes that bear interest at the applicable federal rate or a combination of notes and cash. Additionally, the CCLGLB has the authority to approve all persons owning or controlling the stock of any corporation controlling a gaming licensee.

The Nevada Commission may, in its discretion, require the holder of any debt security of a Registered Corporation to file applications, be investigated and be found suitable to own the debt security of a Registered Corporation if the Nevada Commission has reason to believe that such ownership would otherwise be inconsistent with the declared policies of the State of Nevada. If the Nevada Commission determines that a person is unsuitable to own such security, then pursuant to the Nevada Act, the Registered Corporation can be sanctioned, including the loss of its approvals, if without the prior approval of the Nevada Commission, it: (i) pays to the unsuitable person any dividend, interest, or any distribution whatsoever; (ii) recognizes any voting right by such unsuitable person in connection with such securities; (iii) pays the unsuitable person remuneration in any form; or (iv) makes any payment to the unsuitable person by way of principal, redemption, conversion, exchange, liquidation or similar transaction.

We are required to maintain a current membership interest ledger in Nevada, which may be examined by the Nevada Gaming Authorities at any time. If any securities are held in trust by an agent or by a nominee, the record holder may be required to disclose the identity of the beneficial owner to the Nevada Gaming Authorities. Failure to make such disclosure may be grounds for finding the record holder unsuitable. We are also required to render maximum assistance in determining the identity of the beneficial owner.

We may not make a public offering of our securities without the prior approval of the Nevada Commission if the securities or proceeds therefrom are intended to be used to construct, acquire or finance gaming facilities in Nevada, or to retire or extend obligations incurred for such purposes. On September 22, 2016, the Nevada Commission granted us prior approval, subject to certain conditions, to make public offerings for a period of three years (the "Shelf Approval"). The Shelf Approval also applies to any affiliated company wholly owned by us which is a publicly traded corporation or would thereby become a publicly traded corporation pursuant to a public offering. The Shelf Approval may be rescinded for good cause without prior notice upon the issuance of an interlocutory stop order by the Chair of the Nevada Board. If the Shelf Approval is rescinded for any reason, it could adversely impact our capital structure and liquidity and limit our flexibility in planning for, or reacting to, changes in our business and industry. The Shelf Approval does not constitute a finding, recommendation or approval by any of the Nevada Gaming Authorities as to the accuracy or adequacy of any offering memorandum or the investment merits of the securities offered thereby. Any representation to the contrary is unlawful.

Changes in control of the Company through merger, consolidation, stock or asset acquisitions (including stock issuances in connection with restructuring transactions), management or consulting agreements, or any act or conduct by a person whereby such person obtains control, may not occur without the prior approval of the Nevada Commission. Entities seeking to acquire control of a Registered Corporation must satisfy the Nevada Board and the Nevada Commission that they meet a variety of stringent standards prior to assuming control of such Registered Corporation. The Nevada Commission may also require controlling equity holders, officers, directors and other persons having a material relationship or involvement with the entity proposing to acquire control, to be investigated and licensed as part of the approval process relating to the transaction.

The Nevada legislature has declared that some corporate acquisitions opposed by management, repurchases of voting securities and corporate defense tactics affecting Nevada corporate gaming licensees, and Registered Corporations that are affiliated with those operations, may be injurious to stable and productive corporate gaming. The Nevada Commission has established a regulatory scheme to ameliorate the potentially adverse effects of these business practices upon Nevada's gaming industry and to further Nevada's policy to: (i) assure the financial stability of corporate gaming licensees and their affiliates; (ii) preserve the beneficial aspects of conducting business in the corporate form; and (iii) promote a neutral environment for the orderly governance of corporate affairs. Approvals are, in certain circumstances, required from the Nevada Commission before a Registered Corporation can make exceptional repurchases of voting securities above the current market price thereof and before a corporate acquisition opposed by management can be consummated. The Nevada Act also requires prior approval of a plan of re-capitalization proposed by the Registered Corporation's board of directors or similar governing entity in response to a tender offer made directly to the Registered Corporation's equity holders for the purpose of acquiring control of the Registered Corporation.

License fees and taxes, computed in various ways depending on the type of gaming or activity involved, are payable to the State of Nevada and to the counties and cities in which the Nevada licensee's respective operations are conducted. Depending upon the particular fee or tax involved, these fees and taxes are payable either monthly, quarterly or annually and

are based upon either: (i) a percentage of the gross revenues received; (ii) the number of gaming devices operated; or (iii) the number of table games operated. A live entertainment tax is also paid by casino operations where admission charges are imposed for entry into certain entertainment venues. Nevada licensees that hold a license as an operator of a slot route or manufacturer's or distributor's license also pay certain fees and taxes to the State of Nevada.

Any person who is licensed, required to be licensed, registered, required to be registered, or is under common control with such persons, and who proposes to become involved in a gaming venture outside of Nevada, is required to deposit with the Nevada Board, and thereafter maintain, a revolving fund in the amount of $10,000 to pay the expenses of investigation by the Nevada Board of their participation in such foreign gaming. The revolving fund is subject to increase or decrease at the discretion of the Nevada Commission. The Fourth Revised Order requires us to deposit with the Nevada Board and maintain a revolving fund of $50,000 for all purposes, including foreign gaming and compliance with the Fourth Revised Order. Thereafter, licensees are required to comply with certain reporting requirements imposed by the Nevada Act. Licensees are also subject to disciplinary action by the Nevada Commission if they knowingly violate any laws of the foreign jurisdiction pertaining to the foreign gaming operation, fail to conduct the foreign gaming operation in accordance with the standards of honesty and integrity required of Nevada gaming operations, engage in activities or enter into associations that are harmful to the State of Nevada or its ability to collect gaming taxes and fees, or employ, contract with or associate with a person in the foreign operation who has been denied a license or finding of suitability in Nevada on the grounds of unsuitability or whom a court in the state of Nevada has found guilty of cheating. The loss or restriction of our gaming licenses in Nevada would have a material adverse effect on our business and could require us to cease gaming operations in Nevada.

*Nevada Liquor Regulations*

There are various local ordinances and regulations as well as state laws applicable to the sale of alcoholic beverages in Nevada. Palace Station, Wildfire Rancho, Wildfire Valley View, and Santa Fe Station are subject to liquor licensing control and regulation by the Las Vegas City Council. Red Rock, Boulder Station, Palms, and Wild Wild West are subject to liquor licensing control and regulation by the CCLGLB. Texas Station and Fiesta Rancho are subject to liquor licensing control and regulation by the North Las Vegas City Council. Sunset Station, Green Valley Ranch, Fiesta Henderson, Barley's, Wildfire Sunset, Wildfire Boulder, The Greens, Wildfire Anthem, Wildfire Lanes and Wildfire Lake Mead are subject to liquor licensing control and regulation by the Henderson City Council. All liquor licenses are revocable and are, in some jurisdictions, not transferable. The agencies involved have full power to limit, condition, suspend or revoke any such license, and any such disciplinary action could (and revocation would) have a material adverse effect on the operations of our licensed subsidiaries.

*Native American Gaming Regulations*

The terms and conditions of management contracts and the operation of casinos and all gaming on land held in trust for Native American tribes in the United States are subject to the Indian Gaming Regulatory Act of 1988 (the "IGRA"), which is administered by the NIGC and the gaming regulatory agencies of state and tribal governments. The IGRA is subject to interpretation by the NIGC and may be subject to judicial and legislative clarification or amendment.

The IGRA established three separate classes of tribal gaming: Class I, Class II and Class III. Class I gaming includes all traditional or social games solely for prizes of minimal value played by a tribe in connection with celebrations or ceremonies. Class II gaming includes games such as bingo, pull-tabs, punchboards, instant bingo (and electronic or computer-aided versions of such games) and non-banked card games (those that are not played against the house), such as poker. Class III gaming is casino-style gaming and includes banked table games such as blackjack, craps and roulette, and gaming machines such as slots, video poker, lotteries and pari-mutuel wagering, a system of betting under which wagers are placed in a pool, management receives a fee from the pool, and the remainder of the pool is split among the winning wagers.

The IGRA requires NIGC approval of management contracts for Class II and Class III gaming, as well as the review of all agreements collateral to the management contracts. The NIGC will not approve a management contract if a director or a 10% shareholder of the management company: (i) is an elected member of the governing body of the Native American tribe which is the party to the management contract; (ii) has been or subsequently is convicted of a felony or gaming offense; (iii) has knowingly and willfully provided materially important false information to the NIGC or the tribe; (iv) has refused to respond to questions from the NIGC; or (v) is a person whose prior history, reputation and associations pose a threat to the public interest or to effective gaming regulation and control, or create or enhance the chance of unsuitable activities in gaming or the business and financial arrangements incidental thereto. In addition, the NIGC will not approve a management contract if the management company or any of its agents have attempted to unduly influence any decision or process of tribal government relating to gaming, or if the management company has materially breached the terms of the management contract or the tribe's gaming ordinance or resolution, or a trustee, exercising the skill and due diligence that a trustee is commonly held to, would not approve the management contract. A management contract can be approved only after the NIGC determines that the contract provides for, among other things: (i) adequate accounting procedures and verifiable financial reports, which must be furnished to the tribe; (ii) tribal access to the daily operations of the gaming enterprise, including the right to verify daily gross revenues

and income; (iii) minimum guaranteed payments to the tribe, which must have priority over the retirement of development and construction costs; (iv) a ceiling on the repayment of such development and construction costs; and (v) a contract term not exceeding five years and a management fee not exceeding 30% of net revenues (as determined by the NIGC); provided that the NIGC may approve up to a seven-year term and a management fee not to exceed 40% of net revenues if the NIGC is satisfied that the capital investment required, and the income projections for the particular gaming activity require the larger fee and longer term. There is no periodic or ongoing review of approved contracts by the NIGC. Other than an action by the parties, the only post-approval action that could result in possible modification or cancellation of a contract would be as the result of an enforcement action taken by the NIGC based on a violation of the law or an issue affecting suitability.

The IGRA prohibits all forms of Class III gaming unless the tribe has entered into a written agreement with the state that specifically authorizes the types of Class III gaming the tribe may offer (a "tribal-state compact") or the Secretary of the Interior has issued procedures pursuant to which the tribe may conduct Class III gaming. These tribal-state compacts provide, among other things, the manner and extent to which each state will conduct background investigations and certify the suitability of the manager, its officers, directors, and key employees to conduct gaming on Native American lands.

Title 25, Section 81 of the United States Code states that "no agreement or contract with an Indian tribe that encumbers Indian lands for a period of 7 or more years shall be valid unless that agreement or contact bears the approval of the Secretary of the Interior or a designee of the Secretary". An agreement or contract for services relative to Native American lands which fails to conform with the requirements of Section 81 is void and unenforceable. All money or other things of value paid to any person by any Native American or tribe for or on his or their behalf, on account of such services, in excess of any amount approved by the Secretary or his or her authorized representative will be subject to forfeiture. We intend to comply with Section 81 with respect to any other contract with an Indian tribe in the United States.

Native American tribes are sovereign nations with their own governmental systems, which have primary regulatory authority over gaming on land within the tribes' jurisdiction. Therefore, persons engaged in gaming activities on tribal lands, including the Company, are subject to the provisions of tribal ordinances and regulations. Tribal gaming ordinances are subject to review by the NIGC under certain standards established by the IGRA. The NIGC may determine that some or all of the ordinances require amendment, and those additional requirements, including additional licensing requirements, may be imposed on us.

Several bills have been introduced in Congress that would amend the IGRA. Any amendment of the IGRA could change the governmental structure and requirements within which tribes could conduct gaming, and may have an adverse effect on our results of operations or impose additional regulatory or operational burdens. In addition, any amendment to or expiration of a tribal-state compact may have an adverse effect on our results of operations or impose additional regulatory or operational burdens.

*General Gaming Regulations in Other Jurisdictions*

If we become involved in gaming operations in any other jurisdictions, such gaming operations will subject us and certain of our officers, directors, key employees, equity holders and other affiliates ("Regulated Persons") to strict legal and regulatory requirements, including mandatory licensing and approval requirements, suitability requirements, and ongoing regulatory oversight with respect to such gaming operations. Such legal and regulatory requirements and oversight will be administered and exercised by the relevant regulatory agency or agencies in each jurisdiction (the "Regulatory Authorities"). We and the Regulated Persons will need to satisfy the licensing, approval and suitability requirements of each jurisdiction in which we seek to become involved in gaming operations. These requirements vary from jurisdiction to jurisdiction, but generally concern the responsibility, financial stability and character of the owners and managers of gaming operations as well as persons financially interested or involved in gaming operations. In general, the procedures for gaming licensing, approvals and findings of suitability require the Company and each Regulated Person to submit detailed personal history information and financial information to demonstrate that the proposed gaming operation has adequate financial resources generated from suitable sources and adequate procedures to comply with the operating controls and requirements imposed by law and regulation in each jurisdiction, followed by a thorough investigation by such Regulatory Authorities. In general, the Company and each Regulated Person must pay the costs of such investigation. An application for any gaming license, approval or finding of suitability may be denied for any cause that the Regulatory Authorities deem reasonable. Once obtained, licenses and approvals may be subject to periodic renewal and generally are not transferable. The Regulatory Authorities may at any time revoke, suspend, condition, limit or restrict a license, approval or finding of suitability for any cause that they deem reasonable. Fines for violations may be levied against the holder of a license or approval and in certain jurisdictions, gaming operation revenues can be forfeited to the state under certain circumstances. There can be no assurance that we will obtain all of the necessary licenses, approvals and findings of suitability or that our officers, directors, key employees, other affiliates and certain other stockholders will satisfy the suitability requirements in one or more jurisdictions, or that such licenses, approvals and findings of suitability, if obtained, will not be revoked, limited, suspended or not renewed in the future. We may be required to submit detailed financial and operating reports to Regulatory Authorities.

18

Failure by us to obtain, or the loss or suspension of, any necessary licenses, approval or findings of suitability would prevent us from conducting gaming operations in such jurisdiction and possibly in other jurisdictions, which may have an adverse effect on our results of operations.

*Anti-Money Laundering Laws*

Our services are subject to federal anti-money laundering laws, including the Currency and Foreign Transactions Reporting Act of 1970 (the "Bank Secrecy Act"). On an ongoing basis, these laws require us, among other things, to: (i) maintain an anti-money laundering program; (ii) designate and maintain individuals to assure compliance; (iii) train relevant personnel; (iv) identify and report large cash transactions and suspicious activity; (v) screen individuals and entities against sanctions and watch lists and; (vi) independently test for compliance.

Anti-money laundering regulations and regulator expectations thereof are constantly evolving. We implement policies and procedures to reasonably assure compliance with anti-money laundering regulations and continuously monitor our compliance with these regulations. We cannot predict how these future regulations and expectations thereof might affect us. Complying with future regulation could be expensive or require us to change the way we operate our business.

**Environmental Matters**

Although we are currently involved in monitoring activities at a few of our sites due to historical or nearby operations, compliance with federal, state and local laws and regulations relating to the protection of the environment to date has not had a material effect upon our capital expenditures, earnings or competitive position and we do not anticipate any material adverse effects in the future based on the nature of our future operations.

**Employees**

At January 31, 2019, we had approximately 13,800 employees, including employees of our 50% owned properties, but excluding managed properties that are owned by third-party employers. We believe we have good employee relations. None of our owned casino properties is currently subject to any collective bargaining obligations, agreement or similar arrangement with any union, with the exception of Boulder Station, Palace Station and Palms. However, union activists have actively sought to organize employees at certain of our properties in the past, and we believe that such efforts are ongoing at this time. In September 2016, the National Labor Relations Board ("NLRB") certified the Local Joint Executive Board of Las Vegas ("LJEBLV") as the bargaining representative for a bargaining unit of approximately 556 Boulder Station non-gaming employees. In 2017, Palace Station agreed to voluntarily recognize the LJEBLV as the bargaining representative for a bargaining unit of approximately 509 Palace Station non-gaming employees. In November 2017, the NLRB conducted an election at Green Valley Ranch and determined that a majority of valid votes had been cast in favor of the LJEBLV as the bargaining representative for a bargaining unit of approximately 890 Green Valley Ranch non-gaming employees. Green Valley Ranch has filed objections to the election and is not currently bargaining with the LJEBLV. In April 2018, the NLRB conducted an election at Palms and determined that a majority of valid votes has been cast in favor of the LJEBLV as the bargaining representative for a bargaining unit of approximately 900 Palms non-gaming employees. Palms has filed objections to the election and is not currently bargaining with the LJEBLV. The International Union of Operating Engineers, Local 501 ("Local 501"), which represents a group of approximately eight slot technicians at Palms, has also sought to become the bargaining representative for slot technicians, utility technicians and/or slot mechanics at Green Valley Ranch (13 employees), Palace Station (11 employees), Sunset Station (12 employees), Fiesta Henderson (12 employees) and Red Rock (15 employees). While Local 501 received the majority of valid votes cast in separate elections conducted by the NLRB at each of these properties, each property is challenging Local 501's satisfaction of statutory requirements to be certified as the representative of the bargaining units and is not currently negotiating with Local 501. In addition, Teamsters Local Union 986 represents a group of approximately eight Palms warehouse receivers. Finally, Graton Resort also has two collective bargaining agreements that cover approximately 633 employees and 40 employees, respectively, at January 31, 2019.

**Available Information**

We are required to file annual, quarterly and other current reports and information with the Securities and Exchange Commission ("SEC"). Because we submit filings to the SEC electronically, access to this information is available at the SEC's website (www.sec.gov). This site contains reports and other information regarding issuers that file electronically with the SEC.

We also make available, free of charge, at our principal internet address (www.redrockresorts.com) our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and, if applicable, amendments to those reports filed or furnished pursuant to the Exchange Act as soon as reasonably practicable after we electronically file such material with, or furnish it to, the SEC. Other information on our website is expressly not incorporated by reference into this filing.

We have adopted a Code of Business Conduct and Ethics (the "Code of Ethics") that applies to all of our directors, officers (including our principal executive officer and our principal financial officer) and employees. The Code of Ethics and any waivers or amendments to the Code of Ethics are available on the Investor Relations section of our website at www.redrockresorts.com. Printed copies are also available to any person without charge, upon request directed to our Corporate Secretary, 1505 South Pavilion Center Drive, Las Vegas, Nevada 89135.

### Cautionary Statement Regarding Forward-Looking Statements

This Annual Report on Form 10-K contains forward-looking statements. Such statements contain words such as "believe," "estimate," "expect," "intend," "plan," "project," "may," "will," "might," "should," "could," "would," "seek," "pursue," and "anticipate" or the negative or other variation of these or similar words, or may include discussions of strategy or risks and uncertainties. Forward-looking statements in this Annual Report on Form 10-K include, among other things, statements concerning:

- projections of future results of operations or financial condition;

- expectations regarding our business and results of operations of our existing casino properties and prospects for future development;

- expenses and our ability to operate efficiently;

- expectations regarding trends that will affect our market and the gaming industry generally and the impact of those trends on our business and results of operations;

- our ability to comply with the covenants in the agreements governing our outstanding indebtedness;

- our ability to meet our projected debt service obligations, operating expenses, and maintenance capital expenditures;

- expectations regarding the availability of capital resources, including our ability to refinance our outstanding indebtedness;

- our intention to pursue development opportunities and acquisitions and obtain financing for such development and acquisitions; and

- the impact of regulation on our business and our ability to receive and maintain necessary approvals for our existing properties and future projects.

Any forward-looking statement is based upon a number of estimates and assumptions that, while considered reasonable by us, is inherently subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond our control, and are subject to change. Actual results of operations may vary materially from any forward-looking statement made herein. Forward-looking statements should not be regarded as a representation by us or any other person that the forward-looking statements will be achieved. Undue reliance should not be placed on any forward-looking statements. Some of the contingencies and uncertainties to which any forward-looking statement contained herein is subject include, but are not limited to, the following:

- our reliance on the Las Vegas regional market;

- the impact of business conditions, including competitive practices, changes in customer demand and the cyclical nature of the gaming and hospitality business generally, on our business and results of operations;

- the impact of general economic conditions outside our control, including changes in interest rates, consumer confidence and unemployment levels, on our business and results of operations;

- the effects of intense competition that exists in the gaming industry;

- the risk that new gaming licenses or gaming activities, such as internet gaming and the expansion of sports betting outside the state of Nevada, are approved and result in additional competition;

- our substantial outstanding indebtedness and the effect of our significant debt service requirements on our operations and ability to compete;

- the risk that we will not be able to finance our development and investment projects or refinance our outstanding indebtedness;

20

- the impact of extensive regulation from gaming and other government authorities on our ability to operate our business and the risk that regulatory authorities may revoke, suspend, condition or limit our gaming or other licenses, impose substantial fines or take other actions that adversely affect us;

- risks associated with changes to applicable gaming and tax laws that could have a material adverse effect on our financial condition;

- adverse outcomes of legal proceedings and the development of, and changes in, claims or litigation reserves;

- risks associated with development, construction and management of new projects or the expansion of existing facilities, including cost overruns, construction delays, environmental risks and legal or political challenges; and

- risks associated with integrating operations of any acquired companies and developed properties.

For additional contingencies and uncertainties, see *Item 1A. Risk Factors*.

Given these risks and uncertainties, we can give no assurances that results contemplated by any forward-looking statements will in fact occur and therefore caution investors not to place undue reliance on them. We undertake no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. In light of these risks, uncertainties and assumptions, the forward-looking events discussed in this Annual Report on Form 10-K might not occur.

**Market and Industry Data**

Some of the market and industry data contained in this Annual Report on Form 10-K are based on independent industry publications or other publicly available information. Although we believe that these independent sources are reliable, we have not independently verified and cannot assure you as to the accuracy or completeness of this information. As a result, you should be aware that the market and industry data contained herein, and our beliefs and estimates based on such data, may not be reliable.

## ITEM 1A.   RISK FACTORS

*The following risk factors should be considered carefully in addition to the other information contained in this Annual Report on Form 10-K. This Annual Report on Form 10-K contains forward-looking statements that involve risks and uncertainties. Any of these risks and uncertainties could cause our actual results to differ materially from the results contemplated by the forward-looking statements. The following risk factors set forth the risks that we believe are material to our business, financial condition, assets, operations and equity interests. If any of the following risks actually occur, our business, financial condition and results of operations could be materially and adversely affected.*

### Risks Related to Our Business

**We depend on the residents of the Las Vegas regional market and repeat visitors, which subjects us to greater risks than a gaming company with more diverse operations.**

All of our casino properties are dependent upon attracting Las Vegas residents as well as out of town visitors. As a result of our concentration in the Las Vegas regional market, we have a greater degree of exposure to a number of risks than we would have if we had operations outside of the Las Vegas valley. These risks include the following:

- local economic and competitive conditions;

- changes in local and state governmental laws and regulations, including gaming laws and regulations;

- natural and other disasters; and

- a decline in the local population.

Our strategy of growth through master-planning of our casinos for future expansion was developed, in part, based on projected population growth in Las Vegas. There can be no assurance that population growth in Las Vegas will justify future development, additional casinos or expansion of our existing casino properties, which limits our ability to expand our business.

**Our business is sensitive to changes in consumer sentiment and discretionary spending.**

Consumer demand for the offerings of casino hotel properties such as ours is sensitive to factors impacting consumer confidence, including downturns in the economy and other factors that impact discretionary spending on leisure activities. Changes in discretionary consumer spending or consumer preferences brought about by factors such as perceived or actual

general economic conditions and customer confidence in the economy, unemployment, uncertainty and distress in the housing and credit markets, the impact of high energy, fuel, food and healthcare costs, perceived or actual changes in disposable consumer income and wealth, taxes, effects or fears of war and future acts of terrorism or violence could further reduce customer demand for the amenities that we offer and materially and adversely affect our business and results of operations.

Our casinos draw a substantial number of customers from the Las Vegas metropolitan area, as well as nearby geographic areas, including Southern California, Arizona and Utah. While our business is generally affected by the general economic conditions in the United States, our business and results of operations would be particularly negatively impacted if our target markets experience an economic downturn or other adverse conditions.

***We face substantial competition in the gaming industry and we expect that such competition will intensify.***

Our casino properties face competition for customers and employees from all other casinos and hotels in the Las Vegas metropolitan area including, to some degree, each other. In addition, our casino properties face competition from all smaller nonrestricted gaming locations and restricted gaming locations (locations with 15 or fewer slot machines) in the Las Vegas metropolitan area, including those that primarily target the local and repeat visitor markets. Major additions, expansions or enhancements of existing properties or the construction of new properties by competitors could also have a material adverse effect on the business of our casino properties. If our competitors operate more successfully than we do, or if they attract customers away from us as a result of aggressive pricing and promotion or enhanced or expanded properties, we may lose market share and our business could be adversely affected.

To a lesser extent, our casino properties compete with gaming operations in other parts of the state of Nevada and other gaming markets in the United States and in other parts of the world, with state sponsored lotteries, on- and off-track pari-mutuel wagering (a system of betting under which wagers are placed in a pool, management receives a fee from the pool, and the remainder of the pool is split among the winning wagers), card rooms, other forms of legalized gaming and online gaming. The gaming industry also includes dockside casinos, riverboat casinos, racetracks with slot machines and casinos located on Native American land. There is intense competition among companies in the gaming industry, some of which have significantly greater resources than we do. Our properties have encountered additional competition as large-scale Native American gaming on Indian lands, particularly in California, has increased and competition may intensify if more Native American gaming facilities are developed. Several states are currently considering the approval of legalized casino gaming in designated areas and the expansion of existing gaming operations or additional gaming sites. In May 2018, the United States Supreme Court overturned a law prohibiting states from legalizing sports wagering, which has resulted in a substantial expansion of sports betting outside the state of Nevada. In addition, internet gaming has commenced in Nevada, New Jersey, Delaware and Pennsylvania, and legislation approving internet gaming has been proposed by the federal government and other states. Internet gaming and the expansion of legalized casino gaming or legalized sports betting in new or existing jurisdictions and on Native American land could result in additional competition that could adversely affect our operations, particularly to the extent that such gaming is conducted in areas close to our operations.

For further details on competition in the gaming industry, see *Item 1. Business—Competition*.

***Our success depends on key executive officers and personnel.***

Our success depends on the efforts and abilities of our executive officers and other key employees, many of whom have significant experience in the gaming industry, including, but not limited to, Frank J. Fertitta III, our Chairman of the Board and Chief Executive Officer. Competition for qualified personnel in our industry is intense, and it would be difficult for us to find experienced personnel to replace our current executive officers and employees. We believe that a loss of the services of these officers and/or personnel could have a material adverse effect on our results of operations.

***Our results of operations may be adversely impacted by the expiration or termination of our Native American management agreements and we may not be successful in entering into additional management or development agreements for Native American gaming opportunities.***

Our management agreement for Gun Lake Casino expired in February 2018 and our management agreement for Graton Resort expires in November 2020. Our management fees from these agreements were $87.0 million and $118.0 million for the years ended December 31, 2018 and 2017, respectively, which, based on the margins applicable to our management activities, contributed significantly to our net income for such periods. As a result, our results of operations may be adversely impacted by the expiration or termination of such agreements. Although we intend to seek additional development and management contracts with Native American tribes, we cannot be sure that we will be able to enter into any such agreements. The development of Native American gaming facilities is subject to numerous conditions and is frequently subject to protracted

legal challenges. As a result, even if we are able to enter into development and management agreements for Native American gaming projects, we cannot be sure that the projects, including the North Fork project, will be completed or, if completed, that they will generate significant management fees or return on our investment.

> ***Union organization activities could disrupt our business by discouraging patrons from visiting our properties, causing labor disputes or work stoppages, and, if successful, could significantly increase our labor costs.***

In September 2016, the NLRB certified the LJEBLV as the bargaining representative for a bargaining unit of Boulder Station non-gaming employees in the housekeeping, internal maintenance, food and beverage and bell departments. The LJEBLV and Boulder Station have exchanged correspondence and information, and to date have conducted many bargaining sessions. In October 2016, the NLRB concluded an election at Palace Station, and determined that a majority of valid votes had not been cast for LJEBLV. The LJEBLV filed objections to the election, and Palace Station agreed to a rerun election, which was postponed pending disposition of related unfair labor practice charges. Palace Station subsequently agreed to voluntarily recognize the LJEBLV as the bargaining representative for a bargaining unit of Palace Station non-gaming employees in the housekeeping, internal maintenance and food and beverage departments. The LJEBLV and Palace Station have exchanged correspondence and information and to date have conducted many bargaining sessions. In November 2017, the NLRB conducted an election at Green Valley Ranch and determined that a majority of the votes had been cast for LJEBLV, which was seeking to become the bargaining representative for a bargaining unit of Green Valley Ranch non-gaming employees in the housekeeping, internal maintenance, food and beverage and bell departments. Green Valley Ranch filed objections to the election. The objections were overruled, and the LJEBLV was certified as the bargaining representative of the Green Valley Ranch bargaining unit. Green Valley Ranch refused LJEBLV's invitation to bargain; the NLRB ordered Green Valley Ranch to bargain; and Green Valley Ranch is challenging the NLRB's order in the United States Court of Appeals, to test the NLRB's certification. If the challenge is not ultimately sustained, Green Valley Ranch will commence bargaining with the LJEBLV. In April 2018, the NLRB conducted an election at Palms and determined that a majority of the votes had been cast for LJEBLV, which was seeking to become the bargaining representative for a bargaining unit of Palms non-gaming employees in the housekeeping, internal maintenance, food and beverage and bell departments. The LJEBLV was certified as the bargaining representative of the Palms bargaining unit; Palms refused the LJEBLV's invitation to bargain; the NLRB ordered Palms to bargain; and Palms is challenging the NLRB's order in the United States Court of Appeals, to test the NLRB's certification. If the challenge is not ultimately sustained, Palms will commence bargaining with the LJEBLV.

In addition, a bargaining unit of approximately nine Palms slot technicians is represented by Local 501. Palms and Local 501 have been negotiating for more than three years, and have yet to achieve a labor agreement. Local 501 also seeks to represent bargaining units of Palace Station, Green Valley Ranch, Sunset Station, Fiesta Henderson and Red Rock slot technicians. Elections have been conducted by the NLRB at each of Palace Station, Green Valley Ranch, Sunset Station, Fiesta Henderson and Red Rock in connection with which the NLRB determined that a majority of the valid votes were cast for Local 501. Each of Palace Station, Green Valley Ranch, Sunset Station, Fiesta Henderson and Red Rock is challenging Local 501's satisfaction of statutory requirements to be certified as the representative of the bargaining units; if any such challenge is unsuccessful the relevant property will commence bargaining with Local 501.

Also, Teamsters Local Union 986 was certified as the bargaining representative for a bargaining unit of approximately eight Palms warehouse receivers in June 2018. Palms and Teamsters have exchanged correspondence and information, and to date have conducted several bargaining sessions.

Graton Resort is also subject to collective bargaining agreements. None of our other casino properties is currently subject to any bargaining obligation, collective bargaining agreement or similar arrangement with any union. However, union activists have actively sought to organize employees at certain of our casino properties in the past, and we believe that such efforts are ongoing at this time. Accordingly, there can be no assurance that our owned casino properties or existing or future managed properties will not ultimately be unionized. Union organization efforts that may occur in the future could cause disruptions to our casino properties and discourage patrons from visiting our properties and may cause us to incur significant costs, any of which could have a material adverse effect on our results of operations and financial condition. In addition, union activities may result in labor disputes, including work stoppages, which could have a material adverse effect on our business, financial condition and results of operations. Furthermore, collective bargaining involving any of our existing or future properties in the event that they become organized introduces an element of uncertainty into planning our future labor costs, which could have a material adverse effect on the business of our casino properties and our financial condition and results of operations.

*Work stoppages, labor problems and unexpected shutdowns may limit our operational flexibility and negatively impact our future profits.*

Any work stoppage at one or more of our casino properties, including any construction projects which may be undertaken, could require us to expend significant funds to hire replacement workers, and qualified replacement labor may not be available at reasonable costs, if at all. Strikes and work stoppages could also result in adverse media attention or otherwise discourage customers from visiting our casino properties. Strikes and work stoppages involving laborers at any construction project which may be undertaken could result in construction delays and increases in construction costs. As a result, a strike or other work stoppage at one of our casino properties or any construction project could have an adverse effect on the business of our casino properties and our financial condition and results of operations. There can be no assurance that we will not experience a strike or work stoppage at one or more of our casino properties or any construction project in the future.

Any unexpected shutdown of one of our casino properties or any construction project could have an adverse effect on the business of our casino properties and our results of operations. There can be no assurance that we will be adequately prepared for unexpected events, including political or regulatory actions, which may lead to a temporary or permanent shutdown of any of our casino properties.

*The concentration and evolution of the slot machine manufacturing industry or other technological conditions could impose additional costs on us.*

We rely on a variety of hardware and software products to maximize revenue and efficiency in our operations. Technology in the gaming industry is developing rapidly, and we may need to invest substantial amounts to acquire the most current gaming and hotel technology and equipment in order to remain competitive in the markets in which we operate. In addition, we may not be able to successfully implement and/or maintain any acquired technology.

*We are subject to extensive federal, state and local regulation and governmental authorities have significant control over our operations; this control and the cost of compliance or failure to comply with such regulations that govern our operations in any jurisdiction where we operate could have an adverse effect on our business.*

Our ownership and operation of gaming facilities is subject to extensive regulation, including licensing requirements, by the states, counties and cities in which we operate. These laws, regulations and ordinances vary from jurisdiction to jurisdiction, but generally concern the responsibility, financial stability and character of the owners and managers of gaming operations as well as persons financially interested or involved in gaming operations, and we are subject to extensive background investigations and suitability standards in our gaming business. We also will become subject to regulation in any other jurisdiction where we choose to operate in the future. As such, our gaming regulators can require us to disassociate ourselves from suppliers or business partners found unsuitable by the regulators or, alternatively, cease operations in that jurisdiction. In addition, unsuitable activity on our part, on the part of individuals investing in or otherwise involved with us or on the part of our owners, managers or unconsolidated affiliates in any jurisdiction could have a negative effect on our ability to continue operating in other jurisdictions.

Specifically in Nevada, our gaming operations and the ownership of our securities are subject to extensive regulation by the Nevada Gaming Authorities. The Nevada Gaming Authorities have broad authority with respect to licensing and registration of our business entities and individuals investing in or otherwise involved with us. Although we currently are registered with, and currently hold gaming licenses issued by, the Nevada Gaming Authorities, these authorities may, among other things, revoke the gaming license of any corporate entity or the registration of a registered corporation or any entity registered as a holding company of a corporate licensee for violations of gaming regulations.

In addition, the Nevada Gaming Authorities may, under certain conditions, revoke the license or finding of suitability of any officer, director, controlling person, stockholder, noteholder or key employee of a licensed or registered entity. If our gaming licenses were revoked for any reason, the Nevada Gaming Authorities could require the closing of our casinos, which would have a material adverse effect on our business, financial condition, results of operations or cash flows. Compliance costs associated with gaming laws, regulations or licenses are significant. Any change in the laws, regulations or licenses applicable to our business or gaming licenses could require us to make substantial expenditures or could otherwise have a material adverse effect on our business, financial condition, results of operations or cash flows. For a more complete description of the gaming regulatory requirements that have an effect on our business, see *Item 1. Business—Regulation and Licensing.* The regulatory environment in any particular jurisdiction may change in the future and any such change could have a material adverse effect on our results of operations. There can be no assurance that we will be able to obtain new licenses, including any licenses that may be required if we pursue gaming opportunities in jurisdictions where we are not already licensed, or renew any of our existing licenses, or that if such licenses are obtained, that such licenses will not be conditioned, suspended or revoked, and the loss,

denial or non-renewal of any of our licenses could have a material adverse effect on our business, financial condition, results of operations or cash flows.

In addition, we are subject to various gaming taxes, which are subject to possible increase at any time, and federal income tax. Tax laws are dynamic and subject to change as new laws are passed and new interpretations of the law are issued or applied. The United States recently enacted significant tax reform, and certain provisions of the new law may adversely affect us. In addition, governmental tax authorities are increasingly scrutinizing the tax positions of companies. If United States or state tax authorities change applicable tax laws, including laws relating to taxation of gaming operations, our overall taxes could increase, and our business, financial condition or results of operations may be adversely impacted.

Further, we may not make a public offering of our securities without the prior approval of the Nevada Commission if the securities or proceeds therefrom are intended to be used to construct, acquire or finance gaming facilities in Nevada, or to retire or extend obligations incurred for such purposes. We have been approved by the Nevada Commission, subject to certain conditions, to make public offerings of securities for a period of three years beginning on September 22, 2016. The Shelf Approval may be rescinded for good cause without prior notice upon the issuance of an interlocutory stop order by the Chair of the Nevada Board. If the Shelf Approval is rescinded for any reason, it could adversely impact our capital structure and liquidity and limit our flexibility in planning for, or reacting to, changes in our business and industry. The Shelf Approval does not constitute a finding, recommendation or approval by any of the Nevada Gaming Authorities as to the accuracy or adequacy of any offering memorandum or the investment merits of the securities offered thereby. Any representation to the contrary is unlawful.

We also deal with significant amounts of cash in our operations and are subject to various reporting and anti-money laundering regulations. We are subject to regulation under the Bank Secrecy Act, which, among other things, requires us to report to the Financial Crimes Enforcement Network ("FinCEN") any currency transactions in excess of $10,000 that occur within a 24-hour gaming day, including identification of the individual transacting the currency. We are also required to report certain suspicious activity, including any transactions aggregating to $5,000 or more, where we know, suspect or have reason to suspect such transactions involve funds from illegal activity or are intended to evade federal regulations or avoid reporting requirements. In addition, under the Bank Secrecy Act we are subject to various other rules and regulations involving reporting and recordkeeping. Our compliance with the Bank Secrecy Act is subject to periodic audits by FinCEN, and we may be required to pay substantial penalties if we fail to comply with applicable regulations. Any violations of anti-money laundering laws or regulations by any of our properties could have an adverse effect on our financial condition, results of operations or cash flows. Such laws and regulations could change or could be interpreted differently in the future, or new laws and regulations could be enacted.

***We are subject to a variety of federal, state and local laws and regulations relating to the protection of the environment and human health and safety, which could materially affect our business, financial condition, results of operations and cash flows.***

We are subject to federal, state and local laws and regulations relating to the protection of the environment and human health and safety, including those relating to air emissions, water discharges and remediation of contamination. Such laws and regulations require us to obtain, maintain and renew environmental operating or construction permits or approvals particularly in connection with our development activities. Certain environmental laws can impose joint and several liability without regard to fault on responsible parties, including past and present owners and operators of sites, related to the investigation or remediation of sites at which hazardous wastes or materials were disposed or released. Private parties may also bring claims arising from the presence of hazardous materials on a site or exposure to such materials. We are currently involved in monitoring activities at a few of our sites due to historical or nearby operations. Increasingly stringent environmental laws, regulations or standards may make compliance with such requirements more difficult or costly or otherwise adversely affect our operations. Failure to comply with environmental laws or regulations, or any liabilities or claims arising under such laws or regulations, could require us to incur potentially significant costs or sanctions, including fines, penalties or cessation of operations, or otherwise adversely affect our business, financial condition and results of operations.

***Rising operating and other costs at our casino properties could have a negative impact on our business.***

The operating expenses associated with our casino properties could increase due to, among other reasons, the following factors:

- changes in the federal, state or local regulations, including state and local gaming regulations or taxes, or the way such regulations are administered could impose additional restrictions or increase our operating costs;

- aggressive marketing and promotional campaigns by our competitors for an extended period of time could force us to increase our expenditures for marketing and promotional campaigns in order to maintain our existing customer base and attract new customers;

- as our properties age, we may need to increase our expenditures for repairs, maintenance, and to replace equipment necessary to operate our business compared to amounts that we have spent historically;

- our reliance on slot play revenues and any additional costs imposed on us from vendors;

- availability and cost of the many products and services we provide our customers, including food and beverage, retail items, entertainment, hotel rooms, and spa services;

- availability and costs associated with insurance;

- increases in costs of labor and employee benefits, including due to potential unionization of our employees;

- increases in the prices of electricity, natural gas and other forms of energy; and

- water shortages or other increases in the cost of water.

If our operating expenses increase without any offsetting increase in our revenues, our results of operations would suffer.

***We may incur losses that are not adequately covered by insurance, which may harm our results of operations. In addition, our insurance costs may increase and we may not be able to obtain similar insurance coverage in the future.***

Although we maintain insurance that is customary and appropriate for our business, each of our insurance policies is subject to certain exclusions. Our property insurance coverage is in an amount that may be significantly less than the expected replacement cost of rebuilding our facilities in the event of a total loss. The lack of adequate insurance for certain types or levels of risk could expose us to significant losses in the event of a catastrophe. In addition to the damage caused to our properties by a casualty loss, we may suffer business disruption or be subject to claims by third parties that may be injured or harmed. While we carry general liability insurance and business interruption insurance, there can be no assurance that insurance will be available or adequate to cover all loss and damage to which our business or our assets might be subjected. Certain casualty events, such as labor strikes, nuclear events, loss of income due to terrorism, deterioration or corrosion, insect or animal damage and pollution, may not be covered under our policies. Any losses we incur that are not adequately covered by insurance may decrease our future operating income, require us to fund replacements or repairs for destroyed property and reduce the funds available for payments of our obligations.

We renew our insurance policies on an annual basis. To the extent that the cost of insurance coverage increases, we may be required to reduce our policy limits or agree to exclusions from our coverage.

***We are subject to litigation in the ordinary course of our business. An adverse determination with respect to any such disputed matter could result in substantial losses.***

We are, from time to time, during the ordinary course of operating our businesses, subject to various litigation claims and legal disputes, including contract, lease, employment and regulatory claims as well as claims made by visitors to our properties. There are also litigation risks inherent in any construction or development of any of our properties. Certain litigation claims may not be covered entirely or at all by our insurance policies or our insurance carriers may seek to deny coverage. In addition, litigation claims can be expensive to defend and may divert our attention from the operations of our businesses. Further, litigation involving visitors to our properties, even if without merit, can attract adverse media attention. As a result, litigation can have a material adverse effect on our businesses and, because we cannot predict the outcome of any action, it is possible that adverse judgments or settlements could significantly reduce our earnings or result in losses.

***We may incur delays and budget overruns with respect to current or future construction projects. Any such delays or cost overruns may have a material adverse effect on our operating results.***

We evaluate expansion opportunities as they become available, and in the future we may construct new facilities or enhance our existing properties by constructing additional facilities.

Such construction projects entail significant risks, including the following:

- shortages of material or skilled labor;

- unforeseen engineering, environmental or geological problems;

- work stoppages;

- weather interference;

- floods;

- unanticipated cost increases; and

- legal or political challenges;

any of which can give rise to delays or cost overruns.

The anticipated costs and construction periods are based upon budgets, conceptual design documents and construction schedule estimates prepared by us in consultation with our architects and contractors. Construction, equipment, staffing requirements, problems or difficulties in obtaining and maintaining any of the requisite licenses, permits, allocations or authorizations from regulatory authorities can increase the cost or delay the construction or opening of each of the proposed facilities or otherwise affect the project's planned design and features. We cannot be sure that we will not exceed the budgeted costs of these projects, that the projects will commence operations within the contemplated time frame, if at all, or that we will receive the return on investment that we expect from such projects. Budget overruns and delays with respect to expansion and development projects could have a material adverse impact on our results of operations.

***We may pursue new gaming acquisition and development opportunities and may not be able to recover our investment or successfully expand to additional locations.***

We will regularly evaluate and may pursue new gaming acquisition and development opportunities in existing and emerging jurisdictions. These opportunities may take the form of joint ventures. To the extent that we decide to pursue any new gaming acquisition or development opportunities, our ability to benefit from such investments will depend upon a number of factors including:

- our ability to identify and acquire attractive acquisition opportunities and development sites;

- our ability to secure required federal, state and local licenses, permits and approvals, which in some jurisdictions are limited in number;

- certain political factors, such as local support or opposition to development of new gaming facilities or legalizing casino gaming in designated areas;

- the availability of adequate financing on acceptable terms (including waivers of restrictions in existing credit arrangements); and

- our ability to identify and develop satisfactory relationships with joint venture partners.

Most of these factors are beyond our control. Therefore, we cannot be sure that we will be able to recover our investment in any new gaming development opportunities or acquired facilities, or successfully expand to additional locations.

We have invested, and we will likely continue to invest, in real property in connection with the pursuit of expansion opportunities. These investments are subject to the risks generally incident to the ownership of real property, including:

- changes in economic conditions;

- environmental risks;

- governmental rules and fiscal policies; and

- other circumstances over which we may have little or no control.

The development of such properties will also be subject to restrictions under our credit agreements. We cannot be sure that we will be able to recover our investment in any such properties or be able to prevent incurring investment losses.

***We may experience difficulty integrating operations of any acquired companies and developed properties and managing our overall growth which could have a material adverse effect on our operating results.***

We may not be able to effectively manage our properties, proposed projects with Native American tribes and any future acquired companies or developed properties, or realize any of the anticipated benefits of the acquisitions, including streamlining operations or gaining efficiencies from the elimination of duplicative functions. The management of Native American gaming facilities requires extensive and continued dedication of management resources which may divert management resources and attention from other business. In addition, to the extent we pursue expansion and acquisition opportunities, we would face significant challenges in managing our expansion projects and any other gaming operations we may acquire in the future. Failure to manage our growth effectively could have a material adverse effect on our operating results.

***We require significant capital to fund capital expenditures, pursue proposed development, expansion or acquisition opportunities or refinance our indebtedness.***

Our businesses are capital intensive. For our casino properties to remain attractive and competitive we must periodically invest significant capital to keep the properties well-maintained, modernized and refurbished. Similarly, future construction and development projects, including but not limited to, the proposed North Fork Project, and acquisitions of other gaming operations could require significant additional capital. We rely on earnings and cash flow from operations to finance our business, capital expenditures, development, expansion and acquisitions and, to the extent that we cannot fund such expenditures from cash generated by operations, funds must be borrowed or otherwise obtained. We will also be required in the future to refinance our outstanding debt. Our ability to effectively operate and grow our business may be constrained if we are unable to borrow additional capital or refinance existing borrowings on reasonable terms.

We may be unable to generate sufficient revenues and cash flows to service our debt obligations as they come due, finance capital expenditures and meet our operational needs.

If we are unable to access sufficient capital from operations or borrowings, we may be precluded from:

- maintaining or enhancing our properties;

- taking advantage of future opportunities;

- growing our business; or

- responding to competitive pressures.

Further, our failure to generate sufficient revenues and cash flows could lead to cash flow and working capital constraints, which may require us to seek additional working capital. We may not be able to obtain such working capital when it is required. Further, even if we were able to obtain additional working capital, it may only be available on unfavorable terms. For example, we may be required to incur additional debt, and servicing the payments on such debt could adversely affect our results of operations and financial condition. Limited liquidity and working capital may also restrict our ability to maintain and update our casino properties, which could put us at a competitive disadvantage to casinos offering more modern and better maintained facilities.

If we do not have access to credit or capital markets at desirable times or at rates that we would consider acceptable, the lack of such funding could have a material adverse effect on our business, results of operations and financial condition and our ability to service our indebtedness.

***We may incur impairments to goodwill, indefinite-lived intangible assets, or long-lived assets which could negatively affect our results of operations.***

We test our goodwill and indefinite-lived intangible assets for impairment during the fourth quarter of each year or when a triggering event occurs, and we test other long-lived assets for impairment whenever changes in circumstances indicate that the carrying amount of an asset may not be recoverable. If we do not achieve our projected cash flow estimates related to

such assets, we may be required to record an impairment charge, which could have a material adverse impact on our financial statements. We have recognized significant impairment charges in the past as a result of a number of factors including negative industry and economic trends, reduced estimates of future cash flows, and slower than expected growth. We could be required to recognize additional impairment charges, which could have a material adverse effect on our results of operations if events that negatively impact our business should occur in the future.

*Any failure to protect our trademarks could have a negative impact on the value of our brand names and adversely affect our business.*

The development of intellectual property is part of our overall business strategy, and we regard our intellectual property to be an important element of our success. While our business as a whole is not substantially dependent on any one trademark or combination of several of our trademarks or other intellectual property, we seek to establish and maintain our proprietary rights in our business operations through the use of trademarks. Despite our efforts to protect our proprietary rights, parties may infringe our trademarks and our rights may be invalidated or unenforceable. Monitoring the unauthorized use of our intellectual property is difficult. Litigation may be necessary to enforce our intellectual property rights or to determine the validity and scope of the proprietary rights of others. Litigation of this type could result in substantial costs and diversion of resources. We cannot assure you that all of the steps we have taken to protect our trademarks will be adequate to prevent imitation of our trademarks by others. The unauthorized use or reproduction of our trademarks could diminish the value of our brand and its market acceptance, competitive advantages or goodwill, which could adversely affect our business.

*Shortages or increases in prices of energy or water may adversely affect our business and our results of operations.*

Our casinos and hotels use significant amounts of electricity, natural gas, other forms of energy and water. The southwest United States is currently experiencing a drought, which may result in governmentally-imposed restrictions on water use or increases in the cost of water. Any such restrictions on use of water or increases in cost could adversely impact our business and our results of operations. While no shortages of energy have been experienced recently and gasoline prices are currently lower than historical periods, energy shortages or substantial increases in the cost of electricity and gasoline in the United States have negatively affected our operating results in the past. Increased gasoline prices may cause reduced visitation to our properties because of travel costs or reductions in disposable income of our guests and increased energy prices directly impact our operating costs. Any such increases in prices could negatively affect our business in the future.

*Win rates for our gaming operations depend on a variety of factors, some beyond our control, and the winnings of our gaming customers could exceed our casino winnings.*

The gaming industry is characterized by an element of chance. In addition to the element of chance, win rates are also affected by other factors, including players' skill and experience, the mix of games played, the financial resources of players, the spread of table limits, the volume of bets played and the amount of time played. Our gaming profits are mainly derived from the difference between our casino winnings and the casino winnings of our gaming customers. Since there is an inherent element of chance in the gaming industry, we do not have full control over our winnings or the winnings of our gaming customers. If the winnings of our gaming customers exceed our winnings, we may record a loss from our gaming operations, which could have a material adverse effect on our business, financial condition, results of operations and cash flows.

*We face the risk of fraud and cheating.*

Our gaming customers may attempt or commit fraud or cheat in order to increase winnings. Acts of fraud or cheating could involve the use of counterfeit chips or other tactics, possibly in collusion with our employees. Internal acts of cheating could also be conducted by employees through collusion with dealers, surveillance staff, floor managers or other casino or gaming area staff. Failure to discover such acts or schemes in a timely manner could result in losses in our gaming operations. In addition, negative publicity related to such schemes could have an adverse effect on our reputation, potentially causing a material adverse effect on our business, financial condition, results of operations and cash flows.

*Failure to maintain the integrity of our internal or customer data, including defending our information systems against hacking, security breaches, computer malware, cyber-attacks and similar technology exploitation risks, could have an adverse effect on our results of operations and cash flows, and/or subject us to costs, fines or lawsuits.*

Our business requires the collection and retention of large volumes of data about our customers, employees, suppliers and business partners, including customer credit card numbers and other personally identifiable information of our customers and employees, in various information systems that we maintain and in those maintained by third-party service providers. The integrity and protection of that data is important to our business and is subject to privacy laws enacted by various jurisdictions. The regulatory environment and the requirements imposed on us by the payment card industry surrounding information,

security and privacy are evolving and may be inconsistent. Our systems may be unable to meet changing regulatory and payment card industry requirements and employee and customer expectations, or may require significant additional investments or time in order to do so. Our information systems and records, including those maintained by service providers, may be subject to cyber-attacks, security breaches, system failures, viruses, operator error or inadvertent releases of data. Cyber-attacks and security breaches may include, but are not limited to, attempts to access information, including customer and company information, computer malware such as viruses, denial of service, ransomware attacks that encrypt, exfiltrate, or otherwise render data unusable or unavailable in an effort to extort money or other consideration as a condition to purportedly returning the data to a usable form, operator errors or misuse, or inadvertent releases of data, and other forms of electronic security breaches. The steps we have taken to mitigate these risks may not be sufficient and a significant theft, loss or fraudulent use of customer, employee or company data maintained by us or by a service provider could have an adverse effect on our reputation and employee relationships and could result in remedial and other expenses, fines or litigation. A breach in the security of our information systems or those of our service providers could lead to an interruption in the operation of our systems or loss, disclosure or misappropriation of our business information or other unintended consequences. If any of these risks materialize, they could have an adverse effect on our business, results of operations and cash flows.

### Risks Related to our Indebtedness

***We have a substantial amount of indebtedness, which could have a material adverse effect on our financial condition and our ability to obtain financing in the future and to react to changes in our business.***

We have a substantial amount of debt, which requires significant principal and interest payments. As of December 31, 2018, the principal amount of our outstanding indebtedness totaled approximately $2.91 billion and we had $613.9 million of undrawn availability under our Revolving Credit Facility (after giving effect to the increase of our borrowing capacity under the Revolving Credit Facility in February 2019), which is net of $245.0 million in outstanding borrowings and the issuance of approximately $37.1 million of letters of credit and similar obligations. Our ability to make interest payments on our debt will be significantly impacted by general economic, financial, competitive and other factors beyond our control.

Our substantial indebtedness could:

- make it more difficult for us to satisfy our obligations under our senior notes and senior secured credit facilities and other indebtedness;

- increase our vulnerability to adverse economic and general industry conditions, including interest rate fluctuations, because a portion of our borrowings, including those under our senior secured credit facilities, are and will continue to be at variable rates of interest;

- require us to dedicate a substantial portion of our cash flow from operations to payments on our debt, which would reduce the availability of our cash flow from operations to fund working capital, capital expenditures or other general corporate purposes;

- limit our flexibility in planning for, or reacting to, changes in our business and industry;

- place us at a disadvantage compared to competitors that may have proportionately less debt;

- limit our ability to obtain additional debt or equity financing due to applicable financial and restrictive covenants in our debt agreements; and

- cause us to incur higher interest expense in the event of increases in interest rates on our borrowings that have variable interest rates or if we refinance existing debt at higher interest rates.

***Our indebtedness imposes restrictive financial and operating covenants that limit our flexibility in operating our business and may adversely affect our ability to compete or engage in favorable business or financing activities.***

Our credit agreements and the indenture governing our senior notes contain a number of covenants that impose significant operating and financial restrictions on us, including certain limitations on our and our subsidiaries' ability to, among other things:

- incur additional debt or issue certain preferred units;

- pay dividends on or make certain redemptions, repurchases or distributions in respect of LLC Units issued by Station Holdco or make other restricted payments;

- make certain investments;

- sell certain assets;

- create liens on certain assets;

- consolidate, merge, sell or otherwise dispose of all or substantially all of our assets; and

- enter into certain transactions with our affiliates.

In addition, our credit agreements contain certain financial covenants, including maintenance of a minimum interest coverage ratio and adherence to a maximum total leverage ratio.

As a result of these covenants and restrictions, we are limited in how we conduct our business and we may be unable to raise additional debt or equity financing to compete effectively or to take advantage of new business opportunities. The restrictions caused by such covenants could also place us at a competitive disadvantage to less leveraged competitors. Our ability to comply with covenants and restrictions contained in the agreements governing our indebtedness also may be affected by general economic conditions, industry conditions and other events beyond our control. As a result, we cannot assure you that we will be able to comply with these covenants and restrictions.

A failure to comply with the covenants contained in the credit agreements, the indenture governing our senior notes, or other indebtedness that we may incur in the future could result in an event of default, which, if not cured or waived, could result in the acceleration of the indebtedness and have a material adverse effect on our business, financial condition and results of operations. In the event of any default under any of our credit agreements, the lenders thereunder:

- will not be required to lend any additional amount to us;

- could elect to declare all borrowings outstanding, together with accrued and unpaid interest and fees, to be due and payable and terminate all commitments to extend future credit; and

- could require us to apply all of our available cash to repay these borrowings.

If we are unable to comply with the covenants in the agreements governing our indebtedness or to pay our debts, the lenders under our credit agreements could proceed against the collateral granted to them to secure that indebtedness, which includes substantially all of our assets, and the holders of our senior notes would be entitled to exercise remedies under our indenture. If our indebtedness were to be accelerated, there can be no assurance that our assets would be sufficient to repay such indebtedness in full. Moreover, in the event that such indebtedness is accelerated, there can be no assurance that we will be able to refinance it on acceptable terms, or at all.

***Despite our current indebtedness levels, we and our subsidiaries may still incur significant additional indebtedness, which could increase the risks associated with our substantial indebtedness.***

We and our subsidiaries may be able to incur substantial additional indebtedness, including additional secured indebtedness, in the future. The terms of the documents governing our indebtedness restrict, but do not completely prohibit, us from doing so. As of December 31, 2018, we had $613.9 million of undrawn availability under our Revolving Credit Facility (after giving effect to the increase of our borrowing capacity under the Revolving Credit Facility in February 2019), which is net of $245.0 million in outstanding borrowings and the issuance of approximately $37.1 million of letters of credit and similar obligations. In addition, the indenture governing our senior notes allows us to issue additional notes under certain circumstances. The indenture also allows us to incur certain other additional secured and unsecured debt. Further, the indenture does not prevent us from incurring other liabilities that do not constitute indebtedness. If new debt or other liabilities are added to our current debt levels, the related risks that we and our subsidiaries now face could intensify.

***We may not be able to generate sufficient cash to service all of our indebtedness, and may be forced to take other actions to satisfy our obligations under our indebtedness, which may not be successful.***

Our ability to make scheduled payments on or to refinance our debt obligations depends on our financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business, legislative, regulatory and other factors beyond our control. We cannot assure you that we will maintain a level of cash flows from operating activities sufficient to permit us to pay the principal, premium, if any, and interest on our indebtedness.

If our cash flows and capital resources are insufficient to fund our debt service obligations, we may be forced to reduce or delay investments and capital expenditures, or to sell assets, seek additional capital or restructure or refinance our

indebtedness. These alternative measures may not be successful and may not permit us to meet our scheduled debt service obligations. If our operating results and available cash are insufficient to meet our debt service obligations, we could face substantial liquidity problems and might be required to dispose of significant assets or operations to meet our debt service and other obligations. We may not be able to consummate those dispositions or to obtain the proceeds that we could realize from them, and these proceeds may not be adequate to meet any debt service obligations then due. Additionally, the documents governing our indebtedness limit the use of the proceeds from any disposition; as a result, we may not be allowed, under these documents, to use proceeds from such dispositions to satisfy all current debt service obligations.

***Our substantial indebtedness exposes us to significant interest expense increases.***

As of December 31, 2018, approximately $2.3 billion, or 80%, of our borrowings were at variable interest rates and expose us to interest rate risk. If interest rates increase, our debt service obligations on the variable rate indebtedness would increase even though the amount borrowed remained the same, and our net income would decrease. Assuming our consolidated variable interest rate indebtedness outstanding at December 31, 2018 remains the same, an increase of 1% in the interest rates payable on our variable rate indebtedness would increase our annual estimated debt-service requirements by approximately $7.9 million, after giving effect to our interest rate swaps. Accordingly, an increase in interest rates from current levels could cause our annual debt-service obligations to increase significantly.

### Risks Related to Our Structure and Organization

***Red Rock's only material asset is its interest in Station Holdco and Station LLC. Accordingly, it is dependent upon distributions from Station Holdco to make payments under the tax receivable agreement, pay dividends, if any, and pay taxes and other expenses.***

Red Rock is a holding company. Its only assets are its ownership of LLC Units and its voting interest in Station LLC, other than cash and tax-related assets and liabilities. Red Rock has no independent means of generating revenue. In connection with the IPO, Red Rock entered into a tax receivable agreement ("TRA") with certain pre-IPO owners of Station Holdco. Red Rock intends to cause Station Holdco to make distributions to its members, including us, in an amount sufficient to cover all applicable taxes at assumed tax rates, payments under the TRA and dividends, if any, declared by it. To the extent that Red Rock needs funds, and Station Holdco is restricted from making such distributions pursuant to the terms of the agreements governing its debt or under applicable law or regulation, or is otherwise unable to provide such funds, it could materially and adversely affect Red Rock's liquidity and financial condition. The earnings from, or other available assets of, Station Holdco may not be sufficient to pay dividends or make distributions or loans to Red Rock to enable it to pay taxes and other expenses and make payments under the TRA or pay dividends on the Class A common stock.

Payments of dividends, if any, will be at the discretion of our board of directors after taking into account various factors, including our business, operating results and financial condition, current and anticipated cash needs, plans for expansion and any legal or contractual limitations on our ability to pay dividends. Our credit facility and the indenture governing our senior notes include, and any financing arrangement that we enter into in the future may include, restrictive covenants that limit our ability to pay dividends and make distributions. In addition, Station Holdco is generally prohibited under Delaware law from making a distribution to a member to the extent that, at the time of the distribution, after giving effect to the distribution, liabilities of Station Holdco (with certain exceptions) exceed the fair value of its assets. Subsidiaries of Station Holdco are generally subject to similar legal limitations on their ability to make distributions to Station Holdco.

***Our Principal Equity Holders have control over our management and affairs, and their interests may differ from our interests or those of our other stockholders.***

Each outstanding share of Class B common stock that is held by a holder that, together with its affiliates, owned LLC Units representing at least 30% of the outstanding LLC Units immediately following the IPO and, at the applicable record date, maintains direct or indirect beneficial ownership of at least 10% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the LLC Units were exchanged for Class A common stock) is entitled to ten votes, and each other outstanding share of Class B common stock is entitled to one vote. As a result, Fertitta Family Entities held 86.4% of the combined voting power of Red Rock as of December 31, 2018. Due to their ownership, the Fertitta Family Entities have the power to control our management and affairs, including the power to:

- elect all of our directors;

- agree to sell or otherwise transfer a controlling stake in our Company, which may result in the acquisition of effective control of our Company by a third party; and

- determine the outcome of substantially all actions requiring stockholder approval, including transactions with related parties, corporate reorganizations, acquisitions and dispositions of assets and dividends.

The interests of the Fertitta Family Entities may differ from our interests or those of our other stockholders and the concentration of control in the Fertitta Family Entities will limit other stockholders' ability to influence corporate matters. The concentration of ownership and voting power of the Fertitta Family Entities may also prevent or cause a change of control of our Company or a change in the composition of our board of directors and will make many transactions impossible without the support of the Fertitta Family Entities, even if such events are in the best interests of our other stockholders. As a result of the concentration of voting power among the Fertitta Family Entities, we may take actions that our other stockholders do not view as beneficial, which may adversely affect our results of operations and financial condition and cause the value of your investment in our Class A common stock to decline.

In addition, because the Principal Equity Holders hold their ownership interest in part of our business directly and/or indirectly through Station Holdco, rather than through Red Rock, the public company, these Continuing Owners may have conflicting interests with holders of shares of our Class A common stock. For example, if Station Holdco makes distributions to Red Rock, our Continuing Owners will also be entitled to receive distributions pro rata in accordance with the percentages of their respective LLC Units and their preferences as to the timing and amount of any such distributions may differ from those of our public shareholders. Our Continuing Owners may also have different tax positions from us which could influence their decisions regarding whether and when to dispose of assets, especially in light of the existence of the TRA, whether and when to incur new, or refinance existing, indebtedness, and whether and when Red Rock should terminate the TRA and accelerate its obligations thereunder. The structuring of future transactions may take into consideration these Continuing Owners' tax or other considerations even where no similar benefit would accrue to us. For example, a disposition of real estate or other assets in a taxable transaction could accelerate then-existing obligations under the TRA, which may result in differing incentives between the Principal Equity Holders and Red Rock with respect to such a transaction. For more information on our TRA and the reorganization of our corporate structure, see "Tax Receivable Agreement with Related Parties" within Note 2 to the Consolidated Financial Statements.

***We are a "controlled company" within the meaning of the rules of NASDAQ and, as a result, qualify for, and intend to rely on, exemptions from certain corporate governance requirements. You will not have the same protections afforded to stockholders of companies that are subject to such requirements.***

The Fertitta Family Entities hold more than 50% of the voting power of our shares eligible to vote. As a result, we are a "controlled company" under the rules of NASDAQ. Under these rules, a company of which more than 50% of the voting power in the election of directors is held by an individual, group or another company is a "controlled company" and may elect not to comply with certain corporate governance requirements, including the requirements that (i) a majority of the board of directors consist of independent directors and (ii) that the board of directors have compensation and nominating and corporate governance committees composed entirely of independent directors. Although a majority of the members of our board of directors are independent and our compensation and nominating and corporate governance committees are comprised entirely of independent directors, in the future we may elect not to comply with certain corporate governance requirements that are not applicable to controlled companies.

***We will be required to pay our Continuing Owners for certain tax benefits we may claim arising in connection with the reorganization transactions, and the amounts we may pay could be substantial.***

The TRA with our Continuing Owners provides for the payment by Red Rock to our Continuing Owners of 85% of the amount of benefits, if any, that Red Rock realizes (or is deemed to realize in the case of an early termination payment by us, a change in control or a material breach by us of our obligations under the TRA, as discussed below) as a result of (i) increases in tax basis resulting from our purchases or exchanges of LLC Units and (ii) certain other tax benefits related to our entering into the TRA, including tax benefits attributable to payments that we are required to make under the TRA. See "Tax Receivable Agreement with Related Parties" within Note 2 to the Consolidated Financial Statements.

Any increases in tax basis, as well as the amount and timing of any payments under the TRA, cannot reliably be predicted at this time. The amount of any such increases and payments will vary depending upon a number of factors, including, but not limited to, the timing of exchanges, the price of our Class A common stock at the time of the exchanges, the amount, character and timing of our income and the tax rates then applicable.

The payments that we may make under the TRA could be substantial. At December 31, 2018 and 2017, our liability under the TRA with respect to previously consummated transactions was $24.9 million and $141.9 million, respectively. The decrease in the TRA liability from 2017 to 2018 was primarily attributable to payments made to two pre-IPO owners of Station

Holdco in exchange for their rights under the TRA, and our obligation was significantly reduced in 2017 as a result of federal tax reform legislation enacted in December 2017. Assuming no further material changes in the relevant tax law and based on our current operating plan and other assumptions, including our estimate of the tax basis of our assets as of December 31, 2018 and that Red Rock earns sufficient taxable income to realize all the tax benefits that are subject to the TRA, we expect to make payments under the TRA over a period of approximately 38 years. The foregoing numbers are merely estimates that are based on current assumptions. The amount of actual payments could differ materially.

Future payments to our Continuing Owners in respect of any subsequent exchanges of LLC Units for Class A common stock would be in addition to these amounts and are expected to be substantial. It is possible that future transactions or events could increase or decrease the actual tax benefits realized and the corresponding TRA payments. There may be a material negative effect on our liquidity if, as a result of timing discrepancies or otherwise (as described below), the payments under the TRA exceed the actual benefits we realize in respect of the tax attributes subject to the TRA and/or distributions to Red Rock by Station Holdco are not sufficient to permit Red Rock to make payments under the TRA after it has paid taxes.

*In certain cases, payments under the TRA may be accelerated and/or significantly exceed the actual benefits, if any, we realize in respect of the tax attributes subject to the TRA.*

The TRA provides that in the event that we exercise our right to early termination of the TRA, there is a change in control or a material breach by us of our obligations under the TRA, the TRA will terminate, and we will be required to make a payment equal to the present value of future payments under the TRA, which payment would be based on certain assumptions, including those relating to our future taxable income, and may substantially exceed the actual benefits, if any, we realize in respect of the tax attributes subject to the TRA. In these situations, our obligations under the TRA could have a substantial negative impact on our liquidity, and there can be no assurance that we will be able to finance our obligations under the TRA. In addition, these obligations could have the effect of delaying, deferring or preventing certain mergers, asset sales, other forms of business combinations or other changes of control, in particular in circumstances where our Principal Equity Holders have interests that differ from those of other shareholders. Because our Principal Equity Holders have a controlling ownership interest in the Company, they are able to control the outcome of votes on all matters requiring approval by our stockholders. Accordingly, actions that affect such obligations under the TRA may be taken even if other stockholders oppose them.

Payments under the TRA will be based on the tax reporting positions that we determine. Although we are not aware of any material issue that would cause the Internal Revenue Service (the "IRS") to challenge a tax basis increase, we will not be reimbursed for any payments previously made under the TRA (although we would reduce future amounts otherwise payable under such TRA). No assurance can be given that the IRS will agree with the allocation of value among our assets. As a result, in certain circumstances, payments could be made under the TRA in excess of the benefit that we actually realize in respect of the increases in tax basis resulting from our purchases or exchanges of LLC Units and certain other tax benefits related to our entering into the TRA.

*We may not be able to realize all or a portion of the tax benefits that are expected to result from the exchanges of LLC Units and payments made under the TRA itself.*

Our ability to benefit from any depreciation or amortization deductions or to realize other tax benefits that we currently expect to be available as a result of the increases in tax basis created by the exchanges of LLC Units, including exchanges associated with the sale of the shares of Class A common stock offered hereby, and our ability to realize certain other tax benefits attributable to payments under the TRA itself, depend on a number of assumptions, including that we earn sufficient taxable income each year during the period over which such deductions are available and that there are no adverse changes in applicable law or regulations. If our actual taxable income is insufficient and/or there are adverse changes in applicable law or regulations, we may be unable to realize all or a portion of these expected benefits and our cash flows and stockholders' equity could be negatively affected. However, absent a change in control or other termination event with respect to the TRA, we will generally not be required to make payments under that agreement with respect to projected tax benefits that we do not actually realize, as reported on our tax return. See "Tax Receivable Agreement with Related Parties" within Note 2 to the Consolidated Financial Statements.

### Risks Related to Ownership of Our Class A Common Stock

*The share price for our Class A common stock may fluctuate significantly.*

The market price of our Class A common stock may be significantly affected by factors such as quarterly variations in our results of operations, changes in government regulations, general market conditions specific to the gaming industry, changes in interest rates, changes in general economic and political conditions, volatility in the financial markets, threatened or actual litigation or government investigations, the addition or departure of key personnel, actions taken by our shareholders, including the sale or other disposition of their shares of our Class A common stock, differences between our actual financial and operating results and those expected by investors and analysts and changes in analysts' recommendations or projections. These and other factors may lower the market price of our Class A common stock, even though they may or may not affect our actual operating performance.

Furthermore, in recent years the stock market has experienced significant price and volume fluctuations. This volatility has had a significant impact on the market price of securities issued by many companies, including companies in our industry. The changes frequently appear to occur without regard to the operating performance of the affected companies. Hence, the price of our Class A common stock could fluctuate based upon factors that have little or nothing to do with us, and these fluctuations could materially reduce the price of our Class A common stock and materially affect the value of your investment.

*The market price of our Class A common stock could decline upon the exchange of LLC Units by our Continuing Owners.*

Approximately 47 million LLC Units of Station Holdco are owned by our Continuing Owners, or 40.2% of Red Rock Class A common stock on a fully exchanged basis, and may be sold in the future. In addition, under the Exchange Agreement, each holder of shares our Class B common stock is entitled to exchange its LLC Units for shares of our Class A common stock, as described under "Tax Receivable Agreement with Related Parties" within Note 2 to the Consolidated Financial Statements.

The market price of our Class A common stock could decline as a result of sales of a large number of shares of our Class A common stock eligible for future sale, or the perception that such sales could occur. These sales, or the possibility that these sales may occur, may make it more difficult for holders of our Class A common stock to sell such stock in the future at a time and at a price that they deem appropriate. They also may make it more difficult for us to raise additional capital by selling equity securities in the future.

*We may not have sufficient funds to pay dividends on our Class A common stock.*

Although we intend to pay dividends on our Class A common stock to the extent that we have sufficient funds available for such purpose, the declaration, amount and payment of any future dividends on shares of Class A common stock will be at the sole discretion of our board of directors and we may reduce or discontinue entirely the payment of such dividends at any time. Our board of directors may take into account general and economic conditions, our financial condition and operating results, our available cash and current and anticipated cash needs, capital requirements, contractual, legal, tax and regulatory restrictions and implications on the payment of dividends by us to our stockholders or by our subsidiaries to us, and such other factors as our board of directors may deem relevant. The existing debt agreements of Station LLC limit the ability of Station LLC to make distributions to Station Holdco, which effectively restricts the ability of Station Holdco to distribute sufficient funds to permit Red Rock to pay dividends to its stockholders. Red Rock will be required to apply funds distributed by Station Holdco to pay taxes and make payments under the TRA. Therefore, we cannot assure you that you will receive any dividends on your Class A common stock. Accordingly, you may need to sell your shares of Class A common stock to realize a return on your investment, and you may not be able to sell your shares above the price you paid for them. See Note 14 to the Consolidated Financial Statements.

*Anti-takeover provisions and shareholder requirements in our charter documents, provisions of Delaware law and Nevada gaming laws may delay or prevent our acquisition by a third party, which might diminish the value of our Class A common stock. Provisions in our debt agreements may also require an acquirer to refinance our outstanding indebtedness if a change of control occurs, which could discourage or increase the costs of a takeover.*

In addition to the Fertitta Family Entities owning 86.4% of the combined voting power of our common stock, which permits them to control decisions made by our stockholders, including election of directors and change of control transactions, our amended and restated certificate of incorporation and bylaws contain provisions that make it harder for a third party to acquire us. These provisions include certain super-majority approval requirements and limitations on actions by written consent of our stockholders at any time that the Fertitta Family Entities hold less than 10% of the LLC Units. In addition, our board of directors has the right to issue preferred stock without stockholder approval that could be used to dilute a potential hostile

acquirer. Our amended and restated certificate of incorporation also imposes some restrictions on mergers and other business combinations between us and any holder of 15% or more of our outstanding common stock other than the Fertitta Family Entities.

The Nevada Act provides that persons who acquire beneficial ownership of more than 5% of the voting or non-voting securities of a Registered Corporation under Nevada gaming laws must report the acquisition to the Nevada Commission. The Nevada Act also requires that beneficial owners of more than 10% of the voting securities of a Registered Corporation must apply, subject to certain exceptions, to the Nevada Commission for a finding of suitability within thirty days after the Chair of the Nevada Board mails the written notice requiring such filing.

Further, changes in control of the Company through merger, consolidation, stock or asset acquisitions (including stock issuances in connection with restructuring transactions), management or consulting agreements, or any act or conduct by a person whereby such person obtains control, may not occur without the prior approval of the Nevada Commission. Entities seeking to acquire control of a Registered Corporation must satisfy the Nevada Board and the Nevada Commission that they meet a variety of stringent standards prior to assuming control of such Registered Corporation. The Nevada Commission may also require controlling equity holders, officers, directors, and other persons having a material relationship or involvement with the entity proposing to acquire control, to be investigated and licensed as part of the approval process relating to the transaction. The Nevada legislature has declared that some corporate acquisitions opposed by management, repurchases of voting securities and corporate defense tactics affecting Nevada corporate gaming licensees, and Registered Corporations that are affiliated with those operations, may be injurious to stable and productive corporate gaming. The Nevada Act also requires prior approval of a plan of re-capitalization proposed by the Registered Corporation's board of directors or similar governing entity in response to a tender offer made directly to the Registered Corporation's equity holders for the purpose of acquiring control of the Registered Corporation.

These anti-takeover provisions, shareholder requirements and other provisions under Delaware law and Nevada gaming laws could discourage, delay or prevent a transaction involving a change in control of our Company, including transactions that our stockholders may deem advantageous, and negatively affect the trading price of our Class A common stock. These provisions could also discourage proxy contests and make it more difficult for you and other stockholders to elect directors of your choosing and to cause us to take other corporate actions you desire.

Under our credit facilities, a takeover of our Company would likely constitute a "change of control" and be deemed to be an event of default under such facility, which would therefore require a third-party acquirer to refinance any outstanding indebtedness under the credit facility in connection with such takeover. In addition, the TRA provides that, in the event of a change of control, we are required to make a payment equal to the present value of estimated future payments under the TRA, which would result in a significant payment becoming due in the event of a change of control. These change of control provisions, and similar provisions in future agreements, are likely to increase the costs of any takeover and may discourage, delay or prevent an acquisition of our Company by a third party.

***Nevada gaming laws and regulations include requirements that may discourage ownership of our Class A common stock or otherwise impact the price of our Class A common stock.***

Any beneficial owner of our voting or non-voting securities, regardless of the number of shares owned, may be required to file an application, may be investigated, and may be required to obtain a finding of suitability as a beneficial owner of our securities if the Nevada Commission has reason to believe that such ownership would otherwise be inconsistent with the declared policies of the State of Nevada. If the beneficial owner of our voting or non-voting securities who must be found suitable is a corporation, partnership, limited partnership, limited liability company or trust, it must submit detailed business and financial information, including a list of its beneficial owners, to the Nevada Board. The applicant must pay all costs of investigation incurred by the Nevada Gaming Authorities in conducting any such investigation.

Any person who acquires more than 5% of Red Rock's voting power must report the acquisition to the Nevada Commission. Nevada gaming regulations also require that beneficial owners of more than 10% of Red Rock's voting power apply to the Nevada Commission for a finding of suitability within 30 days after the Chair of the Nevada Board mails written notice requiring such filing. Further, an "institutional investor," as defined in the Nevada gaming regulations, that acquires more than 10%, but not more than 25%, of Red Rock's voting power may apply to the Nevada Commission for a waiver of such finding of suitability if such institutional investor holds Red Rock's voting securities for investment purposes only.

Any person who fails or refuses to apply for a finding of suitability or a license within thirty days after being ordered to do so by the Nevada Commission, or the Chair of the Nevada Board, may be found unsuitable. The same restrictions apply to a record owner if the record owner, after request, fails to identify the beneficial owner. Any equity holder who is found

unsuitable and who holds, directly or indirectly, any beneficial ownership of the common equity of a Registered Corporation beyond such period of time as may be prescribed by the Nevada Commission may be guilty of a criminal offense. We will be subject to disciplinary action if, after we receive notice that a person is unsuitable to be an equity holder or to have any other relationship with us or our licensed or registered subsidiaries, we (i) pay that person any dividend or interest upon our securities, (ii) allow that person to exercise, directly or indirectly, any voting right conferred through securities held by that person, (iii) pay remuneration in any form to that person for services rendered or otherwise, or (iv) fail to pursue all lawful efforts to require such unsuitable person to relinquish his securities including, if necessary, the immediate purchase of said securities for the price specified by the relevant gaming authority or, if no such price is specified, the fair market value as determined by the board of directors of Red Rock. The purchase may be made in cash, notes that bear interest at the applicable federal rate or a combination of notes and cash. Additionally, the CCLGLB has the authority to approve all persons owning or controlling the stock of any corporation controlling a gaming license. The cumulative effect of these laws and regulations may discourage ownership of our Class A common stock or otherwise impact the price of our Class A common stock.

Moreover, if any of our significant stockholders or members of Station Holdco is required to, but does not, apply for a finding or suitability or licensing or is found unsuitable by the Nevada Commission, they may rapidly liquidate their equity holdings, which could cause the market price of our Class A common stock to decline. Additionally, we could be required to repurchase any shares or LLC Units held by such significant stockholder or member for cash, notes bearing interest at the applicable federal rate or a combination of cash and notes. In the event that we were required to repurchase shares for cash, our cash position would be reduced and our liquidity and financial condition could be materially adversely affected. There can be no assurance that we would have sufficient cash available to meet such obligation as well as our continuing operating requirements or that, if additional financing were required, that such financing could be obtained on terms acceptable to us, if at all.

***Future offerings of debt securities or additional or increased loans, which would rank senior to our common stock upon our bankruptcy or liquidation, and future offerings of equity securities that may be senior to our common stock for the purposes of dividend and liquidating distributions, may adversely affect the market price of our Class A common stock.***

In the future, we may attempt to increase our capital resources through offerings of debt securities, entering into or increasing amounts under our loan agreements or additional offerings of equity securities. Upon bankruptcy or liquidation, holders of our debt securities, including holders of our senior notes, and shares of preferred stock, if any is issued, and lenders with respect to our indebtedness, including our credit facility, will receive a distribution of our available assets prior to the holders of our common stock. Additional equity offerings may dilute the holdings of our existing stockholders or reduce the market price of our common stock, or both. Our preferred stock, if issued, will likely have a preference on liquidating distributions or a preference on dividend payments or both that could limit our ability to make a dividend distribution to the holders of our common stock. Our decision to issue securities in any future offering or enter into or increase loan amounts will depend on our management's views on our capital structure and financial results, as well as market conditions and other factors beyond our control. As a result, we cannot predict or estimate the amount, timing or nature of any such future transaction, and purchasers of our Class A common stock bear the risk of our future transactions reducing the market price of our Class A common stock and diluting their ownership interest in our Company.

***If securities analysts do not publish research or reports about our Company, or if they issue unfavorable commentary about us or our industry and markets or downgrade our Class A common stock, the price of our Class A common stock could decline.***

The trading market for our Class A common stock depends in part on the research and reports that third-party securities analysts publish about our Company and our industry and markets. One or more analysts could downgrade our Class A common stock or issue other negative commentary about our Company or our industry or markets. In addition, we may be unable to attract sufficient research coverage. Alternatively, if one or more of these analysts cease coverage of our Company, we could lose visibility in the market. As a result of one or more of these factors, the trading price and volume of our Class A common stock could decline.

*If we fail to maintain an effective system of internal controls, we may not be able to accurately determine our financial results or prevent fraud. As a result, our stockholders could lose confidence in our financial results, which could materially and adversely affect us.*

Effective internal controls are necessary for us to provide reliable financial reports and effectively prevent fraud. We may in the future discover areas of our internal controls that need improvement. We cannot be certain that we will be successful in implementing or maintaining adequate internal control over our financial reporting and financial processes. Furthermore, as we grow our business, our internal controls will become more complex, and we will require significantly more resources to ensure our internal controls remain effective. Additionally, the existence of any material weakness or significant deficiency would require management to devote significant time and incur significant expense to remediate any such material weakness or significant deficiency, and management may not be able to remediate any such material weakness or significant deficiency in a timely manner. The existence of any material weakness or significant deficiency in our internal control over financial reporting could also result in errors in our financial statements that could require us to restate our financial statements, cause us to fail to meet our reporting obligations and cause stockholders to lose confidence in our reported financial information, all of which could materially and adversely affect us.

## ITEM 1B.   UNRESOLVED STAFF COMMENTS

None.

## ITEM 2.   PROPERTIES

Substantially all of the property that we own and lease is subject to liens to secure borrowings under our credit agreements and include the following:

- Red Rock, which opened in 2006, is situated on approximately 64 acres that we own on the northwest side of Las Vegas, Nevada.

- Green Valley Ranch, which opened in 2001, is situated on approximately 40 acres that we own in Henderson, Nevada.

- Palms, which we purchased in 2016, is situated on approximately 42 acres that we own in Las Vegas, Nevada.

- Palace Station, which opened in 1976, is situated on approximately 30 acres that we own in Las Vegas, Nevada.

- Boulder Station, which opened in 1994, is situated on approximately 46 acres that we own on the east side of Las Vegas, Nevada.

- Texas Station, which opened in 1995, is situated on approximately 47 acres that we own in North Las Vegas, Nevada.

- Sunset Station, which opened in 1997, is situated on approximately 80 acres that we own in Henderson, Nevada.

- Santa Fe Station, which we purchased in 2000, is situated on approximately 39 acres that we own on the northwest side of Las Vegas, Nevada.

- Fiesta Rancho, which we purchased in 2001, is situated on approximately 25 acres that we own in North Las Vegas, Nevada.

- Fiesta Henderson, which we purchased in 2001, is situated on approximately 35 acres that we own in Henderson, Nevada.

- Wild Wild West, which we purchased in 1998, is situated on approximately 20 acres of leased land in Las Vegas, Nevada. In December 2018, we exercised our option to purchase the leased land, and the transaction is expected to close in June 2019. The 20 acres of land under contract is immediately adjacent to a 76-acre site that we own, which is being held for future development.

- Wildfire Rancho, which we purchased in 2003, is situated on approximately five acres that we own in Las Vegas, Nevada.

- Wildfire Boulder, which we purchased in 2004, is situated on approximately two acres that we own in Henderson, Nevada.

- Wildfire Sunset, which we purchased in 2004, is situated on approximately one acre that we own in Henderson, Nevada.

- Wildfire Lake Mead, which we purchased in 2006, is situated on approximately three acres that we own in Henderson, Nevada.

- Wildfire Valley View and Wildfire Anthem, which we purchased in 2013, lease land and buildings used in their operations in Las Vegas and Henderson, Nevada, respectively, from third-party lessors.

- Barley's and The Greens, which are 50% owned, lease land and buildings in Henderson, Nevada used in their operations from third-party lessors. Wildfire Lanes, which is 50% owned, owns the land and building in Henderson, Nevada used in its operations. We opened Barley's in 1996 and purchased The Greens in 2005 and Wildfire Lanes in 2007.

We lease our corporate office building in Las Vegas, Nevada from a third-party real estate investment firm, to whom we sold the building in 2007. The initial 20-year term of the lease expires in November 2027, and we have four remaining five-year options to extend the lease.

We control 420 acres of developable land comprised of eight strategically-located parcels in Las Vegas and Reno, Nevada, each of which is zoned for casino gaming and other commercial uses. We also own one additional 57-acre development site which is currently for sale. From time to time we may acquire additional parcels or sell portions of our existing sites that are not necessary to the development of additional gaming facilities.

Subsequent to the opening or purchase of certain of our properties, we have completed a variety of expansion and renovation projects. From time to time we also renovate portions of our properties, such as hotel rooms and restaurants.

## ITEM 3.  LEGAL PROCEEDINGS

We and our subsidiaries are defendants in various lawsuits relating to routine matters incidental to our business. No assurance can be provided as to the outcome of such matters and litigation inherently involves significant costs.

## ITEM 4.  MINE SAFETY DISCLOSURES

Not applicable.

**PART II**

**ITEM 5.   MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

**Market Information**

Our Class A common stock has traded on the NASDAQ under the symbol "RRR" since April 27, 2016. Prior to that date, there was no public market for our Class A common stock. The declaration, amount and payment of dividends on shares of Class A common stock are at the discretion of the board of directors, subject to legally available funds.

**Dividends**

The declaration, amount and payment of any future dividends on shares of Class A common stock will be at the sole discretion of our board of directors and we may reduce or discontinue entirely the payment of such dividends at any time. Our board of directors may take into account general and economic conditions, our financial condition and operating results, our available cash and current and anticipated cash needs, capital requirements, contractual, legal, tax and regulatory restrictions and implications on the payment of dividends by us to our stockholders or by our subsidiaries to us, and such other factors as our board of directors may deem relevant. See Note 14 to the Consolidated Financial Statements for further details on dividends.

During each of the years ended December 31, 2018 and 2017, the Company declared and paid cash dividends of $0.40 per share to Class A common shareholders. In February 2019, the board of directors declared a dividend of $0.10 per share of Class A common stock to holders of record as of March 14, 2019 to be paid on March 29, 2019.

**Holders**

At February 22, 2019, there were 15 holders of record of our Class A common stock, although we believe there are a significantly larger number of beneficial owners of our Class A common stock because many shares are held by brokers and other institutions on behalf of stockholders.

**Issuer Purchases of Equity Securities**—None.

**Recent Sales of Unregistered Securities**—None.

**Stock Performance Graph**

The following graph compares the cumulative total stockholder return on our Class A common stock with the cumulative total return on the Standard & Poor's MidCap 400 Index ("S&P 400") and a peer group for the period beginning on April 27, 2016 (the date our common stock commenced trading on the NASDAQ) and ending on December 31, 2018.



COMPARISON OF 32 MONTH CUMULATIVE TOTAL RETURN*
Among Red Rock Resorts, Inc., the S&P Midcap 400 Index,
and a Peer Group

*$100 invested on 4/27/16 in stock or 3/31/16 in index, including reinvestment of dividends.
Fiscal year ending December 31.

Copyright© 2019 Standard & Poor's, a division of S&P Global. All rights reserved.

|  | April 27, 2016 | December 31, 2018 |
|---|---|---|
| RRR | $ 100.00 | $ 113.04 |
| S&P 400 | 100.00 | 120.24 |
| Peer Group  (a) | 100.00 | 111.75 |

(a)     Includes Boyd Gaming Corporation, Caesars Entertainment Corporation, Eldorado Resorts, Inc., MGM Resorts International and Penn National Gaming, Inc.

Past stock price performance is not necessarily indicative of future results. The performance graph should not be deemed filed or incorporated by reference into any other of our filings under the Securities Act of 1933 or the Exchange Act of 1934, unless we specifically incorporate the performance graph by reference therein.

## ITEM 6.   SELECTED FINANCIAL DATA

The following selected consolidated financial data have been derived from our consolidated financial statements. The selected consolidated financial data are qualified in their entirety by, and should be read in conjunction with, Management's Discussion and Analysis of Financial Condition and Results of Operations and the Consolidated Financial Statements and the notes thereto.

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2018 (a) | 2017 (b)(c) | 2016 (b)(d) | 2015 | 2014 (e) |
| | (amounts in thousands, except per share data) | | | | |
| **Operating Results:** | | | | | |
| Net revenues | $ 1,681,030 | $ 1,642,139 | $ 1,475,760 | $ 1,352,135 | $ 1,291,616 |
| Operating income | 372,208 | 331,281 | 309,711 | 287,189 | 237,061 |
| Income from continuing operations | 219,480 | 63,533 | 155,964 | 143,418 | 131,135 |
| Discontinued operations (f) | — | — | — | (166) | (42,548) |
| Net income | 219,480 | 63,533 | 155,964 | 143,252 | 88,587 |
| Net income (loss) attributable to noncontrolling interests | 61,939 | 28,110 | 64,012 | 5,594 | (11,955) |
| Net income attributable to Red Rock Resorts, Inc. | 157,541 | 35,423 | 91,952 | 137,658 | 100,542 |
| **Per Share Data:** | | | | | |
| Net earnings per share, basic | $ 2.28 | $ 0.53 | $ 1.04 | $ 1.53 | $ 1.12 |
| Net earnings per share, diluted | $ 1.77 | $ 0.42 | $ 1.03 | $ 1.53 | $ 1.12 |
| Cash dividends declared per common share | $ 0.40 | $ 0.40 | $ 0.20 | $ — | $ — |
| **Balance Sheet Data:** | | | | | |
| Cash and cash equivalents, excluding restricted cash | $ 114,607 | $ 231,465 | $ 133,776 | $ 116,426 | $ 122,579 |
| Total assets | 4,009,526 | 3,620,121 | 3,527,016 | 2,932,111 | 2,973,824 |
| Total debt | 2,855,359 | 2,617,822 | 2,422,301 | 2,155,197 | 2,145,364 |
| Total equity | 816,995 | 631,712 | 627,598 | 573,709 | 644,117 |

(a)     During the year ended December 31, 2018, we recognized nontaxable income of $90.4 million as a result of payments made to two pre-IPO owners of Station Holdco in exchange for the assignment of all of their rights under the TRA.

(b)     Selected financial data as of and for the years ended December 31, 2017 and 2016 have been retrospectively adjusted for the adoption of the new revenue recognition standard. See Note 2 to the Consolidated Financial Statements for more information. Selected financial data as of and for the years ended December 31, 2015 and 2014 have not been adjusted and therefore are not comparable.

(c)     During the year ended December 31, 2017, we recognized a $100.3 million charge in related party lease termination costs, which was offset by a $135.1 million adjustment to the tax receivable agreement liability due to tax reform.

(d)     The acquisition of Palms was completed on October 1, 2016.

(e)     During the year ended December 31, 2014, we recognized a $49.1 million gain on repayment of our advances for development of Graton Resort.

(f)     Discontinued operations represents the results of Fertitta Interactive, which ceased operations in the fourth quarter of 2014.

ITEM 7.   MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following discussion and analysis should be read in conjunction with the Consolidated Financial Statements and the notes thereto included in *Item 8. Financial Statements and Supplementary Data* included in this Annual Report on Form 10-K.

**Overview**

Red Rock is a holding company that owns an indirect equity interest in and manages Station LLC, through which we conduct all of our operations. Station LLC is a gaming, development and management company established in 1976 that develops and operates casino entertainment properties. Station LLC owns and operates ten major gaming and entertainment facilities and ten smaller casinos (three of which are 50% owned) in the Las Vegas regional market. Station LLC also manages Graton Resort in Sonoma County, California on behalf of a Native American tribe. Station LLC managed Gun Lake in Allegan County, Michigan on behalf of another Native American tribe through February 2018. Station Holdco holds all of the economic interests in Station LLC, and at December 31, 2018, we held approximately 60% of the equity interests in Station Holdco. We have no material assets other than our ownership interest in Station Holdco and our ownership of 100% of the voting interests in Station LLC. We are designated as the sole managing member of both Station Holdco and Station LLC, and we operate and control all of their business and affairs.

In May 2016, we completed an IPO of approximately 29.5 million shares of Class A common stock, $0.01 par value per share at an offering price to the public of $19.50 per share. We received proceeds from the IPO of approximately $541 million, net of underwriting discount, which was used to purchase newly issued limited liability company interests in Station Holdco and outstanding LLC Units from existing members of Station Holdco.

Station Holdco used the proceeds from the newly issued LLC Units to pay the majority of the $460 million purchase price of Fertitta Entertainment. Prior to the Fertitta Entertainment acquisition, subsidiaries of Fertitta Entertainment managed Station LLC through long-term management agreements and such management agreements were terminated in connection with the Fertitta Entertainment acquisition. Prior to the Fertitta Entertainment acquisition, Station Holdco, Station LLC and Fertitta Entertainment were controlled by Frank J. Fertitta III, our Chairman and Chief Executive Officer, and Lorenzo J. Fertitta, our Vice Chairman, who collectively held a majority of the voting and economic interests in these entities, and accordingly, the Fertitta Entertainment acquisition constituted an acquisition of an entity under common control.

We have no operations outside of our management of Station LLC and Station Holdco, and our Consolidated Financial Statements reflect the consolidation of Station LLC and its consolidated subsidiaries, including the retrospective consolidation of Fertitta Entertainment, and Station Holdco for all periods presented. The financial position and results of operations attributable to LLC Units we do not own are reported separately as noncontrolling interest. Station Holdco, as combined with Fertitta Entertainment, is our predecessor for accounting purposes and accordingly, for all periods prior to May 2, 2016, the financial information presented herein represents the information of the predecessor.

Our principal source of revenue and operating income is gaming, and our non-gaming offerings include restaurants, hotels and other entertainment amenities. Approximately 80% to 85% of our casino revenue is generated from slot play. The majority of our revenue is cash-based and as a result, fluctuations in our revenues have a direct impact on our cash flows from operations. Because our business is capital intensive, we rely heavily on the ability of our properties to generate operating cash flow to fund capital expenditures and repay debt financing.

A significant portion of our business is dependent upon customers who live and/or work in the Las Vegas metropolitan area. Based on population and employment growth, the Las Vegas economy was one of the fastest growing economies in the United States from 2015 to 2018. Based on a recent U.S. Census Bureau release, Nevada was first among all states in percentage growth of population from July 2017 to July 2018. In addition, based on preliminary data for December 2018 from the U.S. Bureau of Labor Statistics, Las Vegas experienced a 3.6% year-over-year increase in employment to 1,023,100, which is an all-time high. This resulted in an unemployment rate of 4.5% which has declined from 14.1% in July 2011. Businesses and consumers in Las Vegas continue to increase their spending as evidenced by 70 consecutive months of year-over-year increases in taxable retail sales from February 2013 to November 2018. Home values have also improved significantly over the past several years with the median price of an existing single family home in Las Vegas up approximately 165% at December 2018 compared to January 2012, as reported by the Greater Las Vegas Association of Realtors.

The Las Vegas economy continues to show growth in employment, taxable sales and home prices, and we believe these positive trends, along with new capital investment planned or underway in Las Vegas, provide a foundation for future growth in our business. Although we experienced improved operating results over the past few years due, in part, to more

favorable local economic conditions, we cannot be sure if, or how long, these favorable market conditions will persist or that they will continue to positively impact our results of operations.

Our operating results for the year ended December 31, 2018 continue to reflect the impact of construction disruption and costs associated with an ongoing $690 million redevelopment project at Palms and a $191 million redevelopment project at Palace Station, which was completed on schedule and on budget in December 2018. Phase one of the Palms redevelopment opened in May 2018, with the remaining components of phase two expected to be complete in the second quarter of 2019 and phase three expected to be complete by the end of the third quarter of 2019. The Palms redevelopment project remains on schedule and the $690 million project budget remains unchanged.

Information about our results of operations is included herein and in the notes to our Consolidated Financial Statements. We adopted the new revenue recognition standard, effective January 1, 2018. Our financial results, including prior period amounts, have been adjusted to reflect the full retrospective adoption of the new standard, with no material impact on operating income or net income. See Note 2 to the Consolidated Financial Statements for more information.

**Our Key Performance Indicators**

We use certain key indicators to measure our performance.

*Gaming revenue measures:*

- Slot handle, table game drop and race and sports write are measures of volume. Slot handle represents the dollar amount wagered in slot machines, and table game drop represents the total amount of cash and net markers issued that are deposited in table game drop boxes. Write represents the aggregate dollar amount wagered on race and sports events.

- Win represents the amount of wagers retained by us and recorded as casino revenue.

- Hold represents win as a percentage of slot handle or table game drop.

As our customers are primarily Las Vegas residents, our hold percentages are generally consistent from period to period. Fluctuations in our casino revenue are primarily due to the volume and spending levels of customers at our properties.

*Food and beverage revenue measures:*

- Average guest check is a measure of sales volume and product offerings, and represents the average amount spent per customer visit.

- Number of guests served is an indicator of volume.

*Room revenue measures:*

- Occupancy is calculated by dividing occupied rooms, including complimentary rooms, by rooms available.

- Average daily rate ("ADR") is calculated by dividing room revenue, which includes the retail value of complimentary rooms, by rooms occupied, including complimentary rooms.

- Revenue per available room is calculated by dividing room revenue by rooms available.

**Results of Operations**

The following table presents information about our results of operations (dollars in thousands):

| | | | Year Ended December 31, | | |
|---|---|---|---|---|---|
| | **2018** | **Percent change** | **2017** | **Percent change** | **2016** |
| Net revenues | $ 1,681,030 | 2.4% | $ 1,642,139 | 11.3% | $ 1,475,760 |
| Operating income | 372,208 | 12.4% | 331,281 | 7.0% | 309,711 |
| | | | | | |
| Casino revenues | 940,483 | 6.1% | 886,206 | 8.8% | 814,218 |
| Casino expenses | 326,980 | 5.1% | 311,086 | 13.8% | 273,443 |
| *Margin* | 65.2% | | 64.9% | | 66.4% |
| | | | | | |
| Food and beverage revenues | 381,197 | 4.3% | 365,448 | 10.6% | 330,488 |
| Food and beverage expenses | 340,212 | 4.3% | 326,069 | 12.0% | 291,224 |
| *Margin* | 10.8% | | 10.8% | | 11.9% |
| | | | | | |
| Room revenues | 170,824 | (4.6)% | 179,041 | 22.8% | 145,810 |
| Room expenses | 78,440 | (4.1)% | 81,768 | 33.2% | 61,410 |
| *Margin* | 54.1% | | 54.3% | | 57.9% |
| | | | | | |
| Other revenues | 100,912 | 8.5% | 92,967 | 26.1% | 73,724 |
| Other expenses | 48,431 | 20.1% | 40,332 | 31.5% | 30,661 |
| | | | | | |
| Management fee revenue | 87,614 | (26.0)% | 118,477 | 6.2% | 111,520 |
| | | | | | |
| Selling, general and administrative expenses | 390,492 | 2.5% | 380,930 | 16.4% | 327,313 |
| *Percent of net revenues* | 23.2% | | 23.2% | | 22.2% |
| | | | | | |
| Depreciation and amortization | 180,255 | 1.1% | 178,217 | 13.8% | 156,668 |
| Write-downs and other charges, net | 34,650 | 17.1% | 29,584 | 20.3% | 24,591 |
| Tax receivable agreement liability adjustment | (90,638) | n/m | (139,300) | n/m | 739 |
| Related party lease termination | — | n/m | 100,343 | n/m | — |
| Asset impairment | — | n/m | 1,829 | n/m | — |
| Interest expense, net | 143,099 | 8.9% | 131,442 | (6.2)% | 140,189 |
| Loss on extinguishment/modification of debt, net | — | n/m | 16,907 | n/m | 7,270 |
| Change in fair value of derivative instruments | 12,415 | (12.0)% | 14,112 | n/m | 87 |
| Provision for income tax | 23,875 | n/m | 134,786 | n/m | 8,243 |
| Net income attributable to noncontrolling interests | 61,939 | n/m | 28,110 | n/m | 64,012 |
| Net income attributable to Red Rock Resorts, Inc. | 157,541 | n/m | 35,423 | n/m | 91,952 |

n/m = not meaningful

We view each of our Las Vegas casino properties as an individual operating segment. We aggregate all of our Las Vegas operating segments into one reportable segment because all of our Las Vegas properties offer similar products, cater to the same customer base, have the same regulatory and tax structure, share the same marketing programs, are directed by a centralized management structure and have similar economic characteristics. We also aggregate our Native American management arrangements into one reportable segment. The results of operations for our Native American management segment are discussed in the section entitled "Management Fee Revenue" below and the results of operations of our Las Vegas

45

operations are discussed in the remaining sections below. References herein to same-store basis represent results of operations excluding the impact of operations of Palms from October 1, 2016, the date of acquisition, through December 31, 2017.

*Net Revenues.*  Net revenues for the year ended December 31, 2018 increased by 2.4% to $1.68 billion as compared to $1.64 billion for the year ended December 31, 2017 despite the negative impact of substantial ongoing construction disruption associated with the redevelopment of Palms and the upgrade and expansion project at Palace Station. In addition, the increase in net revenues was partially offset by a decrease in management fee revenue as a result of the expiration of the Gun Lake management agreement in February 2018. Net revenues for 2017 increased by 11.3% to $1.64 billion as compared to $1.48 billion for 2016 primarily due to the acquisition of Palms.

*Operating Income.*  Operating income increased 12.4% to $372.2 million for 2018 as compared to $331.3 million for 2017. The increase was primarily due to a one-time loss in 2017 on a related party lease termination, partially offset by a lower TRA liability adjustment in 2018. Operating income increased by 7.0% for 2017 as compared to $309.7 million for 2016. The increase was primarily due to a gain representing a decrease in the TRA liability, partially offset by the loss on the related party lease termination. Components of operating income for the comparative periods are discussed below.

*Casino.*  Casino revenues increased by $54.3 million to $940.5 million for 2018 as compared to $886.2 million for 2017 primarily due to increased volume across all major categories of gaming operations. Despite the ongoing construction disruption at Palms and Palace Station, slot handle increased by 2.9%, table games drop increased by 11.0% and race and sports write increased by 9.2% for 2018 as compared to 2017. Casino expenses increased by $15.9 million or 5.1% for 2018 as compared to 2017 primarily due to the increased casino volume.

Casino revenues increased by $72.0 million to $886.2 million for 2017 as compared to $814.2 million for 2016 primarily due to the acquisition of Palms. On a same-store basis, slot handle increased by 4.1%, table games drop increased by 4.1% and race and sports write increased by 18.6%. For 2017, casino expenses increased by $37.6 million or 13.8% as compared to 2016, primarily due to the acquisition of Palms and increased casinos revenues, as well as more gaming promotions and higher employee expenses.

*Food and Beverage.*  Food and beverage revenues for 2018 increased to $381.2 million as compared to $365.4 million for 2017 primarily due to the opening of several new restaurants and entertainment offerings at Palms and Palace Station. For 2018 as compared to 2017, the average guest check increased by 11.2%, partially offset by a decrease of 1.2% in the number of restaurant guests served due to the ongoing construction disruption at Palms and Palace Station. Food and beverage expenses increased by 4.3% for 2018 as compared to 2017, commensurate with the increase in revenue.

Food and beverage revenues for 2017 increased to $365.4 million as compared to $330.5 million for 2016 largely due to the acquisition of Palms. On a same-store basis, the average guest check increased by 4.8% and the number of restaurant guests served decreased by 2.7% for 2017 as compared to 2016. Food and beverage expense increased by 12.0% for 2017 as compared to 2016, primarily due to the acquisition of Palms, as well as increases in employee expenses and enhancements to our food and beverage product offerings and service levels.

*Room.*  Information about our hotel operations is presented below:

| | Year Ended December 31, | | | | | |
| | 2018 | | 2017 | | 2016 | |
|---|---|---|---|---|---|---|
| Occupancy | | 87.7% | | 90.0% | | 92.8% |
| Average daily rate | $ | 118.65 | $ | 112.04 | $ | 100.74 |
| Revenue per available room | $ | 104.03 | $ | 100.79 | $ | 93.51 |

For 2018, room revenues decreased by 4.6% to $170.8 million as compared to $179.0 million for 2017, primarily due to construction disruption and room remodeling projects at Palms and Palace Station. In addition, during the second half of 2017, approximately 400 hotel rooms at Palace Station were permanently removed from service as part of the upgrade and expansion project. Our occupancy rate decreased by 2.3 percentage points for 2018 as compared to 2017, which was partially offset by a 5.9% increase in ADR. Room expenses decreased by 4.1% for 2018 as compared to 2017 due to lower occupancy and the reduced room count at Palace Station.

Room revenues for 2017 increased by 22.8% to $179.0 million as compared to $145.8 million for 2016 primarily due to the acquisition of Palms. ADR increased 11.2% for 2017 as compared to 2016, partially offset by a 2.8 percentage point

decrease in occupancy rate. Room expenses increased by 33.2% for 2017 as compared to 2016, primarily due to the acquisition of Palms, as well as increases in employee expenses.

*Other.* Other primarily includes revenues from tenant leases, retail outlets, bowling, spas and entertainment and their corresponding expenses. Other revenues for 2018 increased by 8.5% to $100.9 million as compared to $93.0 million for 2017. Other expenses for 2018 increased by 20.1% as compared to 2017. The increases in other revenues and other expenses were primarily due to additional entertainment offerings.

Other revenues for 2017 increased by 26.1% to $93.0 million as compared to $73.7 million for 2016, primarily due to the inclusion of a full year of revenues associated with Palms. Other expenses for 2017 increased by 31.5% as compared to 2016, commensurate with the increase in revenue.

*Management Fee Revenue.* Management fee revenue is based on the operating results of our managed properties and primarily represents fees earned from our management agreements with Native American tribes. For 2018, management fee revenue decreased to $87.6 million as compared to $118.5 million for 2017 due to the expiration of the Gun Lake management agreement in February 2018. The Gun Lake management agreement produced $4.3 million, $46.1 million and $40.5 million of the total management fee revenue for 2018, 2017 and 2016, respectively. Partially offsetting this decrease was an increase of 18.7% in management fee revenue from Graton Resort for 2018 as compared to 2017, due to improved operating performance and an increase in the management fee percentage from 24% to 27% as of November 2017.

For 2017, management fee revenue increased to $118.5 million as compared to $111.5 million for 2016 due to improved results at both Graton Resort and Gun Lake, primarily due to higher slot and table games revenue at both properties. Graton Resort opened an expansion in the fourth quarter of 2016, and Gun Lake completed a casino expansion in 2017.

Management fee revenue also includes reimbursable costs, which represent amounts received or due pursuant to our management agreements with Native American tribes for the reimbursement of expenses, primarily payroll costs, that we incur on their behalf. We recognize reimbursable cost revenues on a gross basis with an offsetting amount charged to operating expenses. Management fee revenue for 2018, 2017 and 2016 included $5.2 million, $6.6 million and $8.9 million in reimbursable costs, respectively.

*Selling, General and Administrative ("SG&A").* SG&A expenses increased by 2.5% to $390.5 million for 2018 as compared to $380.9 million for 2017, primarily due to higher employee-related expenses, partially offset by decreased rent expense as a result of the termination of two related party land leases in April 2017.

SG&A expenses increased by 16.4% to $380.9 million for 2017 as compared to $327.3 million for 2016. The increase was primarily due to a full year of operations at Palms, as well as higher employee expenses. These increases were partially offset by decreased rent expense due to the related party lease termination discussed further below and decreased advertising and promotions expense for 2017 as compared to 2016.

*Depreciation and Amortization.* Depreciation and amortization expense for 2018 increased to $180.3 million as compared to $178.2 million for 2017. The increase was primarily due to higher depreciation expense for Palms and Palace Station due to assets placed into service during 2018, partially offset by lower amortization expense for the Gun Lake management agreement intangible asset as well as accelerated depreciation in 2017 for Palace Station. Depreciation and amortization expense for 2017 increased to $178.2 million as compared to $156.7 million for 2016, primarily due to a full year of depreciation and amortization expense associated with Palms, as well as accelerated depreciation related to the upgrade and expansion at Palace Station and the Palms redevelopment.

*Write-downs and Other Charges, net.* Write-downs and other charges, net include asset disposals, preopening and redevelopment, innovation and development costs, severance and non-routine expenses. For 2018, write-downs and other charges, net totaled $34.7 million. Of that amount, Palms redevelopment expenses totaled $19.0 million and included various expenses associated with the brand repositioning campaign and the grand opening of the first phase of the project in May 2018, as well as preopening related to new restaurants, nightclubs, bars and other amenities. For 2017, write-downs and other charges, net totaled $29.6 million, including $11.3 million of losses on disposal of assets, net related to the redevelopment of Palms. For 2016, write-downs and other charges, net totaled $24.6 million, which included transaction-related costs of $9.7 million. Transaction-related costs represent IPO-related advisory, legal and other costs that were not deferred as direct and incremental costs of the IPO, as well as costs related to the Fertitta Entertainment acquisition.

*Tax Receivable Agreement Liability Adjustment.* In connection with the IPO, we entered into the TRA with certain pre-IPO owners of Station Holdco. The TRA requires us to make future payments to the pre-IPO owners of 85% of realized tax benefits related to exchanges of LLC Units for Class A common stock. We recorded a liability related to the expected future

TRA payments based on the corporate tax rate then applicable. From time to time, our liability under the TRA is adjusted based on a number of factors, including the amount and timing of our taxable income, the tax rate then applicable, our amortizable basis in Station Holdco, and the impact of transactions relating to TRA liabilities. Adjustments to our TRA liability are recognized within the Tax receivable agreement liability adjustment line in the Consolidated Statements of Income.

During 2018, we paid a total of $28.9 million to two pre-IPO owners of Station Holdco in exchange for which the owners assigned to us all of their rights under the TRA. As a result, our liability under the TRA was reduced by $119.2 million, and we recognized nontaxable income of $90.4 million. In December 2017, the Tax Cuts and Jobs Act decreased the corporate tax rate from 35% to 21%, which reduced the tax benefits we expect to realize related to exchanges by pre-IPO owners and therefore decreased our obligation under the TRA. The $116.5 million net reduction of the TRA liability during 2017 is the result of a $135.1 million decrease due to the new tax rate, partially offset by increases related to exchanges.

*Related Party Lease Termination.*   In April 2017, we purchased entities that own certain land on which Texas Station and Boulder Station are located for cash consideration of $120.0 million. The land was previously leased under long-term operating leases with a related party lessor. Concurrently with the land acquisition, we assumed a long-term ground lease with an unrelated third-party lessor for an adjacent parcel of land at Boulder Station that previously had been subleased from the related party lessor. As a result, we recognized a charge of $100.3 million in related party lease termination costs during 2017, which was an amount equal to the difference between the aggregate consideration paid and the fair value of the net assets acquired, including the land and residual interests and the assumed lease obligation. Annual rent expense decreased by approximately $7.1 million as a result of the land acquisition.

*Asset Impairment.*   In 2017, we recorded an asset impairment charge of $1.8 million to write down an approximately 31-acre parcel of land held for development in Las Vegas to its estimated fair value of $5.2 million as a result of entering into an agreement to sell a portion of the land at a price less than its carrying amount. The sale was completed in the second quarter of 2018.

*Interest Expense, net.*   The following table presents summarized information about our interest expense (amounts in thousands):

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2018 | | 2017 | | 2016 |
| Interest cost, net of interest income | $ | 134,998 | $ | 115,346 | $ | 122,697 |
| Amortization of debt discount and debt issuance costs | | 16,149 | | 17,206 | | 17,492 |
| Capitalized interest | | (8,048) | | (1,110) | | — |
| Interest expense, net | $ | 143,099 | $ | 131,442 | $ | 140,189 |

Interest expense, net, for 2018 was $143.1 million as compared to $131.4 million for 2017. The increase in interest expense, net was due to higher outstanding indebtedness and higher interest rates, partially offset by higher capitalized interest and the amortization of previously deferred gains on interest rate swaps. Interest expense, net, for 2018 also included an immaterial out-of-period adjustment related to our corporate office lease obligation that increased interest expense by $9.3 million. See Note 11 to the Consolidated Financial Statements for additional information about our long-term debt.

Interest expense, net, for 2017 was $131.4 million as compared to $140.2 million for 2016. The decrease in interest expense, net was primarily a result of credit facility repricings, the redemption of the 7.50% Senior Notes and the repayment of the $105 million loan under which Station LLC's wholly-owned subsidiary, CV Propco, LLC, was the borrower (the "Restructured Land Loan"). As a result of these changes in our indebtedness, the weighted-average interest rate on our outstanding debt decreased, which was partially offset by the impact of an increase in our outstanding indebtedness, including the issuance of the 5.00% Senior Notes in September 2017.

Interest expense, net, also included the impact of our interest rate swaps for which hedge accounting was previously elected. In June 2017, we dedesignated our existing interest rate swaps and discontinued hedge accounting. For 2017 and 2016, interest rate swaps increased our interest expense by $1.2 million and $5.1 million, respectively. These amounts included deferred gains and losses on discontinued cash flow hedging relationships that are being reclassified from accumulated other comprehensive income into interest expense. See Note 12 to the Consolidated Financial Statements for additional information on our interest rate swaps.

*Loss on Extinguishment/Modification of Debt, net.*   During 2017, we recognized a $16.9 million net loss on extinguishment/modification of debt. This included losses on extinguishment/modification of debt of $27.2 million related to

the redemption of the 7.50% Senior Notes and $4.7 million related to credit facility amendments completed throughout the year, partially offset by a $14.9 million gain on debt extinguishment related to the Restructured Land Loan. During 2016, we recognized a $7.3 million loss on extinguishment/modification of debt, primarily related to the refinancing of Station LLC's credit facility. As a result of the refinancing, Station LLC recognized a $6.6 million loss on extinguishment/modification of debt related to the extinguished portion of the debt.

*Change in Fair Value of Derivative Instruments.*  During 2018 and 2017, we recognized $12.4 million and $14.1 million, respectively, in net gains on the change in fair value of our interest rate swaps. The gains were primarily due to upward movements in interest rates and the forward yield curve as well as our election to no longer apply hedge accounting beginning July 2017.

*Provision for Income Tax.*  Income tax expense totaled $23.9 million, $134.8 million and $8.2 million for 2018, 2017 and 2016, respectively. The provision for income taxes in 2017 included the unfavorable impacts of the Tax Cuts and Jobs Act due to the remeasurement of our U.S. federal deferred tax assets and liabilities to apply the new 21% federal tax rate.

We were formed on September 9, 2015 and did not engage in any operations prior to the IPO. We first filed tax returns for tax year 2016, which is the first tax year subject to examination by taxing authorities for U.S. federal and state income tax purposes.

At December 31, 2018 we held an economic interest of approximately 59.8% in Station Holdco, which holds all of the economic interests in Station LLC. Station Holdco is treated as a partnership for income tax reporting and Station Holdco's members are liable for federal, state and local income taxes based on their share of Station Holdco's taxable income. We are not liable for taxes on the noncontrolling interests' share of Station Holdco's taxable income.

We have been notified that our 2016 tax returns and those of Station Holdco will be examined by the Internal Revenue Service. We believe that we have taken sustainable positions; however, there is no assurance that the taxing authorities will not propose adjustments that are different from our expected outcome and that will impact the provision for income taxes.

*Net Income Attributable to Noncontrolling Interests.*  Net income attributable to noncontrolling interests primarily represents the portion of net income attributable to the ownership interest in Station Holdco not held by us. For periods prior to February 2018, net income attributable to noncontrolling interests also included the portion of MPM Enterprises, LLC's ("MPM") net income that was not attributable to us. Net income attributable to noncontrolling interests for 2018, 2017 and 2016 was $61.9 million, $28.1 million and $64.0 million, respectively. Net income attributable to noncontrolling interests for 2017 was directly affected by the related party lease termination described above.

**Adjusted EBITDA**

Adjusted EBITDA for the years ended December 31, 2018, 2017 and 2016 for our two reportable segments and a reconciliation of net income to Adjusted EBITDA are presented below (amounts in thousands). The Las Vegas operations segment includes all of our Las Vegas area casino properties and the Native American management segment includes our Native American management arrangements.

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| **Net revenues** | | | |
| Las Vegas operations | $ 1,588,003 | $ 1,518,442 | $ 1,359,510 |
| Native American management | 87,009 | 117,968 | 110,962 |
| Reportable segment net revenues | 1,675,012 | 1,636,410 | 1,470,472 |
| Corporate and other | 6,018 | 5,729 | 5,288 |
| Net revenues | $ 1,681,030 | $ 1,642,139 | $ 1,475,760 |
| | | | |
| **Net income** | $ 219,480 | $ 63,533 | $ 155,964 |
| **Adjustments** | | | |
| Depreciation and amortization | 180,255 | 178,217 | 156,668 |
| Share-based compensation | 11,289 | 7,922 | 6,893 |
| Write-downs and other charges, net | 34,650 | 29,584 | 24,591 |
| Tax receivable agreement liability adjustment | (90,638) | (139,300) | 739 |
| Related party lease termination | — | 100,343 | — |
| Asset impairment | — | 1,829 | — |
| Interest expense, net | 143,099 | 131,442 | 140,189 |
| Loss on extinguishment/modification of debt, net | — | 16,907 | 7,270 |
| Change in fair value of derivative instruments | (12,415) | (14,112) | (87) |
| Adjusted EBITDA attributable to MPM noncontrolling interest | (962) | (15,262) | (14,675) |
| Provision for income tax | 23,875 | 134,786 | 8,243 |
| Other | 329 | 1,357 | (1,088) |
| **Adjusted EBITDA** | $ 508,962 | $ 497,246 | $ 484,707 |
| | | | |
| **Adjusted EBITDA** | | | |
| Las Vegas operations | $ 457,379 | $ 433,640 | $ 423,957 |
| Native American management | 80,795 | 95,897 | 87,259 |
| Reportable segment Adjusted EBITDA | 538,174 | 529,537 | 511,216 |
| Corporate and other | (29,212) | (32,291) | (26,509) |
| Adjusted EBITDA | $ 508,962 | $ 497,246 | $ 484,707 |

The year-over-year changes in Adjusted EBITDA are due to the factors described under *Results of Operations* above, including the decrease in Native American management fees and the ongoing construction disruption at Palms and Palace Station.

Adjusted EBITDA is a non-GAAP measure that is presented solely as a supplemental disclosure. We believe that Adjusted EBITDA is a widely used measure of operating performance in our industry and is a principal basis for valuation of gaming companies. We believe that in addition to net income, Adjusted EBITDA is a useful financial performance measurement for assessing our operating performance because it provides information about the performance of our ongoing core operations excluding non-cash expenses, financing costs, and other non-operational or non-recurring items. Adjusted EBITDA includes net income plus depreciation and amortization, share-based compensation, write-downs and other charges, net, tax receivable agreement liability adjustment, related party lease termination, asset impairment, interest expense, net, loss on extinguishment/modification of debt, net, change in fair value of derivative instruments, provision for income tax and other, and excludes Adjusted EBITDA attributable to the noncontrolling interests of MPM.

To evaluate Adjusted EBITDA and the trends it depicts, the components should be considered. Each of these components can significantly affect our results of operations and should be considered in evaluating our operating performance,

50

and the impact of these components cannot be determined from Adjusted EBITDA. Further, Adjusted EBITDA does not represent net income or cash flows from operating, investing or financing activities as defined by GAAP and should not be considered as an alternative to net income as an indicator of our operating performance. Additionally, Adjusted EBITDA does not consider capital expenditures and other investing activities and should not be considered as a measure of our liquidity. It should be noted that not all gaming companies that report EBITDA or adjustments to this measure may calculate EBITDA or such adjustments in the same manner as we do, and therefore, our measure of Adjusted EBITDA may not be comparable to similarly titled measures used by other gaming companies.

**Holding Company Financial Information**

The indenture governing the 5.00% Senior Notes contains certain covenants that require Station LLC to furnish to the holders of the notes certain annual and quarterly financial information relating to Station LLC and its subsidiaries. The obligation to furnish such information may be satisfied by providing consolidated financial information of the Company along with additional disclosure explaining the differences between such information and the financial information of Station LLC and its subsidiaries on a standalone basis. The following financial information about the Company and its consolidated subsidiaries, exclusive of Station LLC and its subsidiaries (the "Holding Company"), is furnished to explain the differences between the financial information of the Holding Company and the financial information of Station LLC and its subsidiaries for the periods presented in this report. As discussed below, the primary differences between the financial information of the Holding Company and that of Station LLC relate to income taxes payable by the Holding Company, the liability relating to the TRA and additional SG&A expenses incurred by the Holding Company for professional costs relating to the TRA and public company reporting.

At December 31, 2018, the difference between the balance sheet for Station LLC and its consolidated subsidiaries and the balance sheet for the Holding Company is that the Holding Company had cash of $0.2 million, an income tax receivable of $0.1 million and a net deferred tax asset of $111.8 million that are solely assets of the Holding Company, offset by liabilities that are solely the Holding Company's, consisting of a $24.9 million liability under the TRA and $0.6 million of other net current liabilities. At December 31, 2017, the Holding Company had cash of $22.7 million, an income tax receivable of $0.3 million and a net deferred tax asset of $132.7 million, offset by liabilities that are solely the Holding Company's, consisting of a $141.9 million liability under the TRA and $0.8 million of other net current liabilities.

For the year ended December 31, 2018, the difference between the statement of income for Station LLC and its consolidated subsidiaries and the statement of income for the Holding Company is that the Holding Company had net income of $62.9 million, which primarily included income of $90.6 million from TRA liability adjustments, offset by SG&A expenses of $3.9 million and provision for income tax of $23.9 million. For 2017, the difference between the statement of income for Station LLC and its consolidated subsidiaries and the statement of income for the Holding Company is that the Holding Company incurred a net loss of $3.9 million, which included SG&A expenses of $8.5 million, provision for income tax of $134.8 million and a benefit of $139.3 million primarily related to the impact of tax reform on our obligations under the TRA.

**Financial Condition, Capital Resources and Liquidity**

The following financial condition, capital resources and liquidity discussion contains certain forward-looking statements with respect to our business, financial condition, results of operations, dispositions, acquisitions, expansion projects and issuances of debt and equity, which involve risks and uncertainties that cannot be predicted or quantified, and consequently, actual results may differ materially from those expressed or implied herein. Such risks and uncertainties include, but are not limited to, the risks described in *Item 1A. Risk Factors*.

At December 31, 2018, we had $114.6 million in cash and cash equivalents, and Station LLC's borrowing availability under its credit facility, subject to continued compliance with its terms, was $498.9 million, which was net of $245.0 million in outstanding borrowings and $37.1 million in outstanding letters of credit and similar obligations. On February 8, 2019, we amended Station LLC's credit facility to, among other things, (i) increase the borrowing availability under the revolving credit facility by $115.0 million to $896.0 million and (ii) for consenting lenders under the term loan A facility and the revolving credit facility, extend the maturity date for their portion of such facilities by an additional year and reduce the interest rate thereunder by 25 basis points.

Our anticipated uses of cash for 2019 include (i) approximately $350.0 million to $400.0 million for maintenance and investment capital expenditures, including amounts related to the redevelopment of Palms, (ii) required principal and interest payments on Station LLC's indebtedness, totaling approximately $33.9 million and $134.9 million, respectively, (iii) $57.3 million for the purchase of the leased land on which Wild Wild West is located, and (iv) dividends to our Class A common stockholders and distributions to noncontrolling interest holders of Station Holdco, including approximately $11.7 million to be paid in March 2019.

We are obligated to make payments under the TRA, which is described in Note 16 to the Consolidated Financial Statements. At December 31, 2018, such obligations with respect to previously consummated transactions totaled $24.9 million. Future payments in respect of any subsequent exchanges of LLC Units for Class A common stock would be in addition to these amounts and are expected to be substantial. Required TRA payments are generally limited to one payment per year, and the timing of these payments may vary. The amount of such payments is also limited to the extent we utilize the related deferred tax assets. The payments that we are required to make will generally reduce the amount of overall cash that might have otherwise been available to us, but we expect the cash tax savings we will realize from the utilization of the related deferred tax assets to fund the required payments. See *Contractual Obligations* for additional information about the estimated amounts and timing of payments under the TRA.

From time to time, we may seek to repurchase our outstanding indebtedness. Any such purchases may be funded by existing cash balances or the incurrence of debt, including borrowings under our credit facility. The amount and timing of any repurchase will be based on business and market conditions, capital availability, compliance with debt covenants and other considerations.

In February 2019, our Board of Directors approved an equity repurchase program authorizing the repurchase of up to an aggregate of $150 million of our Class A common stock. We are not obligated to repurchase any shares under this program. Subject to applicable laws and the provisions of any agreements restricting our ability to do so, repurchases may be made at our discretion from time to time through open market purchases, negotiated transactions or tender offers, depending on market conditions and other factors.

We believe that cash flows from operations, available borrowings under the credit facility, other debt financings and existing cash balances will be adequate to satisfy our anticipated uses of capital for the next twelve months. We regularly assess our projected capital requirements for capital expenditures, repayment of debt obligations, and payment of other general corporate and operational needs. In the long term, we expect that we will fund our capital requirements with a combination of cash generated from operations, borrowings under the credit facility and the issuance of debt or equity as market conditions may permit. However, our cash flow and ability to obtain debt or equity financing on terms that are satisfactory to us, or at all, may be affected by a variety of factors, including competition, general economic and business conditions and financial markets. As a result, we cannot provide any assurance that we will generate sufficient income and liquidity to meet all of our liquidity requirements or other obligations.

Following is a summary of our cash flow information (amounts in thousands):

|  | Year Ended December 31, | | |
|  | 2018 | 2017 | 2016 |
| --- | --- | --- | --- |
| **Cash flows provided by (used in):** | | | |
| Operating activities | $   346,007 | $   289,960 | $   346,433 |
| Investing activities | (606,682) | (281,653) | (441,944) |
| Financing activities | 144,189 | 90,284 | 115,041 |

*Cash Flows from Operations*

Our operating cash flows primarily consist of operating income generated by our properties (excluding depreciation and other non-cash charges), interest paid and changes in working capital accounts such as inventories, prepaid expenses, receivables and payables. The majority of our revenue is generated from our slot machine and table game play, which is conducted primarily on a cash basis. Our food and beverage, room and other revenues are also primarily cash-based. As a result, fluctuations in our revenues have a direct impact on our cash flow from operations.

Net cash provided by operating activities for the year ended December 31, 2018 totaled $346.0 million, compared to $290.0 million for 2017. Operating cash flows for 2017 were negatively impacted by $97.2 million paid for the related party lease termination described under *Results of Operations* above, while operating cash flows for 2018 were impacted by a $41.8 million decrease in management fees due to the expiration of the Gun Lake management agreement in February 2018.

For 2017, net cash provided by operating activities totaled $290.0 million, compared to $346.4 million for 2016. Operating cash flows were negatively impacted by $97.2 million paid for the related party lease termination described under *Results of Operations* above and additional costs associated with being a public company. These negative impacts were partially offset by operating results from Palms, which we acquired in October 2016, as well as improved operating results from our properties and our Native American managed properties as described under *Results of Operations* above.

Cash flows from operating activities for all periods presented reflect normal fluctuations in our working capital accounts.

*Cash Flows from Investing Activities*

During 2018, 2017 and 2016, we paid $579.3 million, $248.4 million and $162.4 million, respectively, for capital expenditures, which were primarily related to various renovation projects, including the redevelopment of Palms and the upgrade and expansion project at Palace Station, as well as the purchase of slot machines and related gaming equipment. During 2018, we paid $36.1 million for land held for development. During 2017, we paid $23.4 million to a related party to purchase the land subject to the ground leases on which each of Boulder Station and Texas Station is located. During 2016, we paid $303.7 million, net of cash received, for the acquisition of Palms. Also during 2016, Fertitta Entertainment sold a consolidated subsidiary, which held an aircraft and related debt, to a related party for $8.0 million in cash and collected $18.3 million of related party notes. In addition, during 2018, 2017 and 2016, we paid $0.7 million, $2.5 million and $2.7 million, respectively, in reimbursable advances for the North Fork Project.

*Cash Flows from Financing Activities*

During 2018, we incurred net borrowings under the revolving credit facility of $245.0 million, which were primarily used to fund capital expenditures. We paid $27.7 million in dividends to Class A common shareholders and $19.9 million in cash distributions, primarily to the noncontrolling interest holders of Station Holdco. During 2018, we also paid $28.9 million to two pre-IPO owners of Station Holdco in exchange for which the owners assigned to us all of their rights under the TRA as described in Note 16 to the Consolidated Financial Statements.

During 2017, we completed an aggregate $531.9 million upsizing and repricing of Station LLC's credit facility and issued $550.0 million in aggregate principal amount of 5.00% Senior Notes. We paid fees and costs related to the credit facility amendments and 5.00% Senior Notes issuance of $24.6 million and $6.6 million, respectively. During the same period we paid $105.1 million in full settlement of the outstanding principal owed under the Restructured Land Loan and to acquire outstanding warrants of CV Propco and NP Tropicana. In addition, we redeemed all $500.0 million of the 7.50% Senior Notes and paid redemption premiums totaling $18.8 million. During the same period, we paid $27.0 million in dividends to Class A common shareholders and $38.3 million in cash distributions, consisting of $26.5 million paid to the noncontrolling interest holders of Station Holdco and $11.8 million paid by MPM to its noncontrolling interest holders.

In May 2016, we received net proceeds from the IPO of $531.9 million, which is net of $4.9 million of offering costs and a $4.1 million tax withholding payment. We used $112.5 million to purchase outstanding LLC Units from existing members of Station Holdco. Station LLC used the remaining proceeds from the IPO, along with additional borrowings under its credit facility, to complete the purchase of Fertitta Entertainment. Of the Fertitta Entertainment purchase price, $51.0 million was used to repay amounts outstanding under Fertitta Entertainment's credit facility, $18.7 million was paid to settle Fertitta Entertainment's liability-classified equity awards and $389.1 million was paid as a deemed distribution to Fertitta Entertainment's equity holders.

In 2016, Station LLC entered into a new credit facility, the proceeds of which were used to repay the principal balance outstanding under its prior credit facility and to pay related fees and costs totaling $37.6 million. In 2016, we paid $10.6 million in dividends to Class A common shareholders and we paid $125.5 million in distributions, of which $11.1 million represented distributions to noncontrolling interest holders of MPM. In 2016, we also paid $7.3 million to terminate an interest rate swap concurrently with entering into the credit facility, and we paid $6.0 million to the noncontrolling interest holders of MPM related to a note payable.

**Restrictive Covenants**

Certain customary covenants are included in both the credit agreement governing the credit facility and the indenture governing the 5.00% Senior Notes that, among other things and subject to certain exceptions, restrict Station LLC's ability and the ability of its restricted subsidiaries to incur or guarantee additional debt; create liens on collateral; engage in mergers, consolidations or asset dispositions; pay distributions; make investments, loans or advances; engage in certain transactions with affiliates or subsidiaries; engage in lines of business other than its core business and related businesses; or issue certain preferred units.

The credit facility also includes certain financial ratio covenants that Station LLC is required to maintain throughout the term of the credit facility and measure as of the end of each quarter. As most recently amended in February 2019, these financial ratio covenants include an interest coverage ratio of not less than 2.50 to 1.00 and a maximum consolidated total leverage ratio, with step-downs over the term of the credit facility, ranging from 6.50 to 1.00 at December 31, 2018 to 5.25 to

1.00 at December 31, 2021 and thereafter. A breach of the financial ratio covenants shall only become an event of default under the term loan B facility if the lenders providing the term loan A facility and the revolving credit facility take certain affirmative actions after the occurrence of a default of such financial ratio covenants. At December 31, 2018, Station LLC's interest coverage ratio was 4.40 to 1.00 and its consolidated total leverage ratio was 5.00 to 1.00, both as defined in the credit facility. We believe Station LLC was in compliance with all applicable covenants at December 31, 2018.

**Off-Balance Sheet Arrangements**

We have not entered into any transactions with special purpose entities and our derivative arrangements are described in Note 12 to the Consolidated Financial Statements. We do not have any retained or contingent interest in assets transferred to an unconsolidated entity. At December 31, 2018, we had outstanding letters of credit and similar obligations totaling $37.1 million.

**Contractual Obligations**

The following table summarizes our contractual obligations at December 31, 2018 (amounts in thousands):

| | Payments Due by Period | | | | |
|---|---|---|---|---|---|
| | Less than 1 year | 1-3 years | 3-5 years | Thereafter | Total |
| Long-term debt (a) | $    33,894 | $    178,724 | $ 2,113,290 | $    582,499 | $ 2,908,407 |
| Interest on long-term debt and interest rate swaps (b) | 134,906 | 271,757 | 187,050 | 58,311 | 652,024 |
| Operating leases (c) | 5,387 | 5,607 | 1,791 | 44,598 | 57,383 |
| Construction contracts (d) | 149,201 | — | — | — | 149,201 |
| Obligation under the tax receivable agreement (e) | — | 1,228 | 2,282 | 21,438 | 24,948 |
| Other (f) | 115,633 | 25,182 | 1,001 | — | 141,816 |
| Total contractual obligations | $    439,021 | $    482,498 | $ 2,305,414 | $    706,846 | $ 3,933,779 |

———————————————

(a)    Includes scheduled principal payments and estimated excess cash flow payments on long-term debt outstanding at December 31, 2018. Additional information about Station LLC's long-term debt is included in Note 11 to the Consolidated Financial Statements.

(b)    Includes contractual interest payments on fixed and variable rate long-term debt outstanding at December 31, 2018 based on outstanding amounts and interest rates in effect at that date, and projected cash payments on our interest rate swaps.

(c)    Does not include Wild Wild West land lease payments beyond one year due to the exercise of our option to purchase the land for $57.3 million.

(d)    Includes $138.1 million in commitments related to the redevelopment of Palms.

(e)    The timing and amount of aggregate payments due under the TRA may vary based on a number of factors, including the timing and amount of the taxable income we generate each year and the tax rate then applicable.

(f)    Includes employment contracts, long-term stay-on agreements, open purchase orders, natural gas purchase contracts, equipment purchase obligations and other long-term obligations. Payments due in less than one year include the Wild Wild West land purchase price.

**Inflation**

We do not believe that inflation has had a significant impact on our revenues, results of operations or cash flows in the last three fiscal years.

**Native American Development**

We have development and management agreements with the Mono, a federally recognized Native American tribe located near Fresno, California, pursuant to which we will assist the Mono in developing, financing and operating a gaming and entertainment facility to be located on Highway 99 north of the city of Madera, California. See Note 8 to the Consolidated Financial Statements for additional information.

**Regulation and Taxes**

We are subject to extensive regulation by Nevada gaming authorities, as well as regulation by gaming authorities in the other jurisdictions in which we operate, including the NIGC, the California Gambling Control Commission and the Federated Indians of Graton Rancheria Gaming Commission. We will also be subject to regulation, which may or may not be similar to that in Nevada, by any other jurisdiction in which we may conduct gaming activities in the future.

The gaming industry represents a significant source of tax revenue, particularly to the State of Nevada and its counties and municipalities. From time to time, various state and federal legislators and officials have proposed changes in tax law, or in the administration of such law, affecting the gaming industry. The Nevada legislature meets every two years for 120 days and when special sessions are called by the Governor. The current legislative session began on February 4, 2019, and we are not aware of any specific proposals to increase gaming taxes. There are no assurances that an increase in gaming taxes will not be proposed and passed by the Nevada Legislature in the current legislative session or in the future.

**Description of Certain Indebtedness**

*Long-term Debt*

A description of our indebtedness is included in Note 11 to the Consolidated Financial Statements.

*Derivative Instruments*

A description of our derivative and hedging activities and the related accounting is included in Note 12 to the Consolidated Financial Statements.

**Critical Accounting Policies and Estimates**

The preparation of consolidated financial statements in conformity with GAAP requires us to make estimates and judgments that are subject to an inherent degree of uncertainty. Certain accounting estimates and assumptions may have a material impact on our financial statements due to the significant levels of subjectivity and judgment involved and the susceptibility of such estimates and assumptions to change. We base our estimates on historical experience, information that is currently available to us and various other assumptions that we believe are reasonable under the circumstances, and we evaluate our estimates on an ongoing basis. Actual results may differ from these estimates, and such differences could have a material effect on our consolidated financial statements. Our significant accounting policies are described in Note 2 to the Consolidated Financial Statements. Following is a discussion of our accounting policies that involve critical estimates and assumptions.

*Long-Lived Assets*

Our business is capital intensive and a significant portion of our capital is invested in property and equipment and other long-lived assets. We review long-lived assets for impairment whenever events or changes in circumstances indicate the carrying amount of an asset may not be recoverable. We evaluate the recoverability of our long-lived assets by estimating the future cash flows the asset is expected to generate, and comparing these estimated cash flows, on an undiscounted basis, to the carrying amount of the asset. If the carrying amount is greater, the asset is considered to be impaired, and we recognize an impairment charge equal to the amount by which the carrying amount of the asset exceeds its fair value. We test our long-lived assets for impairment at the reporting unit level, and each of our operating properties is considered a separate reporting unit.

Inherent in the calculation of fair values are various estimates and assumptions, including estimates of future cash flows expected to be generated by an asset or asset group. We base our cash flow estimates on the current regulatory, political and economic climates in the areas where we operate, recent operating information and projections for our properties. These estimates could be negatively impacted by changes in federal, state or local regulations, economic downturns, changes in consumer preferences, or events affecting various forms of travel and access to our properties. Future cash flow estimates are, by their nature, subjective and actual results may differ materially from our estimates. The most significant assumptions used in determining cash flow estimates include forecasts of future operating results, EBITDA margins, tax rates, capital expenditures, depreciation expense, working capital requirements, long-term growth rates and terminal year free cash flows. Cash flow estimates and their impact on fair value are highly sensitive to changes in many of these assumptions. If our ongoing estimates of future cash flows are not met, we may be required to record impairment charges in the future.

*Property and Equipment.* At December 31, 2018, the carrying amount of our property and equipment was approximately $3.0 billion, which represents approximately 75.1% of our total assets. We make estimates and assumptions when accounting for property and equipment. We compute depreciation using the straight-line method over the estimated useful lives of the assets, and our depreciation expense is highly dependent on the assumptions we make about the estimated useful lives of our assets. We estimate the useful lives of our property and equipment based on our experience with similar assets and

our estimate of the usage of the asset. Whenever events or circumstances occur that change the estimated useful life of an asset, we account for the change prospectively. We must also make judgments about the capitalization of costs. Costs of major improvements are capitalized, while costs of normal repairs and maintenance are charged to expense as incurred. If an asset or asset group is disposed or retired before the end of its previously estimated useful life, we may be required to accelerate our depreciation expense or recognize a loss on disposal.

*Goodwill.* We test our goodwill for impairment annually during the fourth quarter of each year, and whenever events or circumstances indicate that it is more likely than not that impairment may have occurred. Impairment testing for goodwill is performed at the reporting unit level, and we consider each of our operating properties to be a separate reporting unit.

When performing the annual goodwill impairment testing, we either conduct a qualitative assessment to determine whether it is more likely than not that the asset is impaired, or elect to bypass this qualitative assessment and perform a quantitative test for impairment. Under the qualitative assessment, we consider both positive and negative factors, including macroeconomic conditions, industry events, financial performance and other changes, and make a determination of whether it is more likely than not that the fair value of goodwill is less than its carrying amount. If, after assessing the qualitative factors, we determine it is more likely than not the asset is impaired, we perform a quantitative test in which the estimated fair value of the reporting unit is compared with its carrying amount, including goodwill. If the carrying amount of the reporting unit exceeds its estimated fair value, an impairment loss is recognized in an amount equal to the excess, limited to the amount of goodwill allocated to the reporting unit.

When performing the quantitative test, we estimate the fair value of each reporting unit using the expected present value of future cash flows along with value indications based on our current valuation multiple and multiples of comparable publicly traded companies. The estimation of fair value requires management to make critical estimates, judgments and assumptions, including estimating expected future cash flows and selecting appropriate discount rates, valuation multiples and market comparables. Application of alternative estimates and assumptions could produce significantly different results.

At December 31, 2018, our goodwill totaled $195.7 million. Approximately 86.8% of our goodwill is associated with one of our properties. As of our 2018 annual goodwill testing date, the estimated fair values of each of our properties exceeded their respective carrying amounts. If the fair value of any of our properties should decline in the future, we may be required to recognize a goodwill impairment charge, which could be material. A property's fair value may decline as a result of a decrease in the property's actual or projected operating results or changes in significant assumptions and judgments used in the estimation process, including the discount rate and market multiple.

*Indefinite-Lived Intangible Assets.* Our indefinite-lived intangible assets primarily represent the value of our brands. At December 31, 2018, the carrying amount of our indefinite-lived intangible assets totaled approximately $77.5 million. Indefinite-lived intangible assets are not amortized unless management determines that their useful life is no longer indefinite. We test our indefinite-lived intangible assets for impairment during the fourth quarter of each year, and whenever events or changes in circumstances indicate that an asset may be impaired, by comparing the carrying amount of the asset to its estimated fair value. If the carrying amount of the asset exceeds its estimated fair value, we recognize an impairment charge equal to the excess. We estimate the fair value of our brands using a derivation of the income approach to valuation based on estimated royalties avoided through ownership of the assets. The fair values of certain of our properties' indefinite-lived intangible assets is highly sensitive to changes in projected operating results. Accordingly, any decrease in the projected operating results of a property could require us to recognize an impairment charge, which could be material.

*Finite-Lived Intangible Assets.* Our finite-lived intangible assets primarily represent the value of our management contracts and customer relationships. We amortize our finite-lived intangible assets over their estimated useful lives using the straight-line method, and we periodically evaluate the remaining useful lives of our finite-lived intangible assets to determine whether events or circumstances warrant a revision to the remaining period of amortization.

Our management contract intangible assets represent the value associated with management agreements under which we provide management services to various casino properties, primarily Native American casinos which we have developed or are currently developing. We estimated the fair values of our management contract intangible assets using discounted cash flow techniques based on future cash flows expected to be received in exchange for providing management services. We amortize our management contract intangible assets using the straight-line method over their expected useful lives, which is generally equal to the initial term of the management agreement. We begin recognizing amortization expense when the managed property commences operations and management fees are being earned. The recoverability of our management contract intangible assets is dependent upon the operating results of the managed casinos and the likelihood that the casino project we are currently developing is successfully completed.

Our customer relationship intangible assets represent the value associated with our rated casino guests. We estimated the fair values of our customer relationship intangible assets using a variation of the cost approach. The recoverability of our customer relationship intangible assets could be affected by, among other things, increased competition within the gaming industry, a downturn in the economy, declines in customer spending which would impact the expected future cash flows associated with the rated casino guests, declines in the number of customer visits which could impact the expected attrition rate of the rated casino guests, and erosion of operating margins associated with rated casino guests.

*Native American Development Costs.*  We incur certain costs associated with our development and management agreements with Native American tribes which are reimbursable by the tribes, and we capitalize these costs as long-term assets. The assets are typically transferred to the tribes at such time as the tribes secure third-party financing, or the gaming facility is completed. We earn a return on the costs incurred for the acquisition and development of Native American projects. Due to the uncertainty surrounding the timing and amount of the stated return, we recognize the return on a cash basis. Development costs and the related return are typically repaid by the tribes from a project's third-party financing or from operating cash flows of the casino after opening. Accordingly, the recoverability of our development costs is highly dependent upon the tribes' success in obtaining third-party financing and our ability to operate the project successfully upon its completion. Our evaluation of the recoverability of our Native American development costs requires us to apply a significant amount of judgment.

We evaluate our Native American development costs for impairment whenever events or changes in circumstances indicate that the carrying amount of the project might not be recoverable, taking into consideration all available information. Among other things, we consider the status of the project, any contingencies, the achievement of milestones, any existing or potential litigation and regulatory matters when evaluating our Native American projects for impairment. If an indicator of impairment exists, we compare the estimated future cash flows of the asset, on an undiscounted basis, to the carrying amount of the asset. If the undiscounted expected future cash flows for a project do not exceed its carrying amount, then the asset is written down to its estimated fair value. We estimate a project's fair value using a discounted cash flow model and market comparables, when available. Our estimate of the undiscounted future cash flows of a Native American development project is based on consideration of all positive and negative evidence about the future cash flow potential of the project including, but not limited to, the likelihood that the project will be successfully completed, the status of required approvals, and the status and timing of the construction of the project, as well as current and projected economic, political, regulatory and competitive conditions that may adversely impact the project's operating results. In certain circumstances, we may discontinue funding of a project due to a revision of its expected potential, or otherwise determine that our advances are not recoverable and as a result, we may be required to write off the entire carrying amount of a project.

*Player Rewards Program*

We have a player rewards program (the "Rewards Program") which allows customers to earn points based on their gaming activity and their non-gaming purchases. Loyalty points may be redeemed at all of our Las Vegas area properties for cash, slot play, food and beverage at any of our restaurants and bars, rooms, entertainment and merchandise. When guests earn points under the Rewards Program, we record a liability for our future performance obligations, measured at the redemption value of earned loyalty points that we believe will ultimately be redeemed. The recognition of the point liability primarily reduces casino revenue. When points are redeemed for cash, the Rewards Program point liability is reduced for the amount of cash paid out. When points are redeemed for slot play, food, beverage, rooms, entertainment and merchandise, revenues are recognized when the goods or services are provided, and such revenues are classified based on the type of goods or services provided with a corresponding reduction to the point liability.

*Self-Insurance Reserves*

We are currently self-insured up to certain stop loss amounts for workers' compensation and general liability costs. Insurance claims and reserves include accruals of estimated settlements for known claims, as well as accruals of estimates for claims incurred but not reported. In estimating these accruals, we evaluate historical loss experience and make judgments about the expected levels of costs per claim. We believe changes in medical costs, trends in claims of our employee base, accident frequency and severity and other factors could materially affect our estimates for these liabilities. We continually monitor changes in employee demographics, incident and claim type, evaluate our self-insurance accruals, and adjust our accruals based on our evaluation of these qualitative data points.

*Derivative Instruments*

We enter into interest rate swaps to hedge our exposure to variability in expected future cash flows related to interest payments on our debt. We recognize our derivative instruments at fair value on our Consolidated Balance Sheets as either assets or liabilities. The fair values of interest rate swaps are subject to significant estimation and a high degree of variability between reporting periods. A description of the assumptions we used in estimating the fair values of our interest rate swaps is included in

*Item 7A. Quantitative and Qualitative Disclosures About Market Risk.* The accounting for changes in the fair value of derivative instruments (i.e. gains or losses) depends on the intended use of the derivative, whether we have elected to designate a derivative in a hedging relationship and apply hedge accounting, and whether the hedging relationship has satisfied the criteria necessary to qualify for hedge accounting. At December 31, 2018 and 2017, none of our interest rate swaps were designated as cash flow hedges.

*Litigation, Claims and Assessments*

We are defendants in various lawsuits relating to routine matters incidental to our business and we assess the potential for any lawsuits or claims brought against us on an ongoing basis. For ongoing litigation and potential claims, we use judgment in determining the probability of loss and whether a reasonable estimate of loss, if any, can be made. We accrue a liability when we believe a loss is probable and the amount of the loss can be reasonably estimated. As the outcome of litigation is inherently uncertain, it is possible that certain matters may be resolved for materially different amounts than previously accrued or disclosed.

*Share-Based Compensation*

Share-based compensation for periods subsequent to the IPO includes stock options and restricted stock awarded to employees. We measure share-based compensation expense at the grant date based on the fair value of the award and recognize the expense over the requisite service period. We use the straight-line method to recognize compensation expense for share-based awards with graded vesting. The fair value of restricted stock awards is based on the closing share price of our stock on the grant date. We estimate the fair value of stock option awards using the Black-Scholes option pricing model, which utilizes various inputs and assumptions, some of which are subjective. Key inputs we use in applying the Black-Scholes option pricing model are the stock price on the date of grant, expected stock price volatility, expected term of the award, risk-free interest rate and expected dividend yield. As a result of the IPO and Reorganization Transactions in May 2016, we have limited historical data on which to base certain assumptions used in the Black-Scholes model. Accordingly, we use the historical volatility of comparable public companies to estimate our expected stock price volatility, and we use the simplified method to estimate the expected term of our stock option awards. The risk-free interest rate is based on the U.S. Treasury yield curve in effect at the date of grant for a period equal to the expected term. The expected dividend yield is based on the current annualized dividend as of the grant date and the average stock price for the year preceding the option grant.

*Income Taxes*

We are taxed as a corporation and will pay corporate federal, state and local taxes on our share of income allocated to us by Station Holdco. Station Holdco continues to operate as a partnership for federal, state and local tax reporting and holds 100% of the economic interests in Station LLC. The members of Station Holdco are liable for any income taxes resulting from their share of income allocated to them by Station Holdco as a pass-through entity.

We recognize deferred tax assets and liabilities based on the differences between the book value of assets and liabilities for financial reporting purposes and those amounts applicable for income tax purposes. Deferred tax assets represent future tax deductions or credits. Realization of the deferred tax assets ultimately depends on the existence of sufficient taxable income of the appropriate character in either the carryback or carryforward period.

Each quarter, we analyze the likelihood that our deferred tax assets will be realized. A valuation allowance is recorded if, based on the weight of all available positive and negative evidence, it is more likely than not (a likelihood of more than 50%) that some portion, or all, of a deferred tax asset will not be realized. On an annual basis, we perform a comprehensive analysis of all forms of positive and negative evidence based on year end results. During each interim period, we update our annual analysis for significant changes in the positive and negative evidence. We have determined that a portion of our deferred tax assets do not meet the "more likely than not" threshold required under the accounting standard and as a result, have provided a valuation allowance on our net deferred tax assets.

We record uncertain tax positions on the basis of a two-step process in which (1) we determine whether it is more likely than not the tax positions will be sustained on the basis of the technical merits of the position and (2) for those tax positions meeting the more likely than not recognition threshold, we recognize the largest amount of tax benefit that is more than 50% likely to be realized upon ultimate settlement with the related tax authority.

We determined that no liability for unrecognized tax benefits for uncertain tax positions was required to be recorded at December 31, 2018. In addition, we do not believe that we have any tax positions for which it is reasonably possible that we will be required to record a significant liability for unrecognized tax benefits within the next twelve months.

Interest and penalties related to income taxes are included in our income tax provision. We have incurred no interest or penalties related to income taxes in any of the periods presented.

*Tax Receivable Agreement with Related Parties*

In connection with the IPO, we entered into the TRA with certain pre-IPO owners of Station Holdco. In the event that such parties exchange any or all of their LLC Units for Class A common stock, the TRA requires us to make payments to such holders for 85% of the tax benefits we realize by such exchange. The annual tax benefits are computed by calculating the income taxes due, including such tax benefits, and the income taxes due without such benefits. At December 31, 2018, our liability under the TRA with respect to previously consummated transactions was $24.9 million. Future payments in respect of any subsequent exchanges of LLC Units for Class A common stock would be in addition to these amounts and are expected to be substantial.

The timing and amount of aggregate payments due under the TRA may vary based on a number of factors, including the timing and amount of the taxable income we generate each year and the tax rate then applicable. The payment obligations under the TRA are our obligations and are not obligations of Station Holdco or Station LLC. Payments are generally due within a specified period of time following the filing of our annual tax return and interest on such payments will accrue from the original due date (without extensions) of the income tax return until the date paid. Payments not made within the required period after the filing of the income tax return generally accrue interest at a rate of LIBOR plus 5.00%.

The TRA will remain in effect until all such tax benefits have been utilized or expired unless we exercise our right to terminate the TRA. The TRA will also terminate if we breach our obligations under the TRA or upon certain mergers, asset sales or other forms of business combinations, or other changes of control. If we exercise our right to terminate the TRA, or if the TRA is terminated early in accordance with its terms, our payment obligations would be accelerated based upon certain assumptions, including the assumption that we would have sufficient future taxable income to utilize such tax benefits, and may substantially exceed the actual benefits, if any, we realize in respect of the tax attributes subject to the TRA.

## ITEM 7A.   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Market risk is the risk of loss arising from adverse changes in market rates and prices, such as interest rates, foreign currency exchange rates and commodity prices.

Our primary exposure to market risk is interest rate risk associated with our long-term debt. We evaluate our exposure to market risk by monitoring interest rates in the marketplace. We attempt to limit our exposure to interest rate risk by managing the mix of our long-term and short-term borrowings and by using interest rate swaps to achieve fixed cash flows attributable to interest payments on our variable-rate debt. Borrowings under our credit agreements bear interest at a margin above LIBOR or base rate (each as defined in the credit agreements) as selected by us. The total amount of outstanding borrowings is expected to fluctuate and may be reduced from time to time.

At December 31, 2018, $2.3 billion of the borrowings under our credit agreements were based on variable rates, primarily LIBOR, plus applicable margins of 2.00% to 2.50%. The LIBOR rate underlying our LIBOR-based borrowings outstanding under our credit facility ranged from 2.50% to 2.53%. The weighted-average interest rates for variable-rate debt shown in the long-term debt table below were calculated using the rates in effect at December 31, 2018. We cannot predict the LIBOR or base rate interest rates that will be in effect in the future, and actual rates will vary. Based on our outstanding borrowings at December 31, 2018, an assumed 1% increase in variable interest rates would cause our annual interest cost to increase by approximately $7.9 million, after giving effect to our interest rate swaps.

We are also exposed to interest rate risk related to our interest rate swap agreements which we use to hedge a portion of our variable-rate debt. At December 31, 2018, our interest rate swaps had a combined notional amount of $1.5 billion and a weighted-average fixed pay rate of 1.46%. This rate will increase to 1.94% over the exposure period ending in July 2021.

Certain of our interest rate swaps were previously designated in cash flow hedging relationships until their dedesignation in June 2017. Although we no longer apply hedge accounting to these interest rate swaps, they continue to meet our risk management objectives by achieving fixed cash flows attributable to interest payments on the debt principal being hedged. See Note 12 to the Consolidated Financial Statements for detailed information about our interest rate swaps. We do not use derivative financial instruments for trading or speculative purposes.

Interest rate movements affect the fair value of our interest rate swaps. The fair values of our interest rate swaps are determined using widely accepted valuation techniques including discounted cash flow analysis on the expected cash flows of the instrument. This analysis reflects the contractual terms of the agreements, including the period to maturity, and uses observable market-based inputs, including forward interest rate curves. We incorporate credit valuation adjustments to appropriately reflect both our own nonperformance risk and the respective counterparty's nonperformance risk in the fair value measurement. Fair value is subject to significant estimation and a high degree of variability between periods and changes in the

fair values of our interest rate swaps are recognized in our Consolidated Statements of Income in the period of change. In addition, we are exposed to credit risk should the counterparties fail to perform under the terms of the interest rate swap agreements; however, we seek to minimize our exposure to this risk by entering into interest rate swap agreements with highly rated counterparties, and we do not believe we were exposed to significant credit risk at December 31, 2018.

Following is information about future principal maturities of our long-term debt and the related weighted-average contractual interest rates in effect at December 31, 2018 (dollars in millions):

| | Expected maturity date | | | | | | | |
| | 2019 | 2020 | 2021 | 2022 | 2023 | Thereafter | Total | Fair value |
|---|---|---|---|---|---|---|---|---|
| Long-term debt: | | | | | | | | |
| Fixed rate | $ 1.5 | $ 1.0 | $ 1.1 | $ 1.2 | $ 1.4 | $ 582.5 | $ 588.7 | $ 525.4 |
| Weighted-average interest rate | 6.44% | 6.70% | 6.70% | 6.70% | 6.70% | 5.10% | | |
| Variable rate (a) | $ 32.4 | $ 79.4 | $ 97.2 | $ 519.3 | $ 1,591.4 | $ — | $ 2,319.7 | $ 2,240.1 |
| Weighted-average interest rate | 4.82% | 4.94% | 4.96% | 4.57% | 5.03% | —% | | |

(a)    Based on variable interest rates and margins in effect at December 31, 2018.

Following is information about the combined notional amount and weighted-average interest rate by contractual maturity date for our interest rate swap agreements, as well as the fair value of the combined net asset at December 31, 2018 (dollars in millions):

| | Expected maturity date | | | | | | | |
| | 2019 | 2020 | 2021 | 2022 | 2023 | Thereafter | Total | Fair value (c) |
|---|---|---|---|---|---|---|---|---|
| Interest rate swaps: | | | | | | | | |
| Notional amount | $ 127.3 | $ 156.2 | $ 1,250.0 | $ — | $ — | $ — | $ 1,533.5 | $ 23.9 |
| Fixed interest rate payable (a) | 1.59% | 1.83% | 1.94% | —% | —% | —% | | |
| Variable interest rate receivable (b) | 2.39% | 2.39% | 2.39% | —% | —% | —% | | |

(a)    Represents the weighted-average fixed interest rate payable on our interest rate swaps.
(b)    Represents the variable receive rate in effect at December 31, 2018.
(c)    Excludes accrued interest.

Additional information about our long-term debt and interest rate swaps is included in Notes 11 and 12 to the Consolidated Financial Statements.

**ITEM 8.   FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 62 |
| Consolidated Balance Sheets as of December 31, 2018 and 2017 | 63 |
| Consolidated Statements of Income — Years ended December 31, 2018, 2017 and 2016 | 64 |
| Consolidated Statements of Comprehensive Income — Years ended December 31, 2018, 2017 and 2016 | 65 |
| Consolidated Statements of Stockholders'/Members' Equity — Years ended December 31, 2018, 2017 and 2016 | 66 |
| Consolidated Statements of Cash Flows — Years ended December 31, 2018, 2017 and 2016 | 69 |
| Notes to Consolidated Financial Statements | 71 |

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Red Rock Resorts, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Red Rock Resorts, Inc. (the Company) as of December 31, 2018 and 2017, the related consolidated statements of income, comprehensive income, stockholders'/members' equity and cash flows for each of the three years in the period ended December 31, 2018, and the related notes and the financial statement schedule listed in the Index at Item 15(a)2. (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the consolidated financial position of the Company at December 31, 2018 and 2017, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2018, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), and our report dated February 26, 2019 expressed an unqualified opinion thereon.

**Adoption of New Accounting Standards**

As discussed in Note 2 to the financial statements, the Company changed its method of accounting for its revenue from contracts with customers in 2018 due to the adoption of Accounting Standards Update ("ASU") No. 2014-09 "*Revenue from Contracts with Customers (Topic 606).*"

**Basis for the Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2015.

Las Vegas, Nevada
February 26, 2019

**RED ROCK RESORTS, INC.**
**CONSOLIDATED BALANCE SHEETS**
**(amounts in thousands, except share data)**

| | December 31, | |
| --- | --- | --- |
| | **2018** | **2017** |
| ASSETS | | |
| Current assets: | | |
| Cash and cash equivalents | $ 114,607 | $ 231,465 |
| Restricted cash | 3,651 | 3,279 |
| Receivables, net | 51,291 | 48,730 |
| Income tax receivable | 65 | 256 |
| Inventories | 14,910 | 12,572 |
| Prepaid gaming tax | 23,422 | 21,597 |
| Prepaid expenses and other current assets | 34,417 | 19,373 |
| Assets held for sale | 19,602 | 4,290 |
| Total current assets | 261,965 | 341,562 |
| Property and equipment, net | 3,012,405 | 2,542,111 |
| Goodwill | 195,676 | 195,676 |
| Intangible assets, net | 117,220 | 128,000 |
| Land held for development | 193,686 | 177,182 |
| Investments in joint ventures | 8,903 | 10,133 |
| Native American development costs | 17,970 | 17,270 |
| Deferred tax asset, net | 111,833 | 132,731 |
| Other assets, net | 89,868 | 75,456 |
| Total assets | $ 4,009,526 | $ 3,620,121 |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | |
| Current liabilities: | | |
| Accounts payable | $ 25,896 | $ 21,626 |
| Accrued interest payable | 7,418 | 10,611 |
| Other accrued liabilities | 266,474 | 182,903 |
| Current portion of payable pursuant to tax receivable agreement | — | 17 |
| Current portion of long-term debt | 33,894 | 30,094 |
| Total current liabilities | 333,682 | 245,251 |
| Long-term debt, less current portion | 2,821,465 | 2,587,728 |
| Deficit investment in joint venture | 2,212 | 2,235 |
| Other long-term liabilities | 10,224 | 11,289 |
| Payable pursuant to tax receivable agreement, net of current portion | 24,948 | 141,906 |
| Total liabilities | 3,192,531 | 2,988,409 |
| Commitments and contingencies (Note 20) | | |
| Stockholders' equity: | | |
| Preferred stock, par value $0.01 per share, 100,000,000 shares authorized; none issued and outstanding | — | — |
| Class A common stock, par value $0.01 per share, 500,000,000 shares authorized; 69,662,590 and 68,897,563 shares issued and outstanding at December 31, 2018 and 2017, respectively | 697 | 689 |
| Class B common stock, par value $0.00001 per share, 100,000,000 shares authorized; 46,884,413 and 47,264,413 shares issued and outstanding at December 31, 2018 and 2017, respectively | 1 | 1 |
| Additional paid-in capital | 361,970 | 349,430 |
| Retained earnings | 155,869 | 26,138 |
| Accumulated other comprehensive income | 1,083 | 2,473 |
| Total Red Rock Resorts, Inc. stockholders' equity | 519,620 | 378,731 |
| Noncontrolling interest | 297,375 | 252,981 |
| Total stockholders' equity | 816,995 | 631,712 |
| Total liabilities and stockholders' equity | $ 4,009,526 | $ 3,620,121 |

The accompanying notes are an integral part of these consolidated financial statements.

**RED ROCK RESORTS, INC.**
**CONSOLIDATED STATEMENTS OF INCOME**
**(amounts in thousands, except per share data)**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | **2016** |
| Operating revenues: | | | |
| Casino | $ 940,483 | $ 886,206 | $ 814,218 |
| Food and beverage | 381,197 | 365,448 | 330,488 |
| Room | 170,824 | 179,041 | 145,810 |
| Other | 100,912 | 92,967 | 73,724 |
| Management fees | 87,614 | 118,477 | 111,520 |
| Net revenues | 1,681,030 | 1,642,139 | 1,475,760 |
| Operating costs and expenses: | | | |
| Casino | 326,980 | 311,086 | 273,443 |
| Food and beverage | 340,212 | 326,069 | 291,224 |
| Room | 78,440 | 81,768 | 61,410 |
| Other | 48,431 | 40,332 | 30,661 |
| Selling, general and administrative | 390,492 | 380,930 | 327,313 |
| Depreciation and amortization | 180,255 | 178,217 | 156,668 |
| Write-downs and other charges, net | 34,650 | 29,584 | 24,591 |
| Tax receivable agreement liability adjustment | (90,638) | (139,300) | 739 |
| Related party lease termination | — | 100,343 | — |
| Asset impairment | — | 1,829 | — |
| | 1,308,822 | 1,310,858 | 1,166,049 |
| Operating income | 372,208 | 331,281 | 309,711 |
| Earnings from joint ventures | 2,185 | 1,632 | 1,913 |
| Operating income and earnings from joint ventures | 374,393 | 332,913 | 311,624 |
| Other (expense) income: | | | |
| Interest expense, net | (143,099) | (131,442) | (140,189) |
| Loss on extinguishment/modification of debt, net | — | (16,907) | (7,270) |
| Change in fair value of derivative instruments | 12,415 | 14,112 | 87 |
| Other | (354) | (357) | (45) |
| | (131,038) | (134,594) | (147,417) |
| Income before income tax | 243,355 | 198,319 | 164,207 |
| Provision for income tax | (23,875) | (134,786) | (8,243) |
| Net income | 219,480 | 63,533 | 155,964 |
| Less: net income attributable to noncontrolling interests | 61,939 | 28,110 | 64,012 |
| Net income attributable to Red Rock Resorts, Inc. | $ 157,541 | $ 35,423 | $ 91,952 |
| | | | |
| Earnings per common share (Note 19): | | | |
| Earnings per share of Class A common stock, basic | $ 2.28 | $ 0.53 | $ 1.04 |
| Earnings per share of Class A common stock, diluted | $ 1.77 | $ 0.42 | $ 1.03 |
| | | | |
| Weighted-average common shares outstanding: | | | |
| Basic | 69,115 | 67,397 | 34,141 |
| Diluted | 116,859 | 115,930 | 34,285 |

The accompanying notes are an integral part of these consolidated financial statements.

**RED ROCK RESORTS, INC.**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
**(amounts in thousands)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| Net income | $ 219,480 | $ 63,533 | $ 155,964 |
| Other comprehensive (loss) income, net of tax: | | | |
| (Loss) gain on interest rate swaps: | | | |
| Unrealized (loss) gain arising during period | — | (1,025) | 5,726 |
| Reclassification into income | (2,442) | 658 | 4,973 |
| (Loss) gain on interest rate swaps recognized in other comprehensive (loss) income | (2,442) | (367) | 10,699 |
| (Loss) gain on available-for-sale securities: | | | |
| Unrealized gain arising during period | — | 8 | 135 |
| Reclassification into income | — | (120) | — |
| (Loss) gain on available-for-sale securities recognized in other comprehensive (loss) income | — | (112) | 135 |
| Minimum pension liability adjustment, net | (310) | (165) | 5 |
| Other comprehensive (loss) income, net of tax | (2,752) | (644) | 10,839 |
| Comprehensive income | 216,728 | 62,889 | 166,803 |
| Less: comprehensive income attributable to noncontrolling interests | 60,610 | 27,649 | 69,950 |
| Comprehensive income attributable to Red Rock Resorts, Inc. | $ 156,118 | $ 35,240 | $ 96,853 |

The accompanying notes are an integral part of these consolidated financial statements.

# RED ROCK RESORTS, INC.
## CONSOLIDATED STATEMENTS OF STOCKHOLDERS'/MEMBERS' EQUITY
### (amounts in thousands)

| | Station Holdco Combined Members' Equity | | Red Rock Resorts, Inc. Stockholders' Equity | | | | | | | | |
| | | | Common Stock | | | | | | | | |
| | | | Class A | | Class B | | | | | | |
| | Controlling members' equity | Noncontrolling interest | Shares | Amount | Shares | Amount | Additional paid in capital | Retained earnings | Accumulated other comprehensive income | Noncontrolling interest | Total stockholders'/members' equity |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balances, December 31, 2015** | $ 552,924 | $  20,785 | — | $  — | — | $  — | $  — | $  — | $  — | $  — | $  573,709 |
| Cumulative-effect adjustment from adoption of new accounting standard for revenue recognition (Note 2) | (6,835) | — | — | — | — | — | — | — | — | — | (6,835) |
| *Activity prior to the IPO and reorganization transactions:* | | | | | | | | | | | |
| Net income | 63,492 | 3,007 | — | — | — | — | — | — | — | — | 66,499 |
| Other comprehensive income | 18 | — | — | — | — | — | — | — | — | — | 18 |
| Share-based compensation | 542 | — | — | — | — | — | — | — | — | — | 542 |
| Distributions | (83,883) | (3,567) | — | — | — | — | — | — | — | — | (87,450) |
| *Effects of the IPO and reorganization transactions:* | | | | | | | | | | | |
| Effects of the reorganization transactions | (526,258) | (20,225) | — | — | — | — | 531,543 | — | (5,285) | 20,225 | — |
| Issuance of Class A common stock in the IPO, net of underwriting discount and offering costs | — | — | 29,512 | 295 | — | — | 531,654 | — | — | — | 531,949 |
| Issuance of Class B common stock | — | — | — | — | 80,562 | 1 | — | — | — | — | 1 |
| Purchase of LLC Units from Continuing Owners — deemed distribution | — | — | — | — | (6,136) | — | (112,474) | — | — | — | (112,474) |
| Issuance of Class A common stock in exchange for LLC Units | — | — | 11,747 | 117 | — | — | (117) | — | — | — | — |
| Purchase of Fertitta Entertainment — deemed distribution | — | — | — | — | — | — | (389,650) | — | — | — | (389,650) |
| Issuance of restricted stock awards | — | — | 190 | 2 | — | — | (2) | — | — | — | — |
| Recognition of tax receivable agreement liability | — | — | — | — | — | — | (44,475) | — | — | — | (44,475) |
| Net deferred tax assets resulting from the reorganization transactions | — | — | — | — | — | — | 30,835 | — | 364 | — | 31,199 |
| Allocation of equity to noncontrolling interests in Station Holdco | — | — | — | — | — | — | (361,812) | — | 3,411 | 358,401 | — |
| *Activity subsequent to the IPO and reorganization transactions:* | | | | | | | | | | | |
| Net income | — | — | — | — | — | — | — | 28,460 | — | 61,005 | 89,465 |
| Other comprehensive income, net of tax | — | — | — | — | — | — | — | — | 4,883 | 5,938 | 10,821 |
| Share-based compensation | — | — | — | — | — | — | 1,975 | — | — | 1,448 | 3,423 |
| Distributions | — | — | — | — | — | — | — | — | — | (38,052) | (38,052) |
| Dividends | — | — | — | — | — | — | — | (10,688) | — | — | (10,688) |
| Forfeitures of restricted stock awards, net of issuances | — | — | (19) | 1 | — | — | (1) | — | — | — | — |
| Repurchases of Class A common stock | — | — | (7) | — | — | — | (157) | — | — | — | (157) |

**RED ROCK RESORTS, INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS'/MEMBERS' EQUITY (continued)**
**(amounts in thousands)**

| | Station Holdco Combined Members' Equity | | Red Rock Resorts, Inc. Stockholders' Equity | | | | | | | | |
| | | | Common Stock | | | | | | | | |
| | | | Class A | | Class B | | | | | | |
| | Controlling members' equity | Noncontrolling interest | Shares | Amount | Shares | Amount | Additional paid in capital | Retained earnings | Accumulated other comprehensive income | Noncontrolling interest | Total stockholders' / members' equity |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Exchanges of noncontrolling interests for Class A common stock | — | — | 24,470 | 244 | (24,470) | — | 126,698 | — | — | (126,942) | — |
| Recognition of tax receivable agreement liability resulting from exchanges of noncontrolling interests for Class A common stock | — | — | — | — | — | — | (213,247) | — | — | — | (213,247) |
| Net deferred tax assets resulting from exchanges of noncontrolling interests of Class A common stock | — | — | — | — | — | — | 223,000 | — | — | — | 223,000 |
| Rebalancing of ownership percentage between the Company and noncontrolling interests in Station Holdco | — | — | — | — | — | — | 2,192 | — | (915) | (1,277) | — |
| **Balances, December 31, 2016** | $ — | $ — | 65,893 | $ 659 | 49,956 | $ 1 | $ 325,962 | $ 17,772 | $ 2,458 | $ 280,746 | $ 627,598 |
| Net income | — | — | — | — | — | — | — | 35,423 | — | 28,110 | 63,533 |
| Other comprehensive loss, net of tax | — | — | — | — | — | — | — | — | (183) | (461) | (644) |
| Share-based compensation | — | — | — | — | — | — | 8,000 | — | — | — | 8,000 |
| Distributions | — | — | — | — | — | — | — | — | — | (38,290) | (38,290) |
| Dividends | — | — | — | — | — | — | — | (27,057) | — | — | (27,057) |
| Issuance of restricted stock awards, net of forfeitures | — | — | 188 | 2 | — | — | (2) | — | — | — | — |
| Repurchases of Class A common stock | — | — | (3) | — | — | — | (93) | — | — | — | (93) |
| Stock option exercises | — | — | 128 | 1 | — | — | 2,500 | — | — | — | 2,501 |
| Exchanges of noncontrolling interests for Class A common stock | — | — | 2,692 | 27 | (2,692) | — | 14,510 | — | 228 | (14,765) | — |
| Recognition of tax receivable agreement liability resulting from exchanges of noncontrolling interests for Class A common stock | — | — | — | — | — | — | (22,761) | — | — | — | (22,761) |
| Net deferred tax assets resulting from exchanges of noncontrolling interests of Class A common stock | — | — | — | — | — | — | 24,291 | — | — | — | 24,291 |
| Tax effects resulting from stock option exercises | — | — | — | — | — | — | (882) | — | — | — | (882) |
| Acquisition of subsidiary noncontrolling interests | — | — | — | — | — | — | 2,850 | — | — | (7,334) | (4,484) |
| Rebalancing of ownership percentage between the Company and noncontrolling interests in Station Holdco | — | — | — | — | — | — | (4,945) | — | (30) | 4,975 | — |
| **Balances, December 31, 2017** | $ — | $ — | 68,898 | $ 689 | 47,264 | $ 1 | $ 349,430 | $ 26,138 | $ 2,473 | $ 252,981 | $ 631,712 |
| Net income | — | — | — | — | — | — | — | 157,541 | — | 61,939 | 219,480 |
| Other comprehensive loss, net of tax | — | — | — | — | — | — | — | — | (1,423) | (1,329) | (2,752) |
| Share-based compensation | — | — | — | — | — | — | 11,343 | — | — | — | 11,343 |
| Distributions | — | — | — | — | — | — | — | — | — | (19,940) | (19,940) |
| Dividends | — | — | — | — | — | — | — | (27,810) | — | — | (27,810) |
| Issuance of restricted stock awards, net of forfeitures | — | — | 122 | 1 | — | — | (1) | — | — | — | — |

67

**RED ROCK RESORTS, INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS'/MEMBERS' EQUITY (continued)**
**(amounts in thousands)**

| | Station Holdco Combined Members' Equity | | Red Rock Resorts, Inc. Stockholders' Equity | | | | | | | | |
| | | | Common Stock | | | | | | | | |
| | | | Class A | | Class B | | | | | | |
| | Controlling members' equity | Noncontrolling interest | Shares | Amount | Shares | Amount | Additional paid in capital | Retained earnings | Accumulated other comprehensive income | Noncontrolling interest | Total stockholders' / members' equity |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Repurchases of Class A common stock | — | — | (10) | — | — | — | (307) | — | — | — | (307) |
| Stock option exercises | — | — | 273 | 3 | — | — | 5,378 | — | — | — | 5,381 |
| Exchanges of noncontrolling interests for Class A common stock | — | — | 380 | 4 | (380) | — | 2,149 | — | 21 | (2,174) | — |
| Recognition of tax receivable agreement liability resulting from exchanges of noncontrolling interests for Class A common stock | — | — | — | — | — | — | (2,528) | — | — | — | (2,528) |
| Net deferred tax assets resulting from exchanges of noncontrolling interests for Class A common stock | — | — | — | — | — | — | 2,675 | — | — | — | 2,675 |
| Tax effects resulting from stock option exercises | — | — | — | — | — | — | (259) | — | — | — | (259) |
| Rebalancing of ownership percentage between the Company and noncontrolling interests in Station Holdco | — | — | — | — | — | — | (5,910) | — | 12 | 5,898 | — |
| Balances, December 31, 2018 | $ — | $ — | 69,663 | $ 697 | 46,884 | $ 1 | $ 361,970 | $ 155,869 | $ 1,083 | $ 297,375 | $ 816,995 |

The accompanying notes are an integral part of these consolidated financial statements.

68

**RED ROCK RESORTS, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(amounts in thousands)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| Cash flows from operating activities: | | | |
| Net income | $ 219,480 | $ 63,533 | $ 155,964 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 180,255 | 178,217 | 156,668 |
| Change in fair value of derivative instruments | (12,415) | (14,112) | (87) |
| Reclassification of unrealized (gain) loss on derivative instruments into income | (2,929) | 1,176 | 5,066 |
| Write-downs and other charges, net | 3,519 | 19,783 | 6,156 |
| Tax receivable agreement liability adjustment | (90,638) | (139,300) | 739 |
| Asset impairment | — | 1,829 | — |
| Amortization of debt discount and debt issuance costs | 16,149 | 17,206 | 17,492 |
| Interest—paid in kind | — | — | 2,130 |
| Share-based compensation | 11,289 | 7,922 | 6,893 |
| Settlement of liability-classified equity awards | — | — | (18,739) |
| Earnings from joint ventures | (2,185) | (1,632) | (1,913) |
| Distributions from joint ventures | 2,033 | 961 | 1,334 |
| Loss on extinguishment/modification of debt, net | — | 16,907 | 7,270 |
| Deferred income tax | 23,860 | 136,156 | 6,993 |
| Changes in assets and liabilities: | | | |
| Receivables, net | (2,054) | (4,610) | (3,492) |
| Interest on related party notes receivable | — | — | (247) |
| Inventories and prepaid expenses | (17,749) | (6,999) | (510) |
| Accounts payable | 2,677 | (1,184) | 8,934 |
| Accrued interest payable | (3,193) | (5,148) | 2,460 |
| Income tax payable/receivable, net | 191 | 7,790 | (8,250) |
| Other accrued liabilities | 13,619 | 6,644 | 100 |
| Other, net | 4,098 | 4,821 | 1,472 |
| Net cash provided by operating activities | 346,007 | 289,960 | 346,433 |
| Cash flows from investing activities: | | | |
| Capital expenditures, net of related payables | (579,287) | (248,427) | (162,377) |
| Acquisition of land held for development | (36,106) | — | — |
| Acquisition of land from related party | — | (23,440) | — |
| Business acquisition, net of cash received | — | — | (303,734) |
| Proceeds from asset sales | 4,702 | 1,045 | 11,094 |
| Proceeds from repayment of related party note receivable | — | — | 18,330 |
| Distributions in excess of earnings from joint ventures | 1,359 | 1,038 | 1,015 |
| Native American development costs | (702) | (2,469) | (2,704) |
| Net settlement of derivative instruments | 9,842 | 585 | — |
| Other, net | (6,490) | (9,985) | (3,568) |
| Net cash used in investing activities | (606,682) | (281,653) | (441,944) |

**RED ROCK RESORTS, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS (continued)**
**(amounts in thousands)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| Cash flows from financing activities: | | | |
| Borrowings under credit agreements with original maturity dates greater than three months | 440,000 | 805,592 | 1,872,500 |
| Payments under credit agreements with original maturity dates greater than three months | (222,743) | (635,874) | (1,517,547) |
| Payments under credit agreements with original maturity dates of three months or less, net | — | — | (53,900) |
| Proceeds from issuance of 5.00% Senior Notes | — | 550,000 | — |
| Redemption of 7.50% Senior Notes | — | (500,000) | — |
| Proceeds from issuance of Class A common stock sold in initial public offering, net of underwriting discount and offering costs | — | — | 531,949 |
| Purchase of LLC Units from existing owners—deemed distribution | — | — | (112,474) |
| Purchase of Fertitta Entertainment—deemed distribution | — | — | (389,149) |
| Cash paid for early extinguishment of debt | — | (18,776) | — |
| Proceeds from exercise of stock options | 5,381 | 2,501 | — |
| Distributions to members and noncontrolling interests | (19,940) | (38,290) | (125,502) |
| Dividends | (27,698) | (26,980) | (10,645) |
| Payment of debt issuance costs | — | (31,419) | (39,815) |
| Payments on derivative instruments with other-than-insignificant financing elements | — | — | (10,831) |
| Payments on other debt | (823) | (5,180) | (22,288) |
| Payments on tax receivable agreement liability | (28,865) | — | — |
| Acquisition of subsidiary noncontrolling interests | — | (4,484) | — |
| Other, net | (1,123) | (6,806) | (7,257) |
| Net cash provided by financing activities | 144,189 | 90,284 | 115,041 |
| (Decrease) increase in cash, cash equivalents and restricted cash | (116,486) | 98,591 | 19,530 |
| Balance, beginning of year | 234,744 | 136,153 | 116,623 |
| Balance, end of year | $ 118,258 | $ 234,744 | $ 136,153 |
| | | | |
| Cash, cash equivalents and restricted cash: | | | |
| Cash and cash equivalents | $ 114,607 | $ 231,465 | $ 133,776 |
| Restricted cash | 3,651 | 3,279 | 2,377 |
| Balance, end of year | $ 118,258 | $ 234,744 | $ 136,153 |
| | | | |
| Supplemental cash flow disclosures: | | | |
| Cash paid for interest, net of $8,048, $1,110 and $0 capitalized, respectively | $ 124,419 | $ 118,519 | $ 116,314 |
| Cash paid for income taxes, net of refunds received | $ (176) | $ (9,160) | $ 9,500 |
| Non-cash investing and financing activities: | | | |
| Capital expenditures incurred but not yet paid | $ 112,668 | $ 39,673 | $ 21,375 |

The accompanying notes are an integral part of these consolidated financial statements.

## RED ROCK RESORTS, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**1.    Organization and Background**

Red Rock Resorts, Inc. ("Red Rock," or the "Company") was formed as a Delaware corporation in September 2015 to own an indirect equity interest in and manage Station Casinos LLC ("Station LLC"). Station LLC, a Nevada limited liability company, is a gaming, development and management company that owns and operates ten major gaming and entertainment facilities and ten smaller casino properties (three of which are 50% owned) in the Las Vegas regional market. Station LLC also manages a casino in Sonoma County, California on behalf of a Native American tribe. Station LLC managed a casino in Allegan County, Michigan on behalf of another Native American tribe through February 2018. The Company owns all of the outstanding voting interests in Station LLC and has an indirect interest in Station LLC through its ownership interest in Station Holdco LLC ("Station Holdco"), which owns all of the economic interests in Station LLC.

In May 2016, the Company completed its initial public offering ("IPO") of approximately 29.5 million shares of Class A common stock, $0.01 par value per share, at an offering price to the public of $19.50 per share. The Company received proceeds from the IPO of approximately $541 million, net of underwriting discount, which was used to purchase newly issued limited liability company interests in Station Holdco ("LLC Units") and outstanding LLC Units from existing members of Station Holdco. Station Holdco used the proceeds from the newly issued LLC Units to pay the majority of the purchase price of Fertitta Entertainment LLC ("Fertitta Entertainment"), a related party that managed Station LLC's properties pursuant to management agreements. The reorganization transactions related to the IPO are referred to herein as the "Reorganization Transactions."

In connection with the IPO and the reorganization of its corporate structure, the Company:

• Amended and restated its certificate of incorporation (as amended and restated, the "Certificate of Incorporation") to provide for Class A common stock and Class B common stock, par value of $0.00001 per share;

• Amended and restated the limited liability company agreements of both Station LLC and Station Holdco to, among other things, designate the Company as the sole managing member of Station LLC and Station Holdco;

• Issued for nominal consideration one share of Class B common stock to LLC Unit holders for each LLC Unit held for an aggregate issuance of 80,562,666 shares of Class B common stock;

• Issued 29,511,828 shares of Class A common stock and received proceeds of approximately $541 million, which is net of underwriting discount, and paid $4.9 million of offering costs;

• Issued 10,137,209 shares of Class A common stock in connection with the merger of certain entities that own LLC Units (the "Merging Blockers"), of which 222,959 shares were withheld to pay withholding tax obligations of $4.1 million with respect to certain members of the Merging Blockers;

• Issued, pursuant to the Red Rock Resorts, Inc. 2016 Equity Incentive Plan, 189,568 restricted shares of Class A common stock and options to purchase 1,687,205 shares of Class A common stock to certain of the Company's executive officers, employees and members of its board of directors, and issued 1,832,884 restricted shares of Class A common stock to current and former employees of Station LLC in substitution for profit units issued by Station Holdco that were held by such current and former employees;

• Purchased 6,136,072 LLC Units from certain LLC Unit holders using approximately $112.5 million of the net proceeds from the IPO at a price of $18.33 per unit, which was the price paid by the underwriters to the Company for Class A common stock in the IPO, and retired an equal number of shares of Class B common stock;

• Acquired newly issued LLC Units using approximately $424.4 million of the net proceeds from the IPO;

• Entered into an exchange agreement (the "Exchange Agreement") with the LLC Unit holders pursuant to which they are entitled at any time to exchange LLC Units, together with an equal number of shares of Class B common stock, for shares of Class A common stock on a one-for-one basis or for cash, at the Company's election; and

• Entered into a tax receivable agreement ("TRA") with the LLC Unit holders, as described in Note 2, that requires the Company to pay 85% of the amount of benefits it realizes as a result of (i) increases in tax basis resulting from the Company's purchase or exchange of LLC Units and (ii) certain other tax benefits related to the TRA, including tax benefits attributable to payments that the Company is required to make under the TRA itself.

At December 31, 2018, the Company held approximately 60% of the economic interests in Station Holdco as well as 100% of the voting interest in Station LLC and 100% of the voting power in Station Holdco, subject to certain limited exceptions, and is designated as the sole managing member of both Station Holdco and Station LLC. The Company controls

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

and operates all of the business and affairs of Station Holdco and Station LLC, and conducts all of its operations through these entities. The Company is a subchapter C corporation subject to federal income taxes and state income taxes in California and Michigan.

*Acquisitions*

Fertitta Entertainment

In May 2016, Station Holdco contributed $419.5 million of the proceeds from its newly issued LLC Units to Station LLC which used the proceeds, along with additional borrowings under its revolving credit facility, to acquire all of the outstanding membership interests of Fertitta Entertainment (the "Fertitta Entertainment Acquisition") for $460 million, which included $51.0 million paid in satisfaction of Fertitta Entertainment's term loan and revolving credit facility on the closing date, $18.7 million paid to settle Fertitta Entertainment's liability-classified equity awards and $1.3 million in assumed liabilities.

Prior to the Fertitta Entertainment Acquisition, Station LLC had long-term management agreements with affiliates of Fertitta Entertainment to manage its properties. In connection with the Fertitta Entertainment Acquisition, the management agreements were terminated and Station LLC entered into new employment agreements with its executive officers and other individuals who were employed by Fertitta Entertainment prior to the completion of the Fertitta Entertainment Acquisition.

Prior to the Fertitta Entertainment Acquisition, Station Holdco, Station LLC and Fertitta Entertainment were controlled by brothers Frank J. Fertitta III, the Company's Chairman and Chief Executive Officer, and Lorenzo J. Fertitta, the Company's Vice Chairman, who collectively held a majority of the voting and economic interests in these entities. The Fertitta Entertainment Acquisition constituted an acquisition of an entity under common control and was accounted for at historical cost in a manner similar to a pooling of interests. The Company recognized a deemed distribution of approximately $389.1 million to equity holders of Fertitta Entertainment, which represented the excess of the purchase price over the historical cost of the net assets acquired.

Palms Casino Resort

On October 1, 2016, the Company acquired Palms Casino Resort ("Palms") in Las Vegas, which offers gaming, lodging accommodations, dining, and entertainment, for $316.4 million. The acquisition was recorded using the acquisition method of accounting and accordingly, results of its operations have been included in the Company's consolidated financial statements for periods subsequent to the acquisition date. The cost of the acquisition was allocated to the assets acquired and liabilities assumed based on their estimated fair values as of the acquisition date, which were based on management estimates and a third-party appraisal. Transaction costs were expensed as incurred. Pro forma results of operations have not been provided as the acquisition was not material to the Company.

**2.      Basis of Presentation and Summary of Significant Accounting Policies**

*Principles of Consolidation*

Station Holdco and Station LLC are variable interest entities ("VIEs"), of which the Company is the primary beneficiary. Accordingly, the Company consolidates the financial position and results of operations of Station LLC and its consolidated subsidiaries and Station Holdco, and presents the interests in Station Holdco not owned by Red Rock within noncontrolling interest in the consolidated financial statements. Prior to the IPO, Red Rock had no operations or net assets. Red Rock's predecessor for accounting purposes was Station Holdco, as combined with Fertitta Entertainment, and accordingly, the accompanying financial statements represent the combined financial statements of Station Holdco and Fertitta Entertainment for periods prior to the IPO.

The amounts shown in the accompanying consolidated financial statements also include the accounts of MPM Enterprises, LLC ("MPM"), which is a 50% owned, consolidated VIE that managed a Native American casino in Allegan County, Michigan through February 2018. The financial position and results of operations attributable to third-party holdings of MPM are reported within noncontrolling interest in the consolidated financial statements. Investments in all other 50% or less owned affiliated companies are accounted for using the equity method.

All significant intercompany accounts and transactions have been eliminated. Certain amounts in the consolidated financial statements for the previous years have been reclassified to be consistent with the current year presentation.

*Use of Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America ("GAAP") requires management to make estimates and assumptions that affect the reported amounts of

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

*Fair Value Measurements*

For assets and liabilities accounted for or disclosed at fair value, the Company utilizes the fair value hierarchy established by the accounting guidance for fair value measurements and disclosures to categorize the inputs to valuation techniques used to measure fair value into three levels. The three levels of inputs are as follows:

Level 1: Quoted market prices in active markets for identical assets or liabilities.

Level 2: Observable market-based inputs or unobservable inputs that are corroborated by market data.

Level 3: Unobservable inputs that are not corroborated by market data.

The accounting guidance for fair value measurements and disclosures also provides the option to measure certain financial assets and liabilities at fair value with changes in fair value recognized in earnings each period. The Company has not elected to measure any financial assets or liabilities at fair value that are not required to be measured at fair value.

*Fair Value of Financial Instruments*

The carrying values of cash and cash equivalents, restricted cash, receivables and accounts payable approximate fair value primarily because of the short maturities of these instruments.

*Cash and Cash Equivalents*

Cash and cash equivalents consist of cash on hand and investments with an original maturity of 90 days or less.

*Restricted Cash*

Restricted cash consists of reserve funds for the Company's condominium operations at Palms.

*Receivables, Net and Credit Risk*

The Company's accounts receivable primarily represent receivables from contracts with customers and consist mainly of casino, hotel, ATM, cash advance, retail, management fees and other receivables, which are typically non-interest bearing.

Receivables are initially recorded at cost and an allowance for doubtful accounts is maintained to reduce receivables to their carrying amount, which approximates fair value. The allowance is estimated based on a specific review of customer accounts, historical collection experience, the age of the receivable and other relevant factors. Accounts are written off when management deems the account to be uncollectible, and recoveries of accounts previously written off are recorded when received. At December 31, 2018 and 2017, the allowance for doubtful accounts was $2.3 million and $1.2 million, respectively. Management believes there are no significant concentrations of credit risk.

*Inventories*

Inventories primarily represent food and beverage items and retail merchandise which are stated at the lower of cost or net realizable value. Cost is determined on a weighted-average basis.

*Assets Held for Sale*

The Company classifies assets as held for sale when an asset or asset group meets all of the held for sale criteria in the accounting guidance for impairment and disposal of long-lived assets. Assets held for sale are initially measured at the lower of their carrying amount or fair value less cost to sell. At December 31, 2018 and 2017, assets held for sale represented certain undeveloped land in Las Vegas.

*Property and Equipment*

Property and equipment is initially recorded at cost. Depreciation and amortization are computed using the straight-line method over the estimated useful lives of the assets, or for leasehold improvements, the shorter of the estimated useful life of the asset or the lease term, as follows:

| | |
|---|---|
| Buildings and improvements | 10 to 45 years |
| Furniture, fixtures and equipment | 3 to 10 years |

Costs of major improvements are capitalized, while costs of normal repairs and maintenance are charged to expense as incurred. Construction in progress is related to the construction or development of property and equipment that has not yet been

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

placed in service for its intended use. Depreciation and amortization of property and equipment commences when the asset is placed in service. When an asset is retired or otherwise disposed, the related cost and accumulated depreciation are removed from the accounts and the gain or loss on disposal is recognized within Write-downs and other charges, net. Assets recorded under capital leases are included in property and equipment and amortization of assets recorded under capital leases is included in depreciation expense and accumulated depreciation.

The Company makes estimates and assumptions when accounting for capital expenditures. The Company's depreciation expense is highly dependent on the assumptions made for the estimated useful lives of its assets. Useful lives are estimated by the Company based on its experience with similar assets and estimates of the usage of the asset. Whenever events or circumstances occur which change the estimated useful life of an asset, the Company accounts for the change prospectively.

*Native American Development Costs*

The Company incurs certain costs associated with development and management agreements with Native American tribes which are reimbursable by the tribes. Such costs are capitalized as long-term assets as incurred, and primarily include costs associated with the acquisition and related development of land and the casino facilities. The Company capitalizes interest on Native American development projects when activities are in progress to prepare the asset for its intended use. The assets are typically transferred to the tribe when the tribe secures third-party financing or the gaming facility is completed. Upon transfer of the assets to the tribe, any remaining carrying amount that has not yet been recovered from the tribe is reclassified to a long-term receivable.

The Company earns a return on the costs incurred for the acquisition and development of Native American development projects. Repayment of the advances and the return typically is funded from the tribe's third-party financing, from the cash flows of the gaming facility, or both. Due to the uncertainty surrounding the timing and amount of the stated return, the Company recognizes the return on a cash basis.

The Company evaluates its Native American development costs for impairment whenever events or changes in circumstances indicate that the carrying amount of a project might not be recoverable, taking into consideration all available information. Among other things, the Company considers the status of the project, any contingencies, the achievement of milestones, any existing or potential litigation, and regulatory matters when evaluating its Native American projects for impairment. If an indicator of impairment exists, the Company compares the estimated future cash flows of the project, on an undiscounted basis, to its carrying amount. If the undiscounted expected future cash flows do not exceed the carrying amount, the asset is written down to its estimated fair value, which typically is estimated based on a discounted future cash flow model or market comparables, when available. The Company estimates the undiscounted future cash flows of a Native American development project based on consideration of all positive and negative evidence about the future cash flow potential of the project including, but not limited to, the likelihood that the project will be successfully completed, the status of required approvals, and the status and timing of the construction of the project, as well as current and projected economic, political, regulatory and competitive conditions that may adversely impact the project's operating results.

*Goodwill*

The Company tests its goodwill for impairment annually during the fourth quarter of each year, and whenever events or circumstances indicate that it is more likely than not that impairment may have occurred. Impairment testing for goodwill is performed at the reporting unit level, and each of the Company's operating properties is considered a separate reporting unit.

When performing the annual goodwill impairment testing, the Company either conducts a qualitative assessment to determine whether it is more likely than not that the asset is impaired, or elects to bypass this qualitative assessment and perform a quantitative test for impairment. Under the qualitative assessment, the Company considers both positive and negative factors, including macroeconomic conditions, industry events, financial performance and other changes, and makes a determination of whether it is more likely than not that the fair value of goodwill is less than its carrying amount. If, after assessing the qualitative factors, the Company determines it is more likely than not the asset is impaired, it then performs a quantitative test in which the estimated fair value of the reporting unit is compared with its carrying amount, including goodwill. If the carrying amount of the reporting unit exceeds its estimated fair value, an impairment loss is recognized in an amount equal to the excess, limited to the amount of goodwill allocated to the reporting unit.

When performing the quantitative test, the Company estimates the fair value of each reporting unit using the expected present value of future cash flows along with value indications based on current valuation multiples of the Company and comparable publicly traded companies. The estimation of fair value involves significant judgment by management. Future cash flow estimates are, by their nature, subjective and actual results may differ materially from such estimates. Cash flow estimates are based on the current regulatory, political and economic climates, recent operating information and projections. Such estimates could be negatively impacted by changes in federal, state or local regulations, economic downturns, competition,

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

events affecting various forms of travel and access to the Company's properties, and other factors. If the Company's estimates of future cash flows are not met, it may have to record impairment charges in the future.

*Indefinite-Lived Intangible Assets*

The Company's indefinite-lived intangible assets primarily represent brands. The fair value of the Company's brands is estimated using a derivation of the income approach to valuation, based on estimated royalties avoided through ownership of the assets, utilizing market indications of fair value. The Company tests its indefinite-lived intangible assets for impairment annually during the fourth quarter of each year, and whenever events or circumstances indicate that it is more likely than not that an asset is impaired. Indefinite-lived intangible assets are not amortized unless it is determined that an asset's useful life is no longer indefinite. The Company periodically reviews its indefinite-lived assets to determine whether events and circumstances continue to support an indefinite useful life. If an indefinite-lived intangible asset no longer has an indefinite life, the asset is tested for impairment and is subsequently accounted for as a finite-lived intangible asset.

*Finite-Lived Intangible Assets*

The Company's finite-lived intangible assets primarily represent assets related to its management contracts and customer relationships, which are amortized over their estimated useful lives using the straight-line method. The Company periodically evaluates the remaining useful lives of its finite-lived intangible assets to determine whether events and circumstances warrant a revision to the remaining period of amortization.

The Company's management contract intangible assets represent the value associated with agreements under which the Company provides management services to various casino properties, primarily Native American casinos which it has developed. The fair values of management contract intangible assets were determined using discounted cash flow techniques based on future cash flows expected to be received in exchange for providing management services. The Company amortizes its management contract intangible assets over their expected useful lives beginning when the property commences operations and management fees are being earned. Should events or changes in circumstances cause the carrying amount of a management contract intangible asset to exceed its estimated fair value, an impairment charge in the amount of the excess would be recognized.

The Company's customer relationship intangible assets primarily represent the value associated with its rated casino guests. The initial fair values of customer relationship intangible assets were estimated based on a variation of the cost approach. The recoverability of the Company's customer relationship intangible assets could be affected by, among other things, increased competition within the gaming industry, a downturn in the economy, declines in customer spending which would impact the expected future cash flows associated with the rated casino guests, declines in the number of customer visits which could impact the expected attrition rate of the rated casino guests, and erosion of operating margins associated with rated casino guests. Should events or changes in circumstances cause the carrying amount of a customer relationship intangible asset to exceed its estimated fair value, an impairment charge in the amount of the excess would be recognized.

*Impairment of Long-Lived Assets*

The Company reviews the carrying amounts of its long-lived assets, other than goodwill and indefinite-lived intangible assets, for impairment whenever events or changes in circumstances indicate the carrying amount of an asset may not be recoverable. Recoverability is evaluated by comparing the estimated future cash flows of the asset, on an undiscounted basis, to its carrying amount. If the undiscounted estimated future cash flows exceed the carrying amount, no impairment is indicated. If the undiscounted estimated future cash flows do not exceed the carrying amount, impairment is measured based on the difference between the asset's estimated fair value and its carrying amount. To estimate fair values, the Company typically uses market comparables, when available, or a discounted cash flow model. Assets to be disposed of are carried at the lower of their carrying amount or fair value less costs of disposal. The fair value of assets to be disposed of is generally estimated based on comparable asset sales, solicited offers or a discounted cash flow model. The Company's long-lived asset impairment tests are performed at the reporting unit level.

*Debt Discounts and Debt Issuance Costs*

Debt discounts and costs incurred in connection with the issuance of long-term debt are capitalized and amortized to interest expense using the effective interest method over the expected term of the related debt agreements. Costs incurred in connection with the issuance of revolving lines of credit are presented in Other assets, net on the Consolidated Balance Sheets. All other capitalized costs incurred in connection with the issuance of long-term debt are presented as a direct reduction of Long-term debt, less current portion on the Consolidated Balance Sheets.

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

*Derivative Instruments*

The Company uses interest rate swaps to hedge its exposure to variability in expected future cash flows related to interest payments. In accordance with the accounting guidance for derivatives and hedging activities, the Company records all derivatives on the balance sheet at fair value. The fair values of the Company's derivatives are determined using widely accepted valuation techniques including discounted cash flow analysis on the expected cash flows of each derivative. This analysis reflects the contractual terms of the derivatives, including the period to maturity, and uses observable market-based inputs, including forward interest rate curves. The Company incorporates credit valuation adjustments to appropriately reflect both its own nonperformance risk and the respective counterparty's nonperformance risk in the fair value measurements.

The accounting for changes in fair value of derivative instruments depends on the intended use of the derivative and whether the Company has elected to designate a derivative in a hedging relationship and apply hedge accounting. For derivative instruments that are not designated as cash flow hedges of forecasted interest payments, all changes in fair value of the derivative instruments are presented in Change in fair value of derivative instruments in the Consolidated Statements of Income in the period in which the change occurs. The Company classifies cash flows for derivative instruments not designated as cash flow hedges as investing activities in the Consolidated Statements of Cash Flows.

For derivative instruments that are designated and qualify as cash flow hedges of forecasted interest payments, the Company defers the effective portion of the change in fair value of the derivative instruments as a component of other comprehensive (loss) income until the interest payments being hedged are recorded as interest expense, at which time the amounts in accumulated other comprehensive income are reclassified as an adjustment to interest expense. Gains or losses on any ineffective portion of the change in fair value of derivative instruments designated in cash flow hedging relationships are recorded in the period in which they occur as a component of Change in fair value of derivative instruments in the Consolidated Statements of Income. The Company classifies cash flows for derivative instruments accounted for as cash flow hedges as operating activities in the Consolidated Statements of Cash Flows. Cash flows related to cash flow hedges that include other-than-insignificant financing elements at inception are classified as financing activities.

*Comprehensive Income*

Comprehensive income includes net income and other comprehensive (loss) income, which includes all other non-owner changes in equity. Components of the Company's comprehensive income are reported in the Consolidated Statements of Comprehensive Income and Consolidated Statements of Stockholders'/Members' Equity, and accumulated other comprehensive income is included in stockholders' equity on the Consolidated Balance Sheets.

*Revenues*

The Company's revenue contracts with customers consist of gaming wagers, sales of food, beverage, hotel rooms and other amenities, and agreements to provide management services. Revenues are recognized when control of the promised goods or services is transferred to the guest, in an amount that reflects the consideration that the Company expects to be entitled to receive in exchange for those goods or services, referred to as the transaction price. Other revenues also include rental income from tenants, which is recognized over the lease term, and contingent rental income, which is recognized when the right to receive such rental income is established according to the lease agreements. Revenue is recognized net of cash sales incentives and discounts and excludes sales and other taxes collected from guests on behalf of governmental authorities.

The Company applies a practical expedient and accounts for its gaming and non-gaming contracts on a portfolio basis. This is because individual customer contracts have similar characteristics, and the Company reasonably expects the effects on the financial statements of applying its revenue recognition policy to the portfolio would not differ materially from applying its policy to the individual contracts.

<u>Casino Revenue</u>

Casino revenue includes gaming activities such as slot, table game and sports wagering. The transaction price for a gaming wagering contract is the difference between gaming wins and losses, not the total amount wagered. The transaction price is reduced for consideration payable to a guest, such as cash sales incentives and the change in progressive jackpot liabilities. Gaming contracts are typically completed daily based on the outcome of the wagering transaction and include a distinct performance obligation to provide gaming activities.

Guests may receive discretionary incentives for complimentary food, beverage, rooms, entertainment and merchandise to encourage additional gaming, or may earn loyalty points based on their gaming activity. The Company allocates the transaction price to each performance obligation in the gaming wagering contract. The amount allocated to loyalty points earned is based on an estimate of the standalone selling price of the loyalty points, which is determined by the redemption value less an estimate for points not expected to be redeemed. The amount allocated to discretionary complimentaries is the

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

standalone selling price of the underlying goods or services, which is determined using the retail price at which those goods or services would be sold separately in similar transactions. The remaining amount of the transaction price is allocated to wagering activity using the residual approach as the standalone selling price for gaming wagers is highly variable and no set established price exists for gaming wagers. Amounts allocated to wagering are recognized as casino revenue when the result of the wager is determined, and amounts allocated to loyalty points and discretionary complimentaries are recognized as revenue when the goods or services are provided.

<u>Non-gaming Revenue</u>

Non-gaming revenues include sales of food, beverage, hotel rooms and other amenities such as retail merchandise, bowling, spa services and entertainment. The transaction price is the net amount collected from the guest and includes a distinct performance obligation to provide such goods or services. Non-gaming revenues are recognized when the goods or services are provided to the guest. Guests may also earn loyalty points from non-gaming purchases or receive discretionary complimentaries that require the transaction price to be allocated to each performance obligation on a relative standalone selling price basis.

Non-gaming revenues also include the portion of the transaction price from gaming or non-gaming contracts allocated to discretionary complimentaries and the value of loyalty points redeemed for food, beverage, room and other amenities. Discretionary complimentaries are classified in the departmental revenue category fulfilling the complimentary with a corresponding reduction in the departmental revenues that provided the complimentary, which is primarily casino revenue. Included in non-gaming revenues are discretionary complimentaries and loyalty point redemptions of $206.5 million, $185.6 million and $166.8 million for the years ended December 31, 2018, 2017 and 2016, respectively.

<u>Management Fee Revenue</u>

Management fee revenue primarily represents fees earned from the Company's management agreements with Native American tribes. The transaction price for management contracts is the management fee to which the Company is entitled for its management services. The management fee represents variable consideration as it is based on a percentage of net income of the managed property, as defined in the management agreements. The management services are a single performance obligation to provide a series of distinct services over the term of the management agreement. The Company allocates and recognizes the management fee monthly as the management services are performed because there is a consistent measure throughout the contract period that reflects the value to the Native American tribe each month.

*Player Rewards Program*

The Company has a player rewards program (the "Rewards Program") that allows customers to earn points based on their gaming activity and non-gaming purchases. Guests may accumulate loyalty points over time that may be redeemed at their discretion under the terms of the Rewards Program. Loyalty points may be redeemed for cash, slot play, food, beverage, rooms, entertainment and merchandise at all of the Company's Las Vegas area properties.

When guests earn points under the Rewards Program, the Company recognizes a liability for future performance obligations. The Rewards Program point liability represents deferred gaming and non-gaming revenue, which is measured at the redemption value of loyalty points earned under the Rewards Program that management ultimately believes will be redeemed. The recognition of the Rewards Program point liability primarily reduces casino revenue.

When points are redeemed for cash, the point liability is reduced for the amount of cash paid out. When points are redeemed for slot play, food, beverage, rooms, entertainment and merchandise, revenues are recognized when the goods or services are provided, and such revenues are classified based on the type of goods or services provided with a corresponding reduction to the point liability.

The Company's performance obligation related to its loyalty point liability is generally completed within one year, as a guest's loyalty point balance is forfeited after six months of inactivity for a local guest and after thirteen months for an out-of-town guest, as defined in the Rewards Program. Loyalty points are generally earned and redeemed continually over time. As a result, the loyalty point liability balance remains relatively constant. The loyalty point liability is presented within Other accrued liabilities on the Consolidated Balance Sheet.

*Slot Machine Jackpots*

The Company does not accrue base jackpots if it is not legally obligated to pay the jackpot. A jackpot liability is accrued with a related reduction in casino revenue when the Company is obligated to pay the jackpot, such as the incremental amount in excess of the base jackpot on a progressive game.

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

*Gaming Taxes*

The Company is assessed taxes based on gross gaming revenue, subject to applicable jurisdictional adjustments. Gaming taxes are included in casino costs and expenses in the Consolidated Statements of Income. Gaming tax expense was as follows (amounts in thousands):

|  | Year Ended December 31, | | |
|  | 2018 | 2017 | 2016 |
|---|---|---|---|
| Gaming tax expense | $ 74,501 | $ 69,429 | $ 63,626 |

*Share-based Compensation*

The Company measures its share-based compensation cost at the grant date based on the fair value of the award, and recognizes the cost over the requisite service period. The fair value of stock options is estimated at the grant date using the Black-Scholes option pricing model. The fair value of restricted stock is based on the closing share price of the Company's stock on the grant date. The Company uses the straight-line method to recognize compensation cost for share-based awards with graded service-based vesting, and cumulative compensation cost recognized to date at least equals the grant-date fair value of the vested portion of the awards. Forfeitures are accounted for as they occur.

*Advertising*

The Company expenses advertising costs the first time the advertising takes place. Advertising expense is primarily included in selling, general and administrative expense in the Consolidated Statements of Income. Advertising expense was as follows (amounts in thousands):

|  | Year Ended December 31, | | |
|  | 2018 | 2017 | 2016 |
|---|---|---|---|
| Advertising expense | $ 24,302 | $ 22,094 | $ 21,144 |

*Write-downs and Other Charges, net*

Write-downs and other charges include asset disposals, preopening and redevelopment, innovation and development costs, severance and non-routine expenses. For the years ended December 31, 2018 and 2017, the Company recognized expenses associated with the ongoing redevelopment project at Palms, including the brand repositioning campaign, the grand opening of the first phase of the project in May 2018, and preopening related to new restaurants, nightclubs, bars and other amenities. For the year ended December 31, 2016, write-downs and other charges included expenses related to the IPO transaction, including advisory, legal and other charges that were not deferred as direct and incremental costs of the IPO, as well as costs related to the Fertitta Entertainment Acquisition.

*Income Taxes*

Red Rock is taxed as a corporation and pays corporate federal, state and local taxes on income allocated to it by Station Holdco. Station Holdco continues to operate as a partnership for federal, state and local tax reporting and holds 100% of the economic interests in Station LLC. The members of Station Holdco are liable for any income taxes resulting from income allocated to them by Station Holdco as a pass-through entity.

The Company recognizes deferred tax assets and liabilities based on the differences between the book value of assets and liabilities for financial reporting purposes and those amounts applicable for income tax purposes using enacted tax rates in effect for the year in which the differences are expected to reverse. The Company classifies all deferred tax assets and liabilities as noncurrent. The effect of a change in tax rates on deferred tax assets and liabilities is recognized in the period in which the enactment date occurs. Deferred tax assets represent future tax deductions or credits. Realization of the deferred tax assets ultimately depends on the existence of sufficient taxable income of the appropriate character in either the carryback or carryforward period.

Each reporting period, the Company analyzes the likelihood that its deferred tax assets will be realized. A valuation allowance is recorded if, based on the weight of all available positive and negative evidence, it is more likely than not (a likelihood of more than 50%) that some portion, or all, of a deferred tax asset will not be realized. On an annual basis, the Company performs a comprehensive analysis of all forms of positive and negative evidence based on year end results. During each interim period, the Company updates its annual analysis for significant changes in the positive and negative evidence.

The Company records uncertain tax positions on the basis of a two-step process in which (1) the Company determines whether it is more likely than not the tax positions will be sustained on the basis of the technical merits of the position and (2)

78

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

for those tax positions meeting the more likely than not recognition threshold, the Company recognizes the largest amount of tax benefit that is more than 50% likely to be realized upon ultimate settlement with the related tax authority.

The Company determined that no liability for unrecognized tax benefits for uncertain tax positions was required to be recorded at December 31, 2018 and 2017. In addition, the Company does not believe that it has any tax positions for which it is reasonably possible that it will be required to record a significant liability for unrecognized tax benefits within the next twelve months.

The Company will recognize interest and penalties related to income taxes, if any, within the provision for income taxes. The Company has incurred no interest or penalties related to income taxes in any of the periods presented.

*Tax Receivable Agreement with Related Parties*

In connection with the IPO, the Company entered into a TRA with certain pre-IPO owners of Station Holdco. In the event that such parties exchange any or all of their LLC Units for Class A common stock, the TRA requires the Company to make payments to such parties for 85% of the tax benefits realized by the Company by such exchange. The annual tax benefits are computed by calculating the income taxes due, including such tax benefits, and the income taxes due without such benefits. When an exchange transaction occurs, the Company initially recognizes the related TRA liability through a charge to equity, and any subsequent adjustments to the liability are recorded through the statements of income.

As a result of exchanges of LLC Units for Class A common stock and purchases by the Company of LLC Units from holders of such units, the Company is entitled to a proportionate share of the existing tax basis of the assets of Station Holdco at the time of such exchanges or purchases. In addition, such exchanges or purchases of LLC Units are expected to result in increases in the tax basis of the assets of Station Holdco that otherwise would not have been available. These increases in tax basis may reduce the amount of tax that the Company would otherwise be required to pay in the future. These increases in tax basis may also decrease gains (or increase losses) on future dispositions of certain capital assets to the extent tax basis is allocated to those capital assets.

The timing and amount of aggregate payments due under the TRA may vary based on a number of factors, including the amount and timing of the taxable income the Company generates each year and the tax rate then applicable and amortizable basis. If the Company does not generate sufficient taxable income in the aggregate over the term of the TRA to utilize the tax benefits, it would not be required to make the related TRA payments. The Company will only recognize a liability for TRA payments if management determines it is probable that it will generate sufficient future taxable income over the term of the TRA to utilize the related tax benefits. If management determines in the future that the Company will not be able to fully utilize all or part of the related tax benefits, it would derecognize the portion of the liability related to the benefits not expected to be utilized. Estimating future taxable income is inherently uncertain and requires judgment. In projecting future taxable income, the Company considers its historical results and incorporates certain assumptions, including revenue growth, and operating margins, among others.

The payment obligations under the TRA are Red Rock's obligations and are not obligations of Station Holdco or Station LLC. Payments are generally due within a specified period of time following the filing of the Company's annual tax return and interest on such payments will accrue from the original due date (without extensions) of the income tax return until the date paid. Payments not made within the required period after the filing of the income tax return generally accrue interest at a rate of LIBOR plus 5.00%.

The TRA will remain in effect until all such tax benefits have been utilized or expired unless the Company exercises its right to terminate the TRA. The TRA will also terminate if the Company breaches its obligations under the TRA or upon certain mergers, asset sales or other forms of business combinations, or other changes of control. If the Company exercises its right to terminate the TRA, or if the TRA is terminated early in accordance with its terms, the Company's payment obligations would be accelerated based upon certain assumptions, including the assumption that it would have sufficient future taxable income to utilize such tax benefits, and may substantially exceed the actual benefits, if any, the Company realizes in respect of the tax attributes subject to the TRA.

Additionally, the Company estimates the amount of TRA payments expected to be paid within the next twelve months and classifies this amount within current liabilities on its Consolidated Balance Sheets. This determination is based on management's estimate of taxable income for the next fiscal year. To the extent the Company's estimate differs from actual results, it may be required reclassify portions of the liability under the TRA between current and non-current.

*Earnings Per Share*

Basic earnings per share ("EPS") is computed by dividing net income attributable to Red Rock by the weighted-average number of Class A shares outstanding during the period. Diluted EPS is computed by dividing net income attributable

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

to Red Rock, including the impact of potentially dilutive securities, by the weighted-average number of Class A shares outstanding during the period, including the number of Class A shares that would have been outstanding if the potentially dilutive securities had been issued. Potentially dilutive securities include the outstanding Class B common stock, outstanding stock options and unvested restricted stock. The Company uses the "if-converted" method to determine the potentially dilutive effect of its Class B common stock, and the treasury stock method to determine the potentially dilutive effect of outstanding stock options and unvested restricted stock.

*Recently Issued and Adopted Accounting Standards*

In August 2018, the Financial Accounting Standards Board ("FASB") issued amended accounting guidance for costs of implementing a cloud computing service arrangement. Under the amended guidance, the requirements for capitalizing implementation costs incurred in a hosting arrangement that is a service contract will be aligned with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software (and hosting arrangements that include an internal-use software license). The amended guidance may be applied either retrospectively or prospectively to all implementation costs incurred after the date of adoption. The amended guidance is effective for fiscal years beginning after December 15, 2019, and interim periods within those fiscal years, and early adoption is permitted. The Company adopted this guidance prospectively in the fourth quarter of 2018. The adoption did not have a material impact on the Company's financial position or results of operations.

In June 2018, the FASB issued accounting guidance that expands the scope of accounting for share-based payment transactions to include those with nonemployees. The amended guidance states that such accounting applies to all share-based payment transactions in which awards are exchanged for goods or services to be used or consumed in a grantor's own operations. The accounting does not apply to financing transactions or revenue transactions under the new revenue recognition guidance. The amended guidance is effective for fiscal years beginning after December 15, 2018, and interim periods within those fiscal years, and early adoption is permitted. The Company adopted this guidance in the fourth quarter of 2018. The adoption did not have an impact on the Company's financial position or results of operations.

In May 2017, the FASB issued accounting guidance that amends the scope of modification accounting for share-based payment arrangements. The amended guidance clarifies which changes to the terms and conditions of share-based payment awards require an entity to apply modification accounting. The Company adopted this guidance in the first quarter of 2018. The adoption did not have an impact on the Company's financial position or results of operations.

In March 2017, the FASB issued amended accounting guidance on the presentation of net periodic pension and postretirement cost. The amendment requires that the service cost component must be separated from the other components and classified as compensation expense in the same income statement line item as payroll costs for the employees who are receiving the retirement benefit. Further, only the service cost component is eligible for capitalization in inventory or other internally constructed assets. Other cost components are required to be reported below the subtotal for operating results, and their classification is required to be disclosed. The Company adopted this guidance in the first quarter of 2018. The Company's defined benefit pension plan has been curtailed since 2009 and as a result, no service cost is being incurred. Accordingly, upon adoption of the amended guidance, the Company reclassified the expense associated with the defined benefit pension plan to other expense for all periods presented, and the adoption did not have an impact on net income.

In November 2016, the FASB issued amended accounting guidance on the presentation of restricted cash in the statement of cash flows. This amendment requires that a statement of cash flows explain the change during the reporting period in the total of cash, cash equivalents, and restricted cash or restricted cash equivalents. The Company adopted this guidance in the first quarter of 2018 using the retrospective transition method, as required by the new standard. The adoption did not have an impact on the Company's financial position or results of operations.

In August 2016, the FASB issued amended accounting guidance intended to reduce diversity in practice in how cash receipts and cash payments are presented and classified in the statement of cash flows. The amendment addresses specific cash flow issues including the presentation and classification of debt prepayment or debt extinguishment costs and distributions received from equity method investees. The amended guidance also addresses the presentation and classification of separately identifiable cash flows and the application of the predominance principle. The Company adopted this guidance in the first quarter of 2018 using the retrospective transition method, as required by the new standard. The adoption did not have an impact on the Company's statement of cash flows.

In February 2016, the FASB issued a new accounting standard that changes the accounting for leases and requires expanded disclosures about leasing activities. Under the new guidance, lessees will be required to recognize a right-of-use asset and a lease liability, measured on a discounted basis, at the commencement date for leases with terms greater than twelve months. Lessor accounting will remain largely unchanged, other than certain targeted improvements intended to align lessor

80

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

accounting with the lessee accounting model and with the new revenue recognition guidance issued in 2014. The amended guidance is effective for fiscal years beginning after December 15, 2018, and interim periods within those fiscal years. The Company will adopt this standard as of the first quarter of 2019 using the modified retrospective transition approach and has elected not to adjust comparative periods presented. The Company has elected to use the package of practical expedients in its transition and accordingly, will not reassess its prior conclusions about lease identification, lease classification and initial direct costs. In addition, the Company has elected the short-term lease recognition exemption, under which it will not recognize right-of-use assets or lease liabilities for leases with a term of twelve months or less, and has elected not to apply the use-of-hindsight practical expedient. The Company is in the final stages of implementing changes to its systems and processes for lease accounting and reporting, and is currently finalizing its evaluation of the financial statement impact of adopting the amended guidance, which will include recognizing lease liabilities and related right-of-use assets for operating leases on the opening balance sheet in the period of adoption. The Company does not expect the adoption to have a material impact on the pattern of lease expense recognition in its statements of income or its cash flows.

In May 2014, the FASB issued a new accounting standard for revenue recognition which requires entities to recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. The Company adopted this guidance in the first quarter of 2018 and elected to apply the full retrospective adoption method.

Under the new standard, the historical presentation of gross revenues for complimentary goods and services provided to guests with a corresponding offsetting amount included in promotional allowances has been eliminated. Promotional allowances are recorded primarily as reductions to casino revenue based on the standalone selling price of the complimentary goods and services provided. The adoption of the new standard also eliminated the historical practice of reclassifying the total cost associated with complimentaries from the expense line of the department fulfilling the complimentary to the expense line of the department that granted the complimentary to the guest. Under the new standard, revenues and expenses associated with providing complimentaries are classified based on the goods and services provided. When guests earn points under the Rewards Program, the Company recognizes a liability for future performance obligations, which is measured at the redemption value of such points. The recognition of the Rewards Program point liability primarily reduces casino revenue. Previously, the Company recorded a liability for the estimated incremental cost of providing complimentary services earned under the Rewards Program. Additionally, amounts paid for wide area progressive operator fees and mandatory service charges that were previously recorded net in revenue are recorded gross, resulting in an increase in revenue with a corresponding increase in expense.

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Adoption of the new standard using the full retrospective method required the Company to apply the new guidance to each prior reporting period presented. The adoption did not have a significant impact on net income for the periods presented. The following tables present the impact of adoption of the new standard to previously reported selected financial statement information (in thousands, except per share data):

| | Year Ended December 31, | | | | | |
| | 2017 | | | 2016 | | |
| | As Reported | Adjustments | As Adjusted | As Reported | Adjustments | As Adjusted |
|---|---|---|---|---|---|---|
| Operating revenues: | | | | | | |
| Casino | $ 1,048,355 | $ (162,149) | $ 886,206 | $ 960,992 | $ (146,774) | $ 814,218 |
| Food and beverage | 298,707 | 66,741 | 365,448 | 270,619 | 59,869 | 330,488 |
| Room | 176,585 | 2,456 | 179,041 | 142,858 | 2,952 | 145,810 |
| Other | 93,695 | (728) | 92,967 | 74,208 | (484) | 73,724 |
| Management fees | 118,477 | — | 118,477 | 111,520 | — | 111,520 |
| Gross revenues | 1,735,819 | (93,680) | 1,642,139 | 1,560,197 | (84,437) | 1,475,760 |
| Promotional allowances | (120,203) | 120,203 | — | (107,770) | 107,770 | — |
| Net revenues | 1,615,616 | 26,523 | 1,642,139 | 1,452,427 | 23,333 | 1,475,760 |
| Operating costs and expenses: | | | | | | |
| Casino | 416,863 | (105,777) | 311,086 | 368,561 | (95,118) | 273,443 |
| Food and beverage | 211,094 | 114,975 | 326,069 | 185,177 | 106,047 | 291,224 |
| Room | 72,300 | 9,468 | 81,768 | 54,963 | 6,447 | 61,410 |
| Other | 35,041 | 5,291 | 40,332 | 26,588 | 4,073 | 30,661 |
| Selling, general and administrative (a) | 379,246 | 1,684 | 380,930 | 325,694 | 1,619 | 327,313 |
| Depreciation and amortization | 178,217 | — | 178,217 | 156,668 | — | 156,668 |
| Write-downs and other charges, net | 29,584 | — | 29,584 | 24,591 | — | 24,591 |
| Tax receivable agreement liability adjustment | (139,300) | — | (139,300) | 739 | — | 739 |
| Related party lease termination | 100,343 | — | 100,343 | — | — | — |
| Asset impairment | 1,829 | — | 1,829 | — | — | — |
| | 1,285,217 | 25,641 | 1,310,858 | 1,142,981 | 23,068 | 1,166,049 |
| Operating income | 330,399 | 882 | 331,281 | 309,446 | 265 | 309,711 |
| Earnings from joint ventures | 1,632 | — | 1,632 | 1,913 | — | 1,913 |
| Operating income and earnings from joint ventures | 332,031 | 882 | 332,913 | 311,359 | 265 | 311,624 |
| Other (expense) income: | | | | | | |
| Interest expense, net | (131,442) | — | (131,442) | (140,189) | — | (140,189) |
| Loss on extinguishment/modification of debt, net | (16,907) | — | (16,907) | (7,270) | — | (7,270) |
| Change in fair value of derivative instruments | 14,112 | — | 14,112 | 87 | — | 87 |
| Other (a) | — | (357) | (357) | — | (45) | (45) |
| | (134,237) | (357) | (134,594) | (147,372) | (45) | (147,417) |
| Income before income tax | 197,794 | 525 | 198,319 | 163,987 | 220 | 164,207 |
| Provision for income tax | (134,755) | (31) | (134,786) | (8,212) | (31) | (8,243) |
| Net income | 63,039 | 494 | 63,533 | 155,775 | 189 | 155,964 |
| Less: net income attributable to noncontrolling interests | 27,887 | 223 | 28,110 | 63,808 | 204 | 64,012 |
| Net income attributable to Red Rock Resorts, Inc. | $ 35,152 | $ 271 | $ 35,423 | $ 91,967 | $ (15) | $ 91,952 |
| | | | | | | |
| Earnings per share of Class A common stock, basic | $ 0.52 | $ 0.01 | $ 0.53 | $ 1.03 | $ 0.01 | $ 1.04 |
| Earnings per share of Class A common stock, diluted | $ 0.42 | $ — | $ 0.42 | $ 1.03 | $ — | $ 1.03 |

(a)     Includes reclassification of pension costs of $357,000 and $45,000 for the years ended December 31, 2017 and 2016, respectively, as a result of the Company's adoption of amended accounting guidance for pension and postretirement benefit plans.

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

|  | December 31, 2017 | | |
|  | As Reported | Adjustments | As Adjusted |
|---|---|---|---|
| Deferred tax asset, net | $ 132,220 | $ 511 | $ 132,731 |
| Other accrued liabilities | 176,813 | 6,090 | 182,903 |
| Total Red Rock Resorts, Inc. stockholders' equity | 381,825 | (3,094) | 378,731 |
| Noncontrolling interest | 255,466 | (2,485) | 252,981 |
| Total stockholders' equity | 637,291 | (5,579) | 631,712 |

|  | December 31, 2016 | | |
|  | As Reported | Adjustments | As Adjusted |
|---|---|---|---|
| Total stockholders' equity | $ 633,352 | $ (5,754) | $ 627,598 |

|  | December 31, 2015 | | |
|  | As Reported | Adjustments | As Adjusted |
|---|---|---|---|
| Total stockholders' equity | $ 573,709 | $ (6,835) | $ 566,874 |

The Company's historical net cash flows provided by (used in) operating, investing and financing activities were not impacted by the adoption of the new standard.

**3.    Noncontrolling Interest in Station Holdco**

As discussed in Note 1, Red Rock holds a controlling interest in and consolidates the financial position and results of operations of Station LLC and its subsidiaries and Station Holdco. Prior to the IPO in May 2016, there were no noncontrolling interests in Station Holdco. As a result of the IPO and Reorganization Transactions, certain owners of LLC Units who held such units prior to the IPO ("Continuing Owners") became noncontrolling interest holders. The Company presents the interests in Station Holdco not owned by Red Rock within noncontrolling interest in the consolidated financial statements.

Immediately after the IPO, the noncontrolling interest holders of Station Holdco owned approximately 66.6% of the outstanding LLC Units, with the remaining 33.4% owned by Red Rock. During the years ended December 31, 2018, 2017 and 2016, approximately 0.4 million, 2.7 million and 24.5 million, respectively, of LLC Units and Class B common shares held by noncontrolling interest holders were exchanged for Class A common shares, which increased Red Rock's ownership interest in Station Holdco. At December 31, 2018, the noncontrolling interest in Station Holdco had been reduced to approximately 40.2%. Noncontrolling interest will continue to be adjusted to reflect the impact of any changes in Red Rock's ownership interest in Station Holdco.

The ownership of the LLC Units is summarized as follows:

|  | December 31, 2018 | | December 31, 2017 | |
|  | Units | Ownership % | Units | Ownership % |
|---|---|---|---|---|
| Red Rock | 69,662,590 | 59.8% | 68,897,563 | 59.3% |
| Noncontrolling interest holders | 46,884,413 | 40.2% | 47,264,413 | 40.7% |
| Total | 116,547,003 | 100.0% | 116,161,976 | 100.0% |

The Company uses monthly weighted-average LLC Unit ownership to calculate the pretax income and other comprehensive (loss) income of Station Holdco attributable to Red Rock and the noncontrolling interest holders. Station Holdco equity attributable to Red Rock and the noncontrolling interest holders is rebalanced, as needed, to reflect LLC Unit ownership at period end.

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

4.    **Property and Equipment**

Property and equipment consisted of the following (amounts in thousands):

| | December 31, | |
| --- | --- | --- |
| | **2018** | **2017** |
| Land | $    270,059 | $    256,173 |
| Buildings and improvements | 2,663,004 | 2,315,124 |
| Furniture, fixtures and equipment | 686,863 | 534,286 |
| Construction in progress | 240,197 | 126,384 |
| | 3,860,123 | 3,231,967 |
| Accumulated depreciation and amortization | (847,718) | (689,856) |
| Property and equipment, net | $    3,012,405 | $    2,542,111 |

Construction in progress at December 31, 2018 included $218.2 million related to the redevelopment of Palms.

Depreciation expense was as follows (amounts in thousands):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | **2016** |
| Depreciation expense | $    169,656 | $    158,327 | $    137,881 |

At December 31, 2018 and 2017, substantially all of the Company's property and equipment was pledged as collateral for its long-term debt.

5.    **Goodwill and Other Intangibles**

Goodwill, net of accumulated impairment losses of $1.2 million, was $195.7 million at December 31, 2018 and 2017. The Company's goodwill is primarily related to the Las Vegas operations segment.

The Company's intangibles, other than goodwill, consisted of the following (amounts in thousands):

| | December 31, 2018 | | | |
| --- | --- | --- | --- | --- |
| | Estimated useful life (years) | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| **Assets** | | | | |
| Brands | Indefinite | $    77,200 | $          — | $    77,200 |
| License rights | Indefinite | 300 | — | 300 |
| Customer relationships | 15 | 23,600 | (11,579) | 12,021 |
| Management contracts | 7 - 20 | 47,000 | (32,532) | 14,468 |
| Condominium rental contracts | 20 | 9,000 | (1,012) | 7,988 |
| Trademarks | 15 | 6,000 | (900) | 5,100 |
| Beneficial leases | 6 | 237 | (94) | 143 |
| Intangible assets | | 163,337 | (46,117) | 117,220 |
| **Liabilities** | | | | |
| Below market leases | 15 - 72 | 4,145 | (371) | 3,774 |
| Net intangibles | | $    159,192 | $    (45,746) | $    113,446 |

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

|  | Estimated useful life (years) | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
|---|---|---|---|---|
| | | | December 31, 2017 | |
| **Assets** | | | | |
| Brands | Indefinite | $ 77,200 | $ — | $ 77,200 |
| License rights | Indefinite | 300 | — | 300 |
| Customer relationships | 15 | 23,600 | (10,006) | 13,594 |
| Management contracts | 7 - 20 | 115,000 | (92,980) | 22,020 |
| Condominium rental contracts | 20 | 9,000 | (562) | 8,438 |
| Trademarks | 15 | 6,000 | (500) | 5,500 |
| Beneficial leases | 2 - 6 | 270 | (72) | 198 |
| Other | 2 | 2,000 | (1,250) | 750 |
| Intangible assets | | 233,370 | (105,370) | 128,000 |
| **Liabilities** | | | | |
| Below market lease | 15 - 72 | 4,145 | (199) | 3,946 |
| Net intangibles | | $ 229,225 | $ (105,171) | $ 124,054 |

The Gun Lake Casino management contract intangible asset, which had a gross carrying amount of $68.0 million, became fully amortized in February 2018 concurrently with the expiration of the management agreement.

Amortization expense for intangibles was as follows (amounts in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2018 | 2017 | 2016 |
| Amortization expense | $ 10,599 | $ 19,890 | $ 18,787 |

Estimated annual amortization expense for intangibles for each of the next five years is as follows (amounts in thousands):

| Years Ending December 31, | |
|---|---|
| 2019 | $ 8,541 |
| 2020 | 8,029 |
| 2021 | 2,399 |
| 2022 | 2,378 |
| 2023 | 2,357 |

**6.      Land Held for Development**

At December 31, 2018, the Company controlled approximately 420 acres of land comprised of eight strategically-located parcels in Las Vegas and Reno, Nevada, each of which is zoned for casino gaming and other uses. The Company owns approximately 391 acres of such land, and 20 acres are leased from a third-party lessor, as described in Note 20.

In the second quarter of 2018, the Company sold a 26-acre parcel of land in Las Vegas that was previously held for development. See Note 13 for additional information.

**7.      Investments in Variable Interest Entities and Joint Ventures**

Station Holdco and Station LLC are VIEs, of which the Company is the primary beneficiary. Substantially all of the Company's assets and liabilities represent the assets and liabilities of Station Holdco and Station LLC, other than assets and liabilities related to income taxes and amounts payable under the TRA. As described in Note 1, the Company holds all of the voting interest in Station Holdco and Station LLC, subject to certain limited exceptions, and was designated as the sole managing member of both entities. The Company controls and operates all of the business and affairs of Station Holdco and Station LLC, and conducts all of its operations through these entities. Accordingly, the Company consolidates the financial position and results of operations of Station LLC and its consolidated subsidiaries and Station Holdco, and presents the

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

economic interests in Station Holdco not owned by Red Rock within noncontrolling interest in the consolidated financial statements.

MPM is a 50% owned, consolidated VIE that managed Gun Lake Casino through February 2018. The Company is the primary beneficiary of MPM and consolidates MPM in its consolidated financial statements because it can direct the activities of MPM that would most significantly impact MPM's economic performance and has the right to receive benefits and the obligation to absorb losses that would be significant to MPM. MPM's beneficial interest holders have no recourse to the general credit of the Company.

The Company has investments in three 50% owned smaller casino properties which are joint ventures accounted for using the equity method. Under the equity method, original investments are initially recorded at cost and are adjusted by the investor's share of earnings, losses and distributions of the joint venture. The carrying amount of the Company's investment in one of the smaller casino properties has been reduced below zero and is presented as a deficit investment on the Consolidated Balance Sheets.

## 8.    Native American Development

*North Fork Rancheria of Mono Indian Tribe*

The Company has development and management agreements with the North Fork Rancheria of Mono Indians (the "Mono"), a federally recognized Native American tribe located near Fresno, California, which were originally entered into in 2003. In August 2014, the Mono and the Company entered into the Second Amended and Restated Development Agreement (the "Development Agreement") and the Second Amended and Restated Management Agreement. Pursuant to those agreements, the Company will assist the Mono in developing and operating a gaming and entertainment facility (the "North Fork Project") to be located in Madera County, California. The Company purchased a 305–acre parcel of land adjacent to Highway 99 north of the city of Madera (the "North Fork Site"), which was taken into trust for the benefit of the Mono by the Department of the Interior ("DOI") in February 2013.

As currently contemplated, the North Fork Project is expected to include approximately 2,000 slot machines, approximately 40 table games and several restaurants, and the cost of the project is expected to be between $250 million and $300 million. Development of the North Fork Project is subject to certain governmental and regulatory approvals, including, but not limited to, approval of the Management Agreement by the Chairman of the National Indian Gaming Commission ("NIGC").

Under the terms of the Development Agreement, the Company has agreed to arrange the financing for the ongoing development costs and construction of the facility. The Company will contribute significant financial support to the North Fork Project. Through December 31, 2018, the Company has paid approximately $33.1 million of reimbursable advances to the Mono, primarily to complete the environmental impact study, purchase the North Fork Site and pay the costs of litigation. The advances are expected to be repaid from the proceeds of third-party financing or from the Mono's gaming revenues; however, there can be no assurance that the advances will be repaid. The carrying amount of the advances was reduced to fair value upon the Company's adoption of fresh-start reporting in 2011. At December 31, 2018, the carrying amount of the advances was $18.0 million. In accordance with the Company's accounting policy, accrued interest on the advances will not be recognized in income until the carrying amount of the advances has been recovered.

The Company will receive a development fee of 4% of the costs of construction (as defined in the Development Agreement) for its development services, which will be paid upon the commencement of gaming operations at the facility. In March 2018, the Mono submitted a proposed Third Amended and Restated Management Agreement (the "Management Agreement") to the NIGC. The Management Agreement allows the Company to receive a management fee of 30% of the North Fork Project's net income. The Management Agreement and the Development Agreement have a term of seven years from the opening of the North Fork Project. The Management Agreement includes termination provisions whereby either party may terminate the agreement for cause, and the Management Agreement may also be terminated at any time upon agreement of the parties. There is no provision in the Management Agreement allowing the tribe to buy-out the agreement prior to its expiration. The Management Agreement provides that the Company will train the Mono tribal members such that they may assume responsibility for managing the North Fork Project upon the expiration of the agreement.

Upon termination or expiration of the Management Agreement and Development Agreement, the Mono will continue to be obligated to repay any unpaid principal and interest on the advances from the Company, as well as certain other amounts that may be due, such as management fees. Amounts due to the Company under the Development Agreement and Management Agreement are secured by substantially all of the assets of the North Fork Project except the North Fork Site. In addition, the Development Agreement and Management Agreement contain waivers of the Mono's sovereign immunity from suit for the purpose of enforcing the agreements or permitting or compelling arbitration and other remedies.

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The timing of this type of project is difficult to predict and is dependent upon the receipt of the necessary governmental and regulatory approvals. There can be no assurance as to when, or if, these approvals will be obtained. The Company currently estimates that construction of the North Fork Project may begin in the next 18 to 30 months and estimates that the North Fork Project would be completed and opened for business approximately 18 months after construction begins. There can be no assurance, however, that the North Fork Project will be completed and opened within this time frame or at all. The Company expects to assist the Mono in obtaining third-party financing for the North Fork Project once all necessary regulatory approvals have been received and prior to commencement of construction; however, there can be no assurance that the Company will be able to obtain such financing for the North Fork Project on acceptable terms or at all.

The Company has evaluated the likelihood that the North Fork Project will be successfully completed and opened, and has concluded that the likelihood of successful completion is in the range of 65% to 75% at December 31, 2018. The Company's evaluation is based on its consideration of all available positive and negative evidence about the status of the North Fork Project, including, but not limited to, the status of required regulatory approvals, as well as the progress being made toward the achievement of all milestones and the successful resolution of all litigation and contingencies. There can be no assurance that the North Fork Project will be successfully completed or that future events and circumstances will not change the Company's estimates of the timing, scope, and potential for successful completion or that any such changes will not be material. In addition, there can be no assurance that the Company will recover all of its investment in the North Fork Project even if it is successfully completed and opened for business.

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The following table summarizes the Company's evaluation at December 31, 2018 of each of the critical milestones necessary to complete the North Fork Project.

| | As of December 31, 2018 |
|---|---|
| Federally recognized as an Indian tribe by the Bureau of Indian Affairs ("BIA") | Yes |
| Date of recognition | Federal recognition was terminated in 1966 and restored in 1983. |
| Tribe has possession of or access to usable land upon which the project is to be built | The DOI accepted approximately 305 acres of land for the project into trust for the benefit of the Mono in February 2013. |
| Status of obtaining regulatory and governmental approvals: | |
|     Tribal-state compact | A compact was negotiated and signed by the Governor of California and the Mono in August 2012. The California State Assembly and Senate passed Assembly Bill 277 ("AB 277") which ratified the Compact in May 2013 and June 2013, respectively. Opponents of the North Fork Project qualified a referendum, "Proposition 48," for a state-wide ballot challenging the legislature's ratification of the Compact. In November 2014, Proposition 48 failed. The State took the position that the failure of Proposition 48 nullified the ratification of the Compact and, therefore, the Compact did not take effect under California law. In March 2015, the Mono filed suit against the State *(see North Fork Rancheria of Mono Indians v. State of California)* to obtain a compact with the State or procedures from the Secretary of the Interior under which Class III gaming may be conducted on the North Fork Site. In July 2016, the DOI issued Secretarial procedures (the "Secretarial Procedures") pursuant to which the Mono may conduct Class III gaming on the North Fork Site. |
|     Approval of gaming compact by DOI | The Compact was submitted to the DOI in July 2013. In October 2013, notice of the Compact taking effect was published in the Federal Register. The Secretarial Procedures supersede and replace the Compact. |
|     Record of decision regarding environmental impact published by BIA | In November 2012, the record of decision for the Environmental Impact Statement for the North Fork Project was issued by the BIA. In December 2012, the Notice of Intent to take land into trust was published in the Federal Register. |
|     BIA accepting usable land into trust on behalf of the tribe | The North Fork Site was accepted into trust in February 2013. |
|     Approval of management agreement by NIGC | In December 2015, the Mono submitted a Second Amended and Restated Management Agreement, and certain related documents, to the NIGC. In July 2016, the Mono received a deficiency letter from the NIGC seeking additional information concerning the Second Amended and Restated Management Agreement. In March 2018, the Mono submitted the Management Agreement and certain related documents to the NIGC. In June 2018, the Mono received a deficiency letter from the NIGC seeking additional information concerning the Management Agreement. Approval of the Management Agreement by the NIGC is expected to occur following the Mono's response to the deficiency letter. The Company believes the Management Agreement will be approved because the terms and conditions thereof are consistent with the provisions of the Indian Gaming Regulatory Act ("IGRA"). |
| Gaming licenses: | |
|     Type | The North Fork Project will include the operation of Class II and Class III gaming, which are allowed pursuant to the terms of the Secretarial Procedures and IGRA, following approval of the Management Agreement by the NIGC. |
|     Number of gaming devices allowed | The Secretarial Procedures allow for the operation of a maximum of 2,000 Class III slot machines at the facility during the first two years of operation and thereafter up to 2,500 Class III slot machines. There is no limit on the number of Class II gaming devices that the Mono can offer. |
|     Agreements with local authorities | The Mono has entered into memoranda of understanding with the City of Madera, the County of Madera and the Madera Irrigation District under which the Mono agreed to pay one-time and recurring mitigation contributions, subject to certain contingencies. The memoranda of understanding with the City and County were amended in December 2016 to restructure the timing of certain payments due to delays in the development of the North Fork Project. |

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Following is a discussion of legal matters related to the North Fork Project.

*Stand Up For California! v. Dept. of the Interior.* In December 2012, Stand Up for California!, several individuals and the Ministerial Association of Madera (collectively, the "Stand Up" plaintiffs) filed a complaint in the United States District Court for the District of Columbia against the DOI, the BIA and the Secretary of Interior and Assistant Secretary of the Interior, in their official capacities, seeking to overturn the Secretary's determination to take the North Fork Site into trust for the purposes of gaming (the "North Fork Determination") and seeking declaratory and injunctive relief to prevent the United States from taking the North Fork Site into trust. The Mono filed a motion to intervene as a party to the lawsuit, which was granted. In January 2013, the Court denied the Stand Up plaintiffs' Motion for Preliminary Injunction and the United States accepted the North Fork Site into trust for the benefit of the Mono in February 2013. The parties subsequently filed motions for summary judgment. In September 2016, the Court denied the Stand Up plaintiffs' motions for summary judgment and granted the defendants' and the Mono's motions for summary judgment in part and dismissed the remainder of the Stand Up plaintiffs' claims. The Stand Up plaintiffs appealed the district court's decision to the United States Court of Appeals for the District of Columbia Circuit, which heard oral argument on the appeal on October 13, 2017. On January 12, 2018, the United States Court of Appeals for the District of Columbia Circuit affirmed the decision of the district court in favor of the defendants and the Mono. On February 26, 2018, the Stand Up plaintiffs filed a petition for rehearing *en banc* of the January 12, 2018 decision, which petition for rehearing was denied on April 10, 2018. On July 9, 2018, the Stand Up plaintiffs filed a Petition for Writ of Certiorari in the Supreme Court of the United States. The defendants and the Mono filed their responses with the Supreme Court of the United States on November 26, 2018, the briefing was completed on December 10, 2018 when the Stand Up plaintiffs filed their reply and the Supreme Court denied the Petition of the Stand Up plaintiffs on January 7, 2019.

*Stand Up For California! v. Brown.* In March 2013, Stand Up for California! and Barbara Leach, a local resident, filed a complaint for declaratory relief and petition for writ of mandate in California Superior Court for the County of Madera against California Governor Edmund G. Brown, Jr., alleging that Governor Brown violated the California constitutional separation-of-powers doctrine when he concurred in the North Fork Determination. The complaint sought to vacate and set aside the Governor's concurrence. Plaintiffs' complaint was subsequently amended to include a challenge to the constitutionality of AB 277. The Mono intervened as a defendant in the lawsuit. In March 2014, the court dismissed plaintiffs' amended complaint, which dismissal was appealed by plaintiffs. In December 2016, an appellate court ruled in favor of the Stand Up plaintiffs concluding that Governor Brown exceeded his authority in concurring in the Secretary's determination that gaming on the North Fork Site would be in the best interest of the tribe and not detrimental to the surrounding community. The appellate court's decision reversed the trial court's previous ruling in favor of the Mono. The Mono and the State filed petitions in the Supreme Court of California seeking review of the appellate court's decision. In March 2017, the Supreme Court of California granted the Mono and State's petitions for review and deferred additional briefing or other action in this matter pending consideration and disposition of a similar issue in *United Auburn Indian Community of Auburn Rancheria v. Brown.* The United Auburn case was fully briefed in December 2017. Oral argument has not yet been scheduled.

*Picayune Rancheria of Chukchansi Indians v. Brown.* In March 2016, Picayune Rancheria of Chukchansi Indians ("Picayune") filed a complaint for declaratory relief and petition for writ of mandate in California Superior Court for the County of Madera against Governor Edmund G. Brown, Jr., alleging that the referendum that invalidated the Compact also invalidated Governor Brown's concurrence with the North Fork Determination. The complaint seeks to vacate and set aside the Governor's concurrence. In July 2016, the court granted the Mono's application to intervene and the Mono filed a demurrer seeking to dismiss the case. In November 2016, the district court dismissed Picayune's complaint, but the court subsequently vacated its ruling based on the December 2016, decision by the Fifth District Court of Appeal in *Stand Up for California! v. Brown.* In May 2017, the court stayed the case for six months by agreement of the parties and scheduled a status conference on November 13, 2017 to address how the case should proceed in light of the California Supreme Court's granting of the Mono and State's petitions for review in *Stand Up for California! v. Brown.* The case remains stayed.

*Picayune Rancheria of Chukchansi Indians v. United States Department of the Interior.* In July 2016, Picayune filed a complaint in the United States District Court for the Eastern District of California for declaratory and injunctive relief against the DOI. The complaint sought a declaration that the North Fork Site did not come under one of the exceptions to the general prohibition against gaming on lands taken into trust after October 1988 set forth in IGRA and therefore was not eligible for gaming. It also sought a declaration that the North Fork Determination had expired because the legislature never ratified Governor Brown's concurrence, and sought injunctive relief prohibiting the DOI from taking any action under IGRA concerning the North Fork Site. The Mono filed a motion to intervene in September 2016, which was subsequently granted. The Mono and federal defendants filed motions for summary judgment in March 2017. On August 8, 2017, Picayune filed a brief arguing that the court should stay the proceedings in light of the Fifth District Court's decision in *Stand Up for California! v. Brown* and the appeal pending in the California Supreme Court. On August 18, 2017, the court denied the Picayune's motion to stay the proceedings and granted the summary judgment motions of the Mono and the federal defendants. Picayune has not filed a timely notice of appeal.

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

*Stand Up for California! et. al. v. United States Department of the Interior.* In November 2016, Stand Up for California! and other plaintiffs filed a complaint in the United States District Court for the Eastern District of California alleging that the DOI's issuance of Secretarial Procedures for the Mono was subject to the National Environmental Policies Act and the Clean Air Act, and violate the Johnson Act. The complaint further alleges violations of the Freedom of Information Act and the Administrative Procedures Act. The DOI filed its answer to the complaint in February 2017 denying plaintiffs' claims and asserting certain affirmative defenses. A motion to intervene filed by the Mono was granted in March 2017. Plaintiffs subsequently filed a motion to stay the proceedings in May 2017. Briefing on the contested stay request concluded in July 2017 and briefing on cross-motions for summary judgment was concluded in September 2017. On July 18, 2018, the court denied plaintiffs' motion to stay the proceedings and granted the summary judgment motions of the Mono and the federal defendants. On September 11, 2018, plaintiffs filed a notice of appeal of the District Court decision and a briefing schedule has been established with the United States Court of Appeals for the Ninth Circuit.

**9.      Management Agreements**

*The Federated Indians of Graton Rancheria*

The Company manages Graton Resort & Casino ("Graton Resort"), which opened in November 2013, on behalf of the Federated Indians of Graton Rancheria (the "Graton Tribe"). Graton Resort is located approximately 43 miles north of downtown San Francisco. The management agreement for Graton Resort will expire in November 2020. The Company received a management fee of 24% of Graton Resort's net income (as defined in the management agreement) in years 1 through 4 of the agreement, and is entitled to receive 27% of Graton Resort's net income in years 5 through 7. Excluding reimbursable expenses, management fees from Graton Resort totaled $77.5 million, $65.3 million and $58.4 million for the years ended December 31, 2018, 2017 and 2016, respectively. The management agreement may be terminated under certain circumstances, including but not limited to, material breach, changes in regulatory or legal status, and mutual agreement of the parties. There is no provision in the management agreement allowing the Graton Tribe to buy-out the management agreement prior to its expiration. Under the terms of the management agreement, the Company will provide training to the Graton Tribe such that the tribe may assume responsibility for managing Graton Resort upon expiration of the seven-year term of the management agreement. Upon termination or expiration of the management and development agreements, the Graton Tribe will continue to be obligated to pay certain amounts that may be due to the Company, such as any unpaid management fees. Certain amounts due to the Company under the management and development agreements are subordinate to the obligations of the Graton Tribe under its third-party financing. The management and development agreements contain waivers of the Graton Tribe's sovereign immunity from suit for the purpose of enforcing the agreements or permitting or compelling arbitration and other remedies.

*Gun Lake Casino*

The Company holds a 50% interest in MPM, which managed Gun Lake Casino ("Gun Lake") in Allegan County, Michigan, under a seven-year management agreement that expired in February 2018. Excluding reimbursable expenses, MPM's management fee revenue from Gun Lake included in the Consolidated Statements of Income for the years ended December 31, 2018, 2017 and 2016 totaled $4.3 million, $46.1 million and $40.5 million, respectively.

*Other Managed Properties*

The Company is the managing member of three 50% owned smaller casino properties in the Las Vegas regional market and receives a management fee equal to 10% of earnings before interest, taxes, depreciation and amortization ("EBITDA") from these properties.

*Reimbursable Costs*

Management fee revenue includes reimbursable payroll and other costs, primarily related to Graton Resort. Reimbursable costs totaled $5.2 million, $6.6 million and $8.9 million for the years ended December 31, 2018, 2017 and 2016, respectively.

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**10.     Other Accrued Liabilities**

Other accrued liabilities consisted of the following (amounts in thousands):

| | December 31, | |
|---|---|---|
| | **2018** | **2017** |
| **Contract and customer-related liabilities:** | | |
| Rewards Program liability | $     20,654 | $     20,254 |
| Advance deposits and future wagers | 18,624 | 16,103 |
| Unpaid wagers, outstanding chips and other customer-related liabilities | 19,640 | 16,882 |
| **Other accrued liabilities:** | | |
| Accrued payroll and related | 55,448 | 51,095 |
| Accrued gaming and related | 22,221 | 20,020 |
| Construction payables and equipment purchase accruals | 108,855 | 39,673 |
| Other | 21,032 | 18,876 |
| | $     266,474 | $     182,903 |

*Contract Balances*

Customer contract liabilities related to future performance obligations consist of the Rewards Program point liability, advance deposits on goods or services yet to be provided and wagers for future sporting events. Advance deposits and wagers for future sporting events represent cash payments received from guests that are typically recognized in revenues within one year from the date received. The Company also has other customer-related liabilities that primarily include unpaid wagers and outstanding chips. Unpaid wagers include unredeemed gaming tickets that are exchanged for cash, and outstanding chips represent amounts owed to guests in exchange for gaming chips in their possession that may be redeemed for cash or recognized as revenue. Fluctuations in contract liabilities and other customer-related liabilities are a result of normal operating activities. The Company had no material contract assets at December 31, 2018 and 2017, respectively.

**11.     Long-term Debt**

Long-term debt consisted of the following (amounts in thousands):

| | December 31, | |
|---|---|---|
| | **2018** | **2017** |
| Term Loan B Facility, due June 8, 2023, interest at a margin above LIBOR or base rate (5.03% and 4.06% at December 31, 2018 and 2017, respectively), net of unamortized discount and deferred issuance costs of $43.3 million and $53.2 million at December 31, 2018 and 2017, respectively | $     1,775,951 | $     1,780,193 |
| Term Loan A Facility, due June 8, 2022, interest at a margin above LIBOR or base rate (4.53% and 3.36% at December 31, 2018 and 2017, respectively), net of unamortized discount and deferred issuance costs of $4.0 million and $5.2 million at December 31, 2018 and 2017, respectively | 251,448 | 263,860 |
| $781 million Revolving Credit Facility, due June 8, 2022, interest at a margin above LIBOR or base rate (4.54% weighted average at December 31, 2018) | 245,000 | — |
| 5.00% Senior Notes, due October 1, 2025, net of deferred issuance costs of $5.7 million and $6.4 million at December 31, 2018 and 2017, respectively | 544,286 | 543,596 |
| Other long-term debt, weighted-average interest of 6.69% and 3.95% at December 31, 2018 and 2017, respectively, maturity dates ranging from 2027 to 2037 | 38,674 | 30,173 |
| Total long-term debt | 2,855,359 | 2,617,822 |
| Current portion of long-term debt | (33,894) | (30,094) |
| Long-term debt, net | $     2,821,465 | $     2,587,728 |

*Credit Facility*

Station LLC's credit facility consists of the Term Loan B Facility, the Term Loan A Facility and the Revolving Credit Facility (collectively, the "Credit Facility"). The Term Loan B Facility bears interest at a rate per annum, at Station LLC's option, equal to either LIBOR plus 2.50% or base rate plus 1.50%. Prior to the February 2019 amendment discussed below, the

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Term Loan A Facility and the Revolving Credit Facility bore interest at a rate per annum, at Station LLC's option, equal to either LIBOR plus an amount ranging from 1.75% to 2.00% or base rate plus an amount ranging from 0.75% to 1.00%, depending on Station LLC's consolidated leverage ratio.

Station LLC is required to make quarterly principal payments of $4.7 million on the Term Loan B Facility and $3.4 million on the Term Loan A Facility on the last day of each quarter. Station LLC also is required to make mandatory payments of amounts outstanding under the Credit Facility with the proceeds of certain casualty events, debt issuances, asset sales and equity issuances and, depending on its consolidated total leverage ratio, Station LLC is required to apply a portion of its excess cash flow to repay amounts outstanding under the Term Loan B Facility, which would reduce future quarterly principal payments. The Company is not required to make an excess cash flow payment in 2019.

Borrowings under the Credit Facility are guaranteed by all of Station LLC's existing and future material restricted subsidiaries and are secured by pledges of all of the equity interests in Station LLC and its material restricted subsidiaries, a security interest in substantially all of the personal property of Station LLC and the subsidiary guarantors, and mortgages on the real property and improvements owned or leased by certain of Station LLC's subsidiaries.

The Credit Facility contains a number of customary covenants that, among other things, restrict, subject to certain exceptions, the ability of Station LLC and the subsidiary guarantors to incur debt; create a lien on collateral; engage in mergers, consolidations or asset dispositions; pay distributions; make investments, loans or advances; engage in certain transactions with affiliates or subsidiaries; or modify their lines of business.

The Credit Facility also includes certain financial ratio covenants that Station LLC is required to maintain throughout the term of the Credit Facility and measure as of the end of each quarter. At December 31, 2018, these financial ratio covenants included an interest coverage ratio of not less than 2.50 to 1.00 and a maximum consolidated total leverage ratio ranging from 6.50 to 1.00 at December 31, 2018 to 5.25 to 1.00 at December 31, 2020 and thereafter. The February 2019 amendment retained these financial ratio covenants and extended the requirement to maintain the maximum total leverage ratio of 5.25 to 1.00 to the quarter ending December 31, 2021 and thereafter, consistent with the extension of the maturity dates for certain loans under the Term Loan A Facility and the Revolving Credit Facility. A breach of the financial ratio covenants shall only become an event of default under the Term Loan B Facility if the lenders providing the Term Loan A Facility and the Revolving Credit Facility take certain affirmative actions after the occurrence of a default of such financial ratio covenants. At December 31, 2018, the Company believes it was in compliance with all applicable covenants as defined in the Credit Facility.

At December 31, 2018, Station LLC's borrowing availability under its Revolving Credit Facility, subject to continued compliance with the terms of the Credit Facility, was $498.9 million, which was net of $245.0 million in outstanding borrowings and $37.1 million in outstanding letters of credit and similar obligations.

*Credit Facility Amendment*

On February 8, 2019, Station LLC amended the Credit Facility to, among other things, (i) increase the borrowing availability under the Revolving Credit Facility by $115.0 million to $896.0 million and (ii) for consenting lenders under the Term Loan A Facility and the Revolving Credit Facility, extend the maturity date for their portion of such facilities by an additional year and reduce the interest rate thereunder by 25 basis points.

*5.00% Senior Notes*

In September 2017, Station LLC issued $550.0 million in aggregate principal amount of 5.00% Senior Notes due October 1, 2025 at par. Interest on the 5.00% Senior Notes is paid every six months in arrears on April 1 and October 1.

The 5.00% Senior Notes and the guarantees of such notes by certain of Station LLC's subsidiaries are general senior unsecured obligations.

On or after October 1, 2020, Station LLC may redeem all or a portion of the 5.00% Senior Notes at the redemption prices (expressed as percentages of the principal amount) set forth below plus accrued and unpaid interest and additional interest to the applicable redemption date:

| Years Beginning October 1, | Percentage |
|---|---|
| 2020 | 102.50% |
| 2021 | 101.25% |
| 2022 and thereafter | 100.00% |

The indenture governing the 5.00% Senior Notes requires Station LLC to offer to purchase the 5.00% Senior Notes at a purchase price in cash equal to 101.00% of the aggregate principal amount outstanding plus accrued and unpaid interest

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

thereon if Station LLC experiences certain change of control events (as defined in the indenture). The indenture also requires Station LLC to make an offer to repurchase the 5.00% Senior Notes at a purchase price equal to 100.00% of the principal amount of the purchased notes if it has excess net proceeds (as defined in the indenture) from certain asset sales.

The indenture governing the 5.00% Senior Notes contains a number of customary covenants that, among other things and subject to certain exceptions, restrict the ability of Station LLC and its restricted subsidiaries to incur or guarantee additional indebtedness; issue disqualified stock or create subordinated indebtedness that is not subordinated to the 5.00% Senior Notes; create liens; engage in mergers, consolidations or asset dispositions; enter into certain transactions with affiliates; engage in lines of business other than its core business and related businesses; or make investments or pay distributions (other than customary tax distributions). These covenants are subject to a number of exceptions and qualifications as set forth in the indenture. The indenture governing the 5.00% Senior Notes also provides for events of default which, if any of them occurs, would permit or require the principal of and accrued interest on such 5.00% Senior Notes to be declared due and payable.

*Corporate Office Lease*

The Company leases its corporate office building under a lease agreement which was entered into in 2007 pursuant to a sale-leaseback arrangement with a third-party real estate investment firm. The lease has an initial term of 20 years with four five-year extension options. The options constitute continuing involvement under the accounting guidance for sale-leaseback transactions involving real estate, and accordingly, the sale-leaseback is accounted for as a financing transaction. The corporate office building is included in Property and equipment, net on the Consolidated Balance Sheets and is being depreciated according to the Company's policy. The carrying amount of the related obligation is $38.1 million, which is included within Other long-term debt, and the lease payments are recognized as principal and interest payments on the obligation. The lease payment in effect at December 31, 2018 was $3.5 million on an annualized basis, which will increase annually by the greater of 1.25% or the percentage increase in a cost of living factor, not to exceed 2%.

In the fourth quarter of 2018, the Company recorded an out-of-period adjustment to interest expense related to the corporate office lease obligation, which was identified during its year-end financial close process. Considering both quantitative and qualitative factors, the Company has determined the out-of-period adjustment is immaterial to any previously issued consolidated financial statements and the correction is immaterial to the Company's 2018 financial results. The adjustment resulted in a $9.3 million overstatement of interest expense and an understatement in net income of $8.6 million or $0.07 in basic and diluted earnings per share for the year ended December 31, 2018.

Minimum lease payments on the corporate office lease for each of the next five years are as follows (amounts in thousands):

| Years Ending December 31, | | |
|---|---|---:|
| 2019 | $ | 3,506 |
| 2020 | | 3,549 |
| 2021 | | 3,594 |
| 2022 | | 3,639 |
| 2023 | | 3,684 |

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

*Principal Maturities*

Scheduled principal maturities of Station LLC's long-term debt for each of the next five years and thereafter are as follows (amounts in thousands):

| Years Ending December 31, | |
|---|---:|
| 2019 | $ 33,894 |
| 2020 | 80,417 |
| 2021 | 98,307 |
| 2022 | 520,539 |
| 2023 | 1,592,751 |
| Thereafter | 582,499 |
| | 2,908,407 |
| Debt discounts and issuance costs | (53,048) |
| | $ 2,855,359 |

## 12. Derivative Instruments

The Company's objective in using derivative instruments is to manage its exposure to interest rate movements. To accomplish this objective, the Company uses interest rate swaps as a primary part of its cash flow hedging strategy. The Company does not use derivative financial instruments for trading or speculative purposes.

The Company's hedging strategy includes the use of forward-starting interest rate swaps that are not designated in cash flow hedging relationships. The interest rate swap agreements allow Station LLC to receive variable-rate payments in exchange for fixed-rate payments over the life of the agreements without exchange of the underlying notional amount. Station LLC's interest rate swaps each have one-year terms that run consecutively through July 2021, with predetermined fixed pay rates that increase with each new term to more closely align with the one-month LIBOR forward curve as of the trade date of the interest rate swap. At December 31, 2018, the weighted-average fixed pay rate for Station LLC's interest rate swaps was 1.46%, which will increase to 1.94% over the exposure period. Certain of these interest rate swaps were previously designated in cash flow hedging relationships until their dedesignation in June 2017 as discussed in more detail below. At December 31, 2018, Station LLC's interest rate swaps had a combined notional amount of $1.5 billion.

Station LLC has not posted any collateral related to its interest rate swap agreements; however, Station LLC's obligations under the interest rate swap agreements are subject to the security and guarantee arrangements applicable to the Credit Facility. The interest rate swap agreements contain a cross-default provision under which Station LLC could be declared in default on its obligation under such agreements if certain conditions of default exist on the Credit Facility. At December 31, 2018, the termination value of Station LLC's interest rate swaps, including accrued interest, was a net asset of $24.8 million.

In June 2017, the Company dedesignated the hedge accounting relationships of Station LLC's interest rate swaps that were previously designated and accounted for as cash flow hedges of forecasted interest payments. Prior to the dedesignation, the gain or loss on the effective portion of changes in their fair values was recorded as a component of other comprehensive (loss) income until the interest payments being hedged were recorded as interest expense, at which time the amounts in accumulated other comprehensive income were reclassified as an adjustment to interest expense. The Company recognized the gain or loss on any ineffective portion of the derivatives' change in fair value in the period in which the change occurred as a component of Change in fair value of derivative instruments in the Consolidated Statements of Income. At December 31, 2018, $4.2 million of cumulative deferred net gains previously recognized in accumulated other comprehensive income will be amortized as a reduction of interest expense through July 2020 as the hedged interest payments continue to occur. Of this amount, approximately $2.8 million of deferred net gains is expected to be reclassified into earnings during the next twelve months.

As a result of and subsequent to (i) the Company's election not to apply hedge accounting for Station LLC's interest rate swaps and (ii) the June 2017 dedesignation of Station LLC's then-outstanding interest rate swaps, the changes in fair value of all of Station LLC's derivative instruments are reflected in Change in fair value of derivative instruments in the Consolidated Statements of Income in the period in which the change occurs. As such, the amount of interest expense reported for the period subsequent to the dedesignation does not reflect a fixed rate as it previously did under hedge accounting for that portion of the debt hedged. However, the economics are unchanged and the Company continues to meet its risk management objective and achieve fixed cash flows attributable to interest payments on the debt principal being hedged by its interest rate swaps.

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

At December 31, 2018, Station LLC's interest rate swaps effectively converted $1.5 billion of Station LLC's variable interest rate debt to a fixed rate of 4.10%.

The fair values of Station LLC's interest rate swaps, exclusive of accrued interest, as well as their classification on the Consolidated Balance Sheets, are presented below (amounts in thousands):

| | December 31, | |
|---|---|---|
| | **2018** | **2017** |
| **Interest rate swaps not designated in hedge accounting relationships:** | | |
| Prepaid expenses and other current assets | $ 8,334 | $ 3,620 |
| Other assets, net | 15,611 | 18,383 |

Information about pretax gains and losses on derivative financial instruments that were not designated in hedge accounting relationships is presented below (amounts in thousands):

| Derivatives Not Designated in Hedge Accounting Relationships | Location of Gain on Derivatives Recognized in Income | Amount of Gain on Derivatives Recognized in Income | | |
|---|---|---|---|---|
| | | Year Ended December 31, | | |
| | | **2018** | **2017** | **2016** |
| Interest rate swaps | Change in fair value of derivative instruments | $ 12,415 | $ 14,110 | $ — |

Information about pretax gains and losses on derivative financial instruments that were designated in cash flow hedging relationships and their location within the consolidated financial statements is presented below (amounts in thousands):

| Derivatives Designated in Cash Flow Hedging Relationships | Amount of (Loss) Gain on Derivatives Recognized in Other Comprehensive (Loss) Income (Effective Portion) | | | Location of Gain (Loss) Reclassified from Accumulated Other Comprehensive Income into Income (Effective Portion) | Amount of Gain (Loss) Reclassified from Accumulated Other Comprehensive Income into Income (Effective Portion) | | |
|---|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | | Year Ended December 31, | | |
| | **2018** | **2017** | **2016** | | **2018** | **2017** | **2016** |
| Interest rate swaps | $ — | $ (1,875) | $ 8,035 | Interest expense, net | $ 2,929 | $ (1,176) | $ (5,066) |

| Derivatives Designated in Cash Flow Hedging Relationships | Location of Gain on Derivatives Recognized in Income (Ineffective Portion and Amount Excluded from Effectiveness Testing) | Amount of Gain on Derivatives Recognized in Income (Ineffective Portion and Amount Excluded from Effectiveness Testing) | | |
|---|---|---|---|---|
| | | Year Ended December 31, | | |
| | | **2018** | **2017** | **2016** |
| Interest rate swaps | Change in fair value of derivative instruments | $ — | $ 2 | $ 87 |

### 13.    Fair Value Measurements

*Assets Measured at Fair Value on a Recurring Basis*

Information about the Company's financial assets measured at fair value on a recurring basis, aggregated by the level in the fair value hierarchy within which those measurements fall, is presented below (amounts in thousands). The Company had no financial liabilities measured at fair value on a recurring basis at December 31, 2018 or 2017.

| | | Fair Value Measurement at Reporting Date Using | | |
|---|---|---|---|---|
| | Balance at December 31, 2018 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| **Assets** | | | | |
| Interest rate swaps | $ 23,945 | $ — | $ 23,945 | $ — |

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

| | | Fair Value Measurement at Reporting Date Using | | |
| --- | --- | --- | --- | --- |
| | Balance at December 31, 2017 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| **Assets** | | | | |
| Interest rate swaps | $ 22,003 | $ — | $ 22,003 | $ — |

*Assets Measured at Fair Value on a Nonrecurring Basis*

During the year ended December 31, 2017, the Company recorded an asset impairment charge of $1.8 million to write down an approximately 31-acre parcel of land held for development in Las Vegas to its estimated fair value of $5.2 million as a result of entering into an agreement to sell a portion of the land at a price less than its carrying amount. The land was classified within assets held for sale in the Consolidated Balance Sheet at December 31, 2017, and the sale was completed in the second quarter of 2018.

*Fair Value of Long-term Debt*

The estimated fair value of the Company's long-term debt compared with its carrying amount is presented below (amounts in millions):

| | December 31, | |
| --- | --- | --- |
| | 2018 | 2017 |
| Aggregate fair value | $ 2,766 | $ 2,677 |
| Aggregate carrying amount | 2,855 | 2,618 |

The estimated fair value of the Company's long-term debt is based on quoted market prices from various banks for similar instruments, which is considered a Level 2 input under the fair value hierarchy.

**14.    Stockholders' Equity**

Subsequent to the IPO and the Reorganization Transactions described in Note 1, the Company has two classes of common stock. The Company's Certificate of Incorporation authorizes 500,000,000 shares of Class A common stock, par value $0.01 per share and 100,000,000 shares of Class B common stock, par value $0.00001 per share. The Certificate of Incorporation also authorizes up to 100,000,000 shares of preferred stock, par value of $0.01 per share, none of which have been issued.

**Class A Common Stock**

*Voting Rights*

The holders of Class A common stock are entitled to one vote per share on all matters to be voted upon by the stockholders and have economic rights. Holders of shares of the Company's Class A common stock and Class B common stock vote together as a single class on all matters presented to the Company's stockholders for their vote or approval, except as otherwise required by applicable law or the Certificate of Incorporation.

*Dividend Rights*

Subject to preferences that may be applicable to any outstanding preferred stock, the holders of Class A common stock are entitled to receive ratably such dividends, if any, as may be declared from time to time by the board of directors out of funds legally available therefor. The declaration, amount and payment of any future dividends on shares of Class A common stock will be at the sole discretion of the board of directors and it may reduce or discontinue entirely the payment of such dividends at any time. The board of directors may take into account general economic and business conditions, the Company's financial condition and operating results, its available cash and current and anticipated cash needs, capital requirements, contractual, legal, tax and regulatory restrictions and implications on the payment of dividends to stockholders or the payment of distributions by subsidiaries (including Station Holdco) to the Company, and such other factors as the board of directors may deem relevant.

As a holding company, Red Rock's only assets are its equity interest in Station Holdco and its voting interest in Station LLC, other than cash and tax-related assets and liabilities. Red Rock has no operations outside of its management of Station LLC. The Company intends to cause Station Holdco to make distributions in an amount sufficient to cover cash dividends

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

declared, if any. If Station Holdco makes such distributions to Red Rock, the other holders of LLC Units will be entitled to receive proportionate distributions based on their percentage ownership of Station Holdco.

During each of the years ended December 31, 2018 and 2017, the Company declared and paid cash dividends of $0.40 per share to Class A common shareholders. In February 2019, the board of directors declared a dividend of $0.10 per share of Class A common stock to holders of record as of March 14, 2019 to be paid on March 29, 2019. Prior to the payment of the dividend, Station Holdco will make a cash distribution to all LLC Unit holders, including the Company, of $0.10 per unit, a portion of which will be paid to its noncontrolling interest holders.

The existing debt agreements of Station LLC, including those governing the Credit Facility, contain restrictive covenants that limit its ability to make cash distributions. Because the only asset of Station Holdco is its interest in Station LLC, the limitations on such distributions will effectively limit the ability of Station Holdco to make distributions to Red Rock, and any financing arrangements that the Company or any of its subsidiaries enter into in the future may contain similar restrictions. Station Holdco is generally prohibited under Delaware law from making a distribution to a member to the extent that, at the time of the distribution, after giving effect to the distribution, liabilities of Station Holdco (with certain exceptions) exceed the fair value of its assets. Subsidiaries of Station Holdco, including Station LLC and its subsidiaries, are generally subject to similar legal limitations on their ability to make distributions to their members or equity holders.

Because the Company must pay taxes and make payments under the TRA, amounts ultimately distributed as dividends to holders of Class A common stock are expected to be less than the amounts distributed by Station Holdco to its members on a per LLC Unit basis.

*Rights upon Liquidation*

In the event of liquidation, dissolution or winding-up of Red Rock, whether voluntarily or involuntarily, the holders of Class A common stock are entitled to share ratably in all assets remaining after payment of liabilities, subject to prior distribution rights of preferred stock, if any, then outstanding.

*Other Rights*

The holders of Class A common stock have no preemptive or conversion rights or other subscription rights. There are no redemption or sinking fund provisions applicable to the Class A common stock. The rights, preferences and privileges of holders of Class A common stock will be subject to those of the holders of any shares of preferred stock the Company may issue in the future.

*Equity Repurchase Program*

In February 2019, the Company's Board of Directors approved an equity repurchase program authorizing the repurchase of up to an aggregate of $150 million of its Class A common stock. The Company is not obligated to repurchase any shares under this program. Subject to applicable laws and the provisions of any agreements restricting the Company's ability to do so, repurchases may be made at the Company's discretion from time to time through open market purchases, negotiated transactions or tender offers, depending on market conditions and other factors.

**Class B Common Stock**

*Voting Rights*

All Continuing Owners of Station Holdco, other than Red Rock, hold shares of Class B common stock. Although Class B shares have no economic rights, they allow those owners of Station Holdco to exercise voting power at Red Rock, which is the sole managing member of Station Holdco.

Each outstanding share of Class B common stock that is held by a holder that, together with its affiliates, owned LLC Units representing at least 30% of the outstanding LLC Units and, at the applicable record date, maintains direct or indirect beneficial ownership of at least 10% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the LLC Units were exchanged for Class A common stock) is entitled to ten votes and each other outstanding share of Class B common stock is entitled to one vote.

Affiliates of Frank J. Fertitta III and Lorenzo J. Fertitta hold all of the Company's issued and outstanding shares of Class B common stock that have ten votes per share. As a result, Frank J. Fertitta III and Lorenzo J. Fertitta, together with their affiliates, control any action requiring the general approval of the Company's stockholders, including the election of the board of directors, the adoption of amendments to the Certificate of Incorporation and bylaws and the approval of any merger or sale of substantially all of the Company's assets.

Each share of Class B common stock is entitled to only one vote automatically upon it being held by a holder that, together with its affiliates, did not own at least 30% of the outstanding LLC Units immediately following the IPO or owns less

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

than 10% of the outstanding shares of Class A common stock (determined on an as-exchanged basis assuming that all of the LLC Units were exchanged for Class A common stock). Holders of LLC Units are entitled at any time to exchange LLC Units, together with an equal number of shares of Class B common stock, for shares of Class A common stock on a one-for-one basis or for cash, at the Company's election. Accordingly, as members of Station Holdco exchange LLC Units, the voting power afforded to them by their shares of Class B common stock will be correspondingly reduced. Holders of Class B common stock exchanged 0.4 million, 2.7 million and 24.5 million shares of such stock, along with an equal number of LLC Units, for an equal number of shares of Class A common stock during the years ended December 31, 2018, 2017 and 2016, respectively.

*Automatic Transfer*

In the event that any outstanding share of Class B common stock shall cease to be held by a holder of an LLC Unit (including a transferee of an LLC Unit), such share shall automatically be transferred to the Company and thereupon shall be retired.

*Dividend Rights*

Class B stockholders will not participate in any dividends declared by the board of directors.

*Rights upon Liquidation*

In the event of any liquidation, dissolution, or winding-up of Red Rock, whether voluntary or involuntary, the Class B stockholders will not be entitled to receive any of the Company's assets.

*Other Rights*

The holders of Class B common stock have no preemptive or conversion rights or other subscription rights. There are no redemption or sinking fund provisions applicable to the Class B common stock. The rights, preferences and privileges of holders of Class B common stock will be subject to those of the holders of any shares of preferred stock the Company may issue in the future.

**Preferred Stock**

Subject to limitations prescribed by Delaware law and the Certificate of Incorporation, the board of directors is authorized to issue preferred stock and to determine the terms and conditions of the preferred stock, including whether the shares of preferred stock will be issued in one or more series, the number of shares to be included in each series and the powers, designations, preferences and rights of the shares. The board of directors is authorized to designate any qualifications, limitations or restrictions on the shares without any further vote or action by the stockholders. The issuance of preferred stock may have the effect of delaying, deferring or preventing a change in control of the Company. The Company has no current plan to issue any shares of preferred stock.

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Accumulated Other Comprehensive Income**

The following table presents changes in accumulated other comprehensive income balances, net of tax and noncontrolling interest (amounts in thousands):

| | Unrealized gain on interest rate swaps | Unrealized gain on available-for-sale securities | Unrecognized pension liability | Total |
|---|---|---|---|---|
| **Balances, December 31, 2016** | $ 2,404 | $ 52 | $ 2 | $ 2,458 |
| Unrealized (loss) gain arising during the period (a) | (236) | 4 | (39) | (271) |
| Amounts reclassified from accumulated other comprehensive income (loss) into income (b) | 144 | (56) | — | 88 |
| Net current-period other comprehensive loss | (92) | (52) | (39) | (183) |
| Exchanges of noncontrolling interests for Class A common stock | 228 | — | — | 228 |
| Rebalancing | (30) | — | — | (30) |
| **Balances, December 31, 2017** | 2,510 | — | (37) | 2,473 |
| Unrealized loss arising during the period (c) | — | — | (159) | (159) |
| Amounts reclassified from accumulated other comprehensive income (loss) into income (d) | (1,264) | — | — | (1,264) |
| Net current-period other comprehensive loss | (1,264) | — | (159) | (1,423) |
| Exchanges of noncontrolling interests for Class A common stock | 21 | — | — | 21 |
| Rebalancing | 12 | — | — | 12 |
| **Balances, December 31, 2018** | $ 1,279 | $ — | $ (196) | $ 1,083 |

_____

(a)    Net of $1.0 million tax benefit.
(b)    Net of $0.5 million tax expense.
(c)    Net of $0.1 million tax benefit.
(d)    Net of $0.5 million tax benefit.

**Net Income Attributable to Red Rock Resorts, Inc. and Transfers from (to) Noncontrolling Interests**

The table below presents the effect on Red Rock Resorts, Inc. stockholders' equity from net income and changes in its ownership of Station Holdco LLC (amounts in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| Net income attributable to Red Rock Resorts, Inc. | $ 157,541 | $ 35,423 | $ 91,952 |
| Transfers from (to) noncontrolling interests: | | | |
| Allocation of equity to noncontrolling interests of Station Holdco in the Reorganization Transactions | — | — | (358,401) |
| Exchanges of noncontrolling interests for Class A common stock | 2,174 | 14,765 | 126,942 |
| Acquisition of subsidiary noncontrolling interests | — | 2,850 | — |
| Rebalancing of ownership percentage between the Company and noncontrolling interests of Station Holdco | (5,898) | (4,975) | 1,277 |
| Net transfers (to) from noncontrolling interests | (3,724) | 12,640 | (230,182) |
| Change from net income attributable to Red Rock Resorts, Inc. and net transfers (to) from noncontrolling interests | $ 153,817 | $ 48,063 | $ (138,230) |

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**15.     Share-based Compensation**

The Red Rock Resorts, Inc. 2016 Equity Incentive Plan (the "Equity Incentive Plan") is designed to attract, retain and motivate employees and to align the interests of those individuals with the interests of the Company. The Equity Incentive Plan was approved by the Company's stockholders and is administered by the Compensation Committee or other designated committee of the board of directors (the "Committee"). The plan authorizes the Committee to grant share-based compensation awards, including stock options, restricted stock, performance awards, stock appreciation rights and certain other stock-based awards, to eligible participants. The Committee may designate plan participants, determine the types of awards to be granted and the number of shares covered by awards, and set the terms and conditions of awards, subject to limitations set forth in the plan. A total of 11,585,479 shares of Class A common stock are reserved for issuance under the plan, of which approximately 3.7 million shares were available to be issued at December 31, 2018.

*Stock Options*

Stock option awards issued under the plan generally vest over a requisite service period of four years and have a term of seven years from the grant date. The exercise price of stock options awarded under the plan is equal to the fair market value of the Company's stock at the grant date. A summary of stock option activity is presented below:

| | Shares | Weighted-average exercise price | Weighted-average remaining contractual life (years) | Aggregate intrinsic value (amounts in thousands) |
|---|---|---|---|---|
| Outstanding at January 1, 2018 | 4,248,465 | $ 21.29 | | |
| Granted | 2,204,155 | 32.40 | | |
| Exercised | (273,030) | 19.70 | | |
| Forfeited or expired | (1,013,025) | 23.92 | | |
| Outstanding at December 31, 2018 | 5,166,565 | $ 25.60 | 5.4 | $ 612 |
| Unvested instruments expected to vest | 4,675,084 | $ 26.12 | 5.5 | $ 377 |
| Exercisable at December 31, 2018 | 491,481 | $ 20.69 | 4.3 | $ 235 |

The following information is provided for stock options awarded under the plan:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| Weighted-average grant date fair value | $ 9.25 | $ 6.26 | $ 6.05 |
| Total intrinsic value of stock options exercised (amounts in thousands) | $ 3,550 | $ 538 | $ — |

The weighted-average assumptions used by the Company to estimate the grant date fair values of stock option awards were as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| Expected stock price volatility | 33.25% | 35.55% | 41.26% |
| Expected term (in years) | 4.87 | 4.95 | 4.75 |
| Risk-free interest rate | 2.63% | 2.06% | 1.35% |
| Expected dividend yield | 1.52% | 1.79% | 1.99% |

As a result of the IPO and Reorganization Transactions in May 2016, the Company has limited historical data on which to base certain assumptions used in estimating the grant date fair value of stock option awards. Accordingly, the Company uses the historical volatility of comparable public companies to estimate its expected stock price volatility and the simplified method to estimate the expected term of stock option awards. The risk-free interest rate is based on the U.S. Treasury yield curve in effect at the date of grant for a period equal to the expected term. The expected dividend yield is based on the current annualized dividend as of the grant date and the average stock price for the year preceding the option grant.

At December 31, 2018, unrecognized share-based compensation cost related to stock options was $24.8 million which is expected to be recognized over a weighted-average period of 2.7 years.

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

*Restricted Stock Awards*

Restricted stock awards issued under the plan generally vest over requisite service periods of two to four years for employee awards and one year for awards to independent directors. A summary of restricted stock activity is presented below:

| | Shares | | Weighted-average grant date fair value |
|---|---|---|---|
| Nonvested at January 1, 2018 | 308,310 | $ | 21.60 |
| Granted | 176,877 | | 31.95 |
| Vested | (55,798) | | 21.41 |
| Forfeited | (55,625) | | 24.53 |
| Nonvested at December 31, 2018 | 373,764 | $ | 26.09 |

The following information is provided for restricted stock awarded under the plan:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2018 | | 2017 | | 2016 | |
| Weighted-average grant date fair value | $ | 31.95 | $ | 22.11 | $ | 19.94 |
| Total fair value of shares vested (amounts in thousands) | $ | 1,194 | $ | 2,364 | $ | 2,830 |

At December 31, 2018, unrecognized share-based compensation cost for restricted stock awards was $6.0 million which is expected to be recognized over a weighted-average period of 2.6 years.

Share-based compensation is classified in the same financial statement line items as cash compensation. The following table presents the location of share-based compensation expense in the Consolidated Statements of Income (amounts in thousands):

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2018 | | 2017 | | 2016 | |
| Operating costs and expenses: | | | | | | |
| Casino | $ | 250 | $ | 228 | $ | 340 |
| Food and beverage | | 36 | | 40 | | 21 |
| Room | | — | | 11 | | 75 |
| Selling, general and administrative | | 11,003 | | 7,643 | | 6,457 |
| Total share-based compensation expense | $ | 11,289 | $ | 7,922 | $ | 6,893 |

In addition to the expense amounts shown in the table above, $0.1 million in share-based compensation was capitalized as part of the cost of property and equipment during each of the years ended December 31, 2018 and 2017. Share-based compensation expense for the pre-IPO period from January 1, 2016 through May 1, 2016 included $3.5 million for awards issued under two terminated plans, which are described below.

*Terminated Plans*

Prior to the IPO, the Company had three share-based compensation plans which were terminated in connection with the IPO and Reorganization Transactions, two of which resulted in share-based compensation expense for the year ended December 31, 2016. At the IPO date, restricted shares of Class A common stock were issued in substitution for certain outstanding vested and unvested profit interests on a value-for-value basis, and the nonvested restricted shares continued to vest under the same terms as the related profit interest awards. The weighted-average grant date fair value of nonvested restricted shares awarded in substitution for unvested Profit Units was $6.83 per share. The Company applied liability accounting for certain awards of profit interests that were subject to cash settlement and remeasured the liability awards at fair value each reporting period. Upon completion of the Fertitta Entertainment Acquisition, certain outstanding profit interests were settled, including the liability awards which were settled for $18.7 million. The estimated fair value of profit interests that vested during the year ended December 31, 2016 was $8.3 million.

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

16.     **Income Taxes**

*Income Taxes*

Red Rock is taxed as a corporation and pays corporate federal, state and local taxes on income allocated to it by Station Holdco based upon Red Rock's economic interest held in Station Holdco. As part of the IPO, Red Rock acquired the outstanding stock of the Merging Blockers which are taxed as corporations. As a result, Red Rock files as a consolidated group for federal income tax reporting purposes and in certain states as required or allowed. During 2018, the Merging Blockers were dissolved; therefore, in future years Red Rock will file a standalone tax return. Station Holdco is treated as a pass-through partnership for income tax reporting purposes. Station Holdco's members, including the Company, are liable for federal, state and local income taxes based on their share of Station Holdco's pass-through taxable income.

The Tax Cuts and Jobs Act (the "Act") was enacted on December 22, 2017. The Act reduces the U.S. federal corporate rate from 35% to 21%. At December 31, 2017, the Company was able to reasonably estimate the effects of the Act and recorded provisional adjustments associated with the effects on existing deferred tax balances. At December 31, 2018, the Company has completed its analysis and determined that there is no change to the provisional amount of $85.3 million related to the remeasurement of its deferred tax balance. The Company believes that it has taken sustainable positions; however, there is no assurance that the taxing authorities will not propose adjustments that are different from the Company's expected outcome and that will impact the provision for income taxes.

*Income Tax Expense*

The components of income tax expense (benefit) were as follows (amounts in thousands):

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2018** | **2017** | **2016** |
| **Current income taxes:** | | | |
| Federal | $          — | $     (1,330) | $      1,239 |
| State and local | 15 | 66 | 17 |
| Total current income taxes | 15 | (1,264) | 1,256 |
| **Deferred income taxes:** | | | |
| Federal | 23,817 | 133,246 | 6,639 |
| State and local | 43 | 2,804 | 348 |
| Total deferred income taxes | 23,860 | 136,050 | 6,987 |
| Total income tax expense | $    23,875 | $   134,786 | $      8,243 |

A reconciliation of statutory federal income tax, which is the amount computed by multiplying income before tax by the statutory federal income tax rate, to the Company's provision for income tax is as follows (amounts in thousands):

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2018** | **2017** | **2016** |
| Expected U.S. federal income taxes at statutory rate | $     51,105 | $     69,411 | $    57,472 |
| Income attributable to noncontrolling interests | (13,007) | (9,839) | (44,682) |
| State and local income taxes, net of federal benefit | 43 | 474 | 100 |
| Non-deductible expenses | 1,525 | (1,361) | 236 |
| Tax credits | (1,985) | (1,062) | (250) |
| Impact of tax rate change due to tax reform | — | 85,348 | — |
| Other | 2,759 | 482 | 1,822 |
| Valuation allowance | (16,565) | (8,667) | (6,455) |
| Income tax expense | $     23,875 | $   134,786 | $      8,243 |

The Company's effective tax rate was 9.81%, 67.96% and 5.02% for the years ended December 31, 2018, 2017 and 2016, respectively. The Company's effective tax rate includes the net tax expense associated with remeasuring its deferred tax assets, deferred tax liabilities and related valuation allowances to reflect the enacted federal rate, and rate benefit attributable to

102

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

the fact that Station Holdco operates as a limited liability company which is not subject to federal income tax. Accordingly, the Company is not liable for income taxes on the portion of Station Holdco's earnings attributable to noncontrolling interests.

The components of deferred tax assets and liabilities are as follows (amounts in thousands):

|  | December 31, | |
| --- | --- | --- |
|  | **2018** | **2017** |
| **Deferred tax assets:** | | |
| Tax credit carryforwards | $ 3,737 | $ 1,496 |
| Net operating loss carryforwards and other attributes | 52,785 | 20,452 |
| Investment in partnership | 90,035 | 138,094 |
| Payable pursuant to tax receivable agreement | 5,244 | 30,296 |
| Total gross deferred tax assets | 151,801 | 190,338 |
| Valuation allowance | (39,968) | (57,607) |
| Total deferred tax assets, net of valuation allowance | $ 111,833 | $ 132,731 |

The Company recorded a reduction to the net deferred tax asset resulting from the outside basis difference of its interest in Station Holdco. The Company also recorded a reduction to the deferred tax asset for its liability related to payments to be made pursuant to the TRA representing 85% of the tax savings the Company expects to receive from the amortization deductions associated with the step up in the basis of depreciable assets under Section 754 of the Internal Revenue Code. This deferred tax asset will be recovered as cash payments are made to the TRA participants. Both of these deferred tax assets were initially recorded through equity.

At December 31, 2018, the Company had a federal net operating loss carryforward of approximately $250.1 million. $101.6 million of the federal net operating loss carryforward will begin to expire in 2037; the remaining $148.5 million have unlimited carryforward but may have usage limitations in a given year. The Company also had $1.1 million of additional pre-tax attributes and $3.7 million of tax credits at December 31, 2018.

Each reporting period, the Company analyzes the likelihood that its deferred tax assets will be realized. A valuation allowance is recorded if, based on the weight of all available positive and negative evidence, it is more likely than not (a likelihood of more than 50%) that some portion, or all, of a deferred tax asset will not be realized. On an annual basis, the Company performs a comprehensive analysis of all forms of positive and negative evidence based on year end results. During each interim period, the Company updates its annual analysis for significant changes in the positive and negative evidence. As a result of this analysis, the Company determined that the deferred tax asset related to acquiring its interest in Station Holdco through the newly issued LLC Units is not expected to be realized unless the Company disposes of its investment in Station Holdco. The Company recognizes changes to the valuation allowance through the provision for income tax or other comprehensive (loss) income, as applicable, and at December 31, 2018 and 2017, the valuation allowance was $40.0 million and $57.6 million, respectively.

*Uncertain Tax Positions*

The Company records uncertain tax positions on the basis of a two-step process in which (1) the Company determines whether it is more likely than not the tax positions will be sustained on the basis of the technical merits of the position and (2) for those tax positions meeting the more likely than not recognition threshold, the Company recognizes the largest amount of tax benefit that is more than 50% likely to be realized upon ultimate settlement with the related tax authority.

The Company determined that no liability for unrecognized tax benefits for uncertain tax positions was required at December 31, 2018 and 2017. In addition, the Company does not believe that it has any tax positions for which it is reasonably possible that it will be required to record a significant liability for unrecognized tax benefits within the next twelve months.

The first tax year subject to examination by taxing authorities for U.S. federal and state income tax purposes is 2015, though the Company reported no activity during that period. Additionally, although Station Holdco is treated as a partnership for U.S. federal and state income tax purposes, it is required to file an annual U.S. Return of Partnership Income, which is subject to examination by the Internal Revenue Service ("IRS"). The statute of limitations has expired for tax years through 2014 for Station Holdco. The Company has been notified that its 2016 tax returns and those of Station Holdco will be examined by the Internal Revenue Service.

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

*Tax Receivable Agreement*

Pursuant to the election under Section 754 of the Internal Revenue Code, the Company continues to expect to obtain an increase in its share of the tax basis in the net assets of Station Holdco when LLC Units are exchanged by Station Holdco's noncontrolling interest holders and other qualifying transactions. These increases in tax basis may reduce the amounts that the Company would otherwise pay in the future to various tax authorities. They may also decrease gains (or increase losses) on future dispositions of certain capital assets to the extent tax basis is allocated to those capital assets.

In connection with the IPO, the Company entered into the TRA with certain pre-IPO owners of Station Holdco. In the event that such parties exchange any or all of their LLC Units for Class A common stock, the TRA requires the Company to make payments to such holders for 85% of the tax benefits realized by the Company by such exchange. The Company expects to realize these tax benefits based on current projections of taxable income. The annual tax benefits are computed by calculating the income taxes due, including such tax benefits, and the income taxes due without such benefits. For the years ended December 31, 2018, 2017 and 2016, exchanges of LLC Units and Class B common shares resulted in increases of $2.5 million, $22.8 million and $213.2 million, respectively, in amounts payable under the TRA liability and net increases of $2.7 million, $24.3 million and $223.0 million, respectively, in deferred tax assets, all of which were recorded through equity. At December 31, 2018 and 2017, the Company's liability under the TRA with respect to previously consummated transactions was $24.9 million and $141.9 million, respectively. During the year ended December 31, 2018, the Company paid a total of $28.9 million to two pre-IPO owners of Station Holdco in exchange for which the owners assigned to the Company all of their rights under the TRA. As a result, the Company's liability under the TRA was reduced by $119.2 million, and the Company recognized nontaxable income of $90.4 million, which is presented in the Tax receivable agreement liability adjustment in the Consolidated Statements of Income for the year ended December 31, 2018.

The timing and amount of aggregate payments due under the TRA may vary based on a number of factors, including the amount and timing of the taxable income the Company generates each year and the tax rate then applicable. The payment obligations under the TRA are Red Rock's obligations and are not obligations of Station Holdco or Station LLC. Payments are generally due within a specified period of time following the filing of the Company's annual tax return and interest on such payments will accrue from the original due date (without extensions) of the income tax return until the date paid. Payments not made within the required period after the filing of the income tax return generally accrue interest at a rate of LIBOR plus 5.00%.

The TRA will remain in effect until all such tax benefits have been utilized or expired unless the Company exercises its right to terminate the TRA. The TRA will also terminate if the Company breaches its obligations under the TRA or upon certain mergers, asset sales or other forms of business combinations, or other changes of control. If the Company exercises its right to terminate the TRA, or if the TRA is terminated early in accordance with its terms, Red Rock's payment obligations would be accelerated based upon certain assumptions, including the assumption that the Company would have sufficient future taxable income to utilize such tax benefits, and may substantially exceed the actual benefits, if any, the Company realizes in respect of the tax attributes subject to the TRA.

**17.   Retirement Plans**

*401(k) Plan*

The Company has a defined contribution 401(k) plan (the "401(k) Plan") which covers all employees who meet certain age and length of service requirements and allows an employer contribution of up to 50% of the first 4% of each participating employee's compensation contributed to the plan. Participants may elect to defer pretax compensation through payroll deductions. These deferrals are regulated under Section 401(k) of the Internal Revenue Code. The Company recorded expense for matching contributions of $4.1 million, $4.1 million and $3.4 million for the years ended December 31, 2018, 2017 and 2016, respectively.

*Palms Pension Plan*

In connection with the acquisition of Palms, the Company acquired a single-employer defined benefit pension plan (the "Pension Plan"), which covers eligible employees of Palms. The Pension Plan provides a cash balance form of pension benefits for eligible Palms employees who met certain age and length of service requirements. There has been a plan curtailment since 2009, and as of the curtailment date, new participants were no longer permitted, and existing participants' accrual of benefits for future service ceased.

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The following table provides information about the changes in benefit obligation and the fair value of plan assets (amounts in thousands):

| | Year Ended December 31, | |
| | 2018 | 2017 |
|---|---|---|
| **Change in benefit obligation:** | | |
| Beginning benefit obligation (accumulated and projected) | $ 14,130 | $ 13,728 |
| Interest cost | 475 | 536 |
| Actuarial loss | (506) | 940 |
| Benefits paid | (742) | (464) |
| Other | — | (610) |
| Ending benefit obligation (accumulated and projected) | 13,357 | 14,130 |
| **Change in fair value of plan assets:** | | |
| Beginning fair value of plan assets | 9,217 | 9,228 |
| Actual return on plan assets | (668) | 813 |
| Employer contributions | 918 | 250 |
| Benefits paid | (742) | (464) |
| Other | — | (610) |
| Ending fair value of plan assets | 8,725 | 9,217 |
| Net funded status at December 31 | $ (4,632) | $ (4,913) |

The Company's qualified pension plan is funded in accordance with requirements of the Employee Retirement Income Security Act of 1974, as amended. The Company expects to contribute $0.7 million to the Pension Plan for the year ending December 31, 2019 and the Company does not expect any plan assets to be returned in the year ending December 31, 2019.

The table below presents the components of pension expense incurred subsequent to the October 1, 2016 acquisition of Palms (amounts in thousands):

| | Year Ended December 31, 2018 | Year Ended December 31, 2017 | Three Months Ended December 31, 2016 |
|---|---|---|---|
| **Components of net periodic benefit cost:** | | | |
| Interest cost | $ 475 | $ 536 | $ 131 |
| Expected return on plan assets | (209) | (192) | (86) |
| Effect of settlement | — | 13 | — |
| Net periodic benefit cost | 266 | 357 | 45 |
| **Other changes recognized in other comprehensive income:** | | | |
| Net loss (gain) | 371 | 319 | (6) |
| Amount recognized due to settlement | — | (13) | — |
| Total recognized in other comprehensive income | 371 | 306 | (6) |
| Total recognized in net periodic benefit cost and other comprehensive income | $ 637 | $ 663 | $ 39 |

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The Company did not incur any service costs or amortize any net gains or losses within the net periodic benefit costs of the Pension Plan during the periods presented. Expense associated with the Pension Plan is classified within Other expense in the Consolidated Statements of Income. Amounts recognized on the Consolidated Balance Sheets at December 31, 2018 and 2017 related to the Pension Plan consisted of the following (amounts in thousands):

|  | December 31, | |
| --- | --- | --- |
|  | **2018** | **2017** |
| Other long-term liabilities | $      4,632 | $      4,913 |
| Net actuarial loss recognized in Accumulated Other Comprehensive Income | 671 | 300 |

The Company does not expect to amortize any net actuarial loss from accumulated other comprehensive income into net pension expense during 2019.

The following tables present the weighted-average actuarial assumptions used to calculate the net periodic benefit cost and obligation:

|  | **Year Ended December 31, 2018** | **Year Ended December 31, 2017** | **Three Months Ended December 31, 2016** |
| --- | --- | --- | --- |
| **Net periodic benefit cost:** | | | |
| Discount rate | 3.60% | 4.15% | 3.85% |
| Expected long-term rate of return | 5.80% | 5.80% | 6.30% |
| Rate of compensation increase | n/a | n/a | n/a |

|  | December 31, | |
| --- | --- | --- |
|  | **2018** | **2017** |
| **Benefit obligations:** | | |
| Discount rate | 4.15% | 3.60% |
| Rate of compensation increase | n/a | n/a |

The discount rate used reflects the expected future benefit payments based on plan provisions and participant data as of the beginning of the plan year. The expected future cash flows are discounted by a pension discount yield curve on measurement dates and modified as deemed necessary. The expected return on plan assets uses a weighted-average rate based on the target asset allocation of the plan and capital market assumptions developed with a primary focus on forward-looking valuation models and market indicators. The key inputs for these models are future inflation, economic growth, and interest rate environment.

The composition of the Pension Plan assets at December 31, 2018, along with the targeted mix of assets, is presented below:

|  | **Target** | **December 31, 2018** |
| --- | --- | --- |
| Fixed income | 50% | 53% |
| Domestic income | 18% | 17% |
| International equity | 14% | 12% |
| Long/short equity | 10% | 10% |
| Other | 8% | 8% |
|  | 100% | 100% |

The investment strategy for the Company's defined benefit plan assets covers a diversified mix of assets, including equity and fixed income securities and real estate. Assets are managed within a risk management framework which addresses the need to generate incremental returns in the context of an appropriate level of risk, based on plan liability profiles and changes in funded status. The return objectives are to satisfy funding obligations when and as prescribed by law and to minimize the risk of large losses primarily through diversification.

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Entities are required to use a fair value hierarchy to measure the plan assets. See Note 2 for a description of the fair value hierarchy. The fair values of the Pension Plan assets at December 31, 2018 and 2017 by asset category were as follows (amounts in thousands):

| | | | Fair Value Measurement at Reporting Date Using | | |
| | Balance at December 31, 2018 | | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|---|
| Fixed income | $ | 4,646 | $ 4,623 | $ 23 | $ — |
| Domestic income | | 1,468 | 120 | 1,348 | — |
| International equity | | 1,059 | 1,059 | — | — |
| Long/short equity | | 880 | 880 | — | — |
| Other | | 672 | 260 | 412 | — |
| | $ | 8,725 | $ 6,942 | $ 1,783 | $ — |

| | | | Fair Value Measurement at Reporting Date Using | | |
| | Balance at December 31, 2017 | | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|---|
| Fixed income | $ | 4,547 | $ 4,547 | $ — | $ — |
| Domestic income | | 1,902 | 189 | 1,713 | — |
| International equity | | 1,387 | 1,106 | 281 | — |
| Long/short equity | | 919 | 919 | — | — |
| Other | | 462 | — | 462 | — |
| | $ | 9,217 | $ 6,761 | $ 2,456 | $ — |

At December 31, 2018, expected benefit payments for the next ten years were as follows (amounts in thousands):

| Years Ending December 31, | |
|---|---|
| 2019 | $ 1,770 |
| 2020 | 610 |
| 2021 | 1,550 |
| 2022 | 1,260 |
| 2023 | 630 |
| 2024 - 2028 | 4,110 |

**18.    Related Party Transactions**

Under the TRA described in Note 16, the Company is required to make payments to certain pre-IPO owners of Station Holdco for 85% of the tax benefits realized by the Company as a result of certain transactions with the pre-IPO owners. At December 31, 2018 and 2017, $24.9 million and $141.9 million, respectively, was payable to certain pre-IPO owners of Station Holdco, including current and former executives of the Company or members of their respective family group, with respect to previously consummated transactions. Of these amounts, $9.0 million and $9.2 million, respectively, was payable to entities related to Frank J. Fertitta III and Lorenzo J. Fertitta. Future payments to pre-IPO owners in respect of any subsequent exchanges of LLC Units for Class A common stock would be in addition to these amounts and are expected to be substantial.

Prior to April 27, 2017, the Company leased the land on which each of Boulder Station and Texas Station is located pursuant to long-term ground leases through 2058 and 2060, respectively. The Company leased this land from entities owned by the Frank J. Fertitta and Victoria K. Fertitta Revocable Family Trust (the "Related Party Lessor"). Frank J. Fertitta, Jr. and

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Victoria K. Fertitta are the parents of Frank J. Fertitta III, the Company's Chairman and Chief Executive Officer, and Lorenzo J. Fertitta, the Company's Vice Chairman. On April 27, 2017, the Company acquired the land (formerly subject to the ground leases), including the residual interest in the gaming and hotel facilities and other real property improvements thereon (the "Gaming Facilities"), for aggregate consideration of $120.0 million. Concurrently with the land acquisition, the Company assumed a long-term ground lease with an unrelated third-party lessor for an adjacent parcel of land at Boulder Station that previously had been subleased from the Related Party Lessor. The assumed ground lease terminates in 2089 and provides for monthly rental payments of approximately $14,000, subject to annual increases of 3% to 6% based on a cost of living factor. During the year ended December 31, 2017, the Company recognized a charge of $100.3 million in related party lease termination costs, which was an amount equal to the difference between the aggregate consideration paid by the Company and the fair value of the net assets acquired, including the land and residual interests in the Gaming Facilities and the assumed lease obligation. The transaction conveyed ownership of the land and interests (current and residual) in the Gaming Facilities to the Company, decreased rent expense over the maximum term of the leases by approximately $300 million, and generated a tax benefit of approximately $35 million to Red Rock and the other owners of Station Holdco. The Company's lease payments under the related party leases totaled approximately $2.3 million for the period from January 1, 2017 to April 27, 2017 and $7.1 million for the year ended December 31, 2016, and they are included in selling, general and administrative expense in the Consolidated Statements of Income.

As described in Note 1, during the year ended December 31, 2016, the Company purchased LLC Units from Continuing Owners using a portion of the net proceeds from the IPO, including $44.6 million paid to entities controlled by Frank J. Fertitta III and Lorenzo J. Fertitta. The Company also completed the Fertitta Entertainment Acquisition in May 2016.

Fertitta Entertainment entered into various agreements for partial use of and to share in the cost of aircraft with Fertitta Enterprises, Inc., a company owned by the Frank J. Fertitta and Victoria K. Fertitta Revocable Family Trust. The agreements were terminated in April 2016. Selling, general and administrative expenses related to these agreements were $1.1 million for the year ended December 31, 2016.

In April 2016, Fertitta Entertainment sold all of the outstanding membership interest in FE Aviation II LLC ("FE Aviation") to Fertitta Business Management LLC, an entity controlled by Frank J. Fertitta III and Lorenzo J. Fertitta for $8.0 million. The carrying amount of FE Aviation exceeded the sales price by approximately $0.5 million, which was recognized as a deemed distribution.

**19.     Earnings Per Share**

Basic earnings per share is calculated by dividing net income attributable to Red Rock by the weighted-average number of shares of Class A common stock outstanding during the period. The calculation of diluted earnings per share gives effect to all potentially dilutive shares, including shares issuable pursuant to outstanding stock options and nonvested restricted shares of Class A common stock, based on the application of the treasury stock method, and outstanding Class B common stock that is exchangeable, along with an equal number of LLC Units, for Class A common stock, based on the application of the if-converted method. Dilutive shares included in the calculation of diluted earnings per share for the years ended December 31, 2018 and 2017 represent outstanding shares of Class B common stock, nonvested restricted shares of Class A common stock and outstanding stock options. Dilutive shares included in the calculation of diluted earnings per share for the year ended December 31, 2016 represent nonvested restricted shares of Class A common stock. All other potentially dilutive shares have been excluded from the calculation of diluted earnings per share because their inclusion would have been antidilutive.

For purposes of calculating earnings per share for the year ended December 31, 2016, of which a portion of the period preceded the IPO, the Company has retrospectively presented earnings per share as if the Reorganization Transactions had occurred at the beginning of the year. Such retrospective presentation reflects approximately 10 million Class A shares outstanding, representing the LLC Units held by the Merging Blockers, which were the only LLC Units exchanged for Class A shares in the Reorganization Transactions. Accordingly, for the portion of 2016 prior to the IPO, the Company has applied a hypothetical allocation of net income to the Class A common stock, with the remainder of net income being allocated to noncontrolling interests. The retrospective presentation does not include the 29.5 million shares of Class A common stock issued in the IPO. This hypothetical allocation of net income differs from the allocation of net income to Red Rock and noncontrolling interests presented in the Consolidated Statements of Income, which assumes no noncontrolling interest in Station Holdco existed prior to the IPO.

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

A reconciliation of the numerator used in the calculation of basic earnings per share is presented below (amounts in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| Net income, basic | $ 219,480 | $ 63,533 | $ 155,964 |
| Less net income attributable to noncontrolling interests, basic (a) | (61,939) | (28,110) | (120,545) |
| Net income attributable to Red Rock, basic (a) | $ 157,541 | $ 35,423 | $ 35,419 |

(a)     Amounts for the year ended December 31, 2016 include the retrospective allocation of net income as if the Reorganization Transactions had occurred at the beginning of the year.

A reconciliation of the numerator used in the calculation of diluted earnings per share is presented below (amounts in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| Net income attributable to Red Rock, basic | $ 157,541 | $ 35,423 | $ 35,419 |
| Effect of dilutive securities | 48,864 | 13,813 | (102) |
| Net income attributable to Red Rock, diluted | $ 206,405 | $ 49,236 | $ 35,317 |

The denominators used in the calculation of basic and diluted earnings per share are presented below (amounts in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| Weighted-average shares of Class A common stock outstanding, basic | 69,115 | 67,397 | 34,141 |
| Effect of dilutive securities | 47,744 | 48,533 | 144 |
| Weighted-average shares of Class A common stock outstanding, diluted | 116,859 | 115,930 | 34,285 |

The calculation of diluted earnings per share of Class A common stock excluded the following shares that could potentially dilute basic earnings per share in the future because their inclusion would have been antidilutive (amounts in thousands):

| | As of December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| Shares issuable in exchange for Class B common stock and LLC Units | — | — | 49,956 |
| Shares issuable upon exercise of stock options | 1,966 | 3,677 | 1,637 |
| Shares issuable upon vesting of restricted stock | 64 | 11 | 5 |

Shares of Class B common stock are not entitled to share in the earnings of the Company and are not participating securities. Accordingly, separate presentation of earnings per share of Class B common stock under the two-class method has not been presented.

**20.     Commitments and Contingencies**

*Leases*

*Wild Wild West Lease*

Station LLC leases from a third-party lessor the 20-acre parcel of land on which Wild Wild West is located and is a party to a purchase agreement for the land. Monthly rental payments under the Wild Wild West lease were $139,000 for the year ended December 31, 2018, which increased to $142,000 in January 2019. In December 2018, the Company exercised its option to purchase the land for $57.3 million. The purchase is expected to close in June 2019.

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

*Other Operating Leases*

In addition to the lease described above, the Company also leases certain other land, buildings and equipment used in its operations, which have operating lease terms expiring through 2089.

Future minimum lease payments required under all operating leases with initial or remaining non-cancelable lease terms in excess of one year are as follows (amounts in thousands):

| Years Ending December 31, | | |
|---|---|---:|
| 2019 | $ | 5,387 |
| 2020 | | 3,351 |
| 2021 | | 2,256 |
| 2022 | | 937 |
| 2023 | | 854 |
| Thereafter | | 44,598 |
| | $ | 57,383 |

Expenses incurred under operating lease agreements totaled $20.2 million, $19.3 million and $21.5 million for the years ended December 31, 2018, 2017 and 2016, respectively.

### Legal Matters

The Company and its subsidiaries are defendants in various lawsuits relating to routine matters incidental to their business. No assurance can be provided as to the outcome of any legal matters and litigation inherently involves significant costs.

**21.    Segments**

The Company views each of its Las Vegas casino properties and each of its Native American management arrangements as an individual operating segment. The Company aggregates all of its Las Vegas operating segments into one reportable segment because all of its Las Vegas properties offer similar products, cater to the same customer base, have the same regulatory and tax structure, share the same marketing techniques, are directed by a centralized management structure and have similar economic characteristics. The Company also aggregates its Native American management arrangements into one reportable segment.

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The Company utilizes adjusted earnings before interest, taxes, depreciation and amortization ("Adjusted EBITDA") as its primary performance measure. The Company's segment information and a reconciliation of net income to Adjusted EBITDA are presented below (amounts in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| **Net revenues** | | | |
| Las Vegas operations: | | | |
| Casino | $ 940,483 | $ 886,206 | $ 814,218 |
| Food and beverage | 381,197 | 365,448 | 330,488 |
| Room | 170,824 | 179,041 | 145,810 |
| Other (a) | 94,894 | 87,238 | 68,436 |
| Management fees | 605 | 509 | 558 |
| Las Vegas operations net revenues | 1,588,003 | 1,518,442 | 1,359,510 |
| Native American management: | | | |
| Management fees | 87,009 | 117,968 | 110,962 |
| Reportable segment net revenues | 1,675,012 | 1,636,410 | 1,470,472 |
| Corporate and other | 6,018 | 5,729 | 5,288 |
| Net revenues | $ 1,681,030 | $ 1,642,139 | $ 1,475,760 |
| | | | |
| **Net income** | $ 219,480 | $ 63,533 | $ 155,964 |
| **Adjustments** | | | |
| Depreciation and amortization | 180,255 | 178,217 | 156,668 |
| Share-based compensation | 11,289 | 7,922 | 6,893 |
| Write-downs and other charges, net | 34,650 | 29,584 | 24,591 |
| Tax receivable agreement liability adjustment | (90,638) | (139,300) | 739 |
| Related party lease termination | — | 100,343 | — |
| Asset impairment | — | 1,829 | — |
| Interest expense, net | 143,099 | 131,442 | 140,189 |
| Loss on extinguishment/modification of debt, net | — | 16,907 | 7,270 |
| Change in fair value of derivative instruments | (12,415) | (14,112) | (87) |
| Adjusted EBITDA attributable to MPM noncontrolling interest | (962) | (15,262) | (14,675) |
| Provision for income tax | 23,875 | 134,786 | 8,243 |
| Other | 329 | 1,357 | (1,088) |
| **Adjusted EBITDA (b)** | $ 508,962 | $ 497,246 | $ 484,707 |
| | | | |
| **Adjusted EBITDA** | | | |
| Las Vegas operations | $ 457,379 | $ 433,640 | $ 423,957 |
| Native American management | 80,795 | 95,897 | 87,259 |
| Reportable segment Adjusted EBITDA | 538,174 | 529,537 | 511,216 |
| Corporate and other | (29,212) | (32,291) | (26,509) |
| Adjusted EBITDA | $ 508,962 | $ 497,246 | $ 484,707 |

| | December 31, | |
|---|---|---|
| | **2018** | **2017** |
| **Total assets** | | |
| Las Vegas operations | $ 3,501,705 | $ 3,017,323 |
| Native American management | 37,274 | 47,495 |
| Corporate and other | 470,547 | 555,303 |
| | $ 4,009,526 | $ 3,620,121 |

**RED ROCK RESORTS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

(a)    Other revenue included revenue from tenant leases of $24.3 million, $23.5 million and $20.1 million, respectively, for the years ended December 31, 2018, 2017 and 2016. Revenue from tenant leases is accounted for under the lease accounting guidance and does not represent revenue recognized from contracts with customers.

(b)    Adjusted EBITDA includes net income plus depreciation and amortization, share-based compensation, write-downs and other charges, net, tax receivable agreement liability adjustment, related party lease termination, asset impairment, interest expense, net, loss on extinguishment/modification of debt, net, change in fair value of derivative instruments, provision for income tax and other, and excludes Adjusted EBITDA attributable to the noncontrolling interests of MPM.

The Company's capital expenditures, which were primarily related to Las Vegas operations, were $579.3 million, $248.4 million and $162.4 million for the years ended December 31, 2018, 2017 and 2016, respectively.

**22.    Quarterly Financial Information (Unaudited)**

Quarterly financial information is presented below (amounts in thousands, except per share data):

| | Year Ended December 31, 2018 | | | |
| --- | --- | --- | --- | --- |
| | First Quarter | Second Quarter (a) | Third Quarter | Fourth Quarter (b) |
| Net revenues | $        421,039 | $        416,188 | $        412,332 | $        431,471 |
| Operating income | 107,841 | 137,791 | 54,618 | 71,958 |
| Net income | 82,130 | 99,102 | 25,067 | 13,181 |
| Net income attributable to Red Rock Resorts, Inc. | 51,180 | 82,735 | 14,680 | 8,946 |
| Earnings per share, basic | $            0.74 | $            1.20 | $            0.21 | $            0.13 |
| Earnings per share, diluted | $            0.65 | $            0.82 | $            0.20 | $            0.11 |

| | Year Ended December 31, 2017 (c) | | | |
| --- | --- | --- | --- | --- |
| | First Quarter | Second Quarter (d) | Third Quarter | Fourth Quarter (e) |
| Net revenues | $        425,738 | $        410,143 | $        405,948 | $        400,310 |
| Operating income (loss) | 92,693 | (30,820) | 56,557 | 212,851 |
| Net income (loss) | 45,419 | (50,171) | 22,316 | 45,969 |
| Net income (loss) attributable to Red Rock Resorts, Inc. | 19,900 | (25,734) | 11,785 | 29,472 |
| Earnings (loss) per share, basic | $            0.30 | $          (0.38) | $            0.17 | $            0.43 |
| Earnings (loss) per share, diluted | $            0.30 | $          (0.38) | $            0.16 | $            0.35 |

(a)    Includes income of $73.5 million related to the TRA liability. See Note 16 for additional information.

(b)    Includes an out-of-period adjustment to interest expense related to the corporate office lease obligation. See Note 11 for additional information.

(c)    Amounts have been retrospectively adjusted for application of new revenue recognition guidance.

(d)    Includes $100.3 million in related party lease termination expense.

(e)    Includes the effects of the Tax Cuts and Jobs Act. See Note 16 for additional information.

**ITEM 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**ITEM 9A.    CONTROLS AND PROCEDURES**

*Disclosure Controls and Procedures*

As of the end of the period covered by this Annual Report on Form 10-K, the Company's management conducted an evaluation, under the supervision and with the participation of the principal executive officer and principal financial officer, of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")). In designing and evaluating disclosure controls and procedures, management recognizes

that any controls and procedures, no matter how well designed and operated, can only provide reasonable assurance of achieving the desired control objectives, and management is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on this evaluation, the principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, the Company's disclosure controls and procedures are effective, at the reasonable assurance level, and are designed to ensure that information required to be disclosed by the Company in reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and that such information is accumulated and communicated to management, including the principal executive officer and principal financial officer to allow timely decisions regarding required disclosure.

*Management's Report on Internal Control over Financial Reporting*

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting. The Company's internal control system was designed to provide reasonable assurance to the Company's management and board of directors regarding the preparation and fair presentation of published financial statements.

All internal control systems, no matter how well designed, have inherent limitations, including the possibility of human error and the circumvention or overriding of controls. Accordingly, even effective internal controls can provide only reasonable assurances with respect to financial statement preparation. Further because of changes in conditions, the effectiveness of internal controls may vary over time.

Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2018. This assessment was performed using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in the 2013 Internal Control — Integrated Framework. Based on such assessment, management believes that, as of December 31, 2018, the Company's internal control over financial reporting was effective based on those criteria.

The Company's independent registered public accounting firm, Ernst & Young LLP, has issued an attestation report on the Company's internal control over financial reporting as of December 31, 2018, which is included below.

*Changes in Internal Control over Financial Reporting*

During the quarter ended December 31, 2018, there were no changes in the Company's internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934) that materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Red Rock Resorts, Inc.

**Opinion on Internal Control over Financial Reporting**

We have audited Red Rock Resorts, Inc.'s internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 Framework) (the COSO criteria). In our opinion, Red Rock Resorts, Inc. (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2018, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets as of December 31, 2018 and 2017, and the related consolidated statements of income, comprehensive income, stockholders'/members' equity and cash flows for each of the three years in the period ended December 31, 2018, and the related notes and the financial statement schedule listed in the Index at Item 15(a)2. (collectively referred to as the "financial statements") of the Company and our report dated February 26, 2019 expressed an unmodified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting, included in Item 9A. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

Las Vegas, Nevada
February 26, 2019

114

**ITEM 9B.   OTHER INFORMATION**

None.

**PART III**

**ITEM 10.   DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

The information required under this item will be included in our definitive Proxy Statement for our 2019 Annual Meeting of Stockholders to be filed with the Securities and Exchange Commission not later than 120 days after December 31, 2018 and is incorporated herein by reference.

**ITEM 11.   EXECUTIVE COMPENSATION**

The information required under this item will be included in our definitive Proxy Statement for our 2019 Annual Meeting of Stockholders to be filed with the Securities and Exchange Commission not later than 120 days after December 31, 2018 and is incorporated herein by reference.

**ITEM 12.   SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED UNITHOLDER MATTERS**

The information required under this item will be included in our definitive Proxy Statement for our 2019 Annual Meeting of Stockholders to be filed with the Securities and Exchange Commission no later than 120 days after December 31, 2018 and is incorporated herein by reference.

**ITEM 13.   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

The information required under this item will be included in our definitive Proxy Statement for our 2019 Annual Meeting of Stockholders to be filed with the Securities and Exchange Commission no later than 120 days after December 31, 2018 and is incorporated herein by reference.

**ITEM 14.   PRINCIPAL ACCOUNTANT FEES AND SERVICES**

The information required under this item will be included in our definitive Proxy Statement for our 2019 Annual Meeting of Stockholders to be filed with the Securities and Exchange Commission no later than 120 days after December 31, 2018 and is incorporated herein by reference.

# PART IV

**ITEM 15.   EXHIBITS, FINANCIAL STATEMENT SCHEDULES**

(a)   1.   Red Rock Resorts, Inc. Consolidated Financial Statements (including related notes to Consolidated Financial Statements) filed in Part II of this report are listed below:

Report of Independent Registered Public Accounting Firm — Ernst & Young LLP

Financial Statements:

Consolidated Balance Sheets as of December 31, 2018 and 2017

Consolidated Statements of Income — Years ended December 31, 2018, 2017 and 2016

Consolidated Statements of Comprehensive Income — Years ended December 31, 2018, 2017 and 2016

Consolidated Statements of Stockholders'/Members' Equity — Years ended December 31, 2018, 2017 and 2016

Consolidated Statements of Cash Flows — Years ended December 31, 2018, 2017 and 2016

Notes to Consolidated Financial Statements

2.   Schedule II — Valuation and Qualifying Accounts

We have omitted all other financial statement schedules because they are not required or are not applicable, or the required information is shown in the consolidated financial statements or notes to the consolidated financial statements.

### SCHEDULE II — VALUATION AND QUALIFYING ACCOUNTS
### RED ROCK RESORTS, INC.
#### For the Years Ended December 31, 2018, 2017 and 2016
#### (in thousands)

| Description | Balance at Beginning of Year | | Additions | | Deductions | | Balance at End of Year |
|---|---|---|---|---|---|---|---|
| Deferred income tax asset valuation allowance: | | | | | | | |
| 2018 | $ | 57,607 | $ | — | $ | (17,639) | $ | 39,968 |
| 2017 | | 104,125 | | — | | (46,518) | | 57,607 |
| 2016 | | — | | 109,398 | | (5,273) | | 104,125 |

3.   Exhibits

| Exhibit Number | Exhibit Description |
|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation of Red Rock Resorts, Inc. (Incorporated herein by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K filed May 2, 2016.) |
| 3.2 | Amended and Restated Bylaws of Red Rock Resorts, Inc. (Incorporated herein by reference to Exhibit 3.2 to the Company's Current Report on Form 8-K filed May 2, 2016.) |
| 4.1 | Specimen Stock Certificate evidencing the shares of Class A Common Stock of Red Rock Resorts, Inc. (Incorporated herein by reference to Exhibit 4.1 to Amendment No. 3 to the Registration Statement on Form S-1 filed by the Company on February 12, 2016 (File No. 333-207397).) |
| 4.2 | Indenture, dated as of September 21, 2017, among Station Casinos LLC, the guarantors party thereto and Wells Fargo Bank, National Association, as trustee. (Incorporated herein by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K filed September 21, 2017.) |
| 10.1 | Third Amended and Restated Limited Liability Company Agreement of Station Holdco LLC, dated April 28, 2016, by and among Holdco and its Members (as defined therein.) (Incorporated herein by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed May 2, 2016.) |
| 10.2 | Amendment No. 1 to the Third Amended and Restated Limited Liability Company Agreement of Station Holdco LLC, dated February 28, 2017. (Incorporated herein by reference to Exhibit 10.5 to the Company's Quarterly Report on Form 10-Q filed May 10, 2017.) |
| 10.3 | Form of Indemnification Agreement, between Red Rock Resorts, Inc., a Delaware corporation, Station Casinos LLC, a Nevada limited liability company, and the directors and officers of Red Rock Resorts, Inc. (Incorporated herein by reference to Exhibit 10.2 to Amendment No. 3 to the Registration Statement on Form S-1 filed by the Company on February 12, 2016 (File No. 333-207397).) |
| 10.4 | Exchange Agreement, dated as of April 28, 2016, among Red Rock Resorts, Inc., Station Holdco LLC and Company Unitholders (as defined therein.) (Incorporated herein by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K filed May 2, 2016.) |
| 10.5 | Tax Receivable Agreement, dated as of April 28, 2016, among Red Rock Resorts, Inc., Station Holdco LLC and Members (as defined therein.) (Incorporated herein by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed May 2, 2016.) |
| 10.6 | Employment Agreement, dated as of May 2, 2016, among Red Rock Resorts, Inc., Station Casinos LLC and Frank J. Fertitta III. (Incorporated herein by reference to Exhibit 10.2 to Station Casinos LLC's Current Report on Form 8-K filed May 2, 2016.)† |
| 10.7 | Employment Agreement, dated as of May 2, 2016, among Red Rock Resorts, Inc., Station Casinos LLC and Richard J. Haskins. (Incorporated herein by reference to Exhibit 10.5 to Station Casinos LLC's Current Report on Form 8-K filed May 2, 2016.)† |
| 10.8 | Employment Agreement, dated as of March 3, 2017, among Red Rock Resorts, Inc., Station Casinos LLC and Stephen L. Cootey. (Incorporated herein by reference to Exhibit 10.4 to the Company's Quarterly Report on Form 10-Q filed May 10, 2017.)† |
| 10.9 | Employment Agreement, dated as of May 25, 2017, among Red Rock Resorts, Inc., Station Casinos LLC and Jeffrey T. Welch. (Incorporated herein by reference to Exhibit 10.6 to the Company's Quarterly Report on Form 10-Q filed August 9, 2017.)† |
| 10.10 | Employment Agreement, dated as of August 16, 2017, among Red Rock Resorts, Inc., Station Casinos LLC and Joseph J. Hasson. (Incorporated herein by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q filed November 9, 2017.)† |
| 10.11 | Credit Agreement, dated as of June 8, 2016, by and among Station Casinos LLC, subsidiary guarantors party thereto the lenders from time to time party thereto, the L/C Lenders party thereto, Deutsche Bank AG Cayman Islands Branch, as swingline lender, Deutsche Bank AG Cayman Islands Branch, as administrative agent and Deutsche Bank AG Cayman Islands Branch, as collateral agent. (Incorporated |

herein by reference to Exhibit 10.1 to Station Casinos LLC's Current Report on Form 8-K filed June 8, 2016.)

10.12    First Amendment to Credit Agreement, dated as of January 30, 2017, by and among Station, the other Station Parties, the lenders party thereto, and Deutsche Bank AG Cayman Islands Branch, as administrative agent. (Incorporated herein by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed January 30, 2017.)

10.13    Incremental Joinder Agreement, dated as of January 30, 2017 by and among Station, the guarantors party thereto, Red Rock Resorts, Inc. Station Holdco LLC, each of the Incremental Term B Lenders party thereto and Deutsche Bank AG Cayman Islands Branch, as administrative agent. (Incorporated herein by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed January 30, 2017.)

10.14    Second Amendment to Credit Agreement, dated as of April 5, 2017, by and among Station, the other Station Parties, the lenders party thereto, and Deutsche Bank AG Cayman Islands Branch, as administrative agent. (Incorporated herein by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed April 6, 2017.)

10.15    Incremental Joinder Agreement No. 2 and Third Amendment to Credit Agreement, dated as of May 2, 2017, by and among Station, the other Station Parties, the lenders party thereto, and Deutsche Bank AG Cayman Islands Branch, as administrative agent. (Incorporated herein by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed May 3, 2017.)

10.16    Incremental Joinder Agreement No. 3, dated as of May 10, 2017, by and among Station Casinos LLC, the guarantors party thereto, Red Rock Resorts, Inc., Station Holdco LLC, each of the Incremental Term B Lenders party thereto and Deutsche Bank AG Cayman Islands Branch, as administrative agent. (Incorporated herein by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed May 10, 2017.)

10.17    Credit Agreement Joinder Agreement, dated as of July 25, 2017, by and among Palms Leaseco LLC, NP Landco Holdco LLC, NP Tropicana LLC, CV Propco, LLC and Deutsche Bank AG Cayman Islands Branch, as administrative agent. (Incorporated herein by reference to Exhibit 10.9 to the Company's Quarterly Report on Form 10-Q filed August 9, 2017.)

10.18    Incremental Joinder Agreement No. 4 and Fourth Amendment to Credit Agreement, dated as of September 21, 2017, among Station Casinos LLC, the guarantor subsidiaries party thereto, Red Rock Resorts, Inc., Station Holdco LLC, Deutsche Bank AG Cayman Islands Branch, as administrative agent, and the lenders party thereto. (Incorporated herein by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q filed November 9, 2017.)

10.19    Incremental Joinder Agreement No. 5 and Fifth Amendment to Credit Agreement dated February 8, 2019, among Station Casinos LLC, the guarantor subsidiaries party thereto, Red Rock Resorts, Inc., Station Holdco LLC, Deutsche Bank AG Cayman Islands Branch, as administrative agent, and the lenders party thereto. (Incorporated herein by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed February 12, 2019.)

10.20    Credit Agreement, dated as of June 8, 2016 (as amended by the First Amendment to Credit Agreement, dated as of January 30, 2017, the Second Amendment to Credit Agreement, dated as of April 5, 2017, the Third Amendment to Credit Agreement, dated as of May 2, 2017, the Incremental Joinder Agreement No. 4 and Fourth Amendment to Credit Agreement, dated as of September 21, 2017 and the Incremental Joinder Agreement No. 5 and Fifth Amendment to Credit Agreement, dated as of February 8, 2019), among Station Casinos LLC, the borrower subsidiaries party thereto, the lenders party thereto, the L/C Lenders party thereto, Deutsche Bank AG Cayman Islands Branch, as administrative agent and Deutsche Bank AG Cayman Islands Branch, as collateral agent.

10.21    Red Rock Resorts, Inc. 2016 Equity Incentive Plan. (Incorporated herein by reference to Exhibit 10.29 to Amendment No. 3 to the Registration Statement on Form S-1 filed by the Company on February 12, 2016 (File No. 333-207397).)†

10.22      Non-Qualified Stock Option Award Agreement pursuant to the Red Rock Resorts, Inc. 2016 Equity Incentive Plan. (Incorporated herein by reference to Exhibit 10.30 to Amendment No. 3 to the Registration Statement on Form S-1 filed by the Company on February 12, 2016 (File No. 333-207397).)†

10.23      Restricted Stock Award Agreement pursuant to the Red Rock Resorts, Inc. 2016 Equity Incentive Plan. (Incorporated herein by reference to Exhibit 10.31 to Amendment No. 3 to the Registration Statement on Form S-1 filed by the Company on February 12, 2016 (File No. 333-207397).)†

10.24      Amended and Restated Gaming Management Agreement, dated as of July 27, 2012, among Federated Indians of Graton Rancheria, a federally recognized Indian tribe, Graton Economic Development Authority and SC Sonoma Management, LLC, a California limited liability company. (Incorporated herein by reference to Exhibit 10.32 to Amendment No. 1 to the Registration Statement on Form S-1 filed by the Company on November 23, 2015 (File No. 333-207397).)

10.25      Amended and Restated Non-Gaming Management Agreement, dated as of August 6, 2012, among Federated Indians of Graton Rancheria, a federally recognized Indian tribe, Graton Economic Development Authority and SC Sonoma Management, LLC, a California limited liability company. (Incorporated herein by reference to Exhibit 10.33 to Amendment No. 1 to the Registration Statement on Form S-1 filed by the Company on November 23, 2015 (File No. 333-207397).)

14.1      Red Rock Resorts, Inc. Code of Business Conduct and Ethics.

21.1      Subsidiaries of the Registrant.

23.1      Consent of Ernst & Young LLP, Independent Registered Public Accounting Firm.

31.1      Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

31.2      Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

32.1      Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

32.2      Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

101      The following information from the Company's Annual Report on Form 10-K for the year ended December 31, 2018 formatted in eXtensible Business Reporting Language: (i) the Consolidated Balance Sheets at December 31, 2018 and 2017, (ii) the Consolidated Statements of Income for the years ended December 31, 2018, 2017 and 2016, (iii) the Consolidated Statements of Comprehensive Income for the years ended December 31, 2018, 2017 and 2016, (iv) the Consolidated Statements of Stockholders'/ Members' Equity for the years ended December 31, 2018, 2017 and 2016, (v) the Consolidated Statements of Cash Flows for the years ended December 31, 2018, 2017 and 2016 and (vi) the Notes to Consolidated Financial Statements.

_____

†    Management contract or compensatory plan or arrangement.

**ITEM 16.**    **FORM 10-K SUMMARY**

None.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

RED ROCK RESORTS, INC.

Dated:                                      By:                    /s/ FRANK J. FERTITTA III
February 26, 2019                                              Frank J. Fertitta III
                                                *Chairman of the Board and Chief Executive Officer*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ FRANK J. FERTITTA III<br>Frank J. Fertitta III | Chairman of the Board and Chief Executive Officer (Principal Executive Officer) | February 26, 2019 |
| /s/ LORENZO J. FERTITTA<br>Lorenzo J. Fertitta | Vice Chairman of the Board | February 26, 2019 |
| /s/ STEPHEN L. COOTEY<br>Stephen L. Cootey | Executive Vice President, Chief Financial Officer and Treasurer (Principal Financial and Accounting Officer) | February 26, 2019 |
| /s/ ROBERT A. CASHELL, JR.<br>Robert A. Cashell, Jr. | Director | February 26, 2019 |
| /s/ JAMES E. NAVE, D.V.M.<br>James E. Nave, D.V.M. | Director | February 26, 2019 |
| /s/ ROBERT E. LEWIS<br>Robert E. Lewis | Director | February 26, 2019 |

[This page intentionally left blank]

[This page intentionally left blank]

BR75700L-0519-10K

# EXHIBIT E

| Organization and Background | 9 Months Ended |
| | Sep. 30, 2011 |

**Organization and Background**

Organization and Background

## 1. Organization and Background

### *Organization*

Station Casinos LLC, (the "Company," "Station," "we," "our," "us," or "Successor"), a Nevada limited liability company, is a gaming and entertainment company that currently owns and operates nine major hotel/casino properties, eight smaller casino properties (three of which are 50% owned), and manages Aliante Station Casino + Hotel ("Aliante Station") in the Las Vegas metropolitan area. We also manage a casino for a Native American tribe. Station was formed on August 9, 2010 to acquire substantially all of the assets of:

- Station Casinos, Inc. ("STN") and its subsidiaries (the "STN Predecessor") pursuant to (a) the "First Amended Joint Plan of Reorganization for Station Casinos, Inc. and its Affiliated Debtors (Dated July 28, 2010)," as amended (the "SCI Plan"), which was confirmed by order of the U.S. Bankruptcy Court for the District of Nevada, located in Reno, Nevada (the "Bankruptcy Court") entered on August 27, 2010, and (b) the "First Amended Prepackaged Joint Chapter 11 Plan of Reorganization for Subsidiary Debtors, Aliante Debtors and Green Valley Ranch Gaming, LLC (Dated May 20, 2011)" (the "Subsidiaries Plan"), which was confirmed with respect to the Subsidiary Debtors and Aliante Debtors by order of the Bankruptcy Court entered on May 25, 2011; and

- Green Valley Ranch Gaming, LLC (the "GVR Predecessor," collectively with STN Predecessor, the "Predecessors") pursuant to the "First Amended Prepackaged Joint Chapter 11 Plan of Reorganization for Subsidiary Debtors, Aliante Debtors and Green Valley Ranch Gaming, LLC (Dated May 24, 2011)" (the "GVR Plan"), which was confirmed with respect to Green Valley Ranch Gaming, LLC by order of the Bankruptcy Court entered on June 8, 2011.

The SCI Plan, Subsidiaries Plan and GVR Plan are collectively referred to herein as the "Plans." The Plans became effective on June 17, 2011 (the "Effective Date"). Prior to June 17, 2011, the Company conducted no business, other than in connection with the reorganization of the Predecessors, and had no material assets or liabilities.

### *Background*

The following details the events leading up to the acquisition of the Predecessors.

On November 7, 2007, STN completed a going private transaction that was sponsored by Frank J. Fertitta III, Lorenzo J. Fertitta and certain affiliates of Colony Capital, LLC (such going private transaction is referred to herein as, the "Merger"). In connection with the Merger, STN's subsidiary, FCP PropCo, LLC ("Propco"), and certain other subsidiaries of STN that directly or indirectly owned interests in Propco (the "Propco Debtors") entered into a mortgage loan and related mezzanine financings in an aggregate principal amount of $2.475 billion (the "CMBS Loans"). The CMBS Loans were secured by substantially all fee and leasehold real property comprising Palace Station Hotel & Casino ("Palace Station"), Boulder Station Hotel & Casino ("Boulder Station"), Sunset Station Hotel & Casino ("Sunset Station") and Red Rock Casino Resort Spa ("Red Rock") (collectively, the "Propco Properties"). In addition, STN, as borrower, entered into a $900 million senior secured credit agreement (the "Credit Agreement") which was secured by substantially all of the assets of STN and its subsidiaries, other than Propco and the Propco Debtors. STN's $450 million 6% senior notes due April 1, 2012, $400 million $7^3/4$% senior notes due August 15, 2016, $450 million $6^1/2$% senior subordinated notes due February 1, 2014, $700 million $6^7/8$%

senior subordinated notes due March 1, 2016 and $300 million 6⅞% senior subordinated notes due March 15, 2018 (collectively, "Senior and Senior Subordinated Notes") remained outstanding following consummation of the Merger. On February 7, 2008, a wholly owned, indirect subsidiary of STN ("Landco"), as borrower, entered into a $250 million delay-draw term loan collateralized by land located on the southern end of Las Vegas Boulevard at Cactus Avenue and land surrounding the Wild Wild West Gambling Hall and Hotel ("Wild Wild West") in Las Vegas, Nevada (the "Land Loan").

On July 28, 2009 (the "Petition Date"), STN, FCP MezzCo Parent, LLC, FCP MezzCo Parent Sub, LLC, FCP MezzCo Borrower VII, LLC, FCP MezzCo Borrower VI, LLC, FCP MezzCo Borrower V, LLC, FCP MezzCo Borrower IV, LLC, FCP MezzCo Borrower III, LLC, FCP MezzCo Borrower II, LLC, FCP MezzCo Borrower I, LLC, FCP PropCo, LLC, Northern NV Acquisitions, LLC, Tropicana Station, LLC, River Central, LLC and Reno Land Holdings, LLC and affiliates FCP Holding Inc., FCP VoteCo, LLC, Fertitta Partners, LLC (collectively, the "Debtors") filed voluntary petitions in the United States Bankruptcy Court for the District of Nevada in Reno, Nevada (the "Bankruptcy Court") under chapter 11 of title 11 of the United States Code ("Chapter 11"). On February 10, 2010, GV Ranch Station, Inc., a wholly owned subsidiary of STN that managed and owned 50% of Green Valley Ranch, filed a voluntary petition in the Bankruptcy Court under Chapter 11. On April 12, 2011, Green Valley Ranch Gaming, LLC, Aliante Gaming, LLC ("Aliante Gaming"), and a number of STN's wholly owned subsidiaries filed Chapter 11 cases with the Bankruptcy Court. These cases were being jointly administered under the caption In re Station Casinos, Inc., et al Debtors Case No. 09-52470 (the "Chapter 11 Case").

On the Effective Date, the Company and its subsidiaries acquired substantially all of the assets of STN and certain of STN's subsidiaries and affiliates, including (i) Palace Station, Boulder Station, Sunset Station and Red Rock (the "Propco Assets"), (ii) Santa Fe Station Hotel & Casino ("Santa Fe Station"), Texas Station Gambling Hall & Hotel ("Texas Station"), Fiesta Henderson Casino Hotel ("Fiesta Henderson"), Fiesta Rancho Casino Hotel ("Fiesta Rancho") and interests in certain Native American gaming projects (collectively, the "Opco Assets"), pursuant to the joint plan of reorganization of STN and certain affiliated debtors under the Chapter 11 Case, effected pursuant to the Order Confirming the First Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, filed with the Bankruptcy Court on July 22, 2009 (as amended, the "Plan") and the Asset Purchase Agreement dated as of June 7, 2010 (the "Opco Asset Purchase Agreement) and (iii) Green Valley Ranch, pursuant to that certain Asset Purchase Agreement, dated as of March 9, 2011 (the "GVR Asset Purchase Agreement"). In conjunction with these transfers: (i) Station's voting equity interests (the "Voting Units") were issued to Station Voteco LLC, a Delaware limited liability company formed to hold the Voting Units of the Company ("Station Voteco"), which is owned by Robert A. Cashell Jr., Stephen J. Greathouse and an entity owned by Frank J. Fertitta III, Station's Chief Executive Officer, President and a member of its Board of Managers, and Lorenzo J. Fertitta, a member of Station's Board of Managers and (ii) Station's non-voting equity interests (the "Non-Voting Units" together with its Voting Units, the "Units") were issued to Station Holdco LLC, a Delaware limited liability company formed to hold the Non-Voting Units of the Company ("Station Holdco"), which is owned by German American Capital Corporation, JPMorgan Chase Bank, N.A., FI Station Investor LLC, a newly formed limited liability company owned by affiliates of Frank J. Fertitta III and Lorenzo J. Fertitta ("FI Station Investor"), and certain former holders of STN's senior and senior subordinated notes.

On the Effective Date, Station and its subsidiaries entered into various new or amended credit agreements (the "Credit Agreements") as further described in Note 9.

As of the Effective Date, the Company and certain of its subsidiaries entered into management agreements with subsidiaries of Fertitta Entertainment LLC ("Fertitta Entertainment") relating to the management of the Propco Properties, the Opco Assets, Green Valley Ranch Resort Spa Casino ("Green Valley Ranch"), and the Wild Wild West (the "Management Agreements").

The transactions that occurred on the Effective Date are collectively referred to herein as the "Restructuring Transactions."

# EXHIBIT F



# State of California
# Kevin Shelley
## Secretary of State

## LIMITED LIABILITY COMPANY
## ARTICLES OF ORGANIZATION

**A $70.00 filing fee must accompany this form.**
**IMPORTANT – Read instructions before completing this form.**

2003 10510056
File#

## FILED
In the office of the Secretary of State
of the State of California

APR 1 4 2003

KEVIN SHELLEY, SECRETARY OF STATE

This Space For Filing Use Only

| | |
|---|---|
| 1. | Name of the limited liability company  (end the name with the words "Limited Liability Company," " " Ltd. Liability Co.," or the abbreviations "LLC" or "L.L.C.") |
| | SC Sonoma Management, LLC |
| 2. | The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the Beverly-Killea limited liability company act. |
| 3. | Name the agent for service of process and check the appropriate provision below: |
| | C T Corporation System _____ which is |
| | [  ] an individual residing in California. Proceed to item 4. |
| | [X] a corporation which has filed a certificate pursuant to section 1505. Proceed to item 5. |
| 4. | If an individual, California address of the agent for service of process: |
| | Address: |
| | City:                        State: **CA**                        Zip Code: |
| 5. | The limited liability company will be managed by:  **(check one)** |
| | [  ] one manager  [  ] more than one manager  **[ x ]** single member limited liability company  [  ] all limited liability company members |
| 6. | Other matters to be included in this certificate may be set forth on separate attached pages and are made a part of this certificate. Other matters may include the latest date on which the limited liability company is to dissolve. |
| 7. | Number of pages attached, if any:  0 |
| 8. | Type of business of the limited liability company. (For informational purposes only) |
| | The management and operation of entertainment facilities and related activities. |
| 9. | **DECLARATION:**  It is hereby declared that I am the person who executed this instrument, which execution is my act and deed. |

_Julia B. Dachs_
Signature of Organizer

Julia B. Dachs
Type or Print Name of Organizer

April 11, 2003
Date

| | |
|---|---|
| 10. | RETURN TO: |
| | NAME |
| | FIRM |
| | ADDRESS |
| | CITY/STATE |
| | ZIP CODE |

SEC/STATE  (REV. 01/03)

FORM LLC-1 – FILING FEE $70.00
Approved by Secretary of State

CA076 - 1/15/03  C T System Online

# EXHIBIT G

EX-99.1 2 a10-8329_1ex99d1.htm EX-99.1

**Exhibit 99.1**

**Station Casinos Reaches Agreement with Opco Bank Steering Committee
to Support Comprehensive Reorganization**

**Plan Includes $772 Million Fertitta-Led
"Stalking Horse" Bid for Opco Assets**

**Station Casinos Expected to Emerge from Bankruptcy by Year End**

LAS VEGAS — April 19, 2010 — Station Casinos, Inc. (the "Company") and its subsidiaries that are debtors and debtors in possession (collectively, the "Debtors") in the Chapter 11 cases pending in the United States Bankruptcy Court announced that an agreement (the "Opco Plan Support Agreement") has been reached between Fertitta Gaming LLC ("Fertitta Gaming"), which is owned by Frank and Lorenzo Fertitta, and the steering committee representing over 60% of the Company's senior secured bank debt (the "Opco Lenders") to support the Debtors' joint plan of reorganization, which is to be modified pursuant to the terms of the Opco Plan Support Agreement (as so modified, the "Joint Plan"). The Joint Plan now has the support of holders of almost 90% of the Debtors' combined secured debt.

Pursuant to the Opco Plan Support Agreement, the Opco Lenders have agreed to support the $772 million "stalking horse" bid by a newly-formed company ("Newco") to be owned by Fertitta Gaming, Colony Capital and the mortgage lenders to FCP Propco, LLC ("Propco" and the "Propco Lenders," respectively), to purchase substantially all of the assets of the Company, which include Santa Fe Station, Texas Station, Fiesta Henderson, Fiesta Rancho and Native American gaming projects (the "Opco Properties"). Newco's purchase of the Opco Properties is subject to the Company conducting a sale process for such assets under the supervision of the Bankruptcy Court. The Newco bid for the Opco Properties will entail significant new investment in Newco by the Fertittas and would result in a substantial cash recovery to the Opco Lenders. If Newco is the successful bidder, Fertitta Gaming will manage the Opco Properties under a long-term management agreement.

Also pursuant to the Opco Plan Support Agreement, the parties have agreed to support the Joint Plan as it relates to the restructuring of Propco, which includes the acquisition of Red Rock Casino Resort Spa, Palace Station, Boulder Station, and Sunset Station (the "Propco Properties") by Newco. As previously announced, the Propco Lenders have agreed to sell 46% of the equity in Newco to Fertitta Gaming, which will be making a new investment in Newco. The remaining equity in Newco will be owned primarily by the Propco Lenders and Colony Capital, which will also be making a new investment in the company. Fertitta Gaming will also manage the Propco Properties under a long-term management agreement. The restructuring of Propco under the Joint Plan is not conditioned upon Newco ultimately becoming the successful bidder for the Opco Properties.

"We are pleased to have reached agreement with the steering committee of the Opco senior lenders on the acceptance of our stalking-horse bid and our plan of

reorganization. This agreement is another important step toward maximizing the value of all of the Station Casinos' properties for the benefit of our team members, guests, lenders and the Las Vegas community," said Frank Fertitta III, Chairman of the Board and Chief Executive Officer of Station Casinos.

The Company said that it anticipates that the Opco sales process will be completed and the plan will be confirmed by the Bankruptcy Court later this summer and, subject to regulatory approvals, for Station Casinos and the other Debtors to emerge from bankruptcy before the end of the year.

Lazard is acting as exclusive financial advisor to the Debtors in connection with the reorganization and Milbank, Tweed, Hadley & McCloy LLP serves as lead counsel to the Debtors.

The plan and the disclosure statement have not yet been approved by the Bankruptcy Court and are subject to further negotiations with stakeholders. As a result, the plan and the disclosure statement may be materially modified before approval. In addition to customary Chapter 11 proceedings, the completion of the transaction is subject to Hart-Scott-Rodino and other antitrust

reviews and customary closing conditions.

This press release is not intended to be, and should not in any way be construed as, a solicitation of votes on the Company's reorganization plan which was filed with the U.S. Bankruptcy Court. The plan was filed together with a proposed disclosure statement which should not be relied on for any purpose until a determination by the U.S. Bankruptcy Court is made that the proposed disclosure statement contains adequate information, as required by the U.S. Bankruptcy Code. Following Bankruptcy Court approval of the disclosure statement and related voting solicitation procedures, the Company will solicit acceptances of the plan and seek its confirmation by the Bankruptcy Court. There can be no assurance that such plan acceptances or confirmation will be obtained.

Company Information and Forward Looking Statements

Station Casinos, Inc. is the leading provider of gaming and entertainment to the residents of Las Vegas, Nevada. The Company's properties are regional entertainment destinations and include various amenities, including numerous restaurants, entertainment venues, movie theaters, bowling and convention/banquet space, as well as traditional casino gaming offerings such as video poker, slot machines, table games, bingo and race and sports wagering. The Company owns and operates Red Rock Casino Resort Spa, Palace Station Hotel & Casino, Boulder Station Hotel & Casino, Santa Fe Station Hotel & Casino, Wildfire Rancho and Wild Wild West Gambling Hall & Hotel in Las Vegas, Nevada, Texas Station Gambling Hall & Hotel and Fiesta Rancho Casino Hotel in North Las Vegas, Nevada, and Sunset Station Hotel & Casino, Fiesta Henderson Casino Hotel, Wildfire Boulder, Gold Rush Casino and Lake Mead Casino in Henderson, Nevada. Station also

owns a 50% interest in Green Valley Ranch Station Casino, Aliante Station Casino and Hotel, Barley's Casino & Brewing Company, The Greens and Wildfire Lanes in Henderson, Nevada and a 6.7% interest in the joint venture that owns the Palms Casino Resort in Las Vegas, Nevada. In addition, the Company manages Thunder Valley Casino near Sacramento, California on behalf of the United Auburn Indian Community.

This press release contains certain forward-looking statements with respect to the Company and its subsidiaries, which involve risks and uncertainties that cannot be predicted or quantified, and consequently, actual results may differ materially from those expressed or implied herein. Such risks and uncertainties include, but are not limited to, failure to obtain necessary bankruptcy court or gaming authority approvals, failure to obtain or loss of continued support of a plan by the Company's stakeholders, delays in the confirmation or effective date of a plan due to factors beyond the Company's control, failure to consummate a restructuring plan, failure to execute a restructuring plan, competition and other economic factors; and other risks described in the filings of the Company with the Securities and Exchange Commission, including, but not limited to, the Company's Annual Report on Form 10-K, as amended, for the year ended December 31, 2009. All forward-looking statements are based on the Company's current expectations and projections about future events. All forward-looking statements speak only as of the date hereof and the Company undertakes no obligation to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise.